# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ILLINOIS TOOL WORKS INC.,
a Delaware corporation,

        Plaintiff,

  v.

FRITO-LAY NORTH AMERICA, INC., f/k/a
RECOT, INC., a Delaware corporation,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 06-_____

## COMPLAINT

      Plaintiff, ILLINOIS TOOL WORKS INC., for its complaint against Defendant alleges as follows:

## NATURE OF THE ACTION

      1.     This is an action pursuant to 35 U.S.C. § 146 to review a Final Decision and Decision on Motions dated November 29, 2005, entered by the Board of Patent Appeals and Interferences (the "Board") of the United States Patent and Trademark Office ("PTO") in Patent Interference No. 105,173 (the "'173 Interference").   This complaint is filed within the administrative deadline for filing a civil action pursuant to 35 U.S.C. § 146.

## JURISDICTION

      2.     This Court has subject matter jurisdiction over this action pursuant to 35 U.S.C. § 146 and 28 U.S.C. § 1338(a) because the action arises under an Act of Congress relating to Patents.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

THE PARTIES

3.    Plaintiff Illinois Tool Works Inc. ("ITW"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 3600 West Lake Avenue, Glenview, Illinois 60026-1215.

4.    Upon information and belief, Defendant Frito-Lay North America, Inc., formerly known as Recot, Inc. (hereinafter, "Recot"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 6140 Stoneridge Mall Road, Suite 420, Pleasanton, California 94588.

VENUE

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

THE PATENT INTERFERENCE

6.    Based on representations in the '173 Interference, Recot is the owner of the entire right, title and interest in and to U.S. Patent No. 5,972,396 (the "'396 patent"), entitled "Flexible Package Having a Re-closable Zipper," which issued on October 26, 1999.  A copy of the '396 patent is attached hereto as Exhibit A.  Recot is also the owner by assignment of the entire right, title and interest in and to U.S. Application No. 09/372,646 (the "'646 application"), entitled "Flexible Package Having a Re-closable Zipper," which was filed on August 12, 1996. The named inventors for both the '396 patent and the '646 application are Marc A. Jurgovan and Martin B. Diehl (collectively referred to as "Jurgovan").  Jurgovan identified Recot as the real party in interest for Jurgovan in the '173 Interference.

7.    ITW is the owner by assignment of the entire right, title and interest in and to U.S. Application No. 09/481,723 (the "'723 application"), entitled "Pinch Grip Zipper," which was filed on January 12, 2000.  The named inventors for the '723 application are Ronald L. Ramsey, Arthur Malin, Robert Hogan, Lawrence Share and Richmond M. Scott (collectively

referred to as "Ramsey"). ITW was the real party in interest for Ramsey in the '173 Interference.

8.     During prosecution in the PTO of the Jurgovan '646 application and the Ramsey '723 application, the Board declared and instituted the '173 Interference between the Jurgovan '396 patent and the '646 application, and the Ramsey '723 application, based on subject matter defined by Counts 1 and 2.

9.     The Board held that the claims of the parties corresponding to Count 1 of the '173 interference are as follows:  claims 1-26 of the Jurgovan '646 application; and claims 42-47 of the Ramsey '723 application.   The Board also held that the claims of the parties corresponding to Count 2 of the '173 interference are as follows: claims 1-31 of the Jurgovan '396 patent; and claims 31-33, 35-39 and 41 of the Ramsey '723 application.

10.     On November 29, 2005, the Board issued and entered a Decision on Motions for Judgment and Motions to Exclude Evidence in the '173 interference that was adverse to Ramsey and favorable to Jurgovan.  (A copy of the November 29, 2005 Decision is attached hereto as Exhibit B).

11.     In the November 29, 2005 Decision, the Board erroneously ruled, *inter alia*:

        A.     that priority as to Counts 1 and 2 should be awarded to Jurgovan and not to Ramsey;

        B.     that Ramsey derived the subject matter of Counts 1 and 2 from Jurgovan;

        C.     that the issue of lack of patentability based on prior art, and raised by Ramsey, does not have to be addressed;

        D.     that Jurgovan is entitled to the Jurgovan '396 patent and the Jurgovan '646 application.

12.     In this action, ITW, as the real party of interest, seeks review and reversal of the November 29, 2005 Final Decision and a Decision of Motions, and for all other relief

available under 35 U.S.C. § 146 concerning the '173 Interference. Based on the record before the Board and the evidence to be presented in this matter, ITW is entitled to judgment reversing the November 29, 2005 Final Decision and a Decision of Motions and awarding further relief to ITW as set forth below.

WHEREFORE, ITW respectfully prays for an Order of this Court:

A.      Reversing the Final Decision and the Decision on Motions, dated November 29, 2005, in Interference No. 105,173;

B.      Awarding Ramsey (whose real-party in interest is ITW) priority as to Counts 1 and 2 and a patent containing claims encompassing the subject matter of Counts 1 and 2;

C.      Declaring that Jurogovan derived the subject matter of Counts 1 and 2 from Ramsey;

D.      Declaring that Jurogovan is not entitled to the Jurgovan '396 patent and the '646 application, or to any claims corresponding to Counts 1 and 2 in Interference No. 105,173.

E.      In the alternative, declaring that if Ramsey is not entitled to priority as to Counts 1 and 2, the subject matter of Counts 1 and 2 and all claims corresponding to those Counts are unpatentable; and

F.      Awarding such other and further relief as this Court shall deem just and equitable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
William M. Lafferty (#2755)
Rodger D. Smith, II (#3778)
1201 N. Market Street
Wilmington, Delaware  19801
(302) 658-9200
   Attorneys for Plaintiff

OF COUNSEL:

Gerald Levy
Richard H. Brown
PITNEY HARDIN LLP
7 Times Square, 20th Floor
New York, NY 10036
(212) 297-5800

January 27, 2006



US005972396A

# United States Patent [19]

## Jurgovan et al.

[11] **Patent Number:** **5,972,396**

[45] **Date of Patent:** **Oct. 26, 1999**

[54] **FLEXIBLE PACKAGE HAVING A RE-CLOSABLE ZIPPER**

[75] Inventors: **Marc A. Jurgovan**, Plano; **Martin B. Dierl**, Allen, both of Tex.

[73] Assignee: **Recot, Inc.**, Pleasanton, Calif.

[21] Appl. No.: **09/079,382**

[22] Filed: **May 15, 1998**

[51] **Int. Cl.⁶** ............................. **B65D 85/00**; B65D 33/16

[52] **U.S. Cl.** .......................... **426/106**; 426/127; 206/810; 383/61; 383/63

[58] **Field of Search** ...................................... 426/106, 127, 426/410; 206/807, 810; 383/61, 63, 210

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,925,316 | 5/1990 | Van Erden et al. | 383/61 |
| 5,224,779 | 7/1993 | Thompson et al. | 383/5 |
| 5,242,516 | 9/1993 | Custer et al. | 156/66 |
| 5,749,658 | 5/1998 | Kettner et al. | 383/204 |

*Primary Examiner*—David Lacey
*Assistant Examiner*—Drew Becker

*Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Kurz

[57] **ABSTRACT**

A modified flexible package includes a front elastomeric wall and a rear elastomeric wall. The front wall and the rear wall are sealed together at a top seal at a top end of the side walls. The top seal is formed by applying heat and/or pressure for a given dwell period, and is preferably a de-laminating seal. A first zipper part is attached to an inside surface of the front wall and has a first engagement member facing the rear wall. A second zipper part is attached to an inside surface of the rear wall and has a second engagement member facing the front wall. The first and second engagement members are engaged together. Both the top seal and the zipper engagement members are "pinch-grip opened" under a pinch-grip pulling force applied to the front and rear walls below the zipper. The front and rear walls have a strength sufficient to resist tearing and deformation under the application of the pinch-grip pulling force during pinch-grip opening. The invention provides a re-closable package that can be opened in an easy one-step manner—"pinch grip opening"—without an additional step of cutting, tearing or the like.

**31 Claims, 7 Drawing Sheets**





FIG. 1

FIG. 2



FIG. 3



FIG. 4                    FIG. 5



FIG. 6



## FIG. 7



## FIG. 8



FIG. 9



FIG. 10

5,972,396

**1**

## FLEXIBLE PACKAGE HAVING A RE-CLOSABLE ZIPPER

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to flexible packages having means for selectively re-closing the packages after their initial opening. Most particularly, the present invention provides a unique re-closable flexible package that is highly consumer-friendly—especially with snack foods such as potato chips, corn chips and the like.

2. Description of the Related Art

The present invention is an improvement over existing flexible packages, including those currently used by the present assignee for containing snack foods such as Lays® potato chips, Tostitos® tortilla chips and the like. Packages for such products usually have top and bottom end seals that are formed by heat sealing and are opened by "pinch gripping" (see FIG. 1) the sides of the package and pulling outward to break the end seal for access therein. These common packages, however, do not contain means to re-close the package after the initial opening of the end seals. Because the heat seal has been destroyed, the most common way of re-closing the package is to fold-over the open end and apply a clip to secure the folded portion.

Flexible packages having re-closable zippers are known in certain applications. A variety of food products can be purchased in pre-sealed flexible packages having re-closable zippers for re-closing the food product after the initial opening.

Although a number of packages with re-closable zippers are known, the existing packages have a number of drawbacks. For example, these prior packages typically must be initially opened using two distinct steps. First, a heat seal must be broken by cutting the package with scissors or by removing a tear-away, perforated strip. The re-closable zipper closure is then opened in a distinct second step. This substantially reduces the consumer appeal of the packages and makes the packages undesirable for a variety of products, such as for snack food chips and the like.

A preferred process of packaging snack food products, such as potato chips, tortilla chips and the like, inside plastic flexible packages is known in the art as a "vertical form/fill/seal process." In this process, as seen in FIG. 9, a length of plastic film F is formed into a vertical tube T around a product delivery cylinder C, the food product is delivered into the vertical tube through the cylinder, the vertical tube is vertically sealed along its length to form a back seal **50** and is transversely sealed to form top and bottom seals delineating individual packages, and the individual packages are cut from the vertical tube.

Providing a zipper closure to a package in a vertical form/fill/seal apparatus presents a number of difficulties. Typically, in non-vertical form/fill/seal apparatuses, a zipper is attached to an elongated moving plastic film lengthwise to the direction of travel of the film. To attach a zipper to a package in a vertical form/fill/seal apparatus, however, the zipper must be attached to the film transverse to the travel direction of the film, in order to create a package with a zipper sealed near the top end of the package.

U.S. Pat. No. 4,909,017 (assigned to Minigrip, Inc.), the entire disclosure of which is incorporated herein by reference, shows a vertical form fill process which fills product into a reclosable package having a zipper or fastener portion 34 and a pilfer-evident seal 35 above the fastener. In

**2**

summary, a film is fed over shaping shoulders 21 and around a vertical forming and filling tube 24. Welding bars 22 and 23 seal edges of the film together to form a tube with a vertical seam. Welding bars 27 and 28 form a lower seal 29, and product is dropped into the vertical tube 24. The fastener strips slide over the tube 24 with only one part fixed to one side of the film tube. The fastener strips are later sealed to both sides of the film by the bars 27 and 28.

As noted on col. 4, lines 29–31, "[the] seam [35] is a pilfer-evident closure for the package and the seam can be removed cut off [sic] the tip of the package before the package is to be used." Thus, the packages require a distinct two-step opening process.

U.S. Pat. No. 4,617,683, (assigned to Minigrip, Inc.), shows another vertical form fill process which fills product into a reclosable package having a top seal 42 and a reclosable zipper or fastener 27 inside of the package. As noted on col. 6, lines 30, et seq.,

[i]n the finished fully sealed package[,] the profiles 52 may remain separated as shown in FIG. 2 until the top end or mouth of the package has been opened as shown in FIG. 3 for access to contents in the package, and then the package can be closed by interengagement of the fastener profiles as shown in FIG. 3. Opening of the package may be effected either by pulling the seal at the top end of the package open, or by severing the top end of the package along a line 58 between the seal 42 and the reclosable fastener 27 . . .

(emphasis added). Among other disadvantages of the '683 patent, when the top end of the package must be severed to be opened, as noted above, this greatly inhibits consumer-friendliness of the packages. Another disadvantage of the '683 patent is that the initial separation of the profiles 52 (see FIG. 2) creates difficulties in the proper placement and alignment of the fastener halves on the film (e.g., in attaching fastener halves they must align at appropriate positions with respect to one another to ensure engagement). Connecting the fastener halves after the formation of the packages can thus lead to substantial alignment problems. It is notable that the '683 patent thus includes a plurality of parallel fastener profiles. (see col. 6, lines 25–29: "By having a plurality of the parallel fastener profiles 52, interengagement of the profiles of the folded section is facilitated since critical lateral alignment is not necessary.") Another disadvantage of the '683 patent is that during manufacture, the fastener halves must be conveyed individually along with the film (e.g., must each be attached thereto); however, if the fastener halves are interlocked, one half can be attached and the other half can be carried thereon. Another disadvantage is that the fastener is exposed to the product during transport such that product can become lodged in the fastener and interfere with the operation thereof (e.g., if the package is inverted or for some reason held topside down during shipping, crumbs, etc., can accumulate within the valleys of the fastener portions).

Other known methods, apparatuses and packages illustrative of the background art of the present invention are seen for example in U.S. Pat. Nos.: 5,558,613 (assigned to Minigrip, Inc.); 5,557,907 and 5,592,802 (assigned to Illinois Tool Works, Inc.); 4,925,316 (assigned to Minigrip, Inc.); 4,709,398 (assigned to Minigrip, Inc.); 4,691, 372 (assigned to Minigrip, Inc.); 5,330,269 (assigned to Toyo Aluminum Kabushiki Kaisha); 5,607,822 (assigned to Reynolds Consumer Products, Inc.); 4,782,951 (assigned to Oscar Mayer Foods Corp.); and 4,976,811 (assigned to Com-Pac International, Inc.

### SUMMARY OF THE INVENTION

According to one aspect of the invention, a flexible package is produced which can be opened in a manner like

5,972,396

**3**

common Frito-Lay, Inc., snack food packages, wherein the packages are "pinch-gripped" at opposite sides and pulled apart to open (see FIG. 1). Thus, the packages, both initially and throughout use, are opened in one simple step.

According to another aspect of the invention, a package is produced having both 1) a heat and/or pressure formed (preferably de-laminating) top seal and 2) a re-closable zipper, wherein both the top seal and the zipper are opened when a user opens a package with a simple "pinch-grip" opening method.

According to another aspect of the invention, 1) a vertical form fill process is used to quickly and efficiently package food product, 2) a re-closable zipper is attached to the package during the vertical form fill process, and 3) a user-friendly pinch-grip open package is produced. The method and apparatus can, thus, be easily adapted to large scale packaging operations.

According to one aspect of the invention, a flexible package is provided having a elastomeric front wall and an elastomeric rear wall; the front wall and the rear wall being sealed together at a top seal; a first zipper part attached to an inside surface of the front wall and having a first engagement member facing the rear wall; a second zipper part attached to an inside surface of the rear wall and having a second engagement member facing the front wall; the first and second engagement members being engaged together; the top seal being manually pinch-grip openable and the first and second engagement members being manually pinch-grip openable under a pinch-grip pulling force applied to the front and rear walls below the engagement members; the front and rear walls having a sufficient strength to resist tearing and deformation under the application of the pinch-grip pulling force during pinch-grip opening; and b) a food product stored inside the package below the first and second engagement members.

The terminology front and rear walls refers to opposing front and rear sides and encompasses separate wall members that are attached together (e.g., by one or more seams), wall members that are integrally formed, e.g., extruded together, etc. In this regard, although some of the preferred embodiments involve packages that are constructed from a single elongated sheet that is formed into a tube having front and rear walls by sealing along a back-seal, such a plastic tube could also, in one alternative embodiment, be formed by extruding an elongated tube.

According to another aspect of the invention, the top seal is a heat/pressure/dwell seal (defined herein-below). For example, the top seal can be formed by heat and pressure for a given dwell period. As another example, the top seal can be formed by pressure, without heat, for a given dwell period.

According to another aspect of the invention, the first engagement member has a male protrusion and the second engagement member has at least one protrusion forming a female socket, the male protrusion being engaged in the female socket.

According to another aspect of the invention, the front and rear walls are laminated plastic walls including at least one inner sealable layer and at least one outer wall layer.

According to another aspect of the invention, the first and second zipper parts have cross-sectional shapes that are different from one another and are separate pieces that are connected together only at the engagement members. Although less preferred, the zipper parts can each have the same cross-sectional shape.

According to another aspect of the invention, the package includes a food product therein. Most preferably, the food

**4**

product includes salty, sweet or savory snack foods, which are known in the art as providing salty, sweet or savory tastes, such as for example certain snack foods containing salt, sugar, etc.

According to another aspect of the invention, a flexible package is provided having: front and rear walls, the front and rear walls being laminated plastic walls including at least one inner sealable layer and at least one outer wall layer; a bottom seal formed between lower sides of the front and rear walls; a top seal formed between upper sides of the front and rear walls, the top seal including a seal between the inner sealable layers; a zipper located within the package proximate the top seal, the zipper having a first zipper part having a first engagement member extending lengthwise along the zipper part and a widened base having at least two points of sealant behind the base; the zipper also having a second zipper part having a second engagement member extending lengthwise along the zipper part and a widened base having at least two points of sealant behind the base; the first engagement member being engaged with the second engagement member; the at least two points of sealant on the first zipper part being sealed to the inner layer of the film at a first side of the vertical tube and the at least two points of sealant on the second zipper part being sealed to the inner layer of the film at a second side of the vertical tube; the seal between the inner sealable layers being openable by de-lamination and the engagement between the engagement members of the zipper being disengaged upon the application of a predetermined pinch-grip pulling force.

According to another aspect of the invention, a method of opening and re-closing a flexible package containing a food product is provided which includes the steps of: 1) providing in combination: a) a flexible package having a elastomeric front wall and an elastomeric rear wall; the front wall and the rear wall being sealed together at a top seal; a first zipper part attached to an inside surface of the front wall and having a first engagement member facing the rear wall; a second zipper part attached to an inside surface of the rear wall and having a second engagement member facing the front wall; the first and second engagement members being engaged together; the top seal and the first and second engagement members being pinch-grip openable under a pinch-grip pulling force applied to the front and rear walls below the engagement members; the front and rear walls having a sufficient strength to resist tearing and deformation under the application of the pinch-grip pulling force during pinch-grip opening; and b) a food product stored inside the package below the first and second engagement members; 2) pinch-grip opening the package by manually pulling with a force of at least the pinch-grip pulling force opposite sides of the package below the zipper to open both the zipper, by disengaging the engagement portions, and the upper seal from the product side outward in a single pinch-grip opening step; 3) removing a portion of the food product from the package; 4) re-closing the package by manually re-engaging the first and second engagement members. According to another aspect of the invention, during the single step of pinch-grip opening, the zipper is at least partially disengaged before the top seal begins to open.

ADVANTAGES OF THE PRESENT INVENTION

The present invention has a number of significant advantages over the prior art. For example, the present invention provides a package having both a top end seal and a zipper that are both closed during transportation and handling of the product, whereby a) the quality and durability of the seal is enhanced, b) food particles are inhibited from interfering

5,972,396

<table>
<tr><td>5</td><td>6</td></tr>
</table>

with the zipper fastener, and c) a vertical form/fill/seal process like that of U.S. Pat. No. 4,909,017 can be utilized to package product.

In addition, the present invention also provides a re-closable package that a consumer can open in a simple one-step process—rather than an awkward two-step process requiring scissors or the like. The re-closable packages of the present invention can be opened using a "pinch grip" method commonly used to open existing snack food packages. It is thus not necessary to educate consumers on how to use the packages. The packages are thus very consumer friendly.

The above and other advantages, features and aspects of the present invention will be more readily perceived from the following description of the preferred embodiments taken together with the accompanying drawings and claims.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the accompanying drawings, in which like references indicate like parts, and in which:

FIG. 1 is a perspective view of a consumer grasping a package according to the preferred embodiments of present invention;

FIG. 2 is cross-sectional view of a top end of a package according to a preferred embodiment of the present invention;

FIG. 3 is a cross-sectional view of a zipper according to a preferred embodiment of the present invention;

FIG. 4 is a cross-sectional view of the zipper shown in FIG. 3 inside a package according to a preferred embodiment of the invention;

FIG. 5 is a cross-sectional view of a modified zipper inside a package according to another embodiment of the invention;

FIG. 6 is a cross-sectional view of a modified zipper inside a package according to another embodiment of the invention;

FIG. 7 is a cross-sectional view of one preferred construction of a sealing head assembly for manufacturing the packages;

FIG. 8 is a cross-sectional view of a modified construction of the sealing head assembly for manufacturing packages like that shown in FIG. 6;

FIG. 9 is a side view of a portion of a vertical/form/fill device used in one exemplary method for making flexible packages of the present invention; and

FIG. 10 is an elevational view of an exemplary strength testing apparatus.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 shows a flexible package 10 according to a preferred embodiment having a top seal 20, a bottom seal 30, a re-closable zipper 40 (shown in dashed lines) proximate the top seal 20, and a vertical back seal 50. Although the back seal 50 is illustrated as a flange extending from the middle of one of the walls 11 or 12 (i.e., formed by attaching an interior surface of the tube to an opposite interior surface of the tube), the back seal could also be flush with the package material (i.e., formed by attaching an interior surface of the tube to an opposite outer surface of the tube to overlap the sides). In addition, the back seal 50 could also be formed at another location. In addition, various other

embodiments could include multiple lengthwise seals or even no lengthwise seal such as if the tube is extruded.

As shown in FIG. 2, the package 10 includes a first wall 11 and a second wall 12. The top seal 20 is formed between the first and second walls 11 and 12 in a region A. The zipper 40 (not shown in FIG. 2) is accommodated in a region B between the walls. Food product FP is stored in a region C within the package.

As shown in FIG. 1, the package 10 is opened via a "pinch-grip" method wherein a consumer pinches the walls 11 and 12 with his or her hands H (left hand shown) and pulls generally perpendicularly outwardly in the directions G, G' (see FIGS. 1 and 2).

At least the top seal is what is defined herein as "heat/pressure/dwell formed." The terminology heat/pressure/dwell formed is defined herein as encompassing seals that are made between two adjacent walls (e.g., opposite walls of a tube of film) by applying heat and/or pressure (e.g., between sealing jaws) for a given dwell period. The seal is most preferably a de-laminating seal. Although less preferred, the seal can be 1) a cohesive seal, 2) an adhesive seal formed by heat/pressure/dwell, 3) a cold seal formed by pressure and dwell only, or 4) any other known heat/pressure/dwell seal.

The top seal 20 is preferably a de-laminating seal wherein one or both of the inner layers 11i and/or 12i de-laminate from outer layers 11o and/or 12o. In this regard, the inner layers 11i and 12i of the first and second sidewalls are sealed together (e.g., via heat and/or pressure) and this seal is broken without tearing the outer layers 11o and 12o. Except for the de-laminated portions of the respective inner layers 11i and/or 12i, the structure of the package, as seen from the outside, remains intact. Although two layers are shown, the illustrated inner and/or outer layers can each include one or more layers.

In the preferred embodiment having a de-laminating seal, the walls of the packages 10 are preferably made with multi-layered plastic materials. In one exemplary embodiment, the package can include a) an outer polypropylene layer, b) a middle polyethylene layer and c) an interior polypropylene layer. It should be apparent to those in the art that a variety of plastic and elastomeric materials can be used, including common additives. In preferred embodiments, the materials for the sidewalls 11 and 12 of the package are selected from materials disclosed in U.S. Pat. No. 5,689,935 (assigned to the present assignee), the entire disclosure of which is also incorporated herein by reference.

The package material is also preferably a clear material having an acceptable clarity to view the contents (e.g., non-cloudy). Zippered packages having cut or severed tops are not easily made clear because films for making such packages typically require properties (e.g., additives) that can inhibit clarity.

The seal 20 preferably opens, e.g., de-laminates, upon the application of a force of less than about 3 lbs per linear inch, and more preferably of about 1 to 2 lbs per linear inch, the opening force being in the direction of the arrows G, G' shown in FIGS. 1 and 2. In less preferred embodiments, however, a larger opening force could be required. A preferred method of testing the seal strength or required opening force includes, as shown in FIG. 10: cutting a strip S having a width of about 1 inch from a top of the package 10; placing the strip S within known force testing equipment, such as equipment made by Instron Corp., having two opposite clamping members CM1 and CM2 that evenly

5,972,396

7

clamp the ends of the cut-out portions of the walls 11 and 12 between upper and lower clamping members; and moving the clamping members slowly outwardly as shown by arrows in FIG. 10, such as at a rate of about 5 inches/minute. Under such conditions, the 1 inch wide portion of the seal 20 preferably opens upon the application of a force of less than 3 lbs, and more preferably between about 1 to 2 lbs. Although the seal strengths have been discussed with reference to delaminating seals, other seals 20 encompassed by the present invention are also preferably openable within the above-noted ranges of applied forces.

According to the present invention, the package is opened by pinch gripping the sides below the top seal and pulling outward. In this manner, the top seal is opened in a direction away from the product FP inside the package (i.e., opening from the product side outward). This allows the package to be opened in a consumer-friendly manner. Moreover, if a de-laminating seal were opened from above the top seal down toward the product (i.e., opening from the consumer side), the film de-lamination could continue well into the product area and undesirably strip the zipper from the package material.

The zipper 40 is attached to the package in a manner to remain engaged under a force sufficient to "pinch-grip open" the top seal. For example, in the most preferred embodiments using a de-laminating top seal, the zipper 40 is constructed so that the inner layers 11i and 12i do not de-laminate under the zipper when the package is opened—e.g., during "pinch-grip opening" of the package. Where the inner layers 11i and 12i can de-laminate, placement of a zipper 40 in a package 10 with de-laminating walls 11 and 12 presents difficulties.

The amount of force required to open the zipper 40 from either the consumer side or from the product side can be adjusted by varying the configuration of the male and female engagement members in a known manner. See e.g. U.S. Pat. No. 5,558,613, the disclosure of which is incorporated herein by reference. The '613 patent indicates that "[i]n general, the profiles must be such as to provide relatively high resistance to opening from inside the package while rendering the package relatively easy to open from the outside." In the present invention, however, the force required to open the zipper from inside the package is preferably reduced, preferably about equal to or less than the force required to open the zipper from outside the package. In one embodiment, for example, the zipper 40 opens from the inside by a force of less than about 2½ lbs per linear inch, preferably about 1½ to 2 lbs per linear inch (roughly 700–900 grams). The method shown in FIG. 10 is also a preferred method for measuring this zipper opening force, measuring for example a 1 inch wide section of the zipper.

Preferably, after the zipper is at least partially disengaged, the force required to continue disengagement of the engagement members is minimal or is greatly reduced. The maximum force required during the entire pinch-grip opening step can thus be minimized, if desired, since the peak of the force required to open the zipper can precede that required to open the top seal during pinch-grip opening. As some examples, this maximum force could be maintained under 3.5 lbs/inch, or even under 3 lbs/inch, or less. In addition, in cases where the force required to disengage the zipper essentially entirely precedes the force required to open the top seal during pinch grip opening, the maximum opening force could essentially be the force required to disengage the zipper or to open the top seal.

In the more preferred embodiments, the food product in the package is light-weight so that the risk of inadvertent

8

opening from the product side outward (e.g., when the package is handled upside down) is reduced.

FIG. 3 illustrates a cross-section of a zipper 40 according to one preferred embodiment of the invention. The zipper 40 includes a male member 40-1 and a female member 40-2. The male and female members are preferably extruded plastic members. The zipper can be formed in a variety of ways, but it is preferably extruded. Although any appropriate material can be used, in one exemplary embodiment the zipper can include a polyethylene material.

Preferably, the zipper includes two separate parts having finite lengths that are equal to, or slightly less than, the package width (separate fastener parts are also shown, for example, in the '017 patent). One part is attached to one side of the package and the other part is attached to the opposite side of the package. In a preferred construction, each of the two parts includes a respective engagement portion and a base portion. The engagement portions preferably include engageable protrusions. Most preferably, the protrusions include male and female protrusions.

In the illustrated embodiment, a first part 40-1 includes a base portion having a left flange 41-1 and a right flange 42-1 extending from opposite sides of a male projection 43-1. In addition, a second part 40-2 includes a base member having a left flange 41-2 and only a minimal portion 42-2 and a female socket 43-2. The male projection 43-1 is received in the female socket 43-2. Although the preferred arrangement is shown, the male and female portions can be reversed, if desired. In alternative embodiments, additional engagement portions, e.g., additional male and female portions, can also be included. However, these additional engagement portions are not needed and are also less preferred.

In one exemplary embodiment, the package 10 can be approximately 20 inches long from its top end to its bottom end. This size package can contain multiple servings of potato chips or the like; for example, it may contain about 20 ounces (about 570 grams) or about 20 servings. The package can also contain one, two, three, etc., servings or another quantity of product. In one non-limiting example: the seal 20 can be about ½ inch wide (or alternatively about ¼ inch wide, or less); the flanges 41-1, 41-2 and 42-1 can each be about ½ inch wide; the width across the male and female engagement members can be about ⅛ inch; and the seal 30 can be about ½ inch wide. Various other dimensions could also be used as would be apparent to those in the art based on this disclosure. In addition, a space or unsealed area can be located between the top seal 20 and the top of the zipper. This space can accommodate mis-alignment during placement of the zipper on the package. Preferably, this space is between about ¼ to ½ inch. A smaller distance is beneficial because it reduces the package length, and it also reduces excess material at the top of the package. Among other things, reducing the extension distance between the bottom of the engagement portions of the zipper (which delineates the top end of the interior compartment) and the topmost end of the package provides an appearance more like prior packages and without an unsightly extension (i.e., a large top flange) off the top of the package. This extension distance can thus easily be under 2 inches, and even under 1½ inches, and even as low as about 1 inch, or less. Longer extension distances can also be used.

Although the package according to the present invention can be made with any known package making means, such as any horizontal or vertical filling apparatus, etc., it is preferably made in a vertical form/fill/seal apparatus. This illustrated zipper structure 40 has particular benefits in a

5,972,396

<table>
<tr><td>9</td><td>10</td></tr>
</table>

vertical form/fill/seal apparatus of the type shown in U.S. Pat. No. 4,909,017, the entire disclosure of which is incorporated herein by reference. In applying the zipper 40 in the '017 apparatus, the minimal portion 42-2 prevents the zipper from disengaging upon downward entry into the vertical path, see point E in FIG. 9. Preferably, as discussed in the '017 patent and as shown in FIG. 9, the zipper parts 40-1 and 40-2 are initially in an interlocked condition on the film F, and the zipper is initially attached to the film F only at the base of the member 40-1.

In the illustrated embodiments, sealant layers C are formed on a rear side of each of a) the left flange 41-1, b) the right flange 42-1, and c) the left flange 41-2 to attach the zipper parts to the film. The sealant layers C are preferably co-extruded with the male and female sections 40-1 and 40-2, and are preferably made of any known sealant material to adhere to the inner layers 11$i$ and 12$i$ of the package 10 upon the application of pressure and/or heat.

Central sections S behind the socket 43-2 and the projection 43-1 are preferably provided with a sealant material like that of the sealant layers C. Preferably, such sealant is located in the section S of the part 40-2. It is not as necessary in all embodiments, however, to have such sealant in the section S of the part 40-1. Providing such sealant in section S of the part 40-2 ensures that separating forces during pinch-grip opening are applied more along the central axis CL of the engagement members. This feature is very beneficial when a minimal portion 42-2 is used. Without sealant applied at this location, shear and other forces during opening can result in, for example, de-lamination, stripping of the zipper seal from the film wall, etc. Each of the sealant layers S and C (when used) are preferably co-extruded with the sections 40-1 and 40-2.

With the zipper shown in FIG. 3, the sealant layers C on the left and right extensions 41-1 and 42-1 can be sufficient to maintain the section 40-1 attached to the inner layer 11$i$ or 12$i$ of the package 10. However, the member 40-2 preferably has its section S formed with a sealant material. In an alternative preferred embodiment, the entire rear side of the member 40-2 can be modified to contain such a sealant material. Similarly, the entire rear side of the member 40-1 can also be modified to contain such a sealant.

As shown in FIG. 4, the left flanges 41-1 and 41-2 extend upward while the right flange 42-1 and the minimal portion 42-2 extend downward. Thus, one of the sides 40-1 or 40-2 has a shortened section (portion 42-2) extending into the package. As noted, this shortened section facilitates proper operation in a vertical form/fill/seal machine of the type disclosed in U.S. Pat. No. 4,909,017. Without the sealant material behind the engagement portion (e.g., in the region S) of the member 40-2, outward movement of the wall 12 (see dashed lines in FIG. 4) can potentially cause shear and other forces sufficient to tear the member 40-2 from the inner layer 12$i$ upon "pinch-grip opening" from the product side.

Although in the preferred embodiment shown the member 40-2 with the minimal portion 42-2 has the female socket 43-2, the female socket 43-2 and the male projection 43-1 can be reversed so that the male projection is on the member having the minimal portion.

The present invention most preferably provides a four point sealant attachment, wherein sealant is applied at opposite sides of a centerline CL through the projection 43-1 and the socket 43-2 on each of the members 40-1 and 40-2, even where one of the members 40-1 and 40-2 includes a minimal portion 42-2. In addition, the present invention also provides a four point sealant attachment, wherein a zipper part having a minimal portion 42-2 includes sealant at a location directly behind its engagement member and over the centerline CL.

In an alternative embodiment shown in FIG. 5, an extension 42-2' is provided on the member 40-2. The extension 42-2' helps to reduce shearing, etc., because a sealant layer can be applied behind the extension 42-2' to attach to the package 10. In this alternative, sealant portion S on the member 40-2 can also be eliminated. As noted above, however, this alternative is not desirable for use in vertical form/fill/seal apparatuses of the type shown in, for example, U.S. Pat. No. 4,909,017, but may be desirable for use in horizontal form/fill/seal apparatuses or in other package making devices. In less preferred variations of the embodiments shown in FIGS. 3 and 5, the sealant can be located only behind the portions 41-1 and 41-2 if the zipper to material bond is strong enough to keep the zipper from separating from the package even without attachment between the zipper and the package at other areas. In other less preferred embodiments, one or more of the extensions 41-1, 42-1, 41-2 and/or 42-2' can be eliminated as long as the zipper to package material bond, e.g., behind the members 43-1 and 43-2, is strong without such portions.

FIG. 6 shows another embodiment of the invention wherein the zipper is located in an inverted state within flexible package. The embodiment shown in FIG. 6 is particularly advantageous in vertical form/fill/seal apparatuses. In this regard, the package is formed and filled in generally the conventional manner of vertical form/fill/seal devices. In this embodiment, however, the zipper 40 is placed adjacent the bottom seal 30 as shown, and preferably the graphics or printing on the film material is also inverted so that the bottom seal 30 is actually at the top end of the flexible packages that are formed. The zipper is first sealed to the flexible package, and product is then delivered into the vertical tube to fill the flexible package. The minimal portion 42-2 of the zipper 40 thus extends towards the top of the flexible package. This embodiment has certain advantages during the manufacture of the packages. For instance, this embodiment can facilitate "stripping" ("stripping" is a well known step in vertical form/fill/seal apparatuses that includes using "stripper bars" that initially contact the vertical tube to move contents towards the bottom of the package before forming the top seal) by re-locating the zipper 40 proximate the bottom seal 30. As shown in FIG. 8 (discussed below), the structure in FIG. 6 enables the zipper sealing jaws to be located above the sealing jaws for the top and bottom seals 20 and 30.

FIG. 7 shows a preferred embodiment of the sealing jaws, or sealing blocks, that form the top and bottom seals 20 and 30 and that seal the zipper 40 to the package material. The sealing blocks 61 and 63 are used to form the upper and lower seals 20 and 30, and the sealing blocks 62 and 64 are used to seal the zipper 40 to the packaging material. Preferably, the blocks 61 and 62 are mounted to move together, and the blocks 63 and 64 are mounted to move together. More specifically: profiles 61A and 63A form a bottom seal 30 of an upper package; profiles 61B and 63B form the top seal 20 of a lower package; profiles 62A and 64A seal the zipper portions 41-1 and 41-2 to the flexible package material; and recessed profiles 62B and 64B seal the zipper in the region of the engagement members 43-2 and 43-1 to the flexible package material. As shown in FIG. 7, in order to more vigorously seal the package walls 11 and 12 to the zipper 40, the profile 62B can include a resilient portion 65, e.g., made with rubber such as for example a silicone rubber, to enable a greater amount of pressure to be applied to the location of the zipper proximate the engage-

5,972,396

11

ment members (i.e., proximate the male projection **43-1** and the female socket **43-2**) without damaging such portions, to enhance sealing capability with the package material. For example, applying rubber at the male side of the embodiment shown in FIG. **4** facilitates applying back-pressure at the female side, so that the female side (having the minimal portion **42-2**) can have a greater pressure applied to ensure engagement of the sealant behind central section S behind the socket **43-2** to the package film material. In cases where the portion **65** is not made of rubber, the region therein can be integral with the block, e.g., metal. In such cases, the zipper is preferably constructed to absorb pressure to avoid damage when back pressure is applied.

As discussed, FIG. **8** shows a modified embodiment of the sealing blocks for manufacturing a flexible package as shown in FIG. **6**. The features in FIG. **8** are like that shown in FIG. **7**, except that the member **61** is mounted below the member **62** and the member **63** is mounted below the member **64**. In this manner, when the jaws **61** and **63** are brought towards one another in the operation of the device, the zipper should not interfere with the motion of the jaws, stripping should be facilitated, such as with stripper bars mounted immediately below the jaws **61** and **63**, etc.

While the present invention has been shown and described with reference to preferred embodiments presently contemplated as best modes for carrying out the invention, it is understood that various changes may be made in adapting the invention to different embodiments without departing from the broader inventive concepts disclosed herein and comprehended by the claims which follow.

What is claimed is:

**1**. A method of opening and re-closing a flexible package containing a food product, comprising the steps of:

1) providing in combination:
   a) a flexible package having
      a elastomeric front wall and an elastomeric rear wall;
      said front wall and said rear wall being sealed together at a top seal;
      a zipper having first and second zipper parts;
      said first zipper part attached to an inside surface of said front wall and having a first engagement member facing said rear wall;
      said second zipper part attached to an inside surface of said rear wall and having a second engagement member facing said front wall;
      said first and second engagement members being engaged together;
      said top seal and said first and second engagement members being pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;
      said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening; and
   b) a food product stored inside said package below said first and second engagement members;

2) pinch-grip opening said package by manually pulling with a force of at least said pinch-grip pulling force opposite sides of said package below said zipper to open both said zipper, by disengaging said first and second engagement members, and said top seal from the product side outward in a single pinch-grip opening step;

3) removing a portion of said food product from said package;

12

4) re-closing said package by manually re-engaging said first and second engagement members.

**2**. The method of claim **1**, wherein during said single step of pinch-grip opening, said zipper is at least partially disengaged before said top seal begins to open.

**3**. The method of claim **2**, wherein after said zipper is at least partially disengaged, the force required to continue disengagement of the engagement members is greatly reduced.

**4**. The method of claim **1**, further including the step of providing said top seal with an engagement strength of less than about 3 lbs/inch, such that said top seal disengages upon a pinch-grip pulling force greater than said engagement strength.

**5**. The method of claim **1**, further including the step of providing said top seal with an engagement strength of between about 1 to 2 lbs/inch, such that said top seal disengages upon a pinch-grip pulling force greater than said engagement strength.

**6**. The method of claim **1**, further including the step of providing said zipper with a zipper engagement strength of less than about 2½ lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

**7**. The method of claim **4**, further including the step of providing said zipper with a zipper engagement strength of less than about 2½ lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

**8**. The method of claim **1**, further including the step of providing said zipper with a zipper engagement strength of between about 1½ to 2 lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

**9**. The method of claim **4**, further including the step of providing said zipper with a zipper engagement strength of between about 1½ to 2 lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

**10**. The method of claim **1**, further including the step of providing said top seal by heat/pressure/dwell forming said top seal.

**11**. The method of claim **10** wherein said heat/pressure/ dwell forming includes applying heat and pressure for a dwell period.

**12**. The method of claim **10**, wherein said heat/pressure/ dwell forming includes applying pressure, without heat, for a dwell period.

**13**. The method of claim **1**, further including the step of providing said first and second engagement members with respective interlocking protrusions.

**14**. The method of claim **13**, wherein said step of providing said first and second engagement members with interlocking protrusions includes providing said first engagement member with a male protrusion and said second engagement member with at least one protrusion forming a female socket, said male protrusion being engaged in said female socket.

**15**. The method of claim **1**, further including the step of providing said front and rear walls as laminated plastic walls including at least one inner sealable layer and at least one outer wall layer.

**16**. The method of claim **1**, further including the steps of providing said first engagement member as a single male protrusion and providing said second engagement member as a single female socket, said male protrusion being engaged in said female socket.

5,972,396

**13**

17. The method of claim **1**, further including the steps of providing said first and second zipper parts with cross-sectional shapes that are different from one another and that are separate pieces that are connected together only at said engagement members.

18. The method of claim **1**, further including the step of providing said food product from the group consisting of salty, sweet or savory snack foods.

19. The method of claim **1**, further including the step of providing said food product from snack food chips.

20. The combination of claim **19**, further including the step of providing said snack food chips from potato or corn based chips.

21. The method of claim **1**, wherein:

a) said step of providing said flexible package further includes,

   i) providing said front and rear walls as laminated plastic walls including at least one inner sealable layer and at least one outer wall layer,

   ii) providing said top seal as a seal between said inner sealable layers, said seal between said inner sealable layers being openable by de-lamination; and

b) during said step of pinch-grip opening, said top seal opens by delamination.

22. The method of claim **21**, wherein said delamination is carried out substantially only above said first and second zipper parts, at a consumer side of said first and second zipper parts.

23. The method of claim **1**, wherein following said step of re-closing said package, said package is re-opened by either: a) again pinch-grip opening said package from below said zipper to open said zipper from the product side to the consumer side of the flexible package; or b) opening said

**14**

package from above said zipper to open said zipper from the consumer side to said product side of said flexible package.

24. The method of claim **23**, wherein following said step of re-closing said package, said package is re-opened by again pinch-grip opening said package from below said zipper to open said zipper from the product side to the consumer side of the flexible package.

25. The method of claim **23**, wherein following said step of re-closing said package, said package is re-opened by opening said package from above said zipper to open said zipper from the consumer side to said product side of said flexible package.

26. The method of claim **1**, wherein said step of providing a food product includes providing between about 1 and 20 ounces of food product.

27. The method of claim **26**, wherein said step of providing a food product includes providing about 20 ounces of food product.

28. The method of claim **1**, further including the step of providing said top seal fully across a width of said package and with a vertical height of between about ¼ to ½ an inch.

29. The method of claim **1**, further including the step of providing said top seal spaced above the top of said first and second zipper parts by at least about ¼ inch.

30. The method of claim **29**, further including the step of providing said top seal spaced above the top of said first and second zipper parts between about ¼ to ½ inches.

31. The method of claim **1**, wherein said step of providing a flexible package includes forming said flexible package with a back seal formed in a middle of said rear wall generally perpendicular to said top seal.

\* \* \* \* \*

The opinion in support of the decision being entered today is <u>not</u> binding precedent of the Board.

Paper 94

Trial Division Merits Panel
Mail Stop Interference
P.O. Box 1450
Alexandria VA 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed:
November 29, 2005

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
_____

MARC A. JURGOVAN
and
MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application No. 09/372,646),

v.

RONALD L. RAMSEY, ARTHUR MALIN,
ROBERT HOGAN, LAWRENCE SHARE,
and
RICHMOND M. SCOTT
Senior Party,
(Application 09/481,723).
_____

Patent Interference No. 105,173
_____

Before TORCZON, DELMENDO, and MEDLEY, <u>Administrative Patent</u>
<u>Judges</u>.

DELMENDO, <u>Administrative Patent Judge</u>.

## <u>DECISION ON MOTIONS FOR JUDGMENT AND</u> <u>MOTIONS TO EXCLUDE EVIDENCE</u>

Party Jurgovan filed a motion for judgment (JMJ) asserting that Party Ramsey derived the inventions recited in counts 1 and 2 from Jurgovan.  (JMJ at 1.)  Jurgovan further asserts that it should be awarded priority because it was the first to conceive and actually reduce the inventions to practice and exercised reasonable diligence from prior to any conception by Ramsey to Jurgovan's reduction to practice.  (<u>Id</u>.)

In counter position, Ramsey filed a motion for judgment (RMJ) asserting that Jurgovan derived the inventions recited counts 1 and 2 from Ramsey.  (RMJ at 2.)  Ramsey also asserts that it should be awarded priority because it was the first to conceive the inventions and to reduce the inventions to practice and exercised reasonable diligence from prior to any conception by Jurgovan through Ramsey's reduction to practice.  (<u>Id</u>.)

We grant Jurgovan's motion for judgment on the basis that, by a preponderance of the evidence, Ramsey derived the inventions from Jurgovan.  Accordingly, we dismiss Ramsey's motion for judgment on the same basis.

Additionally, the Board has before it Jurgovan's "MISCELLANEOUS MOTION 1" and "MISCELLANEOUS MOTION 2," both filed on June 23, 2005, and Ramsey's June 23, 2005 motion to exclude certain evidence.

We deny Ramsey's motion to exclude evidence to the extent that the motion relates to evidence on which we rely in support of our decision.  We do not reach Jurgovan's miscellaneous motions because they are moot.


<u>FINDINGS OF FACT</u>

The following findings of fact are supported by a preponderance of the evidence in the record.  Additional factual findings are made in the analysis section of this decision.

<u>Background</u>

1.    This interference was declared on December 8, 2003 between: (i) Jurgovan's United States Patent 5,972,396 ('396 patent) and Application 09/372,646 ('646 application); and (ii) Ramsey's Application 09/481,723 ('723 application).  (37 CFR § 1.611 notice.)

2.    Jurgovan's '396 patent issued on October 26, 1999 from Application 09/079,382 filed on May 15, 1998. No benefit of an earlier filing date was accorded to Jurgovan.  (37 CFR § 1.611 notice at 3.)

3.    Ramsey's '723 application, on the other hand, was filed on January 12, 2000 and was accorded the benefit of an earlier filing date to March 6, 1998 based on Application 09/036,232, now United States

Patent 6,030,122 issued on February 29, 2000. (37

CFR § 1.611 notice at 4.)

4.    The real parties in interest are said to be: RECOT,

INC. (now known as FRITO-LAY NORTH AMERICA), the

assignee of Jurgovan's '396 patent and '646

application; and ILLINOIS TOOL WORKS, INC., the

assignee of Ramsey's '723 application.[1] (JMJ at 2,

¶¶10, 12; RMJ at 3, ¶¶10, 12.)

5.    The interference was declared with two counts,

Counts 1 and 2. (37 CFR § 1.611 notice at 5-6.)

6.    Count 1, which is identical to claim 1 of Jurgovan's

'646 application or claim 42 of Ramsey's '723

application, is reproduced as follows:

> Count 1.  In combination:
> a)    a flexible package having a [sic,
> an] elastomeric front wall and an elastomeric
> rear wall;
>     said front wall and said rear wall being
> sealed together at a top seal;
>     a first zipper part attached to an
> inside surface of said front wall and having
> a first engagement member facing said rear
> wall;
>     a second zipper part attached to an
> inside surface of said rear wall and having a
> second engagement member facing said front
> wall;

---

[1]    The record in this interference contains numerous
references to "Minigrip" and "Bosch." Minigrip, a division
of ILLINOIS TOOL WORKS, INC. (RMJ at 3, ¶13), is a supplier
of zipper materials. Bosch (THE ROBERT BOSCH COMPANY) is a
supplier of machinery used for applying the zipper material
to flexible film. (Exhibit J2020, Declaration of Marc A.
Jurgovan at 3-4, ¶8.)

said first and second engagement members being engaged together;

said top seal being manually pinch-grip openable and said first and second engagement members being manually pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening; and

b)  a food product stored inside said package below said first and second engagement members.

7.    Count 2, which is identical to claim 1 of Jurgovan's

'396 patent or claim 31 of Ramsey's '723

application, reads as follows:

Count 2.  A method of opening and re-closing a flexible package containing a food product, comprising the steps of:

1) providing in combination:

a) a flexible package having a [sic, an] elastomeric front wall and an elastomeric rear wall;

said front wall and said rear wall being sealed together at a top seal;

a zipper having first and second zipper parts;

said first zipper part attached to an inside surface of said front wall and having a first engagement member facing said rear wall;

said second zipper part attached to an inside surface of said rear wall and having a second engagement member facing said front wall;

said first and second engagement members being engaged together;

said top seal and said first and second engagement members being pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening; and

b) a food product stored inside said package below said first and second engagement members;

2) pinch-grip opening said package by manually pulling with a force of at least said pinch-grip pulling force opposite sides of said package below said zipper to open both said zipper, by disengaging said first and second engagement members, and said top seal from the product side outward in a single pinch-grip opening step;

3) removing a portion of said food product from said package;

4) re-closing said package by manually re-engaging said first and second engagement members.

8.   Count 1: Claims 1-26 of Jurgovan's '646 application and claims 42-47 of Ramsey's '723 application are designated as corresponding to count 1, while claims 1-31 of Jurgovan's '396 patent and claims 31-33, 35-39, and 41 of Ramsey's '723 application do not correspond to count 1.  (37 CFR § 1.611 notice at 5.)

9.   Count 2: Claims 1-31 of Jurgovan's '396 patent and claims 31-33, 35-39, and 41 of Ramsey's '723 application are designated as corresponding to count 2, while claims 1-26 of Jurgovan's '646 application and claims 42-47 of Ramsey's '723 application do not

correspond to count 2.  (37 CFR § 1.611 notice at

6.)

10.  An oral hearing was held on August 10, 2005.

11.  Jurgovan's '396 patent and '646 application explains

(column 1, lines 32-39 of Jurgovan's '396 patent;

page 1, line 29 to page 2, line 1 of Jurgovan's '646

application):

> Although a number of packages with re-
> closable zippers are known, the existing
> packages have a number of drawbacks.  For
> example, these prior packages typically must
> be initially opened using two distinct steps.
> First, a heat seal must be broken by cutting
> the package with scissors or by removing a
> tear-away, perforated strip.  The re-closable
> zipper closure is then opened in a distinct
> second step.

12.  The prior art reclosable packages described in

Jurgovan's '396 patent and '646 application were

representative of commercial products available in

November 1996.  (JX2020 at 5, ¶12-15; JX2021 at 5,

¶9.)

13.  Thus, these prior art reclosable packages are opened

from the "consumer" side rather than from the food

product side.  (JX2020 at 6, ¶¶14-15; JX2021 at 5,

¶¶9-10.)

14.  According to Jurgovan, the two-step opening

characteristic of the prior art package

"substantially reduces the consumer appeal of the

packages and makes the packages undesirable for a
variety of products, such as for snack food chips
and the like." (Column 1, lines 39-42 of Jurgovan's
'396 patent; page 2, lines 1-4 of Jurgovan's '646
application.)

15. Marc A. Jurgovan, one of the named inventors in both
the Jurgovan '396 patent and '646 application,
declares that, in 1996, he was assigned to develop a
reclosable flexible package for certain of Frito-
Lay's salty snack food products. (JX2020, ¶3.)

16. Stephen M. Callahan, Frito-Lay's Senior Project
Engineer (JX2021 at 2, ¶1), is not an inventor in
either of the Jurgovan '396 patent or the '646
application.

17. Mr. Callahan managed Frito-Lay's reclosable flexible
package development project. (Declaration of
Stephen M. Callahan, JX2021 at 1-4, ¶¶1-7.)

18. Mr. Callahan states that Mr. Jurgovan reported to
him on the reclosable flexible package development
project from October 1996 through approximately
March 1997. (JX2021 at 4, ¶7.)

19. Regarding Frito-Lay's reclosable flexible package
development project, Mr. Jurgovan explains (JX2020
at 3):

> 6. Frito-Lay wanted to market a flexible, reclosable package for certain of its salty snack food products in which consumers could open and then reclose to better preserve the freshness of any food product remaining in the package. A reclosure project was initiated at Frito-Lay in 1996 to develop a reclosable package solution for its salty snack food products.

20. To avoid significant costs, Frito-Lay desired to develop a reclosable flexible package using standard Frito-Lay materials and manufacturing processes. (JX2020 at 3, ¶7; JX2021 at 3-4, ¶6.)

21. In connection with Frito-Lay's reclosable package design project, Frito-Lay was engaged in potential customer-vendor business relationships with Minigrip and Bosch. (JX2020 at 3-4, ¶8; JX2021 at 3, ¶4.)

22. In the November and December 1996 timeframe, Minigrip/Bosch offered a solution involving a zipper system similar to those used in prior art reclosable packages. (JX2020 at 3-4, ¶¶8-15; JX2021 at 5, ¶¶9-10.)

23. Regarding the Minigrip/Bosch proposal, Mr. Callahan states (JX2021 at 5-6):

> 9. In November and December 1996, we began evaluating a reclosable bag solution using a Minigrip zipper system applied to the standard Frito-Lay snack-food chip film. It was my understanding that this Minigrip zipper system was similar to zipper systems that Minigrip had supplied to other customers and used commercially. In particular, the Minigrip zipper system was constructed having

a tear strip at the top of the package, a
primary seal below the tear strip, and a
zipper located below the primary seal.  In
use, the tear strip would be torn away
transversely across the top of the package.
The primary seal would then be opened by
peeling apart the upper portions of the film
material thereby exposing the zipper
material.  The zipper members would then be
separated manually thereby allowing access to
the snack-food chip product contained in the
bag.  The package would then be reclosed by
manually re-engaging the zipper material.

    10.  This prototype reclosable package
was similar to all other commercially
available reclosable packages that I became
aware of in connection with my technical
evaluation in that it was opened from the top
of the package and above the zipper (from the
"consumer side") to gain access to the
contents of the package.

    11.  I understood from my involvement in
the project and from conversations with Marc
Jurgovan that we were having significant
problems with the Minigrip design.  In
particular, the film would tear
uncontrollably and randomly when the tear
strips were torn across the top of the
package.  Also, when the primary seal
(located above the zipper material) was
opened, the inner laminar bonds of the Frito-
Lay film would often fail causing further
uncontrolled tearing down and into the
package.

24.  Callahan and inventor Jurgovan believed that the

     Minigrip/Bosch design was unsatisfactory because

     "the film would tear uncontrollably and randomly

     when the tear strips were torn across the top of the

     package."  (JX2021 at 5, ¶11; JX2020 at 6, ¶16.)

25.  Additionally with respect to the proposed

     Minigrip/Bosch design, Callahan and inventor

Jurgovan state that the inner laminar bonds of the Frito-Lay film would often fail when the primary seal (located above the zipper material) was opened, further causing uncontrolled tearing down and into the package. (JX2020 at 6, ¶16; JX2021 at 5, ¶11.)

26.    Because the prior art and the proposed Minigrip/Bosch suffered from these shortcomings, Jurgovan sought a new reclosable package that was pinch-grip openable requiring only a single motion typical of that commonly used to open existing Frito-Lay snack food packages. (JX2020 at 7-8, ¶¶19-22; JX2021 at 5-6; ¶¶11-14.)

27.    The invention recited in Jurgovan's involved claims is said to differ from the proposed Minigrip/Bosch design in that the package "could be pinch grip opened from the interior (or from the 'product side') of the bag like consumers customarily open [Frito-Lay's] snack-food chip bags." (JX2021, ¶14; column 3, lines 5-10 of Jurgovan's '396 patent; page 5, lines 7-11 of Jurgovan's '646 application.)

28.    Jurgovan asserts that it conceived the invention by no later than January 2, 1997. (JMJ at 3-6.)

29.    Jurgovan asserts that it communicated the conception to party Ramsey on January 2, 29, and 30, 1997 and March 10, 1997. (JMJ at 6-9.)

30. Jurgovan further asserts that it actually reduced the invention to practice in September 1997. (JMJ at 7.)

31. Ramsey, on the other hand, contends that it conceived the invention no later than March 29, 1997. (RMJ at 13.)

32. Ramsey further contends that it communicated the conception to Jurgovan no later than May 13, 1997. (RMJ at 23.)

33. Ramsey's preliminary statement also asserts a conception date of March 29, 1997. (Preliminary statement, paper 22, at 2-5.)

34. Ramsey asserts that it actually reduced the invention to practice on November 6, 1997. (RMJ at 17.)

35. Regarding conception of the invention, Mr. Jurgovan avers (JX2020 at 8):

> 22. In the latter part of December 1996, I conceived of a reclosable bag that could solve the problems we experienced with the Bosch/Minigrip prototype. In particular, I thought that we should not be attempting to incorporate a reclose structure which requires the transverse and downward forces on the standard Frito-Lay snack film that it was not designed to experience. Instead, I thought that we should use a reclose solution that took advantage of the standard way that consumers opened Frito-Lay's snack food product, i.e. in a pinch-grip motion.

36. Mr. Jurgovan further explains (id. at 8-9, ¶23):

The top seal and the zipper material would be
opened by manually gripping the front and
back walls of the bag and pulling apart with
a force that would open the zipper material
and then the top seal of the bag from the
product side outward in a single pinch-grip
opening motion.  Because we wanted the
package to be reclosable, the flexible film
needed to withstand the pinch grip opening
process without tearing or deforming.  I knew
this was a quality of the Frito-Lay standard
film which is opened using the pinch-grip
motion without tearing or deformation.

37.  Mr. Jurgovan states that unlike the Bosch/Minigrip

system, the invention would solve the problem of

uncontrollable tearing created by opening the tear

strip as well as the delamination problem created by

delaminating the film down into the bag as the

primary seal is opened.  (Id. at 9, ¶24.)

38.  Mr. Jurgovan states that he disclosed the invention

to Robert E. Hogan, an employee of Minigrip and one

of the named inventors of the Ramsey '723

application, and Steven C. Mulder, former Director

of Engineering and Technical Services and Director

of Operations and Technical Services of Bosch who

worked closely with Minigrip, by telephone on

January 2, 1997.  (JX2020 at 9-10, ¶26.)

39.  Specifically, Mr. Jurgovan declares (id.):

On January 2, 1997, I had a telephone
conversation with Bob Hogan at Minigrip and
Steve Mulder at Bosch.  I explained to them
the problems we were having with the existing
prototypes [proposed by Minigrip/Bosch].  I

also disclosed to them my invention of the
pinch-grip reclosable package which I
believed would solve these problems.  In
particular, I disclosed to them my idea of
attaching the zipper material to the front
and back walls of the Frito-Lay's standard
flexible bag material so that the zipper
could be engaged just below the top seal of
the bag and above the food product.  I
disclosed to them that the top seal and the
zipper material could be opened by the
consumer by manually gripping the front and
back walls of the bag and pulling apart with
a force that would open the zipper material
and then the top seal of the bag from the
product side outward in a single pinch-grip
opening motion.  After consuming the snack
food, the consumer could then reclose the
package using the zipper material.  I
explained to them that this concept would
eliminate the need for tear strips, peel
seals and the like.

40.  Mr. Hogan states (Declaration of Robert E. Hogan,

RX1012 at 6, ¶18):

18.  I note that Marc Jurgovan claims
that on January 2, 1997 he communicated with
me about pinch grip opening.  He states that
he told me that a pinch grip bag would
require a reduced internal opening force
perhaps approaching the bond strength of the
film.  I do not recall whether I had such a
conversation with Mr. Jurgovan on January 2,
1997.  In any event, whenever Marc Jurgovan
first told me that Frito-Lay was requesting
zipper technology that would permit pinch
grip opening, I told him that such a method
would require a zipper opening force lower
than the bond strength of the layers of the
film.  [Emphasis added.]

41.  Mr. Mulder declares (Declaration of Steven C.

Mulder, RX1016, ¶10):

I understood that Mr. Jurgovan now contends
that he conceived of a pinch grip reclosable

bag and specified that the internal opening
force had to be lower and approach the "bond
strength of the film."  While I <u>suspect</u> that
he had previously gotten information about
internal opening force from Minigrip, <u>it
would self-evident [sic] to one skilled in
the art that the internal opening force of
the zipper on a pinch grip openable bag would
have to be less than the force needed to
either separate the zipper from the film or
deform the film itself</u>.  [Underscoring
added.]

42. Thus, neither Hogan nor Mulder denies inventor

Jurgovan's testimony that a January 2, 1997

telephone discussion regarding a pinch-grip

openable, reclosable food package took place on

January 2, 1997.

43. Mr. Callahan states that by January 24, 1997 at the

latest, Mr. Jurgovan informed him about the

invention recited in the involved claims.  (JX2021

at 6-7, ¶¶14-15.)

44. Specifically, Mr. Callahan recalls (JX2021 at 6-7,

¶¶14-15):

14.  At least by January 24, 1997, Marc
Jurgovan came to me and said that he thought
he had an idea for a reclosable bag solution
that is different from the Minigrip system,
and that he thought it might be patentable.
Mr. Jurgovan took me step-by-step through the
elements of his invention.  His concept was
to have a reclosable bag that could be pinch
grip opened from the interior (or from the
"product side") of the bag like consumers
customarily open snack-food chip bags.  He
explained that his invention involved
attaching zipper material to the front and
back walls of the Frito-Lay standard snack-

Interference No. 105,173                              Paper 94

> food chip bag material so that the zipper
> could be engaged just below the top seal of
> the bag and above the food product.  The
> Frito-Lay standard film used for its snack-
> food chip products is a flexible, elastomeric
> material.  Mr. Jurgovan explained that
> consumers would open the top seal and the
> zipper material by manually gripping the
> front and back walls of the bag below the
> zipper material and pulling apart with a
> pinch grip pulling force that would open the
> zipper material and then the top seal of the
> bag, from the product side outward, in a
> single pinch-grip opening motion, without
> tearing or deforming the bag walls.  The
> consumers could then remove a portion of the
> product and reclose the package by manually
> reclosing the zipper material.  [Emphasis
> added.]
>
>     15.  Mr. Jurgovan also explained to me
> at this time that because zippers used in
> standard reclosable packages had internal
> ("product side") opening forces that were
> significantly larger than external ("consumer
> side") opening forces, he wanted to use a
> zipper having a reduced internal opening
> force.  Otherwise, the large internal zipper
> opening force could cause the zipper to strip
> from the bag walls.  He explained that to
> further avoid stripping the zipper material
> away from the package side walls, the zipper
> opening forces must approach the bond
> strength of the sealed film when opened.
> [Emphasis added.]

45. Mr. Callahan is a packaging/project engineer with

    almost 30 years of professional experience with

    extensive expertise in many different facets of

    package and machine development, testing, and

    implementation.  (JX2021 at 2, ¶1.)

46. Mr. Callahan is of the opinion "that Mr. Jurgovan's

    conception of his pinch grip invention, as

Interference No. 105,173                              Paper 94

described...and as reflected on pages 1 and 2 of his
laboratory notebook (JX 2033), contains sufficient
detail that a person working in bag reclosure
technology could make and use a functional pinch
grip openable reclosable bag without undue
experimentation." (<u>Id</u>. at 11, ¶24.)

47. Mr. Callahan corroborates inventor Jurgovan's
testimony as follows (JX2021 at 9, ¶¶19-20):

> 19. On January 24, 1997, Mr. Jurgovan
> asked me to review the laboratory notebook
> that he kept in connection with his work on
> the bag reclsoure [sic] project at Frito-
> Lay...My signature appears at the bottom of
> pages 1 and 2 of the laboratory notebook,
> which I signed on January 24, 1997. At the
> time I signed this laboratory notebook, I
> would have wanted to understand what was
> being described on these pages, both as an
> engineer and as Mr. Jurgovan's supervisor on
> this project, and I would have insisted on
> understanding what was described. By no
> later than January 24, 1997, Mr. Jurgovan
> provided me with a thorough explanation of
> the contents of these pages, and I understood
> them.
> 20. On page 1 of the laboratory
> notebook, Mr. Jurgovan describes his pinch
> grip invention and states that this was
> discussed with Bob Hogan of Minigrip and
> Steve Mulder of Bosch on January 2, 1997.
> The description states that Mr. Jurgovan
> asked Minigrip to develop a prototype that
> allows consumers to open bags like they open
> current flex bags using a pinch grip motion,
> and that this would eliminate the need for
> tear strips, peelable seals, etc. <u>I
> understood this to be communicating the
> concept of a package formed with flexible,
> elastomeric walls sealed at the top and
> bottom, and zipper members attached to the
> side walls of the elastomeric material below</u>

17

<u>the top seal of the package.  I also
understood this to be indicating that the
consumer would open the package by manually
grabbing the side walls of the flexible
package material and pulling with a pinch
grip pulling force to disengage the zipper
material and then open the top seal in a
single pinch grip opening motion, without
tearing or deforming the bag walls.  This
further indicates that after a consumer would
remove a portion of the food product
contained in the package, the package could
be reclosed by manually re-engaging the
zipper material.</u>  I believe that this is how
a person working in the bag reclosure
technology would understand this disclosure.
[Emphasis added.]

48.  Ramsey does not rely on any cross-examination

testimony of Mr. Callahan to challenge the accuracy

or credibility of the averments made in the Callahan

declaration.  (Ramsey Opposition to JMJ filed on May

13, 2005, Appendix A.)

49.  Frito-Lay, Inc. Technology Notebook No. 3558 (JX

2033 at 2) contains the following drawings and

notes, which were "witnessed and understood" by Mr.

Callahan on January 24, 1997:



2

DATE          SUBJECT  BAG RECLOSURES        PROJECT NO. 7578

(EXISTING) MINIGRIP

'A' SIDE      'B' SIDE

S2 > S1 ←|S2          TEAR FLANGE
                      (PERFORATED)

S2 >      ← S2

ZIPPER

S1 >

                 Drawn in error —
                 Material does not exist here.

S1 — Tacks/seals to film
         prior to former

S2 — seals @ modified
         cross-seal jaws

1.5 to 2.0 lbs — for customer to open
                      zipper

5 – 6 lbs — for internal opening force

(PROPOSED) M. TURGNAN

'A' SIDE      'B' SIDE

S1 7

? S1 >  S2 7   §  < S2      FILM
                            TRAVEL

            ZIPPER

?(S1)> S2 7 §  < S2

S1

S1 — Tacks/seals to film
         prior to former

S2 — seals @ modified
         cross-seal jaws

• Zipper opening force from top
  or bottom needs to approach
  sealed film opening force
• Perforated tear flange eliminated

?? S1 >  Does material that is tacked
         at S1 have to be longer than S2
         (take up with Bosch)

WITNESSED AND UNDERSTOOD
SIGNED                        DATE  1/24/97      SIGNED
SIGNED                        DATE              DATE  1/24/97

19

50. Frito-Lay, Inc. Technology Notebook No. 3558 (JX
    2033 at 17) contains certain drawings and notes,
    which were "witnessed and understood" by Mr.
    Callahan on February 24, 1997 and reproduced on the
    following page.



DATE 2/24/97   SUBJECT BAG RECLOSURES   PROJECT NO. 7578   **17**

TE
B

TEAR STRIP (TE)

← PULL STRIP ACROSS FRONT OF PACKAGE

(REQUIRES HOLE TO BE PUNCHED IN FILM — NOT PREFERRED)

Z →

OPTION 4 — TEAR STRIP

AP 2/24/97

← B, TE

AP 2/24/97

PULL BAG APART BELOW ZIPPER

Z

PREFERRED CONCEPT — REQUIRES EQUIPMENT MODS

OPTION 5 — PINCH-GRIP

---

OUTCOMES FROM MEETING:

① REVIEW PERF STRENGTH ON ZIPPERS — CAN THEY ADJUST/CONTROL?

② EXPLORE 1/4" OR 1/8" SEALS FOR TOP SEAL ONLY (vs 1/2") (BARRIER SEAL IS AWAY FROM TOP OF PACKAGE)

③ TEST "CHEVRON" CONCEPT (SEE NEXT PAGE) OR RELIEF IN CENTER OF JAWS TO FACILITATE OPENING

④ TACK/TIE DOWN EXTENDED ZIPPER FLANGE TO AVOID FORMER INTERFACE ISSUE   ← TESTED MATERIAL OVER FORMER ON 2/24/97; MATERIAL BUCKLES TOO MUCH TO TACK/TIE DOWN

WITNESSED AND UNDERSTOOD

SIGNED _____   DATE 2/24/97   SIGNED _____
SIGNED _____   DATE                      DATE 2/24/97

51.  Mr. Callahan declares (JX2021 at 15, ¶31):

> Option 5 on page 17 [of JX2033], however, was
> Mr. Jurgovan's pinch grip design which I
> understood was considered by him to be the
> preferred concept.  I understood Mr.
> Jurgovan's Option 5 to disclose a male zipper
> member attached to the interior surface of
> one side of a flexible bag wall material and
> a female zipper member attached to the
> interior surface of the an [sic] opposite
> side wall of the flexible package material.
> The drawing further shows that the male and
> female zipper members are engaged together
> below the top seal of the package and above
> where the food product would be located.  I
> understood from this drawing that the zipper
> and top seal would be opened by pulling on
> the bag side walls below the zipper material
> with a pinch grip pulling force that would
> disengage the zipper members and open the top
> seal in a single pinch grip pulling motion.
> I also understood from this drawing that the
> package would be reclosed after the product
> is removed from the bag by manually re-
> engaging the zipper members.  Mr. Jurgovan's
> description of his pinch grip invention was
> sufficiently detailed that a person working
> in bag reclosure technology could make and
> use a functional pinch grip openable
> reclosable bag without the exercise of
> special skill or undue experimentation.

52.  Don Keel, a Senior Project Designer at Frito-Lay, is

     not an inventor in either of the Jurgovan '396

     patent or '646 application.  (Declaration of Don

     Keel, JX2023 at 1, ¶1.)

53.  Mr. Keel declares that Mr. Jurgovan made a

     presentation to members of the Frito-Lay Technology

     group on February 20, 1997.  (Declaration of Don

     Keel, JX2023 at 3, ¶7.)

54.  Specifically with respect to Mr. Jurgovan's February
     20, 1997 presentation, Mr. Keel states (JX2023 at 4,
     ¶8):

> 8.  I understood from Mr. Jurgovan's
> presentation that he had conceived a snack
> food package with front and rear elastomeric
> walls sealed at the top and bottom and zipper
> elements attached to the walls and engaged
> with each other, whereby the zipper elements
> could be disengaged and the upper seal could
> be opened by the consumer applying a pinch-
> grip force to the front and rear walls below
> the zipper.  This is reflected in the drawing
> of Option 5 at page 17 of the lab book (JX
> 2033).  [Emphasis added.]

55.  Inventor Jurgovan states (JX2020 at 11, ¶29):

> Because my concept involved opening from the
> product side, the zipper opening force had to
> be reduced.  If not, the consumer experience
> in pinch-grip opening the bag would be
> different and there would be a risk that the
> zipper material would strip off the bag
> walls.

56.  Non-inventor Callahan declares (JX2021 at 9-10,
     ¶21):

> [I]t was known that zipper material intended
> to be opened from the consumer side of the
> package, such as Minigrip's, had a much
> higher zipper opening force from the interior
> (or product side) in comparison to zipper
> opening force from the exterior (or consumer
> side).  This is reflected on page 2 of the
> laboratory notebook [JX2033 at 2] where Mr.
> Jurgovan writes that the consumer side
> opening force of the Minigrip zipper was 1.5
> to 2.0 lbs. and the product side opening
> force was 5-6 lbs.  I therefore understood
> Mr. Jurgovan's disclosure to mean that the
> internal zipper opening force should be
> reduced.  As Mr. Jurgovan explained to me,
> this would facilitate opening the zipper from

> the product side by the consumer and reduce
> the possibility that the zipper material
> would be stripped off of the bag walls.
> [Emphasis added.]

57. Adjusting or optimizing the zipper force by varying

the configuration of the male and female members of

the zipper was well known to a person having

ordinary skill in the art prior to November/December

1996. (Column 7, lines 33-45 of Jurgovan's '396

patent; page 13, line 24 to page 14, line 4.)

58. By January 24, 1997, which is well before Ramsey's

asserted conception date, Mr. Jurgovan conveyed to

non-inventor Callahan that the package Jurgovan

invented would be pinch-grip openable without

tearing or deforming the film walls. (JX2020 at 8-

9, ¶¶22-23; JX2021 at 6-7, ¶14-15.)

59. Frito-Lay, Inc. Technology Notebook No. 3558 (JX

2033 at 1) contains the following hand-written

entries by Mr. Jurgovan, which was "witnessed and

understood" by Mr. Callahan on January 24, 1997:

> • DISCUSSED WITH BOB HOGAN (MINIGRIP) ON
> 1/2/97 AND STEVE MULDER (BOSCH) ISSUES WITH
> EXISITING BAG RECLOSURE PROTOTYPES.
> • TEAR FEATURE DOES NOT WORK RELIABILITY
> [sic] & CONSISTENTLY.
> • ASKED MINIGRIP TO DEVELOP A PROTOTYPE
> THAT ALLOWS CONSUMERS TO OPEN BAGS
> [ILLEGIBLE] LIKE THEY OPEN CURRENT FLEX BAGS
> (USING PINCH-GRIP MOTION)
> • CONCEPT ELIMINATES NEED FOR TEAR STRIPS,
> PEELABLE SEALS, ETC.

Interference No. 105,173                                    Paper 94

         &bull;    CONCEPT REQUIRES REDESIGN OF
MINIGRIP/BOSCH PROPOSED ZIPPER TO REDUCE
ZIPPER OPENING FORCE (IF OPENED FROM
UNDERSIDE OF ZIPPER.
         &bull;    ZIPPER OPENING FORCE MUST APPROACH (BE
LOWER THAN?) BOND STRENGTH OF SEALED FILM
WHEN OPENED
         &bull;    ELIMINATES CONCERNS OF PACKAGE DAMAGE AT
OR AROUND END SEAL/FIN SEAL JUNCTURE

60.  Frito-Lay Technology Computation Notebook (in the

     name of Marc Jurgovan) contains certain hand-written

     entries, including an entry with Mr. Hogan's name

     circled, reproduced as follows:



61. Mr. Callahan declares that he attended a meeting on
    January 29 and 30, 1997 in which members of his
    reclosable bag project team (including inventor
    Jurgovan), Hogan and Arthur Malin of Minigrip, and
    Mulder of Bosch were also present.  (JX2021 at 12,
    ¶26.)

Interference No. 105,173                                    Paper 94

62. Mr. Callahan recalls that at the January 29 and 30,
    1997 meeting, inventor Jurgovan disclosed the
    invention to Hogan and Malin in sufficient detail
    "that a person working in bag reclosure technology
    could make and use a functional pinch grip openable
    reclosable bag without the exercise of special skill
    or undue experimentation." (JX 2021 at 12-13, ¶27.)

63. Mr. Callahan's recollection is as follows (id.):

    Mr. Jurgovan explained his idea of applying a
    reduced opening force zipper to the standard
    Frito-Lay film (which was known to be a
    flexible, elastomeric film) below the top
    seal of the package and above where the food
    product would be located.  He explained that
    the package could be pinch grip opened by
    manually pulling the side walls of the bag
    with a pinch grip pulling force that would
    disengage the zipper members and then the top
    seal in a single pinch grip motion, without
    tearing or deforming the bag walls.  He
    further explained that the consumer could
    then reclose the package by manually re-
    engaging the zipper material after food
    product was removed from the package.  Mr.
    Jurgovan also discussed that his pinch grip
    design would require a reduced opening force
    zipper when opening from the consumer side of
    the package.

64. On March 10, 1997, Mr. Jurgovan addressed a
    memorandum captioned "BAG OPENING DEVELOPMENT
    UPDATE" (reproduced on the following page) to
    various individuals including Messrs. Callahan and
    Keel. (JX2038.)

27

# Frito-Lay, Inc.

To:  Joel Berry                          Copies:  Bob Hogan, Minigrip
     Steve Callahan                               Monte Jump
     Bill Derkach                                 Art Malin, Minigrip
     Don Keel                                     Steve Mulder, Bosch
     Jerry Reaves
     Gary Wilhelmi

From:    Marc Jurgovan

Date:    March 10, 1997

Subject:    BAG OPENING DEVELOPMENT UPDATE

The following options are being pursued to identify a functional opening method on a package with zipper reclosure:

* **"Pinch-Grip" Method** (Preferred): Allows consumers to open packages using current "pinch-grip" manner. Requires new die / die components (block, plates, die) from Minigrip in order to evaluate test material, as well as redesign of the zipper handling parts, former, and jaws on the Bosch bagmaker. The zipper lock mechanism must be redesigned to equilibrate the zipper opening force when opening the package from either direction.

  Minigrip has expressed several concerns with this option, as they have not previously worked with zippers having equal opening forces from both directions. They are concerned with how this zipper will travel over the former shoulder (and whether it will pop open due to the lower opening forces present). Minigrip is also concerned with the impact of the new -13 sealant on the die design, as it behaves differently than other sealants. The zipper material delivery to Bosch was delayed due to rework required with the production die after initial fabrication, as further redesign of the lock mechanism was required to achieve the desired zipper opening forces in both directions.

  Die Fabrication Window:
  Bagmaker Modification Window:                                                 Option
  Evaluation Window:

* **Open Bag From Top By Peeling Apart Film Seal:** Requires packaging film barrier seal to open outward vs. downward to minimize / eliminate film delamination. Frito-Lay is currently evaluating this option using a modified jaw design.
  Option Evaluation Window:        Week of 3/10

* **Open Bag From Top Using Zipper Peelable Seal:** Minigrip will supply test materials the week of 3/17 for evaluation by Frito-Lay. Option is currently least preferred because of the concern that the existing moisture and oxygen barrier will be compromised by relying on the zipper peelable seal as the barrier seal. No Frito-Lay film "barrier" seal would be present with this option.

  Option Evaluation Window

Again, these options all focus on integrating the zipper reclosure with our current flexible packaging structures. The Bosch bagmaker checkout (prior to shipment) is currently scheduled for the week of 3/31, with shipment no later than 4/4. Delivery and installation would occur the week of 4/7, with a Bosch serviceman on-site the week of 4/14 for operator training, etc. The Woodman Polaris bagmaker will be relocated in the Packaging Equipment Lab to accomodate the Bosch bagmaker.

If you have any questions or comments, please advise.

Jurgovan EXHIBIT 2038
Jurgovan v. Ramsey
Interference No. 105,173

28

Interference No. 105,173                                    Paper 94

65.  Copies of Mr. Jurgovan's March 10, 1997 memorandum

      appear to have been provided to Hogan and Malin,

      both of Minigrip, as well as Steven C. Mulder of

      Bosch. (JX2038.)

66.  Mr. Jurgovan states (JX2020 at 25-26, ¶65):

          65.  By at least September 25, 1997, we
          received from Minigrip zipper material that
          had 2 lb. (consumer side) and 2 lb. (product
          side) opening forces, as well as a reversed
          male and female zipper member.  Jerry Reaves
          and I made prototype pinch grip openable bags
          using this zipper material and standard
          Frito-Lay snack food film by at least
          September 25, 1997.  These prototypes had the
          male and female side zipper portions attached
          to the front and back walls of the standard
          Frito-Lay film (which is a flexible,
          elastomeric material) and were engaged below
          the top seal of the bag.  These were not
          "hand made" prototypes, but were made using
          production grade VFFS bag making equipment.[2]
          Jerry Reaves is a technician at Frito Lay
          with expertise in maintaining and running bag
          making equipment.

67.  Mr. Jurgovan further avers that these prototypes

      were tested and that the tests, as recorded in

      Frito-Lay Technology Computation Notebook (JX2051 at

      50), reflected a success rate of 30 out of 41 bags,

      i.e., 30 bags were successfully pinch-grip openable

      and reclosable without deformation and tearing.

      (Id. at 26-27, ¶¶66-67.)

--------------------------------------------------------

      [2]  "VFFS" is an acronym for "vertical form, fill and
seal."  (JX2020 at 4, ¶10.)

68. Frito-Lay technician Mr. Jerry Reaves, who is not an
    inventor in either of Jurgovan's '396 patent or '646
    application, corroborates Mr. Jurgovan's averment
    that the invention was actually reduced to practice
    on September 25, 1997. (JX2022 at 7-9, ¶¶20-24.)

69. A Frito-Lay internal memorandum dated September 25,
    1997 from the inventors of the subject Jurgovan '396
    patent and '646 application to Donna Diermeier
    (JX2052) reads in part as follows:

        Testing of a lower interior opening force
        zipper has reduced stripping the zipper off
        of the film (due to film delamination) from
        100% to approximately 30%.

70. In its opposition to Jurgovan's preliminary motion
    1, Ramsey represented to the Board as follows
    (Ramsey Opposition No. 1 filed on June 11, 2004 at
    16-17):

        Jurgovan refers to the "front and rear walls
        having sufficient strength to resist tearing
        and deformation under the application of a
        pinch-grip pulling force during the pinch
        grip opening" as being an "important aspect
        of the invention". Ramsey's reply is that
        this sufficient strength to perform the
        function and purpose of the pinch grip
        opening is not properly characterized as an
        "important aspect" but rather is an inherent
        characteristic of the walls of the re-
        closable bag...
        The pinch-grip pulling force could not open
        the engagement members if the bags were not
        sufficiently strong to transmit the force to
        the engagement members. It is respectfully
        submitted that this language clearly shows
        that the walls of the bag are inherently

strong enough to not tear or deform during
pinch-grip opening thus rendering the
language "...sufficient strength to resist
tearing and deformation..." inherent,
superfluous and redundant. [Emphasis added.]

71. Party Ramsey states (Ramsey Opposition at 15):

Food packaging designed to be opened with the
"pinch grip" technique (RX 1014, ¶13),
application of reclosable zipper technology
to pinch grip openable packaging (RX 1011,
¶¶14, 17; RX 1012, ¶¶13-16; RX 1016, ¶¶7-8),
and varying of the internal and external
holding forces of the zipper profiles (RX
1012 ¶23) were all known in the art before
December, 1996.

72. Hogan states (RX1012 at 5-6, ¶¶14-16):

14. In November 1996, the Packaging
Machinery Manufacturers Institute ("PMMI")
held its tradeshow ("PacExpo") in Chicago.
Bosch Packaging, which makes FFS equipment
but uses Minigrip's TD technology, and
Minigrip both attended the show.[3] As part
of Bosch's booth at the show, it had a VFFS
machine that produced TD zipper bags
utilizing a three-flange Minigrip zipper.
That is, either the male or female profile
had flanges on both sides of the zipper
track, and the other had a flange only on one
side of the track.
15. The demonstration TD zipper bags
had a top seal and were intended to be opened
by cutting the top seal with a scissors [sic]
and then separating the zipper profiles from
the top (consumer side) of the bag. However,
when scissors (or a knife) were not available

_____
        [3] "FFS" and "TD" are acronyms for "form, fill and
seal" and "transverse direction," respectively. (RX1012 at
2 and 3, ¶¶5, 11.) According to Hogan, "an FFS method
involves a process in which a machine (or series of
machines) form a plastic container from the bag film, fill
the container with the product, and then create the final
seals on the container," while "TD" technology refers to the
application of zipper on the film at a 90° angle relative to
the direction of film travel on the FFS machine. (Id.)

> to cut the top seal, Steven Mulder (a Bosch
> representative at the show) and I both opened
> demonstration bags by applying an outward
> force on the bag walls below the zipper so as
> to cause the zipper to open from the product
> side and then "pop" the top seal to open the
> bag.  Thus, we used a pinch grip method to
> open the sample bags in order to enable us to
> show individuals the zipper structure of the
> bags.  A photocopy of one such bag is shown
> at Ramsey Exhibit 1063.
>      16.  Frito-Lay representatives attended
> the PacExpo trade show and visited the Bosch
> booth at the show in November 1996.  I am
> virtually certain that at least some of the
> Frito-Lay representatives saw the
> demonstration bags being opened with a pinch-
> grip method, as discussed above.

73.  Mulder, like Hogan, asserts that certain bags were

     opened using a pinch-grip opening motion at the

     PacExpo trade show in November 1996.  (RX1016, ¶¶7-

     10.)

74.  Party Ramsey did not file a preliminary motion for

     judgment against Jurgovan based on the

     unpatentability of Jurgovan's involved claims over

     the PacExpo prior art.


                          DISCUSSION

     Each party charges the other with derivation, arguing

that it conceived the invention first and communicated it to

the other party.  (JMJ at 2-9; RMJ at 20-24.)  For reasons

discussed more fully below, Jurgovan has demonstrated by a

preponderance of the evidence that Ramsey derived the

                              32

invention from Jurgovan.  Because Jurgovan has proven that
Ramsey is not the true inventive entity of the subject
matter recited in its involved claims, Ramsey cannot prevail
in this interference.

A party asserting derivation in an interference
proceeding must establish: (1) prior conception of the
claimed subject matter; and (2) communication of the
conception to the party charged with derivation.  Price v.
Symsek, 988 F.2d 1187, 1190, 26 USPQ2d 1031, 1033 (Fed. Cir.
1993).

"Conception is complete only when the idea is so
clearly defined in the inventor's mind that only ordinary
skill would be necessary to reduce the invention to
practice, without extensive research or experimentation."
Burroughs Wellcome Co. v. Barr Laboratories, Inc., 40 F.3d
1223, 1228, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994).  Our
reviewing court explained:

> [T]he test for conception is whether the
> inventor had an idea that was definite and
> permanent enough that one skilled in the art could
> understand the invention; the inventor must prove
> his conception by corroborating evidence,
> preferably by showing a contemporaneous
> disclosure.  An idea is definite and permanent
> when the inventor has a specific, settled idea, a
> particular solution to the problem at hand, not
> just a general goal or research plan he hopes to
> pursue.  See Fiers v. Revel, 984 F.2d 1164, 1169,
> 25 USPQ2d 1601, 1605 (Fed. Cir. 1993); Amgen, Inc.
> v. Chugai Pharmaceutical Co., 927 F.2d 1200, 1206,
> 18 USPQ2d 1016, 1021 (Fed. Cir. 1991)(no
> conception of chemical compound based solely on

> its biological activity).  The conception analysis
> necessarily turns on the inventor's ability to
> describe his invention with particularity.  Until
> he can do so, he cannot prove possession of the
> complete mental picture of the invention.  These
> rules ensure that patent rights attach only when
> an idea is so far developed that the inventor can
> point to a definite, particular invention.

Burroughs Wellcome, 40 F.3d at 1228, 32 USPQ2d at 1919.

The standard for communication requires a showing that

the communication "'enabled an ordinary mechanic, without

the exercise of any ingenuity and special skill on his part,

to construct and put the improvement in successful

operation'" (emphasis original).  Gambro Lundia AB v. Baxter

Healthcare Corp, 110 F.3d 1573, 1577, 42 USPQ2d 1378, 1382

(Fed. Cir. 1997)(quoting Agawam Co. v. Jordan, 74 U.S. 583,

602-03 (1868)); accord Hedgewick v. Akers, 497 F.2d 905,

908, 182 USPQ 167, 169 (CCPA 1978)("Communication of a

complete conception must be sufficient to enable one of

ordinary skill in the art to construct and successfully

operate the invention.").


1. Prior Conception

Ramsey filed its preliminary statement on April 9, 2004

(paper 22 at 3), alleging a conception date of March 29,

1997.[4]  (FF 33.)  At the time the preliminary statement was

---

[4]  Consistent with its preliminary statement, Ramsey
urges the same conception date of March 29, 1997 in its

Interference No. 105,173                                        Paper 94

filed, the interference rules "strictly held [a party] to

any date alleged in the preliminary statement."  37 CFR §

1.629(a)(2004).  Thus, for purposes of proving the prior

conception element of derivation on the part of Ramsey,

Jurgovan need only establish a date of conception before

March 29, 1997.

     In 1996, Frito-Lay undertook a project to develop

reclosable packages for its salty snack food products.  (FF

15.)  While Jurgovan admits that reclosable packages were

already known in the prior art, these prior art packages

suffered from various drawbacks.  One problem of the prior

art is described as follows (FF 11; column 1, lines 32-39 of

Jurgovan's '396 patent; page 1, line 29 to page 2, line 1 of

Jurgovan's '646 application):

> Although a number of packages with re-closable
> zippers are known, the existing packages have a
> number of drawbacks.  For example, these prior
> packages typically must be initially opened using
> two distinct steps.  First, a heat seal must be
> broken by cutting the package with scissors or by
> removing a tear-away, perforated strip.  The re-
> closable zipper closure is then opened in a
> distinct second step.[5]

Thus, these prior art reclosable packages are opened from

the "consumer" side using a two-step process.  (FF 13;

_____

motion for judgment.  (Finding of Fact, hereinafter "FF,"
31; RMJ at 13.)

     [5]  The prior art reclosable packages described in
Jurgovan's '396 patent and '646 application were

JX2020 at 6, ¶¶14-15; JX2021 at 5, ¶¶9-10.)  According to
Jurgovan, the two-step opening characteristic of the prior
art package "substantially reduces the consumer appeal of
the packages and makes the packages undesirable for a
variety of products, such as for snack food chips and the
like." (FF 14; column 1, lines 39-42 of Jurgovan's '396
patent; page 2, lines 1-4 of Jurgovan's '646 application.)

Marc A. Jurgovan, one of the named inventors in both
the Jurgovan '396 patent and '646 application, was assigned
to Frito-Lay's reclosable package project from which a
reclosable package for use with salty snack food products
was to be developed.  (FF 15; JX2020, ¶3.)  During the
significant time periods of this project, Mr. Jurgovan
reported to Frito-Lay Senior Project Engineer Stephen M.
Callahan, who is not an inventor in either of the Jurgovan
'396 patent or the '646 application.  (FF 16-18; JX2021 at
4, ¶7.)

To avoid significant costs, Frito-Lay desired to
develop a reclosable flexible package using standard Frito-
Lay materials and existing manufacturing technology.  (FF
20; JX2020 at 3, ¶7; JX2021 at 3-4, ¶6.)  As part of this
effort, Frito-Lay selected Minigrip and Bosch as potential
suppliers of zipper materials and equipment.  (FF 21; JX2020

representative of commercial products available in November
1996.  (FF 12; JX2020 at 5, ¶12-15; JX2021 at 5, ¶9.)

at 3-4, ¶8; JX2021 at 3, ¶4.)  Thus, Frito-Lay was engaged

in potential customer-vendor business relationships with

Minigrip and Bosch.

In the November and December 1996 timeframe,

Minigrip/Bosch offered a solution involving a zipper system

similar to those used in prior art reclosable packages.  (FF

22; JX2020 at 3-4, ¶¶8-15; JX2021 at 5, ¶¶9-10.)  Regarding

the Minigrip/Bosch proposal, Mr. Callahan recalls (FF 23;

JX2021 at 5-6):

> 9.  In November and December 1996, we began
> evaluating a reclosable bag solution using a
> Minigrip zipper system applied to the standard
> Frito-Lay snack-food chip film.  It was my
> understanding that this Minigrip zipper system was
> similar to zipper systems that Minigrip had
> supplied to other customers and used commercially.
> In particular, the Minigrip zipper system was
> constructed having a tear strip at the top of the
> package, a primary seal below the tear strip, and
> a zipper located below the primary seal.  In use,
> the tear strip would be torn away transversely
> across the top of the package.  The primary seal
> would then be opened by peeling apart the upper
> portions of the film material thereby exposing the
> zipper material.  The zipper members would then be
> separated manually thereby allowing access to the
> snack-food chip product contained in the bag.  The
> package would then be reclosed by manually re-
> engaging the zipper material.
> 10.  This prototype reclosable package was
> similar to all other commercially available
> reclosable packages that I became aware of in
> connection with my technical evaluation in that it
> was opened from the top of the package and above
> the zipper (from the "consumer side") to gain
> access to the contents of the package.
> 11.  I understood from my involvement in the
> project and from conversations with Marc Jurgovan
> that we were having significant problems with the
> Minigrip design.  In particular, the film would

> tear uncontrollably and randomly when the tear
> strips were torn across the top of the package.
> Also, when the primary seal (located above the
> zipper material) was opened, the inner laminar
> bonds of the Frito-Lay film would often fail
> causing further uncontrolled tearing down and into
> the package.

Thus, Callahan and inventor Jurgovan believed that the
Minigrip/Bosch design was unsatisfactory because "the film
would tear uncontrollably and randomly when the tear strips
were torn across the top of the package." (FF 24; JX2021 at
5, ¶11; JX2020 at 6, ¶16.) Additionally, the inner laminar
bonds of the Frito-Lay film would often fail when the
primary seal (located above the zipper material) was opened,
further causing uncontrolled tearing down and into the
package. (FF 25; JX2020 at 6, ¶16; JX2021 at 5, ¶11.)

Because the prior art and the proposed Minigrip/Bosch
suffered from these shortcomings, Jurgovan sought a new
reclosable package that was pinch-grip openable in one
simple motion. (FF 26; JX2020 at 7-8, ¶¶19-22; JX2021 at 5-
6; ¶¶11-14.) Specifically, the package "could be pinch grip
opened from the interior (or from the 'product side') of the
bag like consumers customarily open [Frito-Lay's] snack-food
chip bags." (FF 27; JX2021, ¶14; column 3, lines 5-10 of
Jurgovan's '396 patent; page 5, lines 7-11 of Jurgovan's
'646 application.)

Jurgovan asserts that it conceived the invention by at
least January 2, 1997. (FF 28.) The evidence weighs in

favor of Jurgovan's position that it conceived the invention

prior to Ramsey's earliest conception date of March 29,

1997.  To start, we have inventor Jurgovan's credible

representations to this Board.  Specifically, Mr. Jurgovan

avers (FF 35; JX2020 at 8):

> 22.  In the latter part of December 1996, I
> conceived of a reclosable bag that could solve the
> problems we experienced with the Bosch/Minigrip
> prototype.  In particular, I thought that we
> should not be attempting to incorporate a reclose
> structure which requires the transverse and
> downward forces on the standard Frito-Lay snack
> film that it was not designed to experience.
> Instead, I thought that we should use a reclose
> solution that took advantage of the standard way
> that consumers opened Frito-Lay's snack food
> product, i.e. in a pinch-grip motion.

Mr. Jurgovan further explains (FF 36; id. at 8-9, ¶23):

> The top seal and the zipper material would be
> opened by manually gripping the front and back
> walls of the bag and pulling apart with a force
> that would open the zipper material and then the
> top seal of the bag from the product side outward
> in a single pinch-grip opening motion.  Because we
> wanted the package to be reclosable, the flexible
> film needed to withstand the pinch grip opening
> process without tearing or deforming.  I knew this
> was a quality of the Frito-Lay standard film which
> is opened using the pinch-grip motion without
> tearing or deformation.

Mr. Jurgovan states that unlike the package proposed by

Minigrip/Bosch, the invention would solve the problem of

uncontrollable tearing that could occur with the tear strip

as well as delamination of the film down into the bag as the

primary seal is opened.  (FF 37; id. at 9, ¶24.)

An inventor's testimony alone is not sufficient to prove conception.[6] Here, however, other evidence corroborates Mr. Jurgovan's representations. Mr. Jurgovan's averments are consistent with and fully supported by the unimpeached declaration of Mr. Callahan. According to Mr. Callahan, inventor Jurgovan informed him about the inventions recited in the counts by January 24, 1997 at the latest. (FF 44; JX2021 at 6-7, ¶¶14-15.) Specifically, we credit Mr. Callahan's testimony, which states (id.):

> 14. At least by January 24, 1997, Marc Jurgovan came to me and said that he thought he had an idea for a reclosable bag solution that is different from the Minigrip system, and that he thought it might be patentable. Mr. Jurgovan took me step-by-step through the elements of his invention. His concept was to have a reclosable bag that could be pinch grip opened from the interior (or from the "product side") of the bag like consumers customarily open snack-food chip bags. He explained that his invention involved attaching zipper material to the front and back walls of the Frito-Lay standard snack-food chip bag material so that the zipper could be engaged just below the top seal of the bag and above the food product. The Frito-Lay standard film used for its snack-food chip products is a flexible, elastomeric material. Mr. Jurgovan explained that consumers would open the top seal and the zipper material by manually gripping the front and back walls of the bag below the zipper material and pulling apart with a pinch grip pulling force that would open the zipper material and then the top seal of the bag, from the product side outward, in a single pinch-grip opening motion, without tearing or deforming the bag walls. The consumers could then remove a portion of the product and

---

[6] See, e.g., Price, 988 F.2d at 1194-95, 26 USPQ2d at 1036-37.

Interference No. 105,173                                          Paper 94

reclose the package by manually reclosing the
zipper material.  [Emphasis added.]

15.  Mr. Jurgovan also explained to me at
this time that because zippers used in standard
reclosable packages had internal ("product side")
opening forces that were significantly larger than
external ("consumer side") opening forces, he
wanted to use a zipper having a reduced internal
opening force.  Otherwise, the large internal
zipper opening force could cause the zipper to
strip from the bag walls.  <u>He explained that to
further avoid stripping the zipper material away
from the package side walls, the zipper opening
forces must approach the bond strength of the
sealed film when opened</u>.  [Emphasis added.]

In addition, Frito-Lay, Inc. Technology Notebook No.

3558 (FF 49, 59; JX 2033 at 1-2) contains notes and drawings

that are consistent with the testimonies of Callahan and

inventor Jurgovan.[7]  Mr. Jurgovan's notes (<u>id</u>.) reflect the

understanding that:

-       "current flex bags" (i.e., existing Frito-Lay

        snack food packages) would be modified to be

        reclosable and would be openable using a

        "pinch-grip motion"

-       the concept eliminates the need for problematic

        tear strips or peelable seals

-       the "concept requires redesign of [a]

        Minigrip/Bosch proposed zipper to reduce zipper

        opening force (if opened) from [the] underside

_____

[7]  Mr. Jurgovan's notes and drawings were "witnessed
and understood" by Mr. Callahan on January 24, 1997.

> of [the] zipper" and the "zipper opening force
> must approach (be lower than?) [the] bond
> strength of [the] sealed film when opened"

- the concept "eliminates concerns of package
  damage at or around [the] end seal/fin seal
  juncture"

The drawings (FF 49; JX2033 at 2), reproduced on the following page, provide additional details of Jurgovan's concept.

2



DATE          SUBJECT  BAG RECLOSURES        PROJECT NO. 7578

(EXISTING) MINIGRIP

'A' SIDE      'B' SIDE

S2 > S1 < S2      TEAR FLANGE
                  (PERFORATED)
S2 >      < S2

ZIPPER

S1 >

Drawn in error —
Material does not exist here.

S1 — Tacks/seals to film
      prior to former

S2 — seals @ modified
      cross-seal jaws

1.5 to 2.0 lbs — for customer to open
               zipper

5 – 6 lbs — for internal opening force

(PROPOSED) M. JURGOVAN

'A' SIDE      'B' SIDE

S1 >

(? S1 >) S2 >  < S2       FILM
                          TRAVEL
ZIPPER

?(S1) S2 >  < S2

S1

S1 — Tacks/seals to film
      prior to former

S2 — seals @ modified
      cross-seal jaws

• Zipper opening force from top
  or bottom needs to approach
  sealed film opening force
• Perforated tear flange eliminated

?? S1 >  Does material that is tacked
         at S1 have to be longer than S2
         (take up with Bosch)

WITNESSED AND UNDERSTOOD
SIGNED                        DATE 1/24/97     SIGNED
SIGNED                        DATE             1/24/97
                                               DATE

In the drawings, Mr. Jurgovan includes two package
designs – one identified as "(EXISTING) MINIGRIP" and the
other labeled as "(PROPOSED) M. JURGOVAN."  The latter
depicted design shows an "A" side flexible film wall (i.e.,
an elastomeric wall), a "B" side flexible film wall, a top
seal S1, a zipper part attached to the "A" side, and a
zipper part attached to the "B" side.  Mr. Jurgovan's notes
at JX2033 at 2 indicate that the "zipper opening force from
top or bottom needs to approach sealed film opening force."
As noted in Mr. Callahan's declaration, Mr. Jurgovan
conveyed the idea "that to further avoid stripping the
zipper material away from the package side walls, the zipper
opening forces must approach the bond strength of the sealed
film when opened."  (FF 44; JX2021 at 6-7, ¶¶14-15.)  Thus,
these drawings and notes describe every element of counts 1
and 2.

Frito-Lay, Inc. Technology Notebook No. 3558 (FF 50; JX
2033 at 17) contains further evidence in support of Mr.
Callahan's testimony in the form of certain drawings and
notes, which were "witnessed and understood" by Mr. Callahan
on February 24, 1997.  This documentary evidence is
reproduced on the following page.



DATE 2/24/97   SUBJECT BAG RECLOSURES   PROJECT NO. 7578

**17**

TE, B

TEAR STRIP (TE)

← PULL STRIP ACROSS FRONT OF PACKAGE

(REQUIRES HOLE TO BE PUNCHED IN FILM — NOT PREFERRED)

Z →

OPTION 4 — TEAR STRIP

← B, TE

PULL BAG APART BELOW ZIPPER

PREFERRED CONCEPT — REQUIRES EQUIPMENT MODS

Z

OPTION 5 — PINCH-GRIP

OUTCOMES FROM MEETING

① REVIEW PERF STRENGTH ON ZIPPERS — CAN THEY ADJUST/CONTROL?

② EXPLORE 1/4" OR 1/8" SEALS FOR TOP SEAL ONLY (VS 1/2") (BARRIER SEAL IS AWAY FROM TOP OF PACKAGE)

③ TEST "CHEVRON" CONCEPT (SEE NEXT PAGE) OR RELIEF IN CENTER OF JAWS TO FACILITATE OPENING

④ TACK/TIE DOWN EXTENDED ZIPPER FLANGE TO AVOID FORMER INTERFACE ISSUE ← TESTED MATERIAL OVER FORMER ON 2/24/97; MATERIAL BUCKLES TOO MUCH TO TACK/TIE DOWN

WITNESSED AND UNDERSTOOD

SIGNED _____   DATE 2/24/97   SIGNED _____ DATE 2/24/97

SIGNED _____   DATE

Mr. Callahan declares (FF 51; JX2021 at 15, ¶31):

Option 5 on page 17 [of JX2033], however, was Mr.
Jurgovan's pinch grip design which I understood
was considered by him to be the preferred concept.
I understood Mr. Jurgovan's Option 5 to disclose a
male zipper member attached to the interior
surface of one side of a flexible bag wall
material and a female zipper member attached to
the interior surface of the an [sic] opposite side
wall of the flexible package material.  The
drawing further shows that the male and female
zipper members are engaged together below the top
seal of the package and above where the food
product would be located.  I understood from this
drawing that the zipper and top seal would be
opened by pulling on the bag side walls below the
zipper material with a pinch grip pulling force
that would disengage the zipper members and open
the top seal in a single pinch grip pulling
motion.  I also understood from this drawing that
the package would be reclosed after the product is
removed from the bag by manually re-engaging the
zipper members.  Mr. Jurgovan's description of his
pinch grip invention was sufficiently detailed
that a person working in bag reclosure technology
could make and use a functional pinch grip
openable reclosable bag without the exercise of
special skill or undue experimentation.

The declaration of Don Keel, a Senior Project Designer

at Frito-Lay who is not an inventor in either of the

Jurgovan '396 patent or '646 application, further buttresses

Jurgovan's conception prior to March 29, 1997.  (FF 52-53;

Declaration of Don Keel, JX2023 at 3, ¶7.)  Mr. Keel recalls

that Mr. Jurgovan made a presentation to members of the

Frito-Lay Technology group on February 20, 1997.  (FF 53;

Declaration of Don Keel, JX2023 at 3, ¶7.)  Specifically,

Mr. Keel states (FF 54; id. at 4, ¶8):

> 8.  I understood from Mr. Jurgovan's
> presentation that he had conceived a snack food
> package with front and rear elastomeric walls
> sealed at the top and bottom and zipper elements
> attached to the walls and engaged with each other,
> whereby the zipper elements could be disengaged
> and the upper seal could be opened by the consumer
> applying a pinch-grip force to the front and rear
> walls below the zipper.  <u>This is reflected in the
> drawing of Option 5 at page 17 of the lab book (JX
> 2033)</u>.  [Emphasis added.].

The testimonies of non-inventors Callahan and Keel,[8] as

well as Frito-Lay's laboratory notes, fully corroborate

inventor Jurgovan's testimony.  Taken together, the

preponderance of the evidence indicates that Jurgovan

conceived of the inventions recited in the counts well

before Ramsey's earliest conception date of March 29, 1997.

<u>Price</u>, 988 F.2d at 1195, 26 USPQ2d at 1037 ("An evaluation

of <u>all</u> pertinent evidence must be made so that a sound

determination of the credibility of the inventor's story may

be reached.").

Ramsey argues that Jurgovan's idea lacks certain

elements of the counts.  Specifically, with respect to count

1, Ramsey contends that Jurgovan's idea lacks "any means or

method for disengaging engaged first and second engagement

members by application of a pulling force below the

engagement members sufficient to disengage the members

---

[8]  Ramsey does not rely on any cross-examination
testimony of Callahan or Keel to challenge the accuracy or
credibility of the averments made in the Callahan or Keel

Interference No. 105,173                                    Paper 94

without stripping the members from their associated wall
surfaces or tearing or deforming the walls." (Ramsey
Opposition to JMJ at 1.)  With respect to count 2, Ramsey
urges that Jurgovan's idea lacks "any means or method for
attaching engaged first and second zipper parts to front and
rear walls, any means or method for manually pinch-grip
opening such zipper parts without tearing or deforming the
front and rear walls and any means or method for providing
engaged engagement members manually openable upon
application of a pinch-grip pulling force (rather than
stripping from the wall upon application of such force)."
(Id. at 1-2.)

     We find no merit in Ramsey's argument.  Ramsey does not
accurately identify the language recited in the counts.
Specifically, we find no language in either of the subject
counts on applying a "pulling force below the engagement
members [of the zipper parts] sufficient to disengage the
members without stripping the members from their associated
walls."  Instead, the counts recite: "said front and rear
walls having a sufficient strength to resist tearing and
deformation under the application of said pinch-grip pulling
force during pinch-grip opening."

---

declaration.  (FF 48; Ramsey Opposition to JMJ filed on May
13, 2005, Appendix A.)

Interference No. 105,173                                          Paper 94

Even assuming that the subject counts inherently require the application of a "pulling force below the engagement members [of the zipper parts] sufficient to disengage the members without stripping the members from their associated walls," the evidence indicates that Jurgovan had possession of this concept and disclosed it to others before March 29, 1997.  In particular, inventor Jurgovan states (FF 55; JX2020 at 11, ¶29):

> Because my concept involved opening from the product side, the zipper opening force had to be reduced.  If not, the consumer experience in pinch-grip opening the bag would be different and there would be a risk that the zipper material would strip off the bag walls.  [Emphasis added.]

This testimony is fully corroborated by non-inventor Callahan, who declares (FF 56; JX2021 at 9-10, ¶21):

> [I]t was known that zipper material intended to be opened from the consumer side of the package, such as Minigrip's, had a much higher zipper opening force from the interior (or product side) in comparison to zipper opening force from the exterior (or consumer side).  This is reflected on page 2 of the laboratory notebook [JX2033 at 2] where Mr. Jurgovan writes that the consumer side opening force of the Minigrip zipper was 1.5 to 2.0 lbs. and the product side opening force was 5-6 lbs.  I therefore understood Mr. Jurgovan's disclosure to mean that the internal zipper opening force should be reduced.  As Mr. Jurgovan explained to me, this would facilitate opening the zipper from the product side by the consumer and reduce the possibility that the zipper material would be stripped off of the bag walls.  [Emphasis added.]

Here, Ramsey has failed to sufficiently prove that one of ordinary skill in the art would not have been able to

49

adjust or optimize the zipper opening force by varying the
configuration of the male and female members of the zipper
to avoid stripping the zipper from the film walls.  Most
crucial to our inquiry, Ramsey itself asserts as follows (FF
71; Ramsey Opposition at 15):

> Food packaging designed to be opened with the
> "pinch grip" technique (RX 1014, ¶13), application
> of reclosable zipper technology to pinch grip
> openable packaging (RX 1011, ¶¶14, 17; RX 1012,
> ¶¶13-16; RX 1016, ¶¶7-8), and varying of the
> internal and external holding forces of the zipper
> profiles (RX 1012 ¶23) were all known in the art
> before December, 1996.[9]

Even the declaration of one of Ramsey's own proponents
supports Jurgovan's position.  In particular, Mulder
declares (FF 41; RX1016, ¶10):

> I understood that Mr. Jurgovan now contends that
> he conceived of a pinch grip reclosable bag and
> specified that the internal opening force had to
> be lower and approach the "bond strength of the
> film."  While I suspect that he had previously
> gotten information about internal opening force
> from Minigrip, it would self-evident [sic] to one
> skilled in the art that the internal opening force
> of the zipper on a pinch grip openable bag would
> have to be less than the force needed to either
> separate the zipper from the film or deform the
> film itself.  [Emphases added.]

According to Ramsey's own expert, the element of the counts
which Ramsey argues is missing from Jurgovan's conception

---

[9]  Ramsey's assertion that "varying...the internal and
external holding forces of the zipper profiles...were all
known in the art before December, 1996" is consistent with
the discussions concerning the admitted prior art in
Jurgovan's '396 patent and '646 application.  (FF 57; Column

Interference No. 105,173                                     Paper 94

"would [be] self-evident to one skilled in the art," and
thus necessarily be a part of the pinch-openable, reclosable
bag conceived by Jurgovan prior to Ramsey's earliest
conception date.

With respect to the language "said front and rear walls
having a sufficient strength to resist tearing and
deformation under the application of said pinch-grip pulling
force during pinch-grip opening" actually recited in the
counts, Ramsey has failed to sufficiently demonstrate that
the recited characteristics of the walls would not be
inherent in a reclosable flexible package. If tearing and
deformation occurred, the flexible bag would not be a
reclosable flexible package or even a reusable package at
all. Moreover, the evidence indicates that by January 24,
1997, which is well before Ramsey's asserted conception
date, Mr. Jurgovan conveyed to non-inventor Callahan that
the package he invented would be pinch-grip openable without
tearing or deforming the film walls. (FF 58; JX2020 at 8-9,
¶¶22-23; JX2021 at 6-7, ¶14-15.)

In its opposition to Jurgovan's preliminary motion 1,
Ramsey represented to the Board as follows (FF 70; Ramsey
Opposition No. 1 filed on June 11, 2004 at 16-17):

> Jurgovan refers to the "front and rear walls
> having sufficient strength to resist tearing and

7, lines 33-45 of the '396 patent; page 13, line 24 to page
14, line 4 of the '646 application.)

51

> deformation under the application of a pinch-grip
> pulling force during the pinch grip opening" as
> being an "important aspect of the invention".
> Ramsey's reply is that this sufficient strength to
> perform the function and purpose of the pinch grip
> opening is not properly characterized as an
> "important aspect" but rather is an inherent
> characteristic of the walls of the re-closable
> bag...
> The pinch-grip pulling force could not open the
> engagement members if the bags were not
> sufficiently strong to transmit the force to the
> engagement members.  It is respectfully submitted
> that this language clearly shows that the walls of
> the bag are inherently strong enough to not tear
> or deform during pinch-grip opening thus rendering
> the language "...sufficient strength to resist
> tearing and deformation..." inherent, superfluous
> and redundant.  [Emphasis added.]

After arguing that the recitation "sufficient strength to
resist tearing and deformation" is an inherent
characteristic of the recited pinch-grip openable,
reclosable package, Ramsey is in no position to now argue
the contrary.  Cf. Bosies v. Benedict, 27 F.3d 539, 543-44,
30 USPQ2d 1862, 1865-66 (Fed. Cir. 1994).

     Ramsey also argues that Jurgovan's idea was not
conception that was sufficiently defined "so that a skilled
artisan could take it and reduce the [i]nventions to
practice without undue experimentation." (Ramsey Opposition
at 2.) We disagree. Mr. Callahan is a packaging/project
engineer with almost 30 years of professional experience
with extensive expertise in many different facets of package
and machine development, testing, and implementation. (FF
45; JX2021 at 2, ¶1.) Mr. Callahan avers "that Mr.

Jurgovan's conception of his pinch grip invention, as
described...and as reflected on pages 1 and 2 of his
laboratory notebook (JX 2033), contains sufficient detail
that a person working in bag reclosure technology could make
and use a functional pinch grip openable reclosable bag
without undue experimentation." (FF 46; id. at 11, ¶24.)
We credit Mr. Callahan's testimony. Ramsey must show that
one of ordinary skill in the art would have been subject to
"extensive research or experimentation" to reduce the
conceived invention to practice. Ramsey did not meet this
burden.

Ramsey's position that "extensive research or
experimentation" would have been necessary to reduce
Jurgovan's conception to practice cannot be squared with
other facts on which it relies and is therefore untenable.
By Ramsey's own admission, reclosable zipper technology for
pinch-grip openable packages was well known in the art
before December 1996. Again, we refer to Ramsey's
opposition at 15 (FF 71):

> Food packaging designed to be opened with the
> "pinch grip" technique (RX 1014, ¶13), application
> of reclosable zipper technology to pinch grip
> openable packaging (RX 1011, ¶¶14, 17; RX 1012,
> ¶¶13-16; RX 1016, ¶¶7-8), and varying of the
> internal and external holding forces of the zipper
> profiles (RX 1012 ¶23) were all known in the art
> before December, 1996.

Interference No. 105,173                          Paper 94

Furthermore, Robert E. Hogan, a named inventor of Ramsey's

'723 application, asserts (FF 72; Declaration of Robert E.

Hogan, RX1012 at 5-6, ¶¶14-16):

> 14.  In November 1996, the Packaging
> Machinery Manufacturers Institute ("PMMI") held
> its tradeshow ("PacExpo") in Chicago.  Bosch
> Packaging, which makes FFS equipment but uses
> Minigrip's TD technology, and Minigrip both
> attended the show.  As part of Bosch's booth at
> the show, it had a VFFS machine that produced TD
> zipper bags utilizing a three-flange Minigrip
> zipper.  That is, either the male or female
> profile had flanges on both sides of the zipper
> track, and the other had a flange only on one side
> of the track.
> 15.  The demonstration TD zipper bags had a
> top seal and were intended to be opened by cutting
> the top seal with a scissors [sic] and then
> separating the zipper profiles from the top
> (consumer side) of the bag.  However, when
> scissors (or a knife) were not available to cut
> the top seal, Steven Mulder (a Bosch
> representative at the show) and I both opened
> demonstration bags by applying an outward force on
> the bag walls below the zipper so as to cause the
> zipper to open from the product side and then
> "pop" the top seal to open the bag.  Thus, we used
> a pinch grip method to open the sample bags in
> order to enable us to show individuals the zipper
> structure of the bags.  A photocopy of one such
> bag is shown at Ramsey Exhibit 1063.
> 16.  Frito-Lay representatives attended the
> PacExpo trade show and visited the Bosch booth at
> the show in November 1996.  I am virtually certain
> that at least some of the Frito-Lay
> representatives saw the demonstration bags being
> opened with a pinch-grip method, as discussed
> above.

Mulder, like Hogan, states that certain bags were opened

using a pinch-grip opening motion at the PacExpo trade show

in November 1996.  (FF 73; RX1016, ¶¶7-10.)  Under these

circumstances, Ramsey cannot now argue that one of ordinary

Interference No. 105,173                                        Paper 94

skill in the art would have been subject to "extensive
research or experimentation" to reduce Jurgovan's conception
to practice.[10]

Furthermore, the mere fact that extensive engineering
was or would have been required to make the packages in a
commercially viable manner (i.e., to produce reclosable
packages using Frito-Lay's existing machinery and starting
materials) is not the proper inquiry.  The more relevant
question is whether "extensive research or experimentation"
would have been necessary to reduce Mr. Jurgovan's
conception of a pinch-grip openable reclosable food bag to
practice.  Ramsey does not direct us to any evidence that
would establish that "extensive research or experimentation"
would have been necessary to make the recited reclosable bag
from Jurgovan's conception.[11]  Rather, Ramsey seems to focus
on whether any extensive engineering would have been
necessary to modify Frito-Lay's existing equipment to
facilitate the commercial production of snack foods with the

_____

[10]  We decline to make any ruling on unpatentability of
the involved claims based on this information because Ramsey
did not file a timely preliminary motion based on this
material information.

[11]  Again, Ramsey has represented that "[f]ood packaging
designed to be opened with the 'pinch grip' technique (RX
1014, ¶13), application of reclosable zipper technology to
pinch grip openable packaging (RX 1011, ¶¶14, 17; RX 1012,
¶¶13-16; RX 1016, ¶¶7-8), and varying of the internal and
external holding forces of the zipper profiles (RX 1012 ¶23)

Interference No. 105,173                              Paper 94

new package.  (FF 71; Ramsey Opposition at 9-10.)  Here, the

corroborated evidence indicates that Jurgovan was able to

reduce the conception (i.e., pinch-grip openable bags) to

practice without much difficulty using zipper material

having 2 lb. (consumer side) and 2 lb. (product side)

opening forces.  In this regard, Mr. Jurgovan states (FF 66;

JX2020 at 25-26, ¶65):

> 65.  By at least September 25, 1997, we
> received from Minigrip zipper material that had 2
> lb. (consumer side) and 2 lb. (product side)
> opening forces, as well as a reversed male and
> female zipper member.  Jerry Reaves and I made
> prototype pinch grip openable bags using this
> zipper material and standard Frito-Lay snack food
> film by at least September 25, 1997.  These
> prototypes had the male and female side zipper
> portions attached to the front and back walls of
> the standard Frito-Lay film (which is a flexible,
> elastomeric material) and were engaged below the
> top seal of the bag.  These were not "hand made"
> prototypes, but were made using production grade
> VFFS bag making equipment.  Jerry Reaves is a
> technician at Frito Lay with expertise in
> maintaining and running bag making equipment.

Mr. Jurgovan further avers that these prototypes were

tested and that the tests, as recorded in Frito-Lay

Technology Computation Notebook (FF 67; JX2051 at 50),

reflected a success rate of 30 out of 41 bags, i.e., 30 bags

were successfully pinch-grip openable and reclosable without

deformation and tearing.  (FF 67; id. at 26-27, ¶¶66-67.)

Mr. Jurgovan's statements are not only corroborated by

---

were all known in the art before December, 1996."  (Ramsey
Opposition at 15.)

Frito-Lay's notes but are also consistent with additional
corroborative evidence in the form of a declaration by a
non-inventor, namely Frito-Lay technician Jerry Reaves (FF
68; JX2022 at 7-9, ¶¶20-24) as well as an internal
memorandum to Donna Diermeier (FF 69; JX2052), which reads
in part as follows:

> Testing of a lower interior opening force zipper
> has reduced stripping the zipper off of the film
> (due to film delamination) from 100% to
> approximately 30%.

While these results may not be satisfactory for Frito-Lay's
ultimate _commercial_ manufacturing purposes, it is clear to
us that Jurgovan did reduce the conception to practice
without extensive research or experimentation by at least
September 25, 1997.

Ramsey faults Jurgovan for not manufacturing zippers on
its own or seeking an alternative zipper supplier to reduce
the conception to practice more quickly. (Ramsey Opposition
at 11.) However, there is no requirement under the law for
an inventor to manufacture all of the components (e.g.,
resin, adhesives, zippers, or the like) needed to reduce an
invention to practice. Frito-Lay is in the packaged food
business, not the zipper supply business.

For these reasons, we determine that Jurgovan conceived
the invention prior to Ramsey's earliest conception date of
March 29, 1997.

Interference No. 105,173                                    Paper 94

2. Communication

    Jurgovan sufficiently demonstrated, by a preponderance of the evidence, that Jurgovan communicated its conception to Ramsey on several occasions prior to Ramsey's earliest conception date of March 29, 1997.

    First, we have Mr. Jurgovan's testimony.  According to Mr. Jurgovan, he disclosed the invention to Hogan of Minigrip and Mulder of Bosch by telephone on January 2, 1997.  (FF 38-39; JX2020 at 9-10, ¶26.)  Mr. Jurgovan's declaration states:

> On January 2, 1997, I had a telephone conversation with Bob Hogan at Minigrip and Steve Mulder at Bosch.  I explained to them the problems we were having with the existing prototypes [proposed by Minigrip/Bosch].  I also disclosed to them my invention of the pinch-grip reclosable package which I believed would solve these problems.  In particular, I disclosed to them my idea of attaching the zipper material to the front and back walls of the Frito-Lay's standard flexible bag material so that the zipper could be engaged just below the top seal of the bag and above the food product.  I disclosed to them that the top seal and the zipper material could be opened by the consumer by manually gripping the front and back walls of the bag and pulling apart with a force that would open the zipper material and then the top seal of the bag from the product side outward in a single pinch-grip opening motion.  After consuming the snack food, the consumer could then reclose the package using the zipper material.  I explained to them that this concept would eliminate the need for tear strips, peel seals and the like.

Thus, according to Mr. Jurgovan, he disclosed to Hogan and
Mulder on January 2, 1997 a reclosable food package having
elastomeric front and rear walls ("Frito-Lay's standard
flexible bag"), a top seal, and a "zipper [that] could be
opened by the consumer by manually gripping the front and
back walls of the bag and pulling apart with a force that
would open the zipper material and then the top seal of the
bag from the product side outward in a single pinch-grip
opening motion."  Because the disclosed food package is
reclosable, the elastomeric front and rear walls must
necessarily have "sufficient strength to resist tearing and
deformation" during pinch-grip opening.

Mr. Callahan corroborates Mr. Jurgovan's testimony.
Mr. Callahan, who was not cross-examined by Ramsey,
testifies (FF 47; JX2021 at 9, ¶¶19-20):

> 19.  On January 24, 1997, Mr. Jurgovan asked
> me to review the laboratory notebook that he kept
> in connection with his work on the bag reclsoure
> [sic] project at Frito-Lay...My signature appears
> at the bottom of pages 1 and 2 of the laboratory
> notebook, which I signed on January 24, 1997.  At
> the time I signed this laboratory notebook, I
> would have wanted to understand what was being
> described on these pages, both as an engineer and
> as Mr. Jurgovan's supervisor on this project, and
> I would have insisted on understanding what was
> described.  By no later than January 24, 1997, Mr.
> Jurgovan provided me with a thorough explanation
> of the contents of these pages, and I understood
> them.
> 20.  On page 1 of the laboratory notebook,
> Mr. Jurgovan describes his pinch grip invention
> and states that this was discussed with Bob Hogan
> of Minigrip and Steve Mulder of Bosch on January

> 2, 1997. The description states that Mr. Jurgovan
> asked Minigrip to develop a prototype that allows
> consumers to open bags like they open current flex
> bags using a pinch grip motion, and that this
> would eliminate the need for tear strips, peelable
> seals, etc. <u>I understood this to be communicating
> the concept of a package formed with flexible,
> elastomeric walls sealed at the top and bottom,
> and zipper members attached to the side walls of
> the elastomeric material below the top seal of the
> package. I also understood this to be indicating
> that the consumer would open the package by
> manually grabbing the side walls of the flexible
> package material and pulling with a pinch grip
> pulling force to disengage the zipper material and
> then open the top seal in a single pinch grip
> opening motion, without tearing or deforming the
> bag walls. This further indicates that after a
> consumer would remove a portion of the food
> product contained in the package, the package
> could be reclosed by manually re-engaging the
> zipper material.</u> I believe that this is how a
> person working in the bag reclosure technology
> would understand this disclosure. [Emphasis
> added.]

Thus, Mr. Callahan recalls thoroughly discussing the
reclosable bag project, including reviewing the contents of
Frito-Lay's laboratory notebook (JX2033), with inventor
Jurgovan on January 24, 1997. According to Mr. Callahan's
testimony, Mr. Jurgovan fully explained the contents of the
notebook to him on January 24, 1997 and that he understood
on that date that Mr. Jurgovan stated he had disclosed the
conception to Hogan and Mulder on January 2, 1997. (FF 47;
JX2021 at 9, ¶¶19-20.)

The testimonies of inventor Jurgovan and non-inventor
Callahan, which we find credible, are sufficient to
establish by a preponderance of the evidence that Mr.

Interference No. 105,173                              Paper 94

Jurgovan communicated the inventions to Hogan and Mulder on

January 2, 1997.  Significantly, neither Hogan nor Mulder

denies that Mr. Jurgovan described the conception to them on

January 2, 1997.[12,13]  Indeed, the testimonies of inventor

Jurgovan and non-inventor Callahan are consistent with the

contents of: (i) Frito Lay Technology Computation Notebook

(in the name of Marc Jurgovan)(JX2036 at 47) and (ii) Frito-

Lay, Inc. Technology Notebook No. 3558 (JX 2033 at 1).

---

[12]  Mr. Hogan states (FF 40; RX1012 at 6, ¶18):

    18.  I note that Marc Jurgovan claims that on
January 2, 1997 he communicated with me about
pinch grip opening.  He states that he told me
that a pinch grip bag would require a reduced
internal opening force perhaps approaching the
bond strength of the film.  I do not recall
whether I had such a conversation with Mr.
Jurgovan on January 2, 1997.  In any event,
whenever Marc Jurgovan first told me that Frito-
Lay was requesting zipper technology that would
permit pinch grip opening, I told him that such a
method would require a zipper opening force lower
than the bond strength of the layers of the film.
[Emphasis added.]

[13]  Mr. Mulder declares (FF 41; RX1016, ¶10):

I understood that Mr. Jurgovan now contends that
he conceived of a pinch grip reclosable bag and
specified that the internal opening force had to
be lower and approach the "bond strength of the
film."  While I suspect that he had previously
gotten information about internal opening force
from Minigrip, it would self-evident [sic] to one
skilled in the art that the internal opening force
of the zipper on a pinch grip openable bag would
have to be less than the force needed to either
separate the zipper from the film or deform the
film itself.  [Underscoring added.]

Frito Lay Technology Computation Notebook (FF 60; JX2036 at
47) contains certain hand-written entries, including an
entry with Mr. Hogan's name circled, reproduced as follows:



Frito-Lay, Inc. Technology Notebook No. 3558 (FF 59; JX 2033
at 1) contains the following hand-written entries by Mr.
Jurgovan, which were "witnessed and understood" by Mr.
Callahan on January 24, 1997:

> • DISCUSSED WITH BOB HOGAN (MINIGRIP) ON 1/2/97 AND STEVE MULDER (BOSCH) ISSUES WITH EXISITING BAG RECLOSURE PROTOTYPES.
> • TEAR FEATURE DOES NOT WORK RELIABILITY [sic] & CONSISTENTLY.
> • ASKED MINIGRIP TO DEVELOP A PROTOTYPE THAT ALLOWS CONSUMERS TO OPEN BAGS [ILLEGIBLE] LIKE THEY OPEN CURRENT FLEX BAGS (USING PINCH-GRIP MOTION)
> • CONCEPT ELIMINATES NEED FOR TEAR STRIPS, PEELABLE SEALS, ETC.
> • CONCEPT REQUIRES REDESIGN OF MINIGRIP/BOSCH PROPOSED ZIPPER TO REDUCE ZIPPER OPENING FORCE (IF OPENED FROM UNDERSIDE OF ZIPPER. [sic]
> • ZIPPER OPENING FORCE MUST APPROACH (BE LOWER THAN?) BOND STRENGTH OF SEALED FILM WHEN OPENED
> • ELIMINATES CONCERNS OF PACKAGE DAMAGE AT OR AROUND END SEAL/FIN SEAL JUNCTURE

Second, the declaration of non-inventor Callahan provides additional independent evidence of Jurgovan's communication of the conception to Ramsey before March 29, 1997. Mr. Callahan declares that he attended a meeting on January 29 and 30, 1997 in which members of his reclosable bag project team (including inventor Jurgovan), Hogan and Arthur Malin of Minigrip, and Mulder of Bosch were all present. (FF 61; JX2021 at 12, ¶26.) Mr. Callahan specifically recalls that at the January 29 and 30, 1997 meeting, inventor Jurgovan disclosed the invention to Hogan and Malin in sufficient detail "that a person working in bag reclosure technology could make and use a functional pinch grip openable reclosable bag without the exercise of special skill or undue experimentation." (FF 62; JX 2021 at 12-13,

63

Interference No. 105,173                    Paper 94

¶27.) Specifically, Mr. Callahan's recollection is as follows (FF 63; id.):

> Mr. Jurgovan explained his idea of applying a reduced opening force zipper to the standard Frito-Lay film (which was known to be a flexible, elastomeric film) below the top seal of the package and above where the food product would be located. He explained that the package could be pinch grip opened by manually pulling the side walls of the bag with a pinch grip pulling force that would disengage the zipper members and then the top seal in a single pinch grip motion, without tearing or deforming the bag walls. He further explained that the consumer could then reclose the package by manually re-engaging the zipper material after food product was removed from the package. Mr. Jurgovan also discussed that his pinch grip design would require a reduced opening force zipper when opening from the consumer side of the package.

Thus, again on January 29-30, 1997, Jurgovan communicated to Ramsey a reclosable food package within the scope of the counts.

Third, we have a memorandum, which on its face, disclosed Jurgovan's conception to Ramsey prior to March 29, 1997. On March 10, 1997, Mr. Jurgovan addressed a memorandum captioned "BAG OPENING DEVELOPMENT UPDATE" (reproduced on the following page) to various individuals including Messrs. Callahan and Keel. (FF 64; JX2038.) Copies of the memorandum appear to have been provided to Mr. Hogan and Mr. Malin, both of Minigrip, as well as Mr. Mulder of Bosch. In that memo, inventor Jurgovan describes a

64

pinch-grip openable food package within the scope of the

subject counts.

## Frito-Lay, Inc.

| To: | Joel Berry<br>Steve Callahan<br>Bill Derkach<br>Don Keel<br>Jerry Reaves<br>Gary Wilhelmi | Copies: | Bob Hogan, Minigrip<br>Monte Jump<br>Ari Malin, Minigrip<br>Steve Mulder, Bosch |
|-----|----|----|----|

| From: | Marc Jurgovan |
|-------|----------------|
| Date: | March 10, 1997 |
| Subject: | **BAG OPENING DEVELOPMENT UPDATE** |

The following options are being pursued to identify a functional opening method on a package with zipper reclosure:

* **"Pinch-Grip" Method** (Preferred): Allows consumers to open packages using current "pinch-grip" manner. Requires new die / die components (block, plates, die) from Minigrip in order to evaluate test material, as well as redesign of the zipper handling parts, former, and jaws on the Bosch bagmaker. The zipper lock mechanism must be redesigned to equilibrate the zipper opening force when opening the package from either direction.

  Minigrip has expressed several concerns with this option, as they have not previously worked with zippers having equal opening forces from both directions. They are concerned with how this zipper will travel over the former shoulder (and whether it will pop open due to the lower opening forces present). Minigrip is also concerned with the impact of the new -13 sealant on the die design, as it behaves differently than other sealants. The zipper material delivery to Bosch was delayed due to rework required with the production die after initial fabrication, as further redesign of the lock mechanism was required to achieve the desired zipper opening forces in both directions.

  Die Fabrication Window:

  Bagmaker Modification Window:                                                                 Option
  Evaluation Window:

* **Open Bag From Top By Peeling Apart Film Seal:** Requires packaging film barrier seal to open onward vs. downward to minimize / eliminate film delamination. Frito-Lay is currently evaluating this option using a modified jaw design.
  Option Evaluation Window:               Week of 3/10

* **Open Bag From Top Using Zipper Peelable Seal:** Minigrip will supply test materials the week of 3/17 for evaluation by Frito-Lay. Option is currently least preferred because of the concern that the existing moisture and oxygen barrier will be compromised by relying on the zipper peelable seal as the barrier seal. No Frito-Lay film "barrier" seal would be present with this option.

  Option Evaluation Window

Again, these options all focus on integrating the zipper reclosure with our current flexible packaging structures. The Bosch bagmaker checkout (prior to shipment) is currently scheduled for the week of 3/31, with shipment no later than 4/4. Delivery and installation would occur the week of 4/7, with a Bosch serviceman on-site the week of 4/14 for operator training, etc. The Woodman Polaris bagmaker will be relocated in the Packaging Equipment Lab to accomodate the Bosch bagmaker.

If you have any questions or comments, please advise.

**Jurgovan EXHIBIT 2038**
**Jurgovan v. Ramsey**
**Interference No. 105,173**

Interference No. 105,173                                          Paper 94

Considering the evidence as a whole, Jurgovan has carried the burden of establishing communication of the conception to Ramsey prior to March 29, 1997.

Referring to JX2033 at 2 and JX2036 at 22, Ramsey contends that Mr. Jurgovan's drawing of the conception is "virtually identical to the one sketched in his notebook based on information given to him by Minigrip personnel when he first met with them in October 1996." (Ramsey Opposition at 6.) Ramsey fails to point out, however, that the drawing representing Minigrip's package (JX2033 at 22) shows a tear-open flange at the top, thus indicating that it is nothing more than the prior art. While Ramsey also urges that it advised Jurgovan of certain things in October 1996 and January 1997 (Ramsey Opposition at 6 and 9), these communication(s) cannot constitute communication of the conception because they occurred well before Ramsey's earliest alleged conception date of March 29, 1997. That is, it would be impossible for one to communicate something before he or she is even in possession thereof. At best, these communications merely relate to modification of Frito-Lay's production equipment to accommodate Jurgovan's conception.

In summary, the totality of the evidence supports Jurgovan's position that it conceived the inventions before Ramsey's conception date of March 29, 1997, that the

66

Interference No. 105,173                                    Paper 94

conceptions could have been reduced to practice by one
skilled in the relevant art "without extensive research or
experimentation," and that the conceptions were communicated
to Ramsey before March 29, 1997.

In view of the factual findings and legal
determinations above, Jurgovan has sufficiently demonstrated
that Ramsey derived the invention from Jurgovan.  Because
Ramsey is not the true inventive entity of the subject
matter of its involved claims, it cannot prevail against
Jurgovan under 35 U.S.C. § 102(g).  Hence, Ramsey's motion
on priority is moot.

Evidentiary Issues

Ramsey has filed a motion to exclude certain evidence.
(Ramsey Motion to Exclude Evidence filed on June 23, 2005.)
In it, Ramsey argues for the exclusion of, inter alia,
certain portions of the declarations of Jurgovan, Reaves,
and Keel as well as Jurgovan's notebook entries.

First, Ramsey argues that Mr. Jurgovan's testimony
regarding his January 2, 1997 conversations with Hogan and
Mulder should be excluded for lack of personal knowledge
because "his testimony on those matters was not based on
events perceived by and actually known by him, but was
speculation based on his reading documents years later."
(Ramsey Motion at 2.)  According to Ramsey, "[i]t turns out

67

that this testimony was a fabrication." (Id. at 3.) Ramsey

also attacks the declarations of Reaves and Keel on similar

grounds. (Ramsey Motion at 6.)

Ramsey's position is without merit. While Ramsey cites

to pages 40, 44-5, and 61 of the Jurgovan deposition

(JX2087) as evidence supporting Mr. Jurgovan's

"fabrication," Ramsey is mischaracterizing Mr. Jurgovan's

testimony. For example, Ramsey alleges: "Mr. Jurgovan

conceded at his deposition that he had no recollection of a

January 2, 1997 conversation with Messrs. Hogan or Mulder

(JX 2087 44:22 - 45:1.)" (Ramsey Motion at 3.) This charge

is false. The cited portion of Jurgovan's deposition

relates to whether Jurgovan recalled what Hogan said to him

on January 2, 1997, not what Jurgovan told Hogan or

Mulder.[14] Contrary to what Ramsey would have us believe,

Mr. Jurgovan testified under oath: "It is my clear

recollection that that [zipper opening force lower than bond

strength] is something I said to him [Hogan]." (JX2087 at

44:16-17.) Ramsey failed to establish why Mr. Jurgovan

cannot testify as to his memory of events. The same is true

---

[14] The exchange between Mr. Jurgovan and Ramsey's counsel in the Jurgovan deposition at JX2087, p. 40 relates to whether Mr. Jurgovan recalled if the January 2, 1997 discussions with Hogan and Mulder took place through one joint phone call. With respect to the exchange at JX2087, p. 61, Ramsey has not established that Mr. Jurgovan's answer relates to the deposition testimony that he disclosed the invention to Hogan and Mulder on January 2, 1997.

with respect to the Reaves and Keel declarations.  In any event, it appears to us that Ramsey's attack goes to credibility and weight, not admissibility.

Accordingly, Ramsey's motion as to these evidentiary documents is denied.

Ramsey also contends that Jurgovan's notebook entries as to his telephone conversation with Hogan and Mulder should be excluded because they are inadmissible hearsay in that they were not entered simultaneously with the purported events.  (Ramsey Motion at 7-10.)  For example, Ramsey argues that Jurgovan acknowledged that an entry was made on January 24, 1997 for a January 2, 1997 event.  (Ramsey Motion at 9.)

We reject Ramsey's motion on this ground as well because we are not relying on Jurgovan's notes regarding his conversations with Hogan and Mulder on January 2, 1997 for establishing the truth of the matter asserted (i.e., that Jurgovan disclosed the conception to Ramsey on January 2, 1997).  Rather, we admit them for the limited purpose of establishing that during a January 24, 1997 conference between inventor Jurgovan and non-inventor Callahan, Callahan was made aware of the January 2, 1997 telephone discussion(s) in which Jurgovan disclosed the conception to Hogan and Mulder.  In other words, the notes with respect to the January 2, 1997 telephone discussions are admitted as

69

Interference No. 105,173                                         Paper 94

basis for Callahan's corroborative testimony, not for the
fact that Jurgovan disclosed the conception to Hogan and
Mulder on January 2, 1997.  Moreover, Ramsey's argument
based on the lateness of the entry of the notes regarding
the telephone conversation appears to relate to credibility
and weight, not admissibility.  Thus, we disagree with
Ramsey that these notes should be excluded as inadmissible
hearsay.

Lastly, Ramsey urges that Mr. Jurgovan's testimony as
to the September 1997 reduction to practice is irrelevant
and should be excluded.  (Ramsey Motion at 12.)  We
disagree.  Mr. Jurgovan's testimony is relevant to the issue
that the conception was reduced to practice without
extensive research or experimentation.  To the extent that
the admissibility of Mr. Jurgovan's testimony is attacked on
grounds of credibility and weight, we deny it as well.

Judgment is entered against Ramsey in a separate paper.

Interference No. 105,173                                    Paper 94


                    /Richard Torczon/_____ _____)
                    RICHARD TORCZON                )
                    Administrative Patent Judge    )
                                                   )
                                                   )
                    /Romulo H. Delmendo/_____) BOARD OF PATENT
                    ROMULO H. DELMENDO             )
                    Administrative Patent Judge    )   APPEALS AND
                                                   )
                                                   ) INTERFERENCES
                                                   )
                    /Sally C. Medley/_____)
                    SALLY C. MEDLEY                )
                    Administrative Patent Judge    )



cc (via e-mail):

Attorney for JURGOVAN:
JOSEPH A. HYNDS, ESQ.
e-mail: jhynds@rothwellfigg.com

Attorney for RAMSEY:
GERALD LEVY, ESQ.
e-mail: glevy@pitneyhardin.com

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ILLINOIS TOOL WORKS INC., a Delaware corporation

## DEFENDANTS

FRITO-LAY NORTH AMERICA, INC., f/k/a RECOT, INC., a Delaware corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM ADDRESS AND TELEPHONE NUMBER)
William M. Lafferty (#2755)
Rodger D. Smith, II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, Delaware  19801
(302) 658-9200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgement
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

#### PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

#### PERSONAL INJURY
☐ 362 Personal Injury - Med Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

#### PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
HABEAS CORPUS:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R R & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl Ret Inc Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☒ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant
☐ 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed From State Court
☐ 3 Remanded From Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred From another district (specify) ____
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgement

## VI. CAUSE OF ACTION    (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

35 U.S.C. § 146

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY (See Instructions)

JUDGE ____

DOCKET NUMBER ____

DATE  1/27/06

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ____   AMOUNT ____   APPLYING IFP ____   JUDGE ____   MAG. JUDGE ____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 5 4 _____

## **ACKNOWLEDGMENT**
## **OF RECEIPT FOR AO FORM 85**

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___ 2 ___ COPIES OF AO FORM 85.

1/27/2006
(Date forms issued)

John Ryan Plochary
(Signature of Party or their Representative)

John Ryan Plocharz
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action