# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ILLINOIS TOOL WORKS INC., )
)
               Plaintiff, )
)
    v. )    Civil Action No. 06-054-GMS
)
)
FRITO-LAY NORTH AMERICA, INC., f/k/a )
RECOT, INC., )
)
             Defendant. )

**APPENDIX ACCOMPANYING OPENING BRIEF IN SUPPORT OF REQUEST BY FRITO-LAY NORTH AMERICA, INC. THAT THE COURT DETERMINE THAT THE ISSUE OF UNPATENTABILITY OF THE CONTESTED SUBJECT MATTER MAY NOT BE LITIGATED IN THIS ACTION UNDER 35 U.S.C. § 146**

YOUNG CONAWAY STARGATT & TAYLOR LLP
John W. Shaw (#3362) [jshaw@ycst.com]
Karen L. Pascale (#2903) [kpascale@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: 302-571-6600

*Of Counsel:*

Joseph A. Hynds
Glenn E. Karta
Lisa N. Phillips
ROTHWELL, FIGG, ERNST
 & MANBECK
1425 K Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 783-6040

January 31, 2007

065476.1001

## APPENDIX TABLE OF CONTENTS

Ramsey List of Preliminary Motions, dated January 20, 2004 ...............................................A1

Decision on Preliminary Motions, dated November 17, 2004................................................A4

Ramsey Motion for Judgment (Based on Priority and Derivation), dated
March 25, 2005 ..................................................................................................................A26

Jurgovan Opposition to Ramsey Motion for Judgment (Based on Priority
and Derivation), dated May 13, 2005 ...................................................................................A52

Ramsey Opposition to Jurgovan Motion for Judgment (Based on
Derivation and Priority), dated May 13, 2005 .......................................................................A81

Jurgovan Reply in Support of Jurgovan Motion for Judgment (Based on
Priority and Derivation), dated June 16, 2005 .......................................................................A108

Ramsey Reply Brief (Based on Derivation and Priority), dated June 16,
2005......................................................................................................................................A137

Decision on Motions for Judgment and Motions to Exclude Evidence,
dated November 29, 2005 ......................................................................................................A154

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on January 31, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Rodger D. Smith, III, Esquire
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19801
rsmith@mnat.com

I further certify that I caused a copy of the foregoing document to be served by e-mail and hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### *By E-mail and FedEx*

Gerald Levy, Esquire
PITNEY HARDIN LLP
7 Times Square, 20th Floor
New York, NY 10036-7311
glevy@pitneyhardin.com

Richard H. Brown, III, Esquire
PITNEY HARDIN LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
rbrown@pitneyhardin.com

YOUNG CONAWAY STARGATT & TAYLOR LLP

January 31, 2007

/s/ *Karen L. Pascale*
Karen L. Pascale (No. 2903) [kpascale@ycst.com]
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Phone: 302-571-6600
  *Attorneys for Defendant,*
  *Frito-Lay North America, Inc.*

Paper _____

Filed on behalf of Illinois Tool Works Inc.
By:          Gerald Levy, Esq.
              Lindsay S. Adams, Esq.
              Ronald E. Brown, Esq.
              Bridget A. Cooney, Esq.
              PITNEY HARDIN KIPP & SZUCH LLP
              685 Third Avenue
              New York, NY 10017-4024
              Tel: 212-297-5800
              Fax: 212-682-3485

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

MARC A. **JURGOVAN** and MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application 09/372,646),

v.

RONALD L. **RAMSEY**, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application 09/481,723)

---

Patent Interference No. 105,173

---

RAMSEY LIST OF PRELIMINARY MOTIONS

1136288A01012004

**A1**

In response to the "NOTICE DECLARING INTERFERENCE" mailed December 8, 2003, Illinois Tool Works Inc., hereby submits a list of Preliminary Motions under 37 C.F.R. §1.633 that are intended to be filed:

    (1)    A Preliminary Motion under 37 C.F.R. §1.633(a) for anticipation based on prior art under 35 U.S.C. §102(f); and

    (2)    A Preliminary Motion under 37 C.F.R. §1.633(a) for obviousness based on prior art under 35 U.S.C. §102(f).

In addition, Illinois Tool Works Inc., hereby submits a list of additional motions that are intended to be filed to support its Preliminary Motions under 37 C.F.R. §1.633(a):

    (3)    A Miscellaneous Motion under 37 C.F.R. §1.635 to Request Testimony; and

    (4)    A Miscellaneous Motion under 37 C.F.R. §1.635 to Request Discovery pursuant to 37 C.F.R. §1.687(c).

Respectfully submitted,

Lindsay S. Adams
Reg. No. 36,425

Backup Counsel for RAMSEY

Pitney, Hardin, Kipp & Szuch LLP
685 Third Avenue
New York, NY 10017
212-297-5800

**A2**

<u>CERTIFICATE OF FACSIMILE</u>

I hereby certify a true copy of the foregoing "RAMSEY LIST OF

PRELIMINARY MOTIONS" was filed on January 20, 2004, with the Board of Patent Appeals

and Interferences by facsimile at 703-305-0942.


<u>CERTIFICATE OF SERVICE</u>

I hereby certify, pursuant to 37 C.F.R. §1.646, a true copy of the foregoing

"RAMSEY LIST OF PRELIMINARY MOTIONS", filed herewith, was served by facsimile on:


ROTHWELL, FIGG, ERNST & MANBECK, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
Tel.: 202-783-6040


Date:    January 20, 2004

Lindsay S. Adams
Reg. No. 36,425

Backup Counsel for RAMSEY


1136305A01012004

**A3**

The opinion in support of the decision being
entered today is not binding precedent of the Board.

Paper 47

Filed by: Trial Section Motions Panel
Mail Stop Interference
P.O. Box 1450
Alexandria, VA   22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

Filed
17 November 2004

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

MARC A. **JURGOVAN** and MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application 09/372,646),

v.

RONALD L. **RAMSEY**, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application 09/481,723).

Patent Interference No. 105,173

Before: McKELVEY, Senior Administrative Patent Judge, and LEE, and MEDLEY,
Administrative Patent Judges.

MEDLEY, Administrative Patent Judge.

### DECISION ON PRELIMINARY MOTIONS

#### A.   Introduction

This interference was declared on 8 December 2003.  Jurgovan, through its preliminary

motion 1, moves for judgment against Ramsey on the ground that Ramsey claims 31-33, 35-39

**A4**

and 41-47 are unpatentable under 35 U.S.C. § 112, ¶ 1, for lack of written description (Paper 25).

Jurgovan filed preliminary motion 2 requesting that claims 15-26 of Jurgovan application

09/372,646 ('646) be designated as not corresponding to count 1 and that claims 6-9, 21 and 22

of Jurgovan patent 5,972,396 ('396) be designated as not corresponding to count 2 (Paper 26).

Ramsey filed a responsive preliminary motion 1, to add claims 48-62 to its application

(Paper 30). Ramsey filed a responsive preliminary motion 2, to substitute counts 3 and 4 for

counts 1 and 2 (Paper 31).

Neither party requested oral argument. For the reasons that follow, Jurgovan preliminary

motions 1 and 2 are <u>denied</u>. Ramsey preliminary motions 1 and 2 are <u>dismissed</u>.

## B. Findings of fact[1]

1. Jurgovan is involved on the basis of application 09/372,646, filed 12 August 1999,

and patent 5,972,396, granted 26 October 1999, based on application 09/079,382, filed 15 May

1998.

2. Jurgovan has been accorded benefit for the purpose of priority of application

09/079,382, filed 15 May 1998, now patent 5,972,396, granted 26 October 1999, for the involved

application.

3. Ramsey is involved on the basis of application 09/481,723, filed 12 January 2000.

4. Ramsey has been accorded benefit for the purpose of priority of application

09/036,232, filed 6 March 1998, now patent 6,030,122, granted 29 February 2000.

5. Jurgovan real party in interest is Recot, Inc. (Paper 4).

---

[1]    The following findings of fact as well as those contained elsewhere in this opinion are
supported by a preponderance of the evidence.

6. Ramsey real party in interest is Illinois Tool Works Inc. (Paper 11).

7. Count 1 is as follows:

Claim 1 of Jurgovan Application 09/372,646

or

Claim 42 of Ramsey Application 09/481,723

8. Count 2 is as follows:

Claim 1 of Jurgovan Patent 5,972,396

or

Claim 31 of Ramsey Application 09/481,723

9. Jurgovan '646 claim 1 is identical to Ramsey claim 42 and is as follows:

In combination:

a) a flexible package having a elastomeric front wall and an elastomeric rear wall;

said front wall and said rear wall being sealed together at a top seal;

a first zipper part attached to an inside surface of said front wall and having a first engagement member facing said rear wall;

a second zipper part attached to an inside surface of said rear wall and having a second engagement member facing said front wall;

said first and second engagement members being engaged together;

said top seal being manually pinch-grip openable and said first and second engagement members being manually pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

- 3 -

**A6**

said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening; and

b) a food product stored inside said package below said first and second engagement members.

10. Jurgovan '396 claim 1 is identical to Ramsey claim 31 and is as follows:

A method of opening and re-closing a flexible package containing a food product, comprising the steps of:

1) providing in combination:

a) a flexible package having a elastomeric front wall and an elastomeric rear wall;

said front wall and said rear wall being sealed together at a top seal;

a zipper having first and second zipper parts;

said first zipper part attached to an inside surface of said front wall and having a first engagement member facing said rear wall;

said second zipper part attached to an inside surface of said rear wall and having a second engagement member facing said front wall;

said first and second engagement members being engaged together;

said top seal and said first and second engagement members being pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening;  and

b) a food product stored inside said package below said first and second engagement members;

2) pinch-grip opening said package by manually pulling with a force of at least said pinch-grip pulling force opposite sides of said package below said zipper to open both said zipper, by disengaging said first and second engagement members,

– 4 –

**A7**

and said top seal from the product side outward in a single pinch-grip opening step;

3) removing a portion of said food product from said package;

4) re-closing said package by manually re-engaging said first and second engagement members.

11. The claims of the parties are:

| | |
|---|---|
| Jurgovan '646 application: | 1-26 |
| Jurgovan '396 patent: | 1-31 |
| Ramsey: | 31-33, 35-39 and 41-47 |

12. The claims of the parties which correspond to Count 1 are:

| | |
|---|---|
| Jurgovan '646 application: | 1-26 |
| Jurgovan '396 patent: | none |
| Ramsey: | 42-47 |

13. The claims of the parties which correspond to Count 2 are:

| | |
|---|---|
| Jurgovan '646 application: | none |
| Jurgovan '396 patent: | 1-31 |
| Ramsey: | 31-33, 35-39 and 41 |

14. The level of ordinary skill in the art is defined by the prior art of record.

C.    **Decision**

*Jurgovan preliminary motion 1*

Jurgovan moves under 37 CFR § 1.633(a) for judgment against Ramsey on the ground that all of Ramsey's involved claims 31-33, 35-39 and 41-47 are unpatentable under 35 U.S.C.

§ 112, ¶ 1, for lack of written description. As the moving party, Jurgovan bears the burden to demonstrate that it is entitled to the relief sought. 37 CFR § 41.208(b).

Jurgovan argues that Ramsey's specification fails to provide support for "said front and rear walls having sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening" which is recited in Ramsey independent claims 31 and 42 (Paper 25 at 12).

Whether Ramsey has provided adequate written description, either explicitly or inherently, must be determined from the disclosure considered as a whole. Reiffin v. Microsoft Corp., 214 F.3d 1342, 1345, 54 USPQ2d 1915, 1917 (Fed. Cir. 2000). Satisfaction of the written description requirement does not require the description of claim terms to be ipsis verbis antecedence in the originally filed application. In re Lukach, 442 F.2d 967, 969, 169 USPQ 795, 796 (CCPA 1971). Furthermore, the written description requirement may be satisfied if the descriptive matter must necessarily be present in the specification such that one skilled in the art would recognize such a disclosure. Tronzo v. Biomet, Inc., 156 F.3d 1154, 1159, 47 USPQ2d 1829, 1834 (Fed. Cir. 1998).

Jurgovan has presented no evidence of what one of ordinary skill in the art would understand from reading Ramsey's disclosure. Instead, Jurgovan relies on attorney argument, which is insufficient. See Estee Lauder Inc. v. L'Oreal, S.A., 129 F.3d 588, 595, 44 USPQ2d 1610, 1615 (Fed. Cir. 1997) (Argument of counsel cannot take the place of evidence lacking in the record).

For this reason alone, Jurgovan preliminary motion 1 is denied.

- 6 -

**A9**

Although not necessary to this opinion, we nonetheless address Jurgovan's unsupported attorney arguments. Jurgovan has failed to sufficiently demonstrate that the claimed limitation of having sufficient strength to resist tearing and deformation under the application of a pinch-grip pulling force during pinch-grip opening is not an inherent and necessary feature present in the Ramsey specification. Although Jurgovan argues that Ramsey does not inherently describe the claimed feature, Jurgovan does not, in any meaningful way, tell us why that is so. Jurgovan argues:

> The '723 application discloses only that the front and rear walls are made from a polymeric film, and that the package can be opened by pulling on front and rear walls below the zipper. However, there is nothing explicit or inherent in the '723 application to suggest that the front and rear panels have sufficient strength to resist tearing and deformation under a pinch-grip pulling force during pinch-grip opening. Clearly, front and rear wall materials might be used (inadvertently or otherwise) which would tear or deform under a pinch-grip pulling force. This is especially true where, as here, the '723 application provides no guidance or suggestion as to any of these issues, failing entirely to mention or discuss wall strength, resisting tearing or deformation, pinch-grip pulling forces, or the relation between the two. The '723 application simply provides no evidence that this was ever considered. (Paper 25 at 14-15).

Throughout Ramsey's involved specification, Ramsey describes a reclosable and thus reusable package. Upon initial opening, the package may be reclosed to retain the food that remains in the package (Jurgovan 2003 at 2, lines 22-31). A package that is reclosable and thus reusable would appear to be inherently strong enough to withstand, for example, tearing of the package upon opening. Otherwise, the package would not be reclosable or reusable. Jurgovan has failed to demonstrate otherwise.

Jurgovan has not provided evidence of what one of ordinary skill in the art would have understood Ramsey's specification to convey with respect to the described reclosable package. Jurgovan does not even address those passages throughout Ramsey's specification that describe a

**A10**

reclosable package.  By not addressing the described "reclosable" feature, Jurgovan has failed to

sufficiently demonstrate that the disputed limitation is not inherent and necessarily present in the

Ramsey specification.

Jurgovan further argues that during prosecution of Ramsey's involved application Ramsey

had acknowledged that the "sufficient strength" limitation is separate and distinct from pinch-

grip opening.  Even if that is the case, it is of no moment here, because the basis of our opinion is

not that pinch-grip opening and suffient strength in the front and rear walls to resist tearing and

deformation bare no patentable distinction.  Rather, it is Jurgovan's failure to account for the

recloseable feature disclosed in Ramsey's specification in connection with the lack of inherency

argument that undermines the motion.

Jurgovan preliminary motion 1 is <u>denied</u>.  Since Jurgovan's preliminary motion 1 fails to

make a <u>prima</u> <u>facie</u> case, we need not and have not considered Ramsey opposition 1, or Jurgovan

reply 1.

### *Jurgovan preliminary motion 2*

Jurgovan moves to designate its '646 application claims 15-26 as not corresponding to

count 1, and to designate its '396 patent claims 6-9, 21 and 22 as not corresponding to count 2.

Jurgovan seeks to demonstrate that none of its '646 claims 15-26 and its '396 claims 6-9, 21 and

22 are anticipated or rendered obvious by any one of Ramsey's involved claims (Paper 26 at 10).

In connection with its preliminary motion 2, Jurgovan's arguments with respect to

nonobviousness, e.g., the scope of the Ramsey and Jurgovan claims, the differences between

those claims, and what the prior art teaches, with respect to all of the Jurgovan claims it seeks to

undesignate is based on attorney argument alone.  Jurgovan does not direct our attention to

evidence of the record, e.g., a declaration, that would support Jurgovan's conclusions. For example, in connection with Jurgovan claims 15 and 16, Jurgovan argues that the prior art reclosable packages require an opening force from within the package that is greater than the force required to open the package from outside the package. Jurgovan then concludes that zippers of the prior art reclosable packages could not be made openable upon application of the low opening force that is recited in Jurgovan claims 15 and 16, especially so low an opening force applied below the zipper (Paper 26 at 13). That conclusion, however, is apparently not based on knowledge of one of ordinary skill, but is based on attorney's unsupported assertions. As discussed above, in connection with Jurgovan preliminary motion 1, attorney argument is insufficient to establish entitlement to the relief requested. For this reason alone, Jurgovan's preliminary motion 2 is <u>denied</u>.

Although not necessary to the decision to deny Jurgovan preliminary motion 2, we make the following observations with respect to Jurgovan's attorney arguments.

Jurgovan '646 claims 15 and 16 each depend from claim 1 and are as follows:

15. The combination of claim 1, wherein said first and second engagement members are manually pinch-grip openable under a pinch-grip pulling force of less than about $2\frac{1}{2}$ lbs/inch.

16. The combination of claim 1, wherein said first and second engagement members are manually pinch-grip openable under a pinch-grip pulling force of between about $1\frac{1}{2}$ to 2 lbs/inch.

Jurgovan argues, and we agree, that no Ramsey claim that is designated as corresponding to count 1 recites the specific pinch-grip pulling force specified in either of Jurgovan '646 claims 15 or 16.

– 9 –

**A12**

In arguing that none of Ramsey's claims 42-47 render obvious Jurgovan '646 claims 15 and 16, Jurgovan states that:

As established during prosecution of both Jurgovan's and Ramsey's claims, the prior art does not teach a package that is openable upon application of a pinch-grip pulling force below the zipper to open the zipper and the top seal from the product side outward. JX 2012, at 8; JX 2013, at 11. In developing the claimed invention, Jurgovan and his co-inventor discovered that one way a practical pinch-grip openable package can be achieved is by providing a zipper having a relatively low zipper engagement strength of, for example, less than $2^{1}/_{2}$ lbs/inch and preferably between $1^{1}/_{2}$ to 2 lbs/inch, when opened from inside the package. JX 2001, col. 7, lines 46-48; JX 2002, at 14. In the preferred application of the invention contemplated by Jurgovan, the food product that would be stored in the reclosable package would be snack food chips, a relatively light-weight material. JX 2001, at col. 1, lines 14-17, col. 7, line 66 - col. 8, line 2; JX 2002, at 1, 14. Such a light-weight material would not put a great deal of load on the zipper when the reclosable package is inverted.

With prior art reclosable packages, on the other hand, the material to be contained in the package could potentially be much heavier than snack food chips, for example, soup or chilli. Such heavy package contents could well cause the zipper to undesirably disengage when the package is inverted. Thus, in prior art reclosable packages that are not pinch-grip openable, the force required to open the package from within the package is preferably greater than the force required to open the package from outside the package. See, e.g., JX 2015, col. 1, lines 26-28, 54-56, col. 2, lines 31-34, col. 6, lines 35-38. The zippers of prior art reclosable packages could not be made openable upon application of so low an opening force as recited in claims 15 and 16, especially so low an opening force applied below the zipper.

Ramsey's claims 42-47 do not disclose nor in any way suggest specific pinch-grip forces under which the engagement members are openable, and these claims certainly do not disclose or suggest the specific forces recited in claims 15 and 16. Thus, claims 15 and 16 are not obvious in view of Ramsey's claims 42-47 (as "prior art").

Moreover, there is no teaching in the prior art from which one of ordinary skill might have been motivated to employ engagement members that can be opened by a pinch grip force of less than $2^{1}/_{2}$ lbs/inch or between $1^{1}/_{2}$ to 2 lbs/inch in the pinch-grip openable package of Ramsey's corresponding claims. (Paper 26 at 12-13).

Jurgovan acknowledges that the prior art, e.g., Tilman[2], teaches that the force required to open a zipper of a reclosable package from either the outside or the inside can be adjusted by varying the configuration of the male and female engagement members (e.g., the zipper members) (Jurgovan 2002 at 13, lines 24-28). Yet, Jurgovan concludes that there would have been no motivation to use a low opening force to open the prior art zippers such as those taught in Tilman, since the prior art zippers would not open at such low forces. That is so, Jurgovan argues, because the prior art packages, e.g., ones that are not pinch-grip openable have zippers that are constructed so that heavy items contained in the package, e.g., soup or chili would not break the zipper seal if the package is turned upside down.

Jurgovan's analysis is based on what Tilman alone teaches, and not whether it would have been obvious to combine the presumed prior art of Ramsey claim 42, for example, with the teachings of Tilman. For example, Jurgovan concludes that since Tilman does not teach a pinch-grip openable package, that it would not have been obvious to design the Tilman package zipper to open at such low forces as claimed in Jurgovan claim 15 and 16. Jurgovan's argument is misplaced. Ramsey claim 42 recites a pinch-grip openable package. Thus, the presumption, or starting point is that such packages were known. Jurgovan should have explained why it would not have been obvious to vary the zipper of a pinch-grip openable package to accommodate a low pinch-grip force, especially in light of Tilman which Jurgovan acknowledges teaches varying the construct of the zipper to accommodate the particular force required to open the zipper.

---

[2]    U.S. Patent 5,558,613, granted 24 September 1996, based on application 08/337,569, filed 10 November 1994. (Jurgovan 2015).

- 11 -

**A14**

Jurgovan '646 independent claim 17 is as follows:

17.  In combination:

a) a flexible package, including front and rear walls, said front and rear walls being laminated plastic walls including at least one inner sealable layer and at least one outer wall layer,

a bottom seal formed between lower sides of said front and rear walls;

a top seal formed between upper sides of said front and rear walls, said top seal including a seal between said inner sealable layers;

a zipper located within said package proximate said top seal, said zipper having a first zipper part having a first engagement member extending lengthwise along said zipper part and a widened base having at least two points of sealant behind said base;

said zipper also having a second zipper part having a second engagement member extending lengthwise along said zipper part and a widened base having at least two points of sealant behind said base;

said first engagement member being engaged with said second engagement member;

said at least two points of sealant on said first zipper part being sealed to said inner layer of one of said front and rear walls and said at least two points of sealant on said second zipper part being sealed to said inner layer of the other of said front and rear walls;

said seal between said inner sealable layers being openable by de-lamination and said engagement between said engagement members of said zipper being disengaged upon the application of a predetermined pinch-grip pulling force applied to each of said front and rear walls below said zipper; and

b) food product stored within said package between said closed zipper and said bottom seal.

Jurgovan claims 18-26 depend either directly or indirectly from claim 17.  Jurgovan '646 claim 17 recites a first zipper part having a widened base with at least two points of sealant behind the base, and a second zipper part having a widened base with at least two points of

sealant behind the base. Jurgovan refers to this feature as the "four point sealant attachment" feature.

Once again, Jurgovan relies on attorney argument to conclude that Jurgovan claims 17-26 with the four-point sealant attachment feature are nonobvious. For reasons already discussed earlier in this decision, Jurgovan's attorney argument fails. Nonetheless, we make the following observations regarding Jurgovan's argument of nonobviousness.

Initially, we agree with Jurgovan that Ramsey claim 42, for example does not specifically recite that each of the two zipper parts are attached at two points behind the base of each zipper part with sealant. Ramsey claim 42 does recite a first zipper part "attached to an inside surface" of the front wall of the package and a second zipper part "attached to an inside surface" of the rear wall of the package. Thus, Ramsey claim 42 requires that the zipper parts are attached, but does not specify how each zipper part is attached.

Although Jurgovan recognizes that the prior art May[3] teaches packages with zipper members which have two points of sealant in the widened bases of both zipper parts, Jurgovan concludes that the teachings of May would not apply to a package that is pinch-grip openable (Paper 26 at 16). Jurgovan has failed to explain, however, why that is so.

Jurgovan should have explained why the design of a package that is pinch-grip openable would not lend itself to having the zipper parts attached to the walls of the package in the four point configuration as taught by the prior art. Both May and the Jurgovan invention are directed to reclosable packages, where the package is resealed with a zipper. The Jurgovan package is

---

[3]     U.S. Patent 5,470,156, granted 28 November 1995, based on application 08/225,864, filed 11 April 1994 (Jurgovan 2014).

initially opened by grasping the walls of the package and pulling, whereby both the top seal and the zipper are opened (Jurgovan 2002 at 5, lines 7-11, Fig. 1). May teaches cutting the top of the package, and then pulling apart, from the top of the package the sides of the package in order to pull apart the reclosable zipper, and a pealable seal (Jurgovan 2014, col. 5, lines 59-67, col. 9, line 65 to col. 10, line 1).

Both the Jurgovan and May packages are reclosable by way of a zipper. The different opening methods of the May and Jurgovan packages do not, without more, shed light on why one having ordinary skill in the art would not look to May to teach how to attach the zipper parts. Both May and Jurgovan include reclosable zippers, thus May would, in combination with Ramsey claim 42, appear to render Jurgovan claim 17 obvious. Without an explanation to the contrary, supported by evidence of the record, Jurgovan has failed to sufficiently demonstrate that it is entitled to the relief sought.

Jurgovan's arguments as to what Ramsey's specification teaches are also not persuasive. Initially, Jurgovan has failed to direct us to legal authority that stands for the position that Ramsey's involved specification may be relied on as prior art. Cf. Noelle v. Lederman, 355 F.3d 1343, 1352, 69 USPQ2d 1508, 1516 (Fed. Cir. 2004) (For interference-in-fact determination, the parties' involved specifications are not "prior art.").

Still further, even if it is proper to look to Ramsey's specification for determining obviousness of Jurgovan's claims, Jurgovan has failed to explain as discussed above, why one of ordinary skill in the art would not have been motivated to add two attachment points (resulting in four attachment points as taught by May) to the already two attachment points taught by Ramsey. Jurgovan has failed to explain in any meaningful way, with supporting evidence, why the

- 14 -

**A17**

combination of the teachings of May's attachments to Ramsey's package would not have been obvious.

Jurgovan additionally argues that none of Ramsey's claims recites or renders obvious a package in which "both a top seal opens by delamination and a zipper is disengaged upon application of a pinch-grip pulling force", as claimed in Jurgovan claim 17 (Paper 26 at 16-17). Once again, Jurgovan has failed to sufficiently demonstrate, with supporting evidence why given Ramsey claim 42, for example as prior, Jurgovan claim 17 would not have been obvious.

Both Ramsey claim 42 and Jurgovan claim 17 recite pinch-grip opening of a zipper and a seal. While Ramsey claim 42 does not recite delamination of the seal, Ramsey claim 42 nonetheless recites that the top seal is pinch-grip openable. It is incumbent upon Jurgovan to explain why, given Ramsey as prior art, that it would not have been obvious to open the recited Ramsey top seal through "delamination", whatever that term may mean to one skilled in the art. This is especially so since Jurgovan acknowledges that delamination of a top seal was known in the prior art (Paper 26 at 17).

The reasons why it would not have been obvious to open the top seal through delamination that Jurgovan gives, are all based on the premise that the prior art does not teach the combination of a pinch-grip openable zipper and top seal. However, the starting point is Ramsey's claims, which do recite a pinch-grip openable zipper and top seal. As such, Jurgovan's analysis is flawed.

Jurgovan argues the separate patentability of '646 claims 25 and 26, which depend from claim 17 and are as follows:

**A18**

25. The combination of claim 17, wherein said first and second engagement members are manually pinch-grip openable under a pinch-grip pulling force of less than about $2^1/_2$ lbs/inch.

26. The combination of claim 17, wherein said first and second engagement members are manually pinch-grip openable under a pinch-grip pulling force of between about $1^1/_2$ to 2 lbs/inch.

With respect to Jurgovan '646 claims 25 and 26, Jurgovan provides similar arguments as previously addressed in connection with Jurgovan claims 15 and 16 (Paper 26 at 18-19). For the reasons given in connection with '646 claims 15 and 16, Jurgovan's arguments with respect to '646 claims 25 and 26 are not deemed persuasive.

_____Jurgovan '396 claim 6 depends from claim 1 and is follows:

6. The method of claim 1, further including the step of providing said zipper with a zipper engagement strength of less than about $2^1/_2$ lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

Jurgovan argues that '396 claim 6 should be designated as not corresponding to count 2, since none of Ramsey's claims anticipates or renders obvious the '396 claim 6. With respect to why the '396 claim 6 is not obvious over any of the Ramsey claims, Jurgovan argues that

[I]t would not have been obvious to one of ordinary skill in the art to have employed the specific zipper engagement strength recited in claim 6 in the pinch-grip openable package recited in Ramsey's corresponding claims.

As discussed above with respect to claim 15 of the '646 application, because of the possibility of the zipper coming open when inverted while containing a heavy substance, the zippers of prior art reclosable packages could not be made openable upon application of so low an opening force, especially so low an opening force applied below the zipper.

Thus, there is no teaching in the prior art from which one of ordinary skill might have been motivated to employ a zipper engagement force of $2^1/_2$ lbs/inch or less in the pinch-grip openable package of Ramsey's corresponding claims. Accordingly, claim 6 is separately patentable and therefor does not correspond to Count 2. (Paper 26 at 20).

- 16 -

**A19**

Claim 15 of '646 recites the force needed to open the zipper, not to engage or close the zipper as recited in '396 claim 6. Claim 6 recites that the zipper disengages with a force greater than the engagement strength. The force needed to open is not specified, other than it need be greater than the force required to engage the zipper. Thus, the claim is broad enough to include a force that is infinitely greater than the engagement force of $2^1/_2$ lbs/inch.

Jurgovan's argument with respect to claim 15 of '646 does not appear to be applicable to the '396 claim 6. With respect to the '646 claim 15, Jurgovan argues that the prior art packages could not be made openable upon application of <u>so low</u> an opening force, referring to the opening force of "less than about $2^1/_2$ lbs/inch" recited in claim 15.

However, claim 6 does not require a force of "less than about $2^1/_2$ lbs/inch" to disengage the zipper as that recited in the '646 claim 15. Rather, claim 6 recites that the disengagement force is greater than the engagement strength, and as stated above, may be infinitely greater. Thus, Jurgovan's argument is not commensurate in scope with those limitations recited in claim 6, and to the extent that the rationale for '646 claim 15 does apply to '396 claim 6, the argument is rejected as discussed above in connection with the '646 claim 15.

Jurgovan '396 claim 8 depends from claim 1 and recites:

8. The method of claim 1, further including the step of providing said zipper with a zipper engagement strength of between about $1^1/_2$ to 2 lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

Jurgovan relies on its arguments made in connection with '396 claim 6 to argue that '396 claim 8 should be designated as not corresponding to count 2 (Paper 26 at 23). For the reasons given above, Jurgovan's argument made in connection with '396 claim 6 is not persuasive and thus is also not persuasive with respect to '396 claim 8.

- 17 -

**A20**

Jurgovan '396 claim 7 depends from claim 4.  Jurgovan '396 claims 4 and 7 are as

follows:

4.  The method of claim 1, further including the step of providing said top seal with an engagement strength of less than about 3 lbs/inch, such that said top seal disengages upon a pinch-grip pulling force greater than said engagement strength.

7.  The method of claim 4, further including the step of providing said zipper with a zipper engagement strength of less than about $2^1/_2$ lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

Jurgovan argues that its '396 claim 7 is nonobvious over any of Ramsey's claims for the

following reasons:

As explained above with respect to claim 6 (and claim 15 of the '646 application), the relatively low zipper engagement force recited in claim 7 is one way to achieve a pinch-grip openable package.  But achieving a pinch-grip openable package by employing a zipper with such a low engagement strength would not have been obvious to a person of ordinary skill because of the risk that such a package could inadvertently open if inverted with a heavy material contained therein.

Furthermore, for certain embodiments, pinch-grip openability is facilitated by employing a package in which the zipper engagement strength is less than or equal to the top seal engagement strength.  In some embodiments, the means by which the zipper members are attached to the elastomeric walls of the package is the same means by which the walls of the package are attached to each other to form the top seal.  If the strength of the top seal, which would also be the strength of the zipper-package wall bond, is less than the zipper engagement strength, the zipper would strip off the package before the zipper members disengage from one another.  Thus, for such an embodiment, it is important that the zipper engagement force be equal to or less than the top seal strength to ensure that the zipper members are not pulled off the package walls during pinch-grip opening.

There is no teaching in the prior art from which one of ordinary skill in the art might have been motivated to employ a zipper engagement force of $2^1/_2$ lbs/inch or less, in combination with a top seal strength of 3 lbs/inch or less, in the pinch-grip openable package of Ramsey's corresponding claims (Paper 26 at 21-22).

In essence, Jurgovan makes two arguments as to why its claim 7 is nonobvious over

Ramsey's claims.  The first is similar to the argument made in connection with, for example '396

–  18  –

**A21**

claim 6 - that it would not have been obvious to employ a zipper with such a low engagement strength. That argument has already been addressed and found not to be persuasive. The second argument advanced by Jurgovan is that the combination of a zipper engagement force that is equal to or less than the top seal strength would not have been obvious. This argument has not been previously addressed.

Jurgovan's argument as to the nonobviousness of the combination of zipper engagement strength that is less than or equal to the top seal strength, as with all of Jurgovan's arguments is unsupported by evidence of the record, and for that reason alone is not persuasive. Moreover, Ramsey claim 31 recites the step of "pinch-grip opening said package by manually pulling with a force of at least said pinch-grip pulling force opposite sides of said package below said zipper to open both said zipper, by disengaging said first and second engagement members, and said top seal from the product side outward in a single pinch-grip opening step." Jurgovan has failed to discuss in any meaningful way why given Ramsey claim 31, for example, which recites a pinch-grip pulling force to open the zipper and the top seal, its claim 7 would not have been obvious. Again, the starting point is Ramsey's claim, and not what other prior art alone teaches.

Jurgovan '396 claim 9 depends from claim 4 and recites:

9. The method of claim 1, further including the step of providing said zipper with a zipper engagement strength of between about $1\frac{1}{2}$ to 2 lbs/inch, such that said engagement portions disengage upon a pinch-grip pulling force greater than said zipper engagement strength.

Jurgovan's argument in connection with '396 claim 9 is essentially the same made in connection with '396 claim 7. For the reasons given above in connection with '396 claim 7, Jurgovan's argument with respect to its claim 9 is not persuasive.

Jurgovan '396 claim 21 depends from claim 1 and is as follows:

- 19 -

**A22**

21. The method of claim 1, wherein:

a) said step of providing said flexible package further includes,

    i) providing said front and rear walls as laminated plastic walls including at least one inner sealable layer and at least one outer wall layer,

    ii) providing said top seal as a seal between said inner sealable layers, said seal between said inner sealable layers being openable by de-lamination; and

b) during said step of pinch-grip opening, said top seal opens by delamination.

Jurgovan's argument in connection with '396 claim 21 is essentially the same made in connection with '646 claim 17 (Paper 26 at 24). For the reasons given above in connection with '646 claim 17, Jurgovan's argument with respect to '396 claim 21 is not persuasive.

For all of the reasons given above, Jurgovan preliminary motion 2 is <u>denied</u>.

<u>Ramsey preliminary motions 1 and 2</u>

Ramsey filed a responsive preliminary motion 1 to add claims 48-62 to Ramsey's involved application. Ramsey filed a responsive preliminary motion 2 to substitute Count 3 for Count 1 and to substitute Count 4 for Count 2. The motions were filed in response to Jurgovan's

preliminary motion 1 for judgment against Ramsey on the ground that Ramsey claims 31-33, 35-39 and 41-47 are unpatentable under 35 U.S.C. § 112, ¶ 1.  Since Jurgovan preliminary motion 1 is denied, there is no occasion to consider Ramsey's responsive preliminary motions 1 and 2.

Ramsey preliminary motions 1 and 2 are <u>dismissed</u> as moot.


/s/    FRED E. McKELVEY, Senior           )
       Administrative Patent Judge        )
                                          )BOARD OF PATENT
       JAMESON LEE                        )  APPEALS AND
       Administrative Patent Judge        ) INTERFERENCES
                                          )
       SALLY C. MEDLEY                     )
       Administrative Patent Judge        )


- 21 -

**A24**

cc (via e-mail):

Attorney for Jurgovan:

Mr. Joseph A. Hynds
e-mail: jhynds@rothwellfigg.com


Attorney for Ramsey:

Mr. Gerald Levy
e-mail: glevy@pitneyhardin.com

**A25**

Paper ____

Filed on behalf of Illinois Tool Works Inc.
By:          Gerald Levy, Esq.
             Lindsay S. Adams, Esq.
             Ronald E. Brown, Esq.
             PITNEY HARDIN LLP
             7 Times Square
             New York, NY 10036-7311
             Tel: 212-297-5800
             Fax: 212-682-3485

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

_____

MARC A. **JURGOVAN** and MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application 09/372,646),

v.

RONALD L. **RAMSEY**, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application 09/481,729)

_____

Patent Interference No. 105,173

_____

**RAMSEY MOTION FOR JUDGMENT**
**(Based on Priority and Derivation)**

## STATEMENT OF PRECISE RELIEF REQUESTED

Ronald L. Ramsey, Arthur Malin, Robert Hogan, Lawrence Share, and Richmond M. Scott (collectively, "Ramsey") move, pursuant to 37 C.F.R. §41.121(a)(1)(iii), for judgment against Marc A. Jurgovan and Martin B. Dierl (collectively, "Jurgovan") on the ground that Ramsey is entitled to priority because Ramsey: (1) was the first to conceive the inventions defined by counts 1 and 2 (the "Inventions") and to reduce the inventions to practice; and (2) exercised reasonable diligence from before any conception by Jurgovan through the date on which Ramsey reduced the Inventions to practice. Claims 1-26 of Application No. 09/372,646 and claims 1-31 of Patent No. 5,972,396 are therefore unpatentable to Jurgovan under 35 U.S.C. §102(g) because Jurgovan was not the first to invent the subject matter defined by these claims.

Ramsey also moves, pursuant to 37 C.F.R. §41.121(a)(1)(iii), for judgment against Jurgovan on the ground that Jurgovan derived from Ramsey the inventions defined by counts 1 and 2 of this interference. Claims 1-26 of Application No. 09/372,646 and claims 1-31 of Patent No. 5,972,396 are therefore unpatentable to Jurgovan under 35 U.S.C. §102(f) because Jurgovan is not the actual inventor of the subject matter defined by these claims.

## EVIDENCE UPON WHICH RAMSEY RELIES IN SUPPORT OF MOTION

Ramsey's list of evidence in support of this motion is attached as Appendix A.

## STATEMENT OF MATERIAL FACTS SUPPORTING THE MOTION

Ramsey's statement of material facts supporting this motion is attached as Appendix B.

## FULL STATEMENT OF REASONS WHY
## RELIEF REQUESTED SHOULD BE GRANTED

As noted above, and supported by the arguments set forth below, judgment should be entered for Ramsey based on two separate and independent grounds. First, Ramsey was the first to invent the subject matter defined by counts 1 and 2 because Ramsey was the first to conceive

2

**A27**

the subject matter defined by counts 1 and 2 and also the first to reduce to practice the subject matter defined by counts 1 and 2. Second, Ramsey exercised reasonable diligence in reducing the Inventions to practice. Ramsey's diligence continued to the dates of his actual and constructive reductions to practice. As a result, claims 1-26 of Application No. 09/372,646 and claims 1-31 of Patent No. 5,972,396 are unpatentable to Jurgovan under 35 U.S.C. §102(g) because Jurgovan was not the first to invent the subject matter defined by these claims.

Second, Jurgovan is not the inventor of the subject matter defined by counts 1 and 2 because Jurgovan derived the inventions from Ramsey. Ramsey was the first to have conception of the Inventions and then communicated that conception to Jurgovan before any conception by Jurgovan. As a result, claims 1-26 of Application No. 09/372,646 and claims 1-31 of Patent No. 5,972,396 are unpatentable to Jurgovan under 35 U.S.C. §102(f) because Jurgovan is not the true inventor of the subject matter defined by these claims. [1]

## I.    RAMSEY IS ENTITLED TO JUDGMENT UNDER 35 U.S.C. §102(g).

### A.    Applicable Legal Standards For Conception, Corroboration, Reduction To Practice, and Diligence.

Conception is the formation in the mind of an inventor of "a definite and permanent idea of the complete invention, as it is hereafter to be applied in practice." *Burroughs Wellcome Co. v. Barr Labs*, 40 F.3d 1229, 1238, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994), *cert. denied*, 516 U.S. 1070 (1996)(citations omitted). A "definite and permanent idea" in the conception context exists when the idea is so clearly defined in an inventor's mind that only ordinary skill would be

---

[1] As discussed below, Ramsey did not derive the Inventions from Jurgovan. Even if Jurgovan's naked idea for a pinch grip openable bag could be considered "conception" of the Inventions (which Ramsey disputes), such an idea would not be patentable to Jurgovan because he merely derived these ideas from Ramsey or from prior art in existence more than one year before Jurgovan's effective filing date.

3

necessary to reduce the invention to practice without extensive research or experimentation. Conception thus "turns on the inventor's ability to describe the invention with particularity." *Slip-Track Systems, Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1263, 64 USPQ2d 1423, 1427 (Fed. Cir. 2002).

It is beyond dispute that the definite and permanent idea must be of a specific means, not just a desirable end or result. *Chisum on Patents*, §10.04 at 10-71 (collecting authority); *Roensch v. Billner*, 212 F.2d 193, 196, 101 USPQ 281, 283 (CCPA 1954); *Alpert v. Slatin*, 305 F.2d 891, 894, 134 USPQ 296, 299 (CCPA 1962). An inventor must have a specific, settled idea, and not merely a general goal or research plan which he hopes to pursue. *Fiers v. Revel*, 984 F.2d 1164, 1169, 25 USPQ2d 1601, 1605 (Fed. Cir. 1993); *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1206, 18 USPQ2d 1016, 1021 (Fed. Cir. 1989). Thus, simply posing a problem to another cannot constitute conception. *Morgan v. Hirsch*, 728 F.2d 1449, 1452, 221 USPQ 193, 195 (Fed. Cir. 1984). Further, conception is not complete and a "definite and permanent idea" does not exist if the subsequent course of experimentation, especially experimental failures, reveals uncertainty that so undermines the specificity of the inventor's idea that it is not yet a definite and permanent reflection of the complete invention as it will be used in practice. *Amgen*, 927 F.2d at 1207; *Alpert*, 134 USPQ at 299; *Burroughs*, 40 F.3d at 1229; *Bac v. Loomis*, 252 F.2d 57, 117 USPQ 29, 34 (CCPA 1958).

Conception must include every element of the claimed invention. *Slip-Track Systems*, 304 F.3d at 1263. In the interference context, a party must show conception of every feature recited in the interference count, and that every limitation of the count must have been known to the inventor at the time of the conception. *Coleman v. Dines*, 754 F.2d 353, 224 USPQ 857, 862 (Fed. Cir. 1985); *Kwon v. Perkins*, 1998 WL 252493, 6 USPQ2d 1747, 1753 (BPAI 1988). In

4

**A29**

assessing all features, express limitations of the count may not be ignored. *Hitzeman v. Rutter*, 243 F.3d 1345, 1354, 58 USPQ2d 1161, 1170 (Fed. Cir. 2001).

An inventor can prove prior conception using evidence from a variety of sources considered as a whole. *Price v. Symsek*, 988 F.2d 1187, 1196, 26 USPQ2d 1031, 1037-38 (Fed. Cir. 1993). An inventor's testimony alone, however, cannot prove conception. *Gambros Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576, 42 USPQ2d 1378, 1381 (Fed. Cir. 1997), but must be accompanied by corroboration to show conception. *Id.* The Federal Circuit applies a "rule of reason" analysis to determine whether the inventor's testimony has been corroborated and evaluates all evidence to determine the credibility of the inventor's conception. *Price v. Symsek*, 988 F.2d 1187, 1196, 26 USPQ2d 1031, 1037 (Fed. Cir. 1993).

Reduction to practice occurs in the patent interference context when an embodiment of the invention meeting every limitation of the interference count may be shown to have performed as intended. *Newkirk v. Lulejian*, 825 F.2d 1581, 1582, 3 USPQ2d 1793, 1794 (Fed. Cir. 1987). Reduction to practice thus requires: (1) that the invention works for its intended purpose; and (2) the invention is comprised of all limitations in the claim or count, not merely equivalents of the limitations present in the count or claim. *Eaton v. Evans*, 204 F.3d 1094, 1097, 53 USPQ2d 1696, 1698 (Fed. Cir. 2000).

Proof of actual reduction to practice requires that the embodiment relied upon actually worked for its intended purposes. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1445, 223 USPQ 603, 607 (Fed. Cir. 1984). Reduction to practice of an article of manufacture requires that the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. *Field v. Knowles*, 183 F.2d 593, 599, 86 USPQ 373, 379 (CCPA 1950). Reduction to practice of a process requires performance

5

**A30**

of every step of the process and successfully obtaining the result intended by the process. *Corona v. Dovan*, 276 U.S. 358, 383 (1928). The invention need not be in a commercially satisfactory stage of development in order to reduce the invention to practice, although events occurring after an alleged actual reduction to practice can call into practice has in fact occurred. *DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122, 1126, 18 USPQ2d 1152, 1155 (Fed. Cir. 1991). As discussed below, Jurgovan's evaluation of whether zipper technology designed, supplied and tested by Ramsey could be used on a pinch grip openable bag inures to Ramsey's benefit for purposes of reduction to practice. *See Cooper v. Goldfarb*, 154 F.3d 1321, 1331-32, 47 USPQ2d 1896, 1905 (Fed. Cir. 1998).

A party is also entitled to an award of priority if it was the first to conceive coupled with reasonable diligence in reducing the invention to practice. 35 U.S.C. §102(g); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577; 38 USPQ2d 1288, 1290 (Fed. Cir.), *cert. denied*, 524 U.S. 1106 (1999). Diligence is activity toward reduction to practice such that the invention's conception and reduction to practice are "substantially one continuous act." *Id.*

To prove diligence, an inventor must account for the entire critical period by demonstrating activity aimed at reducing to practice and give legally acceptable excuses for any gaps in that activity. *Griffith v. Kanamaru*, 816 F.2d 624, 626, 2 USPQ2d 1361, 1362 (Fed. Cir. 1987). Proof of reasonable diligence does not require a party to drop all other projects or to work constantly on the invention. *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1316, 58 USPQ2d 1891, 1899 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002). The work attributed to reducing the invention to practice must ordinarily be directly related to reduction to practice of the invention. *Naber v. Cricchi*, 567 F.2d 382, 384, 196 USPQ2d 294, 296 (CCPA 1977), *cert. denied*, 439 U.S. 826 (1978). Finally, the activities of the inventor and

6

**A31**

his attorney in deciding to file a patent application and in drafting, reviewing, revising, executing and forwarding the application may be used to establish actual reduction to practice. *Haskell v. Colebourne*, 621 F.2d 1362, 1366, 213 USPQ 192, 196 (CCPA 1982). Attorney diligence can be coupled to engineering diligence toward actual reduction to practice. *Rey-Bellet v. Engelhardt*, 493 F.2d 1380, 1387, 181 USPQ 453, 458 (CCPA 1974).

**B.    Ramsey Was The First To Conceive The Inventions.**

**1.    Pinch Grip Opening And Reclosable Technology In The Prior Art.**

Food packaging designed to be opened with the "pinch-grip" technique was well known in the art prior to Ramsey's invention. (RX 1014 ¶13). Indeed, the Board can take judicial notice of the fact that this was and is the conventional way of packaging salty snacks, such as potato chips. Such packaging commonly utilized bag walls heat-sealed at the top and bottom ends, and opened by "pinch-gripping" the sides of the bag and pulling outward to delaminate the film at the top seal. However, prior packages specifically designed for "pinch-grip" opening did not have zipper technology that would allow a package to be reclosable after being opened. *See* U.S. Patent No. 5,972,396, col. 1, lines 14-26.

In 1996, Frito-Lay (Mr. Jurgovan's employer at the time) approached Minigrip/Zip-Pak (a division of Illinois Tool Works, which employed the Ramsey co-inventors) and expressed interest in having snack food packages with reclosable zippers. (RX 1012, ¶11; RX 1014, ¶11). Minigrip had longstanding experience and expertise in incorporating reclosable zipper technology into form, fill and seal (FFS) methods that enable consumer goods, including a wide variety of food products, to be packaged in reclosable plastic containers. (RX 1012 ¶¶2-4; RX 1010 ¶7). One of Minigrip's FFS technologies particularly well suited for packaging food products employs zipper applied across the film (i.e., "transversely," at a 90° angle to the film

direction) as the film travels in a FFS machine. (RX 1011 ¶12; RX 1012 ¶11). The technology is known as "transverse direction" or "TD". Typically, such a TD bag utilized a conventional zipper and hence required a consumer to open the bag from the top (consumer side) of the bag to access the food contents. (RX 1012 ¶11). In an October 1996 meeting with Mr. Jurgovan, Bob Hogan and Art Malin of Minigrip (two of the Ramsey co-inventors) described the Minigrip technology that could be used to apply zipper on Frito-Lay film, and then form, fill and seal packages using Frito-Lay's bag making equipment. (RX 1011 ¶14; RX 1012 ¶13). They told Mr. Jurgovan and others at the meeting that Minigrip's conventional TD zipper required a 1.5-2.0 lbs./inch force to open the package from the consumer side, and that the internal opening force would be 5-6 lbs./inch to prevent the bag from popping open. (RX 1011 ¶14). Hogan and Malin knew that the Frito-Lay film was a laminate material with relatively low bond strength between the layers and hence would require a low opening force zipper to prevent inadvertent delaminating of the film during the opening process. (RX 1011 ¶14; RX 1012 ¶13)

Before January 1997, Mr. Hogan and others demonstrated a pinch grip openable bag with zipper technology. At a November, 1996 PacExpo trade show attended by Mr. Jurgovan and others at Frito-Lay, Mr. Hogan and Steve Mulder of Bosch Packaging repeatedly demonstrated the opening with a "pinch grip" of a reclosable package formed with TD technology and utilizing Minigrip zipper. (RX 1016 ¶7-8; RX 1012 ¶¶14-16). Although the purpose of opening the TD packages at the trade show was to demonstrate the Minigrip zipper and TD technology, the "pinch-grip" method employed by Messrs. Hogan and Mulder at the demonstration establishes that pinch-grip opening of reclosable zipper bags was known at least as early as November 1996. Representatives of Frito-Lay attended PacExpo and specifically visited the Bosch booth where the demonstration took place. (RX 1012 ¶15-16; RX 1016 ¶7-8; RX 1011 ¶17).

8

**A33**

2.    **Frito Lay's Desire For Minigrip To Develop Zipper Technology For A Food Package That Can Be Opened With A Pinch Grip Technique.**

In early January 1997, Mr. Jurgovan claims to have told Messrs. Hogan and Mulder that Frito-Lay desired to retain the pinch grip openable feature of its salty snack package, but also have zipper technology so as to make it a reclosable package.  (JX 2020, ¶22-31; JX 2033 at 1; JX 2036 at 47).  Jurgovan also requested Minigrip to develop zipper technology for such a package.  Jurgovan also contends that he developed the idea of a lower internal opening force than the conventional Minigrip zipper. (JX 2020, ¶26-31).  However, by that time Minigrip had already told Mr. Jurgovan and others at Frito-Lay that the opening force of the zipper had to be less than the bond strength of the layers of the film to which it was to be attached.  (RX 1011 ¶19; RX 1012 ¶19).  This is true if the package is to be opened from the product side or the consumer side.  Minigrip had vast experience altering the opening (also described as holding) forces both on the product and consumer side of the zipper.  (RX 1012 ¶23).  The varying of the holding force on opposite sides of the zipper was well known in the art at the time of Mr. Jurgovan's request.[2] (*Id.*) Mr. Jurgovan's communication thus represented a request for Minigrip to develop a low internal (i.e. product side) opening force zipper (previously known in the art) that would bond to existing films for salty snack foods  to form reclosable packages.  Such a zipper, when developed by Minigrip, could render the package to which it was attached pinch grip openable.

---

[2] *See* Paper No. 47, "Decision on Preliminary Motions" at page 11 "Jurgovan acknowledges that the prior art, e.g., Tilman, teaches that the force required to open a zipper of a reclosable package from either the outside or the inside can be adjusted by varying the configuration of the male and female engagement members (e.g., the zipper members")(JX 2002 at page 13, lines 24-28).

9

**A34**

Jurgovan's January 2, 1997 "idea" neither contained all of the limitations of counts 1 and 2 nor was so well defined that it could be reduced to practice at that time without undue experimentation. There were two significant problems to overcome. First, the conventional zippers with low opening forces (on both the product and consumer side of the package) that were available at the time were not compatible with the form, fill and seal equipment used for snack packages. Specifically, the product side of the zipper leads the zipper over the forming collar of the FFS machine. Zipper with low enough product side opening forces so as to not cause the bag film to delaminate during opening would pop open while going through an FFS machine, notably while passing over the forming collar of the machine. (JX 2036 at 53; RX 1012 ¶¶8 and 21; RX 1014 ¶8; RX 1011 ¶20). Until that problem was solved, conventional zipper with a low product side opening force would not remain "engaged together" as required by counts 1 and 2.

Another aspect of the project that required development was that zippers with a high product side holding force (so as to not pop open during the FFS process) would cause the walls of the packages to delaminate (or the zipper to separate from the walls) before opening, thereby resulting in non-reclosable packages. (JX 2020 ¶38; JX 2033 at 7; JX 2036 at 69; RX 1014 ¶14; RX 1013 ¶7; RX 1011 ¶20). Until that problem was solved, the walls of the packages formed with such zipper did not "resist tearing and deformation" during pinch-grip opening as required by counts 1 and 2. In view of these two problems that were not addressed by Jurgovan at any time (let alone in January 1997), his request for a pinch-grip openable bag lacked the requisite definiteness of an inventive concept, and was simply an expression of a desired goal to be achieved. *See Fiers* at 984 F.2d at 1169, *Morgan* at 728 F.2d at 1452.

10

**A35**

### 3.    Ramsey Was The First To Conceive The Invention.

As discussed above, the prior art as of January 1997 included flexible, pinch-grip openable packages with: (1) elastomeric front and rear walls;  (2) front and rear walls of the packages sealed together at a top seal; (3) first and second zipper parts on the front and rear walls having first and second engagement members, where the zipper parts are attached to the inside surfaces of the front and rear walls, respectively; and (4) first and second engagement members as well as the top seal being "pinch-grip" openable under a "pinch-grip" pulling force applied to the front and rear walls of the bag below the engagement members.  (RX 1011 ¶¶4, 8; RX 1012 ¶¶4, 5, 15).

As also noted above, two elements of counts 1 and 2 not found in the prior art are: (1) the ability of the first and second engagement members of a zipper to remain "engaged together" during package formation and subsequent handling to enable a food product to be provided in a sealed bag; and (2) the zipper parts being configured and attached to the package wall in a manner to prevent stripping of the zipper parts from the elastomeric walls during "pinch-grip" opening that would result in the walls of the package being subjected to "tearing and deformation."  Conception of the Inventions was not complete without both of these elements.

### a.    After Frito-Lay's Request, Minigrip Identified The Specific Problems That Must Be Overcome By The Inventions.

After Jurgovan's alleged January 2, 1997 communication to Messrs. Hogan and Mulder, Ramsey articulated specific issues needed to be addressed in creating a reclosable, pinch-grip openable bag for food products.  Early experimentation revealed to Ramsey and, as a result of communication from Ramsey, to Jurgovan, the essential elements explicitly and inherently required for such an invention: a zipper with a low enough holding force on the product side of the package to enable pinch grip opening without causing a failure of the film, but yet with

11

**A36**

sufficiently high holding force to enable the zipper profiles to remain together so that the zipper could be applied to the packaging film during bag formation.

Mr. Malin conveyed to Mr. Jurgovan on January 16, 1997 that the reduction of opening forces would not by itself solve the engineering difficulties presented by Mr. Jurgovan's request. (RX 1011 ¶20). Thus, focusing solely on reducing product side opening forces might well produce a product unsuitable for its intended use since such a zipper could not necessarily be applied to film. Specifically, Mr. Malin also noted that in any solution to Mr. Jurgovan's goal of a pinch-grip openable package for snack foods, the zippers would have to remain closed as an air blast was introduced into the bag during the manufacturing process to cause the "pillowing" effect. (RX 1011 ¶22). Mr. Malin's comments are corroborated in Mr. Jurgovan's notebook. (JX 2036 at 53).

On January 29, 1997, a meeting was held between Frito-Lay and Minigrip personnel. (RX 1011 ¶22; RX 1012 ¶22). At this meeting, Mr. Hogan noted that the inside and outside opening forces of the zipper could be varied by modifying the shapes and properties of the zipper profiles. (RX 1012 ¶¶22-23). Mr. Hogan further stated that in addition to having a low product side holding force, the zipper profiles must be designed so as to give sufficient zipper holding strength to maintain its integrity while the zipper and associated film traveled through a FFS machine to form a package. (RX 1011 ¶22; RX 1012, ¶21). Mr. Hogan's statements are referenced in Mr. Jurgovan's notebook. (JX 2036 at 58).

On February 26, 1997, Mr. Malin communicated to Mr. Jurgovan a potential solution for one of the engineering obstacles inherent in creating a pinch-grip openable bag. (RX 1011 ¶25). Mr. Malin's solution involved inverting placement of the zipper on the bag produced in the FFS machine. That is, the bag was to be formed upside down so that the consumer side of the zipper

12

**A37**

would lead the zipper over the forming collar to allow intact passage of the zipper through the FFS process while maintaining a low internal (product side) opening force. (*Id.*; RX 1026). This communication is discussed in Mr. Jurgovan's notebook. (JX 2033 at 19; see RX 1011 ¶¶24-25). However, that approach was not ultimately pursued. (RX 1011 ¶25). On March 14, 1997, Mr. Malin provided to a drawing to Frito-Lay of a three-flange zipper for pinch grip application, and Frito-Lay suggested a four flange zipper for such an application. (RX 1011 ¶27; RX 1022). Mr. Malin advised Frito-Lay that a four flange zipper would not work on a VFFS machine. (RX 1011 ¶27).

**b.    Ramsey's Proposed Zipper Design Constitutes The First Definite And Permanent Idea Of The Inventions of Counts 1 and 2.**

Ramsey conceived the Inventions no later than March 29, 1997. On that date, Rick Scott (one of the Ramsey co-inventors) stated in a writing to Messrs. Hogan and Ramsey his solution to the above-described obstacles in the development of reclosable bags that are "pinch-grip" openable. (RX 1023; RX 1014 ¶17; RX 1012 ¶25).

Mr. Scott described his concept of solving the problems associated with keeping the engagement members "engaged together" and with preventing zipper stripping resulting in "tearing and deformation" of the package walls. (RX 1023; RX 1014 ¶17; RX 1012 ¶26). First, Mr. Scott addressed modifying the female profile on the consumer side of the zipper so as to provide adequate opening force from the consumer side to ensure that the zipper members remain "engaged together" throughout the FFS process. Mr. Scott's memo noted that "[s]ince we have to keep the zipper closed going over the forming collar maybe we should address the female hook on the consumer side" (RX 1023).

Second, Mr. Scott recognized that a cantilever effect of the zipper mounting results in high forces being applied to the zipper that may cause stripping of the zipper from the wall. (*Id.*)

13

**A38**

Mr. Scott saw the need to address this problem and suggested modifying the hooks of the female profile and reversing the profile to be attached to the film as possible solutions. Mr. Scott's contribution of these two solutions in combination with the elements of counts 1 and 2, which were already known to the inventors, resulted in a permanent and definite idea of the inventions defined by counts 1 and 2. As subsequent events demonstrated, Ramsey's conception was reduced to practice without undue experimentation. Thus, Ramsey had complete conception of the Inventions no later than March 29, 1997. Mr. Ramsey's conception is corroborated by his written memorandum of March 29, 1997. (RX 1023).

### C. Ramsey's Conception Of The Elements Defined By Counts 1 and 2 Is Corroborated.

Ramsey's conception of each and every element of the inventions defined by counts 1 and 2 is corroborated by contemporaneous documents produced by the inventors as well as Jurgovan's testimony and lab notebooks. The inventors contemporaneously recorded their inventive concepts in the form of internal and external memoranda sent to other employees of Minigrip/Zip-Pak, Frito-Lay, and Bosch. (*See* RX 1017; RX 1020; RX 1021; RX 1023). Mr. Jurgovan's notebook and his own testimony, likewise corroborate Ramsey's conception. (*See generally* JX 2020 and JX 2033, JX 2036, and JX 2051 as cited *supra*).

### D. Ramsey First Reduced The Inventions To Practice Before Jurgovan Had A Reduction To Practice.

Minigrip's practice for each zipper modification that it developed in 1997 and 1998 to be used in the pinch grip bags was to test the zipper before sending it to Frito-Lay. (RX 1014 ¶16). That testing, among other parameters, would involve sealing a section of zipper onto Frito-Lay film and then measuring the opening force required on the consumer side and the product side to separate the zipper profiles from each other from both sides. (*Id.*). Based on Minigrip's long experience working with zipper for application on FFS machines, Ramsey knew that a zipper

14

## A39

having three flanges and certain dimensions would be able to go through the FFS process without the zipper profiles separating. (*Id.*) Thus, before September 25, 1997, Ramsey reduced to practice the inventions defined by counts 1 and 2 by bench testing the zipper it had developed to determine that the zipper had the requisite product side holding force that would render the zipper openable on FFS equipment yet permit pinch grip opening (i.e. opening by a force sufficiently low as to not deform the film to which it was attached). (*Id.*) Because Minigrip did not have a fully-functional FFS machine, it sent the already-tested zipper to Frito-Lay so that the zipper could be attached to film and made into packages. (RX 1010 ¶17; RX 1011 ¶36).

Jurgovan claims "reduction to practice" took place on September 25, 1997. Ramsey does not agree that the supposed evaluation on September 25, 1997 constituted reduction to practice of the Inventions. However, to the extent that there was a reduction to practice on September 25, 1997, it inured to Ramsey's benefit. That is so because before that date, Ramsey had provided already-tested zipper to Jurgovan and also advised Jurgovan as to how and where the zipper should be attached to the film in the FFS machine. Jurgovan simply took the Minigrip zipper, applied it on an FFS machine (which Minigrip did not have) and had the machine make bags using Frito-Lay film on September 25, 1997. According to Jurgovan, he opened the packages using a pinch grip technique, and 30% of packages failed the evaluation because either the zipper stripped or the bag walls deformed and the package thus could not be reclosed after having being opened. (JX 2020 ¶67). Because Jurgovan simply took Ramsey's pre-tested zipper technology (which Ramsey expected would work for pinch-grip purposes), put zipper on an FFS machine, and evaluated whether the bag was pinch-grip openable, Jurgovan's conduct inured to the benefit

of Ramsey.[3]  *See Cooper*, 154 F.3d at 1331-32, 47 U.S.P.Q.2d at 1905; *Genentech Inc. v. Chiron Corp.*, 220 F.3d 1345, 1354, 55 USPQ2d 1636, 1643 (Fed. Cir. 2000).

Ramsey reduced the inventions of counts 1 and 2 to practice on November 6, 1997.  On November 5, 1997, Mr. Ramsey sent modified zipper (which Minigrip had recently tested) for use in a pinch grip bag, along with a diagram of the modified zipper. (RX 1010 ¶16; RX 1041). Then, on November 6, 1997, Mr. Ramsey, Mr. Jurgovan and Mr. Reaves made approximately 150 pinch-grip openable packages falling within the scope of count 1 using this Minigrip zipper material in the Frito-Lay FFS machine. (RX 1010 ¶17; JX 2020 ¶¶ 77-78; JX 2022, ¶¶ 31-32, 34). Mr. Ramsey, Mr. Jurgovan and Mr. Reaves then tested these packages within the scope of count 2, and successfully opened and reclosed approximately all but 7 or 8 of the 150 packages. (RX 1010, ¶17; JX 2051 at 70; JX 2033 at 46; JX 2020, ¶79; JX 2022, ¶¶32, 35). Mr. Ramsey directly participated in the testing. (RX 1010 ¶17).  Even if he had not participated, the November 6, 1997 activity would have inured to Ramsey's benefit for the reasons discussed above.

Thereafter, Ramsey constructively reduced the inventions of Counts 1 and 2 to practice by filing a patent application on March 6, 1998.  This patent application subsequently issued as U.S. Patent No. 6,030,122 and a continuation of that patent application is the subject of this Interference.

---

[3] On September 30, 1997, it is claimed that Mr. Reaves manufactured an additional 130 pinch-grip openable packages, and that he successfully pinch-grip opened and reclosed approximately half of those packages. (JX 2051 at 51; JX2022, ¶25; JX 2023, ¶28).  That later result undermines Jurgovan's claim that there was reduction to practice on September 25, 1997. *See DSL Dynamic Sciences Ltd.,* 928 F.2d at 1126. However, to the extent that the September 30 test constitutes reduction to practice, it also inured to the benefit of Ramsey for the reasons discussed above.

E.     **Ramsey Diligently Reduced The Invention Of Counts 1 and 2 To Practice From Before Any Conception By Jurgovan Through Ramsey's Actual And Constructive Reductions To Practice.**

Ramsey was diligent in reducing to practice the Inventions from conception on March 29, 1997 to actual reduction to practice on November 6, 1997 and constructive reduction to practice on March 6, 1998.   Ramsey continuously worked on attempting to reduce its invention to practice for the entire time period between March 29, 1997 and November 6, 1997 and continued to optimize zipper technology for the pinch grip concept through March 6, 1998.[4]   For example, Ramsey was actively working in March 1997 to develop a coextrudable sealant for zipper flanges that provides good seal strength to Frito Lay package film sealant layers (RX 1021; RX 1013 ¶¶10-11), and in April 1997 continued to work to develop an embodiment of the Inventions that could be reduced to practice.  (RX 1012 ¶28; JX 2036 at 112; JX2036 at 118; RX 1011 ¶31). In May 1997, Ramsey continued to develop zipper technology for pinch-grip applications even as Frito-Lay made clear at that time that its priority was for a top-opening bag, as distinct from a pinch grip openable bag. (RX 1012 ¶28; RX 1011 ¶31; RX 1014 ¶20).  On May 13, 1997, Ramsey met with Jurgovan to discuss further development of the pinch grip concept. (JX 2020 ¶53; JX 2045; RX1011 ¶31; RX1012 ¶28).

Minigrip's testing of the adherence of various of its zippers to Frito-Lay film continued in June 1997. (RX 1013 ¶12).   On June 24, 1997, Jurgovan indicated that Frito-Lay decided to suspend efforts on a pinch grip concept (RX 1012 ¶29; RX 1011 ¶32).  Specifically, in the Frito-Lay prepared minutes of the June 24, 1997 meeting, Mr. Jurgovan indicated that Frito-Lay considered the pinch-grip concept "tabled." (RX 1028).

---

[4] As required by the Miscellaneous Order of January 21, 2005, Ramsey's Diligence Timeline is attached to this Motion as Appendix C.

Despite the decision by Jurgovan to "table" the pinch grip concept, Ramsey continued to develop the zipper-to-film bonding necessary for reduction to practice of the Inventions throughout July and August 1997 (JX 2051, page 16; RX 1011 ¶33; RX 1012 ¶30). Ramsey developed a new zipper on or about July 1, 1997. (RX 1029; RX 1014 ¶21). Ramsey continued to work to reduce the Inventions to practice, by extruding zipper and bench testing the zipper to determine the internal and external opening forces of Minigrip zipper attached to Frito-Lay film on or about September 18, 1997. (RX 1013 ¶13). Mr. Jurgovan's notebook reflects numerous communications with Ramsey on technology for pinch grip applications. (JX 2051 at 16, 20, 22, 41).

In early September 1997, Frito-Lay renewed its interest in technology related to pinch grip applications because Frito-Lay was having difficulty in making the top-opening concepts compatible with its film. (RX 1011 ¶33). On September 24, 1997, Messrs. Malin, Hogan, and Scott met with Mr. Jurgovan and others at Frito-Lay to review issues of zipper to be sent for pinch grip bags and other issues concerning this technology. (RX 1014 ¶24; RX 1012 ¶31; RX 1011 ¶38). One agenda item was additional variations of zipper for pinch grip application, and one of Ramsey's ideas is depicted in a sketch. (RX 1033).

Before September 25, 1997, Ramsey had provided to Jurgovan a sample of zipper, which Jurgovan claims was then used to "reduce to practice" the Inventions on that date. Prior to the zipper being sent to Frito-Lay it was pretested at Minigrip (JX 2051 at 50; *see* RX 1014 ¶22). After that date, Ramsey continued to diligently work to reduce the Inventions to practice. (RX 1010 ¶15; RX 1012 ¶34. On October 23, 1997, Ramsey conveyed new test data and zipper to Jurgovan. (RX 1040; RX 1013 ¶14).

18

**A43**

On November 6, 1997, Mr. Ramsey tested zipper with Mr. Jurgovan and Mr. Reaves, resulting in a reduction to practice. (*See supra* at 15). Based on this development, Mingrip made some minor modifications to the zipper profiles so that Frito-Lay could perform consumer testing of pinch grip bags. (RX 1010 ¶18). After November 6, 1997, Ramsey worked to optimize its zipper technology for the demonstrated pinch-grip concept. (RX 1014 ¶¶29-31; RX 1012 ¶37; RX 1010 ¶¶ 21-24). Throughout the first quarter of 1998, Ramsey continued to work diligently to optimize its invention for commercial application. For example, Ramsey participated in meetings on January 20 and 26, 1998, the latter with Jurgovan, at which Ramsey presented additional options for minimizing the failure rate of pinch-grip openable bags. (RX 1013 ¶¶16-17; RX 1014 ¶30; RX 1012 ¶¶36-37; RX 1010 ¶¶21-22; RX 1011 ¶¶40-42). Ramsey continued to optimize its invention through February and March 1998, including numerous tests of various zippers designs and modifications. (*See* RX 1053; RX 1057; RX 1013 ¶¶17-18; RX 1011 ¶45; RX 1010 ¶23).

Ramsey's attorneys also worked diligently toward filing an application for the Inventions. On October 2, 1997, Tom Buckman, Minigrip's in-house patent counsel, asked outside patent counsel, Gerald Levy, to review the invention and draft a patent application directed to Ramsey's invention. (RX 1015 ¶2; RX 1035). Ramsey continued to work on revising its patent application with its patent counsel, Mr. Buckman and Mr. Levy. (RX 1015 ¶¶3-9). Ramsey constructively reduced the invention defined by counts 1 and 2 to practice by filing a patent application on March 6, 1998. (RX 1015 ¶9; RX 1058).

## II. RAMSEY IS ENTITLED TO JUDGMENT UNDER 35 U.S.C. 102(f) ON GROUNDS THAT JURGOVAN DERIVED THE INVENTION FROM RAMSEY.

### A. Applicable Legal Standard.

To prove derivation of an invention, a party must prove both (1) prior conception of the subject matter of an interference count, and (2) communication of that conception to the opponent, by clear and convincing evidence. *Eaton Corp. v. Rockwell Intern. Corp.,* 329 F.3d 1332, 1344, 66 USPQ2d 1271, 1280 (Fed. Cir. 2002); *English v. Ausnit,* 38 USPQ2d 1625, 1637-38 (BPAI 1993). The subject matter communicated must have been sufficient to enable one of ordinary skill in the art to construct and successfully operate the invention, e.g. the communication must communicate so much of the invention that will 'enable(d) one of ordinary skill in the art to make the patented invention.' *Gambro Lundia AB,* 110 F.3d at 1578. Such communication must enable an ordinary mechanic, "without the exercise of any special skill on his part, to construct and put the improvement in successful operation." *Id.* at 1577 (citing *Agawam Woolen v. Jordan,* 74 U.S. 583 (1868)); *Hedgewick v. Akers,* 497 F.2d 905, 908, 182 USPQ 167, 169 (CCPA 1974). The entire invention as embodied in the combination of elements claimed in the counts at issue must have been communicated to the opponent. *Polye v. Uhl,* 328 F.2d 893, 898, 140 USPQ 584, 588 (CCPA 1964). Proof of conception by the party charged with derivation before the alleged communication defeats the charge of derivation. *English v. Ausnit,* 38 USPQ2d at 1638.

### B. Ramsey First Conceived Of The Subject Matter Of The Interference Counts.

#### 1. Ramsey Communicated Elements Of The Invention Known In The Art To Jurgovan Before March 29, 1997.

As noted in Section I.B.1. *supra,* packages that could be opened with the "pinch-grip" technique were known in the art before Ramsey's invention and were demonstrated at the

20

**A45**

November 1996 trade show. Frito-Lay's representatives may have been familiar with this pinch-grip openable packaging, including application of a "pinch-grip" pulling force applied to the front and rear walls of the bag below the engagement members since they were present at the show. In seeking the technological expertise of Minigrip and Bosch Packaging for a reclosable pinch grip openable snack food package, Frito-Lay's representatives demonstrated that they had little experience in the field of reclosable bag technology. (*See* RX 1016 ¶¶9-10).

By contrast, Ramsey had vast experience with reclosable zipper technology and the application of such technology to various packaging solutions, and communicated an enabling description of the elements of the prior art relevant to pinch-grip technology and contained in counts 1 and 2 to Jurgovan prior to conception of the invention. For example, Minigrip communicated to Jurgovan in October 1996 that zipper technology to enable a reclosable package (as known in the art) required: (1) elastomeric front and rear walls; (2) front and rear walls sealed together as a top seal; (3) first and second zipper parts having first and second engagement members, where the zipper parts are attached to the inside surfaces of the front and rear walls, respectively; and (4) a food product stored inside the package below the first and second engagement members. (RX 1011 ¶14; RX 1012 ¶13). Further, Minigrip was familiar with the design of zippers with different opening force requirements and the manner of altering these forces as a method of designing reclosable zippers for use in various packaging contexts. (RX 1012 ¶23; RX 1014 ¶15). Mr. Hogan also told Mr. Jurgovan that pinch-grip opening of a reclosable bag would require zipper with an internal opening force lower than the bond strength of the layers of the film or the bond strength of the zipper to the film. (RX 1012 ¶18).

Ramsey further communicated specific issues that needed to be addressed in creating the Inventions during the first three months of 1997. As noted *supra*, Mr. Malin communicated to

Mr. Jurgovan that any workable solution to Mr. Jurgovan's goal would require ensuring that the zipper members would remain engaged throughout the manufacturing process. (RX 1011 ¶¶ 21-22; JX 2036 at 53). Mr. Hogan and Mr. Malin then communicated to Mr. Jurgovan and other Frito-Lay employees that the engagement members must be designed so as to give sufficient zipper holding force so as to maintain package integrity while the package traveled through a FFS machine. (JX 2036 at 58; RX 1012 ¶22). Further, Mr. Malin communicated an "inverted graphics" method of applying zipper technology to allow the zipper to traverse the FFS process intact, and yet maintain a low enough internal opening force to allow pinch-grip opening without bag deformation. (JX 2033 at 19; RX 1011 ¶¶24-25).

Taken together, Ramsey's communications to Jurgovan prior to March 29, 1997 indicate that Ramsey had communicated all elements of the Inventions to Jurgovan before March 29, 1997, except the solutions devised by Ramsey to keep the engagement members "engaged together" in the FFS process, in a manner that would also prevent the zipper stripping or "tearing and deformation" of the package walls during pinch grip opening.

### 2.    Ramsey First Conceived Of The Inventions As Defined By Counts 1 and 2.

Ramsey first conceived of a definite and permanent idea of the inventions of Counts 1 and 2 by conceiving of solutions to the problems associated with keeping the engagement members "engaged together" and with preventing zipper stripping resulting in "tearing and deformation" of the package walls. (RX 1023; RX 1014 ¶17; RX 1012 ¶26; RX 1011 ¶29).[5] In

---

[5] Ramsey notes above that Jurgovan did not conceive the Inventions, and that conception of the Inventions was accomplished by Ramsey on March 29, 1997. However, if the Board accepts Jurgovan's contention that he first conceived the Inventions, he is not entitled to priority as he derived the Inventions from Ramsey or as a result of the

conceiving a complete solution to Mr. Jurgovan's desire for a pinch grip openable bag, Ramsey noted that modification of the female profile on the consumer side of the zipper and lowering the internal opening force sufficiently to obviate the cantilever effect were essential elements in a complete and permanent idea of a pinch-grip reclosable bag. When combined with the elements of the invention already disclosed by Ramsey prior to March 29, 1997, these solutions to the cantilever and engagement issues constitute a complete conception of the inventions defined by counts 1 and 2.

### 3.    Ramsey Communicated The Entire Scope Of The Inventions To Jurgovan Before Any Invention By Jurgovan.

Ramsey communicated its complete conception to Mr. Jurgovan, a named inventor on the Jurgovan '646 application and '396 patent, no later than May 13, 1997. On that day, Messrs. Hogan, Malin, and Scott met with Frito-Lay representatives. At that meeting, Mr. Malin discussed Minigrip's continued work on the pinch-grip concept. (RX 1011 ¶31; RX 1012 ¶28). Mr. Malin conveyed to Mr. Jurgovan that Minigrip was continuing to develop a zipper with a 2-3 lbs/inch internal opening force. (See JX 2036 at 137; RX 1011 ¶31). When considered with the disclosure of all other limitations of counts 1 and 2, Ramsey's May 13, 1997 communication of its concept of reducing the internal opening force on its 3-flange zipper while allowing the zipper profiles to remained engaged in the FFS process constituted a enabling communication of Ramsey's complete invention to Jurgovan.

Ramsey again communicated its complete, enabled conception of counts 1 and 2 to Jurgovan on September 24, 1997. On that date, representatives from Frito-Lay and Minigrip met to discuss bag reclosure options. At that meeting, as had been done before, Ramsey conveyed

---

November 1996 PrintPac demonstration. This point will be addressed more fully in Ramsey's opposition to Jurgovan's motion.

conception of the Inventions, as shown in RX 1033, which illustrates a zipper profile incorporating the Inventions by Ramsey. (RX 1014 ¶24; RX 1012 ¶31; RX 1011 ¶35; RX 1033).

Finally, Ramsey again provided a communication of his complete conception of counts 1 and 2 to Jurgovan in September, October and November 1997 when Ramsey shipped pre-tested zipper material that incorporated the concepts conceived by Ramsey on March 29, 1997. The concepts encompassed by the Inventions were evident in the zipper shipped and thus receipt of the zipper by Jurgovan is another instance in which Ramsey communicated an enabling conception to Jurgovan. *See Gambro Lundia AB,* 110 F.3d 1573, 1578. This zipper, together with the other elements of Counts 1 and 2, provided Jurgovan with a complete and enabled conception of the Inventions.

### C.     Ramsey Communicated The Entire, Enabling Conception To Jurgovan Prior To Jurgovan's Alleged Invention.

As discussed above at page 9, Jurgovan's "idea" of January 2, 1997 was not conception. Jurgovan has presented no evidence suggesting that he ever independently conceived of the invention of Counts 1 and 2 (including a solution to the problems associated with keeping the engagement members "engaged together" and preventing zipper stripping resulting in "tearing and deformation" of the package") before Ramsey's actual reduction to practice of the Inventions. Each and every instance of communication addressed above represents a complete communication of Ramsey's conception to Jurgovan before independent conception by Jurgovan. Thus, to the extent that the Jurgovan claims conception of the Inventions, it was derived from Ramsey.

24

**A49**

III.    **CONCLUSION**

For the foregoing reasons, judgment should be entered for Ramsey on the grounds that

(1) Ramsey was the first to conceive and the first to reduce to practice the inventions defined by

Counts 1 and 2; and (2) Jurgovan derived the inventions defined by Counts 1 and 2 from Ramsey

and, therefore, is not the inventor of the claimed subject matter.

Date:   March 2⁄ , 2005

Respectfully submitted,

Gerald Levy
Registration No. 24,419
Lead Counsel for RAMSEY

Lindsay S. Adams
Registration No. 36,425
Back-up Counsel for RAMSEY

Pitney Hardin LLP
7 Times Square
New York, NY 10036-7311
212-297-5800

25

**A50**

## CERTIFICATE OF FILING

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY MOTION FOR JUDGMENT** was filed this 25th day of March, 2005, via electronic filing, with the following:

> The Board of Patent Appeals and Interferences
> United States Patent and Trademark Office
> Crystal Gateway 2
> 10th Floor
> 1225 Jefferson Davis Highway
> Arlington, Virginia 22202
> Facsimile: 703-305-0942

Lindsay S. Adams

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY MOTION FOR JUDGMENT** was served on this 25th day of March, 2005, via electronic filing, on the following counsel for Jurgovan:

> Joseph A. Hynds, Esq.
> Rothwell, Figg, Ernst & Manbeck, PC
> 1425 K Street, N.W.
> Suite 800
> Washington, DC 20005
> Tel.: (202) 783-6040
> Fax: (202) 783-6031
> E-mail: jhynds@rothwellfigg.com

Lindsay S. Adams

**A51**

Paper No._____

Filed on behalf of JURGOVAN
By:    Lead Counsel - Joseph A. Hynds
        Backup Counsel - Richard Wydeven
        Rothwell, Figg, Ernst & Manbeck, PC
        1425 K Street, N.W.
        Suite 800
        Washington, DC 20005
        Tel:    202-783-6040
        Fax:   202-783-6031

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

———————

MARC A. JURGOVAN and MARTIN B. DIERL
Junior Party,
(Patent No. 5,972,396 and Application No. 09/372,646),

v.

RONALD L. RAMSEY, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application No. 09/481,723).

———————

Patent Interference No. 105,173

———————

**JURGOVAN OPPOSITION TO RAMSEY MOTION FOR JUDGMENT**
**(Based on Priority and Derivation)**

**A52**

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LIST OF EVIDENCE IN SUPPORT OF THE OPPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT WHETHER EACH FACT ALLEGED IN RAMSEY'S
MOTION FOR JUDGMENT IS ADMITTED OR DENIED . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF ADDITIONAL FACTS SUPPORTING THE OPPOSITION . . . . . . . . . . . 2

ARGUMENT STATING WHY RELIEF IS OPPOSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    RAMSEY WAS NOT THE FIRST TO CONCEIVE THE INVENTIONS OF
      COUNTS 1 AND 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Jurgovan Was the First to Have a Complete Conception of the Invention
            Defined by the Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Ramsey Fails to Identify a Single Element of the Counts That Was
            Lacking from Jurgovan's Conception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    Ramsey's Suggestion That Jurgovan's Conception Was Not So Clearly
            Defined to Be Reduced to Practice Without Undue Experimentation Is
            Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.    Ramsey Fails to Establish that it Conceived the Invention of the Counts –
            Independently of Jurgovan – by March 29, 1997 . . . . . . . . . . . . . . . . . . . . 8

II.   RAMSEY FAILS TO ESTABLISH THAT IT HAD A REDUCTION TO
      PRACTICE BEFORE JURGOVAN OR AT ANYTIME THEREAFTER . . . . . . . . . . . 10

      A.    Ramsey Never Actually Reduced to Practice the Inventions of Counts 1
            and 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    Jurgovan's Reductions to Practice Do Not Inure to the Benefit of Ramsey . . . . 14

      C.    Ramsey's Evidence of Actual Reduction to Practice Is Not Adequately
            Corroborated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  RAMSEY WAS NOT DILIGENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

|     | A. | Ramsey's Diligence Is Irrelevant Because Jurgovan Was the First to Conceive ................................................. 17 |
|     | B. | Even If Ramsey's Diligence Were Relevant, it Has Failed to Show Reasonable Diligence Throughout the Entire Critical Period ............... 17 |
|     | C. | Ramsey's Evidence of Diligence Is Not Adequately Corroborated .......... 20 |
| IV. | | JURGOVAN DID NOT DERIVE THE INVENTION OF THE COUNTS FROM RAMSEY ................................................. 21 |
|     | A. | Jurgovan's Conception Pre-Dates Ramsey's Conception and Ramsey's Earliest Possible Communication to Jurgovan on September 24, 1997 ....... 21 |
|     | B. | Ramsey Fails to Establish That it Independently Conceived All Elements of the Counts and Communicated That Conception to Jurgovan ........... 22 |
| CONCLUSION | | ................................................. 25 |

## Table of Authorities

**Cases**

Burroughs Wellcome Co. v. Barr Labs.,
40 F.3d 1223, 32 U.S.P.Q.2d 1915 (Fed. Cir. 1994),
cert. denied, 516 U.S. 1070 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cooper v. Goldfarb,
154 F.3d 1321, 47 U.S.P.Q.2d at 1896 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Cooper v. Goldfarb,
240 F.3d 1378, 57 U.S.P.Q.2d 1990 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Denen v. Buss,
801 F.2d 385, 231 U.S.P.Q. 159 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Eaton v. Evans,
204 F.3d 1094, 53 U.S.P.Q.2d 1696 (Fed. Cir 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

English v. Ausnit,
38 U.S.P.Q.2d 1625 (Bd. Pat. App. & Interferences 1993) . . . . . . . . . . . . . . . . . . . . . . . 22

Gambro Lundia AB v. Baxter Healthcare Corp.,
110 F.3d 1573, 42 U.S.P.Q.2d 1378 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Jolley,
308 F.3d 1317, 64 U.S.P.Q.2d 1901 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

Reese v. Hurst,
661 F.2d 1222, 211 U.S.P.Q. 936 (C.C.P.A. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


**Statutes**

35 USC §102(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

37 CFR §41.121(a)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## INTRODUCTION

Marc A. Jurgovan and Martin B. Dierl ("Jurgovan") hereby oppose the Motion for Judgment ("motion") based on priority and derivation under 37 CFR §41.121(a)(1)(iii) by Ronald L. Ramsey, Arthur Malin, Robert Hogan, Lawrence Share and Richmond M. Scott ("Ramsey").  Ramsey's motion should be denied for at least the following reasons:

First, as explained below in Section I, Ramsey was not the first to conceive the invention. Jurgovan has established by independently corroborated evidence that it had complete conception of the invention on multiple dates in January, February and March, 1997 – and communicated that complete conception to Ramsey – prior to Ramsey's earliest possible conception date on March 29, 1997.  Moreover, Ramsey's proofs fail to establish a corroborated conception of each element of the counts – independently of Jurgovan – as of March 29, 1997, or anytime thereafter.

Second, as explained below in Section II, Ramsey fails to establish that it ever reduced to practice the invention.  Ramsey's alternative argument, that Jurgovan's reduction to practice inures to Ramsey's benefit, fails as a matter of law.

Third, as explained below in Section III, Ramsey has not established that it was diligent in reducing its invention to practice during the critical time period.  Ramsey's proofs are largely uncorroborated and contain large gaps of unexplained inactivity for which there is no legally acceptable excuse.

Fourth, as explained below in Section IV, Ramsey cannot establish that Jurgovan derived the invention from Ramsey.  The date of first communication alleged in Ramsey's preliminary statement is *September 24, 1997.*  Jurgovan's corroborated complete conception of the invention – and communication of that invention to Ramsey – occurred months prior to Ramsey's earliest possible communication to Jurgovan on September 24, 1997.

1

**A56**

## LIST OF EVIDENCE IN SUPPORT OF THE OPPOSITION

Jurgovan's list of evidence in support of the opposition is attached as Appendix A.

## STATEMENT WHETHER EACH FACT ALLEGED IN RAMSEY'S MOTION FOR JUDGMENT IS ADMITTED OR DENIED

Jurgovan's statement of whether each fact alleged in Ramsey's motion for judgment is admitted or denied is attached as Appendix B.

## STATEMENT OF ADDITIONAL FACTS SUPPORTING THE OPPOSITION

Jurgovan's statement of additional facts supporting the opposition is attached as Appendix C.

## ARGUMENT STATING WHY RELIEF IS OPPOSED

**I.    RAMSEY WAS NOT THE FIRST TO CONCEIVE THE INVENTIONS OF COUNTS 1 AND 2**

On page 7, line 6 (and page 13, line 11) of the motion, Ramsey argues that it was the first to conceive the inventions of Counts 1 and 2 by no later than March 29, 1997. Jurgovan's response is that Ramsey has submitted no evidence that it was in possession of all elements of the counts (1) prior to the complete conception by Jurgovan, and (2) prior to the disclosure of that complete conception by Jurgovan to Ramsey. Contrary to Ramsey's assertions, Jurgovan has submitted independently corroborated evidence establishing an independent conception of all elements of the counts, and communication of that complete conception to Ramsey, long before Ramsey's alleged March 29, 1997 conception date. Ramsey's assertions of making unspecified, but allegedly critical, contributions to the inventions are no more than a *post hoc* attempt to redefine the subject matter of the counts and confuse conception with reduction to practice.

### A.    Jurgovan Was the First to Have a Complete Conception of the Invention Defined by the Counts

As demonstrated on pages 3-9 of Jurgovan's Motion for Judgment, Jurgovan established a complete conception of a reclosable, pinch-grip openable package and a method of using same defined by the counts by no later than each of the following dates:  January 2, 1997 (see JX 2020, ¶¶ 22-31, JX 2033, page 1, JX 2036, page 47); January 24, 1997 (see JX 2020, ¶ 34; JX 2033, pages 1-2; JX 2021, ¶¶ 14-24); January 29-30, 1997 (see JX 2020, ¶¶ 35-36; JX 2021, ¶¶ 26-28; JX 2037); February 20, 1997 (see JX 2020, ¶ 39; JX 2021, ¶¶ 30, 31; JX 2033, pages 15-17; JX 2033, ¶¶ 7-8); March 10, 1997 (see JX 2038; JX 2020, ¶¶ 42-45; JX 2021, ¶¶ 33-36; JX 2022, ¶ 9; JX 2023, ¶10); and March 14, 1997. (see JX 2040; JX 2020, ¶¶ 47-48).  Jurgovan's complete conception is fully corroborated independently of Jurgovan's testimony by Jurgovan's contemporaneous notes, laboratory notebooks and memoranda, as well as testimony and documents by non-inventors.  (See JX 2033, pages 1-2, 17, 22; JX 2036, page 47; JX 2037; JX 2038; JX 2021, ¶¶ 14-23; JX 2023, ¶¶7, 10-12; JX 2040).  Jurgovan's conception pre-dates the earliest possible conception date by Ramsey on March 29, 1997.

### B.    Ramsey Fails to Identify a Single Element of the Counts That Was Lacking from Jurgovan's Conception

At page 10, lines 1-3 of its motion, Ramsey argues that Jurgovan's January 2, 1997 conception did not contain all of the limitations of Counts 1 and 2 and, moreover, was not so well defined that it could be reduced to practice without undue experimentation.  In particular, at page 10, lines 11 and 18, Ramsey suggests that Jurgovan had not conceived that the zipper members must be engaged together and that the bag was to have sufficient strength to resist tearing or deformation.  Jurgovan's response is that Jurgovan has submitted independently corroborated evidence that it had conceived these elements of the counts long before Ramsey's

earliest possible conception date on March 29, 1997. For example, Mr. Jurgovan's laboratory notebook, signed and witnessed by Mr. Callahan on January 24, 1997, clearly describes and illustrates a reclosable package having zipper members engaged together (see JX 2033, pages 2, 17; JX 2021, ¶4), and bag walls having sufficient strength to withstand tearing or deformation. (see JX 2021, ¶¶ 14, 16, 20-24). (See also JX 2020, ¶¶ 23, 27, 33, 34, 36, 48; JX 2040; JX 2021, ¶¶ 27, 31, 34-35; JX 2022, ¶¶ 9-10; JX 2033, ¶¶ 7-9, 11).

Ramsey argues at page 10, lines 3-16 that Jurgovan's conception presented two significant problems to overcome: namely, that (1) conventional zippers with low consumer and product side opening forces available at the time were not compatible with the packaging equipment used for snack food packages, and (2) zippers with opening forces high enough to accommodate packaging equipment would cause the walls of the package to delaminate or the zipper to separate from the package walls. Jurgovan's response is that these alleged "problems" are not evidence that Jurgovan's conception was not complete. Rather, this reflects that there may have been typical engineering issues in reducing the invention to practice and, moreover, reduction to practice on commercial production VFFS equipment. These alleged technical issues do not relate to features or characteristics of a reclosable, pinch-grip openable package that are elements of the counts. Specifically, the compatibility of the zipper with vertical form, fill, and seal ("VFFS") equipment that can be used for snack food packaging is not a limitation of either count. Count 1, directed to a reclosable, pinch-grip openable package with food product therein, and Count 2, directed to a method of using such a package, both recite "first and second engagement members being engaged together," and that the front and rear walls have sufficient strength to withstand a pinch grip pulling force. (JX 2009, pages 1 and 9). Neither count is directed to a method of manufacturing such a package on a VFFS machine and neither requires that the zipper

opening forces be compatible with VFFS equipment. (JX 2009). The record is clear that Jurgovan conceived of the "engaged together" and "sufficient strength" limitations of the counts prior to Ramsey's earliest possible conception.[1] See page 4, supra.

### C.    Ramsey's Suggestion That Jurgovan's Conception Was Not So Clearly Defined to Be Reduced to Practice Without Undue Experimentation Is Without Merit

Conception requires that the idea must be "so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." Burroughs Wellcome Co. v. Barr Labs., 40 F.3d 1223, 1228, 32 U.S.P.Q.2d 1915, 1919 (Fed. Cir. 1994), cert. denied, 516 U.S. 1070 (1996) (citations omitted). On page 10, lines 1-3, Ramsey appears to suggest that Jurgovan's January 2, 1997 conception was not so well defined that it could be reduced to practice without undue experimentation. Jurgovan's response is that Ramsey provides no evidence (or even attorney argument) explaining how or why undue experimentation was required to reduce Jurgovan's January 2, 1997 conception to practice. In fact, not one of the seven declarants for Ramsey states in his declaration that undue experimentation was required to reduce that conception to practice.

----

[1]Ramsey argued in its opposition to Jurgovan Preliminary Motion No. 1 for invalidity based on lack of written description that it is *inherent* that a reclosable package would have bag walls having sufficient strength that resist tearing and deformation. (See Ramsey Opposition No. 1, pages 16-17). Ramsey cannot argue that it *inherently* possessed the "sufficient strength" limitation to avoid Jurgovan's motion, and now argue that Jurgovan's conception was incomplete because Jurgovan did not possess this "inherent" limitation of a reclosable package.

Jurgovan also responds that Ramsey acknowledges that reducing Jurgovan's conception to practice required no more than ordinary skill. At page 9, lines 13-15 of the motion, Ramsey states factually that:

> [t]he varying of the holding force on opposite sides of the zipper was well known in the art at the time of Mr. Jurgovan's request [for a reclosable, pinch-grip openable package]. Mr. Jurgovan's communication thus represented a request for Minigrip to develop a low internal (i.e. product side) opening force zipper (previously known in the art) that would bond to existing films for salty snack foods to form reclosable packages. Such a zipper, when developed by Minigrip, could render the package to which it was attached pinch grip openable. (emphasis added).

Ramsey's statement that the development of a previously known, low product side opening force zipper that would bond to existing films would render the package pinch grip openable is an acknowledgment that Jurgovan's January 2, 1997 conception was sufficiently detailed and complete that it could be reduced to practice with the exercise of ordinary skill.

Moreover, the Ramsey inventors represented in their declarations that it is an inherent quality of a reclosable package that the zipper separation force be less than the zipper bond strength and packaging strength. (RX 1010, ¶ 8; RX 1011, ¶¶ 8, 19; RX 1012, ¶ 19; RX 1013, ¶ 7; RX 1014, ¶ 7). Indeed, after Jurgovan communicated his conception of a reclosable, pinch-grip openable package, it became apparent that the zipper separation force for such a package must be less than the zipper bond strength and the package strength. The Ramsey inventors also acknowledged that zippers with different internal and external opening forces were known at the time of Jurgovan's request for zipper material. (RX 1011, ¶ 9; RX 1012, ¶ 23; RX 1014, ¶ 8). These admissions by Ramsey further evidence that Jurgovan's conception could be reduced to practice without undue experimentation.

On page 9, lines 3-12 of the motion, Ramsey states that when Jurgovan communicated on January 2, 1997 his conception of a reclosable, pinch-grip openable package and the requirement

that such a package would require a zipper with a lower internal opening force, "Minigrip had already told Mr. Jurgovan and others at Frito-Lay that the opening force of the zipper had to be less than the bond strength of the layers of the film to which it was to be attached." Jurgovan's response is that Mr. Jurgovan communicated this concept to Ramsey, not *vice-versa*. (JX 2020, ¶ 30, 31; JX 2036, page 47). In any event, this communication hardly seems controversial in view of Ramsey's contention that it was well known at the time that the opening force of the zipper must be less than the bond strength.

Jurgovan also responds that Ramsey's suggestion regarding undue experimentation relates only to Jurgovan's January 2, 1997 conception. Ramsey provides no explanation of whether or how Jurgovan's conceptions on January 24, 1997, January 29-30, 1997, February 20, 1997, March 10, 1997 and March 14, 1997 – all prior to Ramsey's earliest possible conception date on March 29, 1997 – would require undue experimentation to reduce to practice. They would not. Jurgovan has submitted substantial evidence that Jurgovan conceived of all elements of the counts with sufficient specificity that the inventions could be reduced to practice without undue experimentation. (See JX 2021, ¶¶24, 27, 31, 35).

Last, Jurgovan responds that Mr. Jurgovan conducted laboratory experiments which demonstrated that the invention could be reduced to practice with only routine experimentation. In the December 1996 to January 1997 time frame, Mr. Jurgovan made pinch-grip openable packages in the laboratory by taking a standard Minigrip zipper (which has 2-lb. consumer side and 6-lb. product side open forces), inverting that zipper, and applying it to a package made with standard Frito-Lay film. (JX 2088, pages 51-52, 59-60, 66-68, 172-175). Mr. Jurgovan was able to successfully pinch grip open these packages, which had 2-lb. internal opening force zippers based on the inversion of the standard Minigrip zipper, without the zipper stripping off the bag

walls. (Id. at 59, 173-174). These experiments proved to Mr. Jurgovan that his pinch-grip

openable bag concept would work for its intended purpose. (Id. at 51-52, 59-60, 66, 173-74).

Ramsey's allegation that undue experimentation was required to reduce to practice Mr.

Jurgovan's conception is unfounded for this additional reason.

### D.    Ramsey Fails to Establish that it Conceived the Invention of the Counts – Independently of Jurgovan – by March 29, 1997

On page 13, lines 11-14 of the motion, Ramsey claims that it had a complete conception

by no later than March 29, 1997. Jurgovan's response is that Ramsey has provided no

corroborated evidence that it was in possession of all elements of the counts – independently of

Jurgovan – as of that date (or any other date). Ramsey only offers testimony of the inventors in

support of the alleged March 29, 1997 conception. (See RX 1011, ¶¶ 28-29; RX 1012, ¶¶ 25, 26;

RX 1014, ¶ 17.) Inventor testimony alone, however, is insufficient to prove prior conception.

Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1576, 42 U.S.P.Q.2d 1378, 1381

(Fed. Cir. 1997).

The only alleged corroborating evidence of conception offered by Ramsey is a memo

purportedly authored by co-inventor Mr. Scott on March 29, 1997 ("the March 29 Scott memo")

(RX 1023). However, that memo does not evidence a conception of anything. It purports to

identify a problem with the initial zippers Minigrip had hoped to supply Frito-Lay for

manufacture of its pinch-grip bag on commercial production equipment, and merely discusses

design considerations and unspecific proposals for future design modifications. Any design

considerations discussed in the March 29 Scott memo do not embrace any elements of the counts

– size or shape of the zipper profile, length and number of flanges, and "going over the forming

collar" are not elements of the counts. Moreover, any design considerations in the March 29

Scott memo are unspecific and tentative. At best, the memo suggests that Mr. Scott might make additional, unspecified zippers in the future.

Each of the Ramsey inventors – in nearly identical, lawyer generated language – characterizes as a "significant insight" Mr. Scott's suggestion in his March 29, 1997 memo that in order to reduce the zipper opening force, Minigrip would have to modify the male and female profiles. (RX 1010, ¶12; RX 1011, ¶29; RX 1012 ¶26; RX 1014, ¶17). Without explanation, the Ramsey inventors state that this insight was "significant" because "it indicated that [Ramsey] could develop [a zipper] to enable a workable pinch grip bag formed on an FFS machine by modifying certain aspects of the zipper profile." (RX 1010, ¶ 12; RX 1011, ¶ 29; RX 1012, ¶ 26; RX 1014, ¶ 17). Ramsey's exaggeration is palpable. These statements stand in dramatic contrast to Ramsey's representation on page 12 of its motion that Mr. Ramsey stated at the January 29, 1997 meeting that "the inside and outside opening forces of the zipper could be varied by modifying the shapes and properties of the zipper profiles." (See also JX 2088 (Ramsey deposition), page 26, lines 14-19 ("Minigrip/Zip-Pak, yes, did have many years of experience modifying the male and/or female component of the zipper to vary the opening forces of the male and female, both from the consumer side and from the product side of a package."); see also Ramsey motion, fn. 2.)

Moreover, neither this statement nor any other statement in the March 29, 1997 Scott memo identifies each element of the counts. And, while Mr. Scott states that "[t]his is the design that was ultimately used to validate the pinch grip openable bag for food products" (RX 1014, ¶17 (emphasis added)), he never describes what "[t]his ... design" specifically entails and none of the inventors identify the "certain aspects" of the zipper profile that would be modified to enable

a workable pinch grip bag. Simply put, Ramsey fails to provide evidence (corroborated or otherwise) that Ramsey conceived of all elements of the counts.

Last, Jurgovan responds that Ramsey's reliance on the March 29, 1997 Scott memo is improper for two additional reasons. First, Ramsey did not submit evidence corroborating that the memo in fact existed as of March 29, 1997. Second, Ramsey appears to be relying on this memo as a first written description of Ramsey's complete conception. However, Ramsey did not identify this document in Ramsey's preliminary statement as the first written description of Ramsey's invention. (See JX 2027, pages 2, 4). Instead, Ramsey identified a memo dated *September 24, 1997* (RX 1033) as the first written description of Ramsey's conception. (Id.) This memo therefore cannot be relied on by Ramsey to support a conception on March 29, 1997.

## II.    RAMSEY FAILS TO ESTABLISH THAT IT HAD A REDUCTION TO PRACTICE BEFORE JURGOVAN OR AT ANYTIME THEREAFTER

On pages 14-16 of the motion, Ramsey argues that it reduced the inventions of Counts 1 and 2 to practice before Jurgovan, and that to the extent Jurgovan had an actual reduction to practice, it inured to Ramsey's benefit. In particular, Ramsey relies on two different acts for an actual reduction to practice: one occurring at some unspecified time before September 25, 1997, and one occurring on November 6, 1997. Jurgovan's response is that: (1) Ramsey does not even allege, much less prove, that the work Ramsey performed met all the limitations of Counts 1 and 2, and hence Ramsey never had an actual reduction to practice; (2) Jurgovan's actual reductions to practice do not inure to the benefit of Ramsey, because Ramsey never had an independent conception of the inventions of the counts and Jurgovan did not perform its work at Ramsey's request; and (3) the evidence relied on by Ramsey as allegedly establishing an actual reduction to practice is not adequately corroborated. Therefore, Jurgovan was the first to reduce to practice, and Ramsey's motion must be denied.

**A.    Ramsey Never Actually Reduced to Practice the Inventions of Counts 1 and 2**

It is well-established that the physical embodiment relied upon as an actual reduction to practice must include every limitation of the counts. <u>Eaton v. Evans</u>, 204 F.3d 1094, 1097-98, 53 U.S.P.Q.2d 1696, 1698-99 (Fed. Cir 2000) ("an actual reduction to practice requires that a constructed embodiment include every element of the interference count."). Ramsey's motion does not even allege, much less prove, that it constructed the combination of Count 1 or carried out the method defined by Count 2 before Jurgovan's actual reductions to practice.

On page 15, lines 2-6, of the motion, Ramsey states that it reduced to practice the invention defined by Counts 1 and 2 prior to September 25, 1997 by bench testing the zipper it had developed to determine that the zipper had the requisite product side holding force that would render the zipper openable on FFS equipment yet permitted pinch-grip opening. Jurgovan's response is that Ramsey's described activity could not have been a reduction to practice of the counts, because it fails to prove that each element of the counts was present. The only evidence on which Ramsey relies (RX 1014, ¶16) at best purports to show that Ramsey performed bench testing by attaching its zipper to small strips of Frito-Lay film and then measuring the opening forces for zippers using an Instron machine (which pulls apart the film strips) at some time during the 1997-98 time frame. That falls far short, however, of establishing the presence of all elements of the counts. For example, with respect to Count 1, there is no evidence that: (1) the film to which the zipper was applied had a front wall and a rear wall "sealed together at a top seal;" (2) the top seal was " pinch-grip openable;" and (3) there was a "food product stored inside" the package below the zipper. All of these elements are recited in Count 1. (<u>See</u> JX 2009).

11

**A66**

Ramsey's evidence is no better with respect to Count 2. Ramsey does not even allege, much less prove, that: (1) the film to which the zipper was applied had a front wall and a rear wall "sealed together at a top seal;" (2) the top seal, if present, was "manually pinch-grip openable;" (3) there was a "food product stored inside" the package below the zipper; (4) it pinch-grip opened the package; (5) it removed a portion of the food product from the package; and (6) it reclosed the package. All of these elements are recited in Count 2. (See JX 2009).

Jurgovan further responds that Ramsey's evidence (RX 1014, ¶16) fails to establish what was tested, when it was tested, by whom it was tested or what the results were. Therefore, for each of these reasons, the pre-September 25, 1997 work on which Ramsey relies was not an actual reduction to practice of Counts 1 and 2. Ramsey's proofs fail for the additional reason that it relies exclusively on uncorroborated inventor testimony.

Ramsey's proofs with respect to the alleged November 6, 1997 actual reduction to practice are no better. On page 16, lines 3-14, of the motion, Ramsey states factually that it reduced the inventions of Counts 1 and 2 to practice on November 6, 1997. Jurgovan's response is that the alleged activity did not constitute a reduction to practice by Ramsey. First, Minigrip's activity in allegedly testing the modified zipper that was sent to Frito-Lay on November 5, 1997 could not have been a reduction to practice for the same reasons as discussed above with respect to the alleged pre-September 25, 1997 actual reduction to practice, *i.e.*, there is simply no evidence or allegation that all the elements of Counts 1 and 2 were met.

Moreover, on page 16, lines 6-12, of the motion, Ramsey states factually that on November 6, 1997, Mr. Ramsey directly participated in the testing that Frito-Lay performed on packages containing food product.[2] Jurgovan's response is that Ramsey did not participate in the

---

[2] Significantly, Ramsey admits that Jurgovan's activity on November 6, 1997 constituted

November 6, 1997, activity, therefore it cannot rely on Jurgovan's activity on that day. Contrary to Mr. Ramsey's uncorroborated assertion years later that he participated in the November 6, 1997 activity, the contemporaneous documentary record establishes otherwise. Mr. Ramsey's fax sent to Mr. Jurgovan during the afternoon of November 5, 1997 (JX 2033 at 43-44) states that the "attached drawing of the Male and Female PROFILE ONLY are of the zipper that you will receive tomorrow." Id. at 43. Mr. Ramsey's fax further states that "[p]lease let me know the results from tomorrow's testing along with the idea of elimination the seal in the center area of the seal below the profile." Id. (emphasis added). Of course, if Mr. Ramsey had planned to travel to Plano, Texas for testing the next day after sending this fax in the afternoon of November 5, 1997, he would not have requested Mr. Jurgovan to let him "know the results from tomorrow's testing." That Mr. Ramsey planned to stay in New York and not travel to Plano, Texas is further evidenced by the fact that Mr. Ramsey requested that Mr. Jurgovan call him in New York with any questions about the attached drawings. Id.; JX 2088, pages 42-43.

Moreover, just as Mr. Ramsey had requested, Mr. Jurgovan called Mr. Ramsey on November 7, 1997 to report the results of the testing conducted at Frito-Lay on November 6, 1997. (RX 1042; JX 1051 at 70). This telephone conversation was memorialized by Mr. Ramsey in a memorandum dated November 7, 1997, sent to Messrs. Scott, Collins, Share and Hogan. (RX 1042). Nowhere in this memorandum does Mr. Ramsey state or suggest that he actually participated in testing the previous day at Frito-Lay. (See JX 2088 at 52, lines 3-6). If he had, Mr. Ramsey would not have had to rely on Mr. Jurgovan to inform him what those test results were.

---

an actual reduction to practice of Counts 1 and 2. Ramsey motion, page 16.

In his deposition, Mr. Ramsey admitted that it was possible that he did not participate in the November 6, 1997 testing at Frito-Lay. (See JX 2088, page 53, lines 13-20; page 54, lines 15-23). He also admitted that he was aware of no documents that indicate that he was at Frito-Lay that day. (Id.) And Mr. Ramsey certainly had a practice of indicating in documents when he met with Frito-Lay in Plano, Texas. (See RX 1036). Consistent with what the contemporaneous documents make clear, and what Mr. Ramsey admits is possible, Mr. Jurgovan testified in his deposition that Mr. Ramsey did not participate in the November 6, 1997 testing at Frito-Lay. (See JX 2087, page 144, line 24 - page 145, line 10). Thus, the only allegation that Mr. Ramsey was present is his own uncorroborated and contradicted statement, which is insufficient to carry Ramsey's burden of establishing that Mr. Ramsey actually participated in Jurgovan's reduction to practice. Moreover, even if Mr. Ramsey had participated in that testing – which he clearly did not – any reduction to practice would have inured to Jurgovan's benefit. Therefore, Ramsey has not proven that it reduced to practice the invention on November 6, 1997.

**B.    Jurgovan's Reductions to Practice Do Not Inure to the Benefit of Ramsey**

On pages 15 and 16 of the motion, Ramsey argues that Jurgovan's September 25, 1997 and November 6, 1997, reductions to practice inured to Ramsey's benefit.[3]  Jurgovan's response

---

[3] In light of additional evidence, it now appears that Jurgovan's September 25, 1997 reduction to practice actually occurred between September 27 and September 30, 1997. (JX 2089, ¶6; JX 2090, ¶6, JX 2087, page 181, line 5 to page 182, line 2). Mr. Jurgovan also manufactured and tested reclosable, pinch-grip openable packages with a 70% success rate prior to September 24, 1997 and communicated his test results to Minigrip on September 24, 1997 (JX 2087, page 137, line 21 - page 138, line 2). The results of these tests were memorialized in a September 25, 1997 internal Frito-Lay memorandum. (JX 2052, page 1, JX 2087, page 138, lines

is that Ramsey is legally incorrect. Inurement involves a claim by an inventor that the acts of another person should accrue to the benefit of the inventor. Cooper v. Goldfarb, 240 F.3d 1378, 1383, 57 U.S.P.Q.2d 1990, 1993 (Fed. Cir. 2001). However, as shown herein, and in Jurgovan's motion for judgment, Ramsey is not an inventor of the subject matter of the counts. Rather, Ramsey derived the invention from Jurgovan, therefore, Jurgovan's activities cannot inure to Ramsey's benefit. Moreover, even if Ramsey were an inventor, the acts by others upon which it relies need to be done at Ramsey's explicit or implicit request. See Cooper v. Goldfarb, 154 F.3d 1321, 1332, 47 U.S.P.Q.2d 1896, 1905 (Fed. Cir. 1998) ("Acts by others working explicitly or implicitly at the inventor's request will inure to his benefit."). Here, a fair reading of the record compels the conclusion that Ramsey was working at the request of Jurgovan, and not *vice versa*. It was Frito-Lay/Jurgovan who wanted a reclosable bag for its snack food products, and who asked Minigrip/Ramsey to provide the appropriate zipper material that Frito-Lay/Jurgovan could incorporate into its bags. (See RX 1012, ¶11; RX 1011, ¶12; JX 2020, ¶¶8, 27, 29; JX 2033, pages 1, 35, 38). Therefore, Ramsey's inurement argument must fail as a matter of law.

### C.    Ramsey's Evidence of Actual Reduction to Practice Is Not Adequately Corroborated

To establish an actual reduction to practice, "an inventor's testimony must be corroborated by independent evidence." Cooper, 154 F.3d at 1330, 57 U.S.P.Q.2d at 1903. Because Ramsey has submitted no independent corroboration of its acts purporting to be an actual reduction to practice, Ramsey's motion fails to establish an actual reduction to practice.

Regarding the alleged pre-September 25, 1997 actual reduction to practice, the only evidence cited in Ramsey's motion is RX 1014, ¶16, RX 1010, ¶17 and RX 1011, ¶36 (motion at

3-7). Ramsey contends that this activity was not a reduction to practice (page 15, lines 9-11), but offers no evidence or argument in support of that contention.

14-15). Those are, respectively, the Declarations of Richmond M. Scott, Ronald L. Ramsey, and Arthur Malin, all of whom are named inventors of the involved Ramsey application. Paragraph 16 of the Scott declaration asserts generally that Minigrip performed bench tests on the zippers for Frito-Lay. Paragraph 36 of the Malin declaration simply refers to the Frito-Lay testing, and adds nothing with respect to the alleged pre-September 25, 1997 testing. Finally, ¶17 of the Ramsey declaration does not refer to the Minigrip testing, but rather the testing that took place at Frito-Lay on November 6, 1997. None of those paragraphs refers to additional documentary evidence.

Because Ramsey's evidence of the pre-September 25, 1997 alleged reduction to practice consists solely of inventor testimony, and it relies on no evidence independent of the inventors, its proof of that reduction to practice is inadequate. Reese v. Hurst, 661 F.2d 1222, 1225, 211 U.S.P.Q. 936, 940 (C.C.P.A. 1981) ("evidence of corroboration must not depend solely on the inventor himself."). Moreover, Ramsey's allegation that it reduced to practice the invention on November 6, 1997 is uncorroborated inventor testimony which is plainly inconsistent with the contemporaneous record. Thus, Ramsey has not established an actual reduction to practice.

## III.    RAMSEY WAS NOT DILIGENT

On pages 17-19 of the motion, Ramsey argues that it diligently reduced the invention of Counts 1 and 2 to practice. Jurgovan's response is that: (1) any diligence on the part of Ramsey is irrelevant because Ramsey was not the first to conceive, and indeed never had a conception independent of Jurgovan; (2) even if relevant, Ramsey has not proven reasonable diligence throughout the entire critical period; and (3) any proof of Ramsey's diligence is not adequately corroborated.

A.    **Ramsey's Diligence Is Irrelevant Because Jurgovan Was the First to Conceive**

As a matter of law, under 35 USC §102(g), a party's reasonable diligence toward a reduction to practice is relevant only if that party was the first to conceive and the last to reduce to practice.  In re Jolley, 308 F.3d 1317, 1327, 64 U.S.P.Q.2d 1901, 1908 (Fed. Cir. 2002).  As shown above in Section I.A, any possible conception by Ramsey occurred subsequent to Jurgovan's conception.  As shown below in Section IV.B., Ramsey did not independently conceive the invention.  Therefore, Ramsey's allegations of reasonable diligence are irrelevant.

B.    **Even If Ramsey's Diligence Were Relevant, it Has Failed to Show Reasonable Diligence Throughout the Entire Critical Period**

Even if the Board were to find that Ramsey's allegations of diligence were relevant, Ramsey has failed to prove that it was diligent throughout the entire critical period from its alleged March 29, 1997 conception until its alleged actual and/or constructive reduction to practice.  For example, on page 17 of the motion, Ramsey states that in March 1997, it was actively working to develop a sealant for zipper flanges.  Jurgovan's response is that the evidence on which Ramsey relies (RX 1021 and RX 1013, ¶¶10-11) does not support the allegation. While RX 1021 does mention results of sealant testing, there is no evidence of when the work took place.  The March 1997 and April 22, 1997 dates on the face of the document do not establish with any certainty when the reported work occurred.  Further, RX 1013, ¶¶10-11 are equally vague ("At some point in February or March 1997;" "approximately April or May 1997"), and do not account for the entire March 1997 period.

On page 17 of the motion, Ramsey states that in April 1997, it continued to develop an embodiment that could be reduced to practice.  Jurgovan's response is that Ramsey's evidence (RX 1012, ¶ 28; JX 2036 at 112; JX 2036 at 118; and RX 1011, ¶ 31) does not support the

17

**A72**

allegation. RX 1012, ¶ 28 simply states that "in April and May 1997, Minigrip continued to develop zipper specifically for pinch-grip reclosable technology." Again, that vague allegation does not establish exactly when the work took place, and does not account for the entire period of April 1997. The other evidence relied on by Ramsey is no better. RX 1011, ¶ 31 is identically vague, broadly referring to April and May 1997. Further, the two pages from JX 2036 (112 and 118) upon which Ramsey relies were created by Mr. Jurgovan, and not anyone from party Ramsey. Those two pages are unexplained by Mr. Jurgovan, and Ramsey offers no detailed explanation of their content. Looking at those two pages in the light most favorable to Ramsey, all they show is that on two particular days within the period (April 11 and 21), Mr. Jurgovan had discussions with representatives of Minigrip regarding the reclosable bag project.

On page 17 of the motion, Ramsey states factually that in May 1997, it continued to develop zipper technology for pinch-grip applications. Jurgovan's response is that the evidence on which Ramsey relies (RX 1012, ¶ 28; RX 1011, ¶ 31; RX 1014, ¶ 20) does not support the allegation. RX 1012, ¶ 28 states generally that in May 1997, Minigrip continued to develop a zipper for pinch-grip reclosable technology and describes a meeting on May 13, 1997 with Frito-Lay representatives. RX 1011, ¶ 31 contains the identical broad and non-specific allegation. RX 1014, ¶ 20 does not even mention work occurring during the period of May 1997, but instead makes a general allegation regarding the period of June through August 1997. The only mention of Minigrip activity during May 1997 in RX 1014 is in ¶19, which merely describes the meeting between Minigrip and Frito-Lay that took place on one day in May 1997.

On page 17 of the motion, Ramsey states that Minigrip's testing of the adherence of various of its zippers to the Frito-Lay film continued in June 1997. Jurgovan's response is that the evidence relied on by Ramsey does not show activity throughout the month of June 1997.

Indeed, RX 1013, ¶12 contains a broad and vague statement of testing between June and September 1997, without giving particulars as to dates or work performed.

On page 18 of the motion, Ramsey states that it continued to develop a zipper-to-film bonding necessary for reduction to practice throughout July and August 1997. Jurgovan's response is that the evidence on which Ramsey relies does not support its allegations. For example, in RX 1011, ¶33 and RX 1012, ¶30, it is stated without citation of evidence merely that the work took place in July and August 1997, without pinpointing what specific work was performed, by whom it was performed, or when it was done.

On page 18 of the motion, Ramsey states that its diligence continued during the period of September-October 1997. Jurgovan's response is that the only evidence Ramsey relies on during that period is one meeting with Frito-Lay on September 24, and the alleged conveyance of test data to Jurgovan on October 23, 1997. This is plainly insufficient to show diligence throughout that entire period.

On page 19 of the motion, Ramsey argues that is was diligent until March 1998. Jurgovan's response is that the only evidence Ramsey relies on during that period is a test on November 6, 1997 with Jurgovan (which did not occur with Mr. Ramsey's participation; see Section II.A), and meetings on January 20 and 26, 1998, plus undated testing during February and March 1998. That sketchy picture is clearly inadequate to prove reasonable diligence throughout the period in question.

On page 19 of the motion, Ramsey states that its attorneys worked diligently toward filing an application for the inventions of the counts. Jurgovan's response is that the evidence relied on by Ramsey does not show reasonable diligence throughout the entire period. Indeed, the only activity alleged was a drafting request on October 2, 1997; the transmittal of a first draft on

October 17, 1997; the receipt of revisions on November 18, 1997; the incorporation of the revisions into a revised draft on December 23, 1997; and further activity on February 12, 13 and 17, 1998. Activity on those selected dates within the critical period of five months does not suffice to show reasonable diligence throughout the entire period.

Ramsey's lack of evidence presents a stark contract to its diligence timeline (which is not independent evidence), which purports to show activity on every working day from January 2, 1997 until March 6, 1998. To the contrary, Ramsey's evidence shows that there were significant unexplained gaps during the critical period. Even viewing the evidence in the light most favorable to Ramsey, it has shown no activity toward an actual reduction to practice during at least the following periods: March 30 - April 10, 1997; April 12-20, 1997; April 22 - May 12, 1997; May 14 - September 23, 1997; September 25 - October 22, 1997; October 24, 1997 - January 19, 1998; January 21-25, 1998; and January 27 - March 6, 19989; and no activity toward a constructive reduction to practice during at least the following periods: October 3-19, 1997; October 18 - November 17, 1997; November 19 - December 22, 1997; December 24, 1997 - February 11, 1998; February 14-16, 1998 and February 18 - March 3, 19998.

### C.    Ramsey's Evidence of Diligence Is Not Adequately Corroborated

Proof of reasonable diligence must be corroborated by something other than inventor testimony. In re Jolley, 308 F.3d at 1328, 64 U.S.P.Q.2d at 1909. However, Ramsey presents no testimony from non-inventors regarding diligence to any alleged actual reduction to practice. Moreover, the documents upon which Ramsey relies of non-inventor origin (RX 1021, 1028, 1029, and JX 2036) at best constitute evidence of activity on particular days, and not during the entire critical period in question. Simply put, there is no adequate corroboration of diligence throughout the entire critical period.

## IV.    JURGOVAN DID NOT DERIVE THE INVENTION OF THE COUNTS FROM RAMSEY

At page 20, lines 1-2, Ramsey argues that Jurgovan derived the invention from Ramsey. As an initial matter, the date identified in Ramsey's preliminary statement on which it first communicated the invention to Jurgovan is *September 24, 1997*. (<u>See</u> JX 2027, pages 3, 5, 6). Jurgovan's response is that Ramsey's derivation claim must fail because prior to Ramsey's earliest possible date of communication, Jurgovan has established both conception and communication of that conception to Ramsey. Ramsey's derivation claim fails for the separate and independent reason that Ramsey has not demonstrated an independent conception of all elements of the count – let alone a communication of that conception to Jurgovan.

### A.    Jurgovan's Conception Pre-Dates Ramsey's Conception and Ramsey's Earliest Possible Communication to Jurgovan on September 24, 1997

As set forth in Section I.A, Jurgovan established a complete conception of all elements of the counts on multiple dates in January, February and March, 1997. Jurgovan further established that it communicated its invention to Ramsey on at least January 2, 1997, January 29-30, 1997, March 10, 1997 and March 14, 1997. (<u>See</u> JX 2020, ¶¶ 22-31, 35-36, 42-45, 47-48; JX 2033, page 1, JX 2036, page 47; JX 2021, ¶¶ 26-28, 33-36; JX 2037; JX 2038; JX 2022, ¶ 9; JX 2023, ¶10; JX 2040). Jurgovan's conception and communication of that conception to Ramsey predate Ramsey's earliest possible communication of its invention to Jurgovan on September 24, 1997 (<u>see</u> JX 2027). They also predate Ramsey's earliest possible date of conception on March 29, 1997. (<u>Id</u>.) Ramsey's derivation claim therefore must fail. "Proof of conception by the party charged with derivation prior to the alleged communication vitiates the charge of derivation." <u>English v. Ausnit</u>, 38 U.S.P.Q.2d 1625, 1638 (Bd. Pat. App. & Interferences 1993), citing, <u>Denen v. Buss</u>, 801 F.2d 385, 386, 231 U.S.P.Q. 159, 160 (Fed. Cir. 1986)).

**B.    Ramsey Fails to Establish That it Independently Conceived All Elements of the Counts and Communicated That Conception to Jurgovan**

Ramsey states at page 23, lines 10 - 19, that it communicated its complete conception to Jurgovan no later than May 13, 1997. Jurgovan's response is that Ramsey is precluded from establishing communication of its alleged invention to Jurgovan prior to September 24, 1997. (See JX 2027, page 3, 6). Jurgovan also responds that Ramsey fails to establish that it communicated all elements of the counts to Jurgovan at any date.

On page 20, lines 20-24 through page 22, lines 1-14, Ramsey argues that it communicated several – but not all – of the elements of the counts to Jurgovan, including several elements that Ramsey alleges that Mr. Hogan placed into the public domain at the PacExpo trade show in November 1996. Jurgovan's response is that Ramsey fails to establish that it placed anything into the public domain at PacExpo, and fails to establish that it communicated anything to Jurgovan at that trade show.

Specifically, at page 8, lines 16-18 of the motion, Ramsey alleges that at the PacExpo trade show in November 1996, inventor Bob Hogan and Steve Mulder of Bosch (a packaging equipment manufacturer) repeatedly "demonstrated the opening with a 'pinch-grip' of a reclosable package formed with TD technology and utilizing a Minigrip zipper." Jurgovan's response is that Ramsey's evidence (the declarations of Messrs. Hogan and Mulder) lack sufficient specificity to establish, inter alia: (1) what packages were allegedly pinch-grip opened at PacExpo, (2) what features those packages had, and (3) what the results were of the alleged attempts to pinch-grip open the bags.[4] We do know, however, that Ramsey admits that these

---

[4] Ramsey also references exhibit RX 1063, which is purported to be a photocopy of "the type of bag that was made on the Bosch VFFS machine during the Pac Expo trade show in

packages did not meet all elements of the counts. See Ramsey motion, page 11, lines 1-16. Ramsey has not established that it placed anything into the public domain at PacExpo.[5]

Jurgovan also responds that Ramsey admittedly fails to establish that Jurgovan saw the alleged demonstration by Hogan and Mulder at PacExpo. Not one of the Ramsey declarants can state conclusively that Mr. Jurgovan or anyone else at Frito-Lay saw the alleged demonstration. See RX 1012, ¶¶ 14-16; RX 1016, ¶¶ 7-8. In its motion, Ramsey can only state that Frito-Lay "may have been familiar with pinch grip openable packaging" since "they were present at the show." Ramsey motion, page 21, lines 1-6. This fails to establish anything. Moreover, although Mr. Jurgovan did attend the PacExpo show, he did not witness anyone pinch-grip open reclosable bags. (See JX 2087, page 30, lines 4-22).

On page 23, lines 10-19, Ramsey claims that it communicated the "entire scope" of the invention to Jurgovan at a meeting with Frito-Lay representatives on May 13, 1997. Specifically, Ramsey claims that when considered with the disclosure of all other limitations of Counts 1 and

_____

November 1996" and which was allegedly pinch-grip opened. (RX 1065, ¶7 (emphasis added)). RX 1063 is evidence of nothing. The photocopy provides no evidence of the structure or contents, if any, of the bag that was photocopied nor does it indicate when the bag was manufactured.

[5] Jurgovan notes that, during prosecution of Ramsey's involved application before the USPTO, Ramsey never advised the Patent Office that inventor Ramsey pinch-grip opened reclosable packages at the 1996 PacExpo. If this actually happened, Mr. Hogan may have had a duty to disclose this information to the Patent Office, especially in view of the fact that Ramsey argued for patentability before the Examiner and the Board that there is nothing in the prior art to suggest that the seal could be opened form the product side of the package. See JX 2016, page 8.

2, the communication of its concept of reducing the internal opening force on its 3-flange zipper while allowing the zipper profiles to remain engaged in the VFFS process constituted an enabling communication of the Ramsey's complete invention to Jurgovan. Aside from the fact that Ramsey cannot establish communication to Jurgovan before September 24, 1997, Ramsey's proofs fall far short of establishing that Ramsey communicated this information to Jurgovan at this May 13, 1997 meeting. Ramsey purports to rely on handwritten notes taken by Mr. Jurgovan during those meetings. (JX 2036 at 137). However, Ramsey's interpretation of Mr. Jurgovan's notes is self-serving, as it cannot be determined from those notes who said what to whom during that meeting. Ramsey could have asked Mr. Jurgovan during his deposition what those notes meant – but chose not to do so.

Ramsey's reliance on the Malin declaration at paragraph 31 (RX 1011) is no better. Mr. Malin allegedly stated at this meeting that "Minigrip could modify the profiles of the existing zipper to reduce the opening force, while still having a zipper that can remain closed in the FFS process." (RX 1011, ¶31). This general statement does not reflect a definite and permanent idea of anything and adds nothing to conception.

At page 21, line 23 through page 22, line 6, Ramsey contends that Messrs. Hogan and Malin told Jurgovan that a solution to his "goal" (i.e., a reclosable, pinch-grip openable package) would require zippers that remain engaged during the FFS manufacturing process. Jurgovan's response is that, remaining engaged during the FFS manufacturing process is not an element of the counts. This relates to reduction to practice on <u>commercial production equipment</u>.

Ramsey states on page 23, lines 20 - 21 that it communicated a complete conception of Counts 1 and 2 to Jurgovan on September 24, 1997. Jurgovan's response is that Ramsey has submitted no evidence of what was communicated to Jurgovan on that date. Ramsey also states

at page 23, line 22 to page 24, line 2 of its motion that "[a]t that [September 24, 1997] meeting, as had been done before, Ramsey conveyed conception of the Inventions, as shown in RX 1033, which illustrates a zipper profile incorporating the Inventions by Ramsey." Jurgovan's response is that Ramsey stops short of stating that RX 1033 was shown to Jurgovan, and Ramsey's declarants merely state that a number of Ramsey inventors met with Frito-Lay and "discussed several possible modifications to [the] zipper." (RX 1011, ¶ 35; RX 1012, ¶ 31; RX 1014, ¶ 24).

At page 24, lines 3-10 of its Motion, Ramsey argues that it also communicated a complete conception to Jurgovan in September, October, and November 1997 by providing to Jurgovan "pre-tested zipper material that incorporated the concepts conceived by Ramsey on March 29, 1997." Jurgovan's response is that by providing zipper material to Jurgovan, at Jurgovan's request, did not communicate a complete conception of every element of the counts.

## CONCLUSION

For the foregoing reasons, Ramsey's Motion for Judgment should be denied.

Respectfully submitted,
ROTHWELL, FIGG, ERNST & MANBECK, P.C.

Date: May 13, 2005                    By _____ Reg No. 39881
                                          Joseph A. Hynds
                                          Registration No. 34,627
                                          1425 K Street, N.W., Suite 800
                                          Washington, D.C. 20005
                                          Telephone: (202) 783-6040
                                          Facsimile: (202) 783-6031
                                          *Lead Counsel for Jurgovan*

Paper _____

Filed on behalf of Illinois Tool Works Inc.
By:          Gerald Levy, Esq.
             Lindsay S. Adams, Esq.
             Ronald E. Brown, Esq.
             PITNEY HARDIN LLP
             7 Times Square
             New York, NY 10036-7311
             Tel: 212-297-5800
             Fax: 212-682-3485

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

———————————

MARC A. **JURGOVAN** and MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application 09/372,646),

v.

RONALD L. **RAMSEY**, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application 09/481,729)

———————————

Patent Interference No. 105,173

———————————

**RAMSEY OPPOSITION TO JURGOVAN MOTION FOR JUDGMENT**
**(Based on Derivation And Priority)**

**A81**

I.    **EVIDENCE UPON WHICH RAMSEY RELIES IN SUPPORT OF OPPOSITION**

*See* Appendix A


II.    **WHETHER FACTS ALLEGED BY JURGOVAN ARE ADMITTED OR DENIED**

*See* Appendix B


III.    **ADDITIONAL FACTS UPON WHICH RAMSEY RELIES**

*See* Appendix C


IV.    **ARGUMENT**

At pages 2 to 9 of its Motion for Judgment, Jurgovan asserts that it is entitled to judgment under 35 U.S.C. §102(f) because it was the first to conceive the complete subject matter of Counts 1 and 2 (hereinafter the "Inventions") and then communicated that alleged conception to Ramsey. The Board should deny that motion because Jurgovan has not met its burden of establishing that the "idea" transmitted to Ramsey constituted conception of the Inventions. The evidence shows that Jurgovan's request to Ramsey that Minigrip/Zip-Pak (a division of Illinois Tool Works Inc. ("ITW"), which is the Ramsey real party in interest)[1] develop technology for a reclosable pinch grip package did not recognize the following limitations of Counts 1 and 2:

As to Count 1, any means or method for disengaging engaged first and second engagement members by application of a pulling force below the engagement members sufficient to disengage the members without stripping the members from their associated wall surfaces or tearing or deforming the walls; and as to Count 2, any means or method for attaching engaged first and second zipper parts to front and rear walls, any means or method for manually

---

[1] In its Opposition, Ramsey uses the term "Minigrip" to refer to ITW, including its Minigrip division.

1

**A82**

pinch-grip opening such zipper parts without tearing or deforming the front and rear walls and any means or method for providing engaged engagement members manually openable upon application of a pinch-grip pulling force (rather than stripping from the wall upon application of such force).

A second, related reason that Jurgovan's "idea" transmitted to Ramsey was not conception is that it was not sufficiently defined so that a skilled artisan could take it and reduce the Inventions to practice without undue experimentation. Because Jurgovan does not show either conception or communication of a conception to Ramsey before the date of Ramsey's conception, the Board should deny Jurgovan's Motion for Judgment based on derivation.

At pages 9-21 of its Motion, Jurgovan contends that it is entitled to judgment on priority based on 35 U.S.C. §102(g) because it conceived the Inventions before Ramsey and reduced them to practice after diligently attempting to do so. The Board should deny this motion for several reasons. First, the idea that Jurgovan relies on was not a "conception," much less a conception of the Inventions. Second, to the extent that Jurgovan's desire for a pinch grip openable food package is held to be a "conception," such a "conception" would not be patentable under 35 U.S.C. §102, in light of the Mingrip/Bosch demonstration at a November 1996 trade show of the "pinch grip" opening of conventional zipper bags. Third, even if Jurgovan were able to establish conception of the Inventions in January 1997, Jurgovan's failure to diligently work to reduce its "conception" to practice defeats its claim of priority. For those reasons, as well as Ramsey's proof that it conceived the Inventions before Jurgovan, worked diligently to reduce the Inventions to practice, and did reduce them to practice before Jurgovan, the Board should deny Jurgovan's motion for judgment based on priority.

I.    **JURGOVAN IS NOT ENTITLED TO JUDGMENT UNDER 35 U.S.C. 102(f) ON GROUNDS THAT RAMSEY DERIVED THE INVENTIONS FROM JURGOVAN.**

A.    **Jurgovan Did Not Have A Conception Of The Inventions Before March 29, 1997 Because His Idea Did Not Contain Every Limitation Of The Counts.**

On page 3, line 13- page 5, line 18 of its Motion, Jurgovan alleges that it had a conception of the Inventions by no later than January 2, 1997 and corroborated this conception by January 24, 1997.   On page 5, line 19 – page 6, line 10, Jurgovan further alleges conception of the Inventions based on disclosure to representatives of Frito-Lay (the Jurgovan real party in interest) on February 20, 1997, as "evidenced" in a February 24, 1997 notebook entry.

The response is that Jurgovan's "conceptions" of January 2, January 24, February 20, and February 24 do not encompass the elements of the zipper remaining engaged together while attached to a bag wall and having an internal opening force that would enable pinch grip opening while resisting tearing and deformation upon application of such pinch grip opening force and thus cannot be conception of the Inventions.  In addition, to the extent that Jurgovan's "idea" to pinch-grip open a zipper bag without the means/method discussed above could be considered a conception of an invention, such a "conception" would not be patentable under 35 U.S.C. §§102(a) and 102(b), in light of the pinch-grip opening of zipper bags by Robert Hogan and Steven Mulder at a November 1996 packaging trade show.  (*See infra* at 13-15).

On page 4, lines 8-9, Jurgovan argues that its "conception" of January 2, 1997 met "each limitation of Counts 1 and 2."  On page 5, line 22 – page 6, line 3, Jurgovan argues that the material contained at pages 15-17 of one of Jurgovan's notebooks[2] and presented during a

---

[2]  Mr. Jurgovan states that he maintained two separate notebooks on this project, one containing a contemporaneous recording of events (JX 2036 and 2051), and a lab notebook (JX 2033) containing mostly after-the-fact entries of events that Mr. Jurgovan decided were relevant.  (RX 1073, 31:19 – 32:4; 16:17 – 17:13).

February 20, 1997 meeting describes "all elements of the invention defined by Counts 1 and 2."

The response is that Jurgovan's "conceptions" fail to meet all of the elements of the Counts and thus cannot be considered a conception of the Inventions. Conception requires the idea to include every element of the claimed invention, *Slip-Track Systems, Inc. v. Metal-Lite, Inc.,* 304 F.3d 1256, 1263, 64 USPQ2d 1423, 1427 (Fed. Cir. 2002), and an inventor must show knowledge of every limitation of the count at the time of conception in order to prove conception in an interference proceeding. *Coleman v. Dines,* 754 F.2d 353, 359, 224 USPQ 857, 862 (Fed. Cir. 1985).

Jurgovan's naked idea does not meet this standard. The evidence shows that Jurgovan's "conception" was, in fact, a request to Ramsey to invent the subject matter of the counts in a manner that would satisfy Frito-Lay's desire for reclosable food packaging that was pinch grip openable. Jurgovan's "conception" of January 2, 1997 thus did not recognize, let alone propose a solution to, two limitations of the Inventions: (a) a zipper openable by a pinch grip pulling force; and (b) a method for attaching such zipper to bag walls in a manner that would preclude the zipper from stripping from the wall (and hence remaining closed) or the walls tearing or deforming upon application of a pinch grip force. As a practical consideration, such food packages would have to have characteristics that enabled the packages to be made on form, fill and seal (FFS) equipment. Such FFS equipment requires the engagement members of the zipper remaining closed during the forming, filling and sealing operations to result in food packages with the engagement members engaged as required by the Counts. Further, the engagement members would have to have an opening force that enables the package to be pinch grip openable without the zipper delaminating from the sides of the food package or the package itself deforming --- the "resist tearing and deformation" element of Counts 1 and 2.

Jurgovan's alleged conceptions of January 2, January 24, February 20, and February 24, 1997 do not address either the means or method of attaching to the front and rear walls of a package first and second zipper parts with engagement means that will disengage upon application of a pinch-grip force without stripping from the wall or deforming or tearing the wall. Thus, Jurgovan did not have a conception of Counts 1 and 2, and did not communicate conception to Ramsey.

Jurgovan contends that he conceived the Inventions in December 1996, and claims that this "conception" is reflected in Mr. Jurgovan's after-the-fact notes of a supposed conversation with Robert Hogan on January 2, 1997 (JX 2033 at 1).[3] Mr. Jurgovan's notes of his conversation with Mr. Hogan do not support Jurgovan's assertion that it recognized those elements at that time, as they say nothing about the two limitations: (a) a zipper openable by a pinch grip pulling force; and (b) a method for attaching such zipper to bag walls in a manner that would preclude the zipper from stripping from the wall (and hence remaining closed) or the walls tearing or deforming upon application of a pinch grip force. (JX 2033, at 1-3; JX 2020, ¶¶26-31). Indeed, the only reference to anything about the zipper technology is that there needed to be a lower opening force in relation to the top seal of the food package (JX 2033 at 1), which expresses Mr. Jurgovan's desire that the consumer's "experience" with existing, non-reclosable food packages not change with the addition of zipper technology. (Jurgovan Motion, page 4, lines 11-13; RX 1073 42:8 – 42:29).

The second page of Mr. Jurgovan's lab notebook (JX 2033 at 2) also does not mention

---

[3] There is no written corroboration of Jurgovan's contention that it conceived the Inventions in December 1996. Indeed, neither of Mr. Jurgovan's notebooks, including his lab notebook with "relevant entries," records any idea about "pinch grip" opening before January 1997. (*See* JX 2033 and JX 2036).

either limitation. The diagram that Mr. Jurgovan claims as his proposal is virtually identical to the one sketched in his other notebook based on information given to him by Minigrip personnel when he first met with them in October 1996. (*Compare* JX 2033 at 2 with JX 2036 at 22). Mr. Jurgovan, who had no previous experience with reclosable zipper technology and came late to an existing cooperation between Frito-Lay and Minigrip (RX 1073 11:8-14), met with Minigrip to learn about the existing project between Frito-Lay and Minigrip. (JX 2036 at 22; RX 1073, 18:9– 19:14). At that meeting, Mr. Hogan and Art Malin (both from Minigrip) described zipper technology. (RX 1011, ¶¶13-14; RX 1012, ¶¶12-13; RX 1073, pp. 12-14).

Jurgovan also contends that his disclosure to Mr. Callahan "no later than January 24, 1997" also evidences "conception," but again there is no evidence suggesting that Jurgovan's "conception" is anything more than what was described at JX 2033, p. 1 and 2. Although Mr. Callahan contends that Mr. Jurgovan told him on January 24, 1997 "the bag walls should be able to withstand the pinch grip opening process without tearing or deformation" (JX 2021, ¶14), Mr. Jurgovan himself does not make such a claim, and that supposed statement is not found in any of the contemporaneous documents. Accordingly, Mr. Callahan's statement should be accorded no weight. Further, neither Mr. Jurgovan nor Mr. Callahan allege there was any discussion as to how this was to be accomplished. There is no suggestion that Mr. Jurgovan said anything more than something that was evident to anyone with experience with reclosable zipper technology. More important, Mr. Callahan's description of this "conception" also does not indicate either a recognition of the need for zipper technology that would enable the zipper to remain attached to the package walls upon application of a pinch grip force without stripping the zipper from the walls or delaminating the walls, or a solution to that problem.

Mr. Jurgovan's claim that his February 24th notes of a Frito-Lay internal meeting on

6

**A87**

February 20, 1997 evidence conception also misses the mark. Those notes show no recognition of the limitations discussed above, and merely indicate that a pinch grip method would require "equipment modifications." (JX 2033 at 18). None of the evidence presented by Jurgovan suggests that Jurgovan considered how to produce a zipper openable by a pinch grip pulling force and a method for attaching such zipper to bag walls in a manner that would preclude the zipper from stripping from the wall or the walls tearing or deforming upon application of a pinch grip force. Absent conception and articulation of all elements of the Inventions required by Counts 1 and 2, Jurgovan's January/February ideas cannot be a basis for its Motion for Judgment on priority and derivation.

There is an additional consideration given that the Inventions are directed to a food package and a method for opening it. Another limitation of both of the Counts is that the first and second engagement members are engaged together. (JX 2002, claim 1, line 9; JX 2001, claim 1, lines 15-16). As both parties acknowledge, such food packaging is produced on FFS equipment. Accordingly, a requirement inherent in both Counts is that the zipper technology (i.e., both zipper design and method of attaching zipper to the bag walls) that had to be developed included a requirement that the first and second engagement members remain engaged during the package forming and filling as required by the FFS equipment. None of Jurgovan's "ideas" discussed above addresses that requirement (RX 1073, 38:12-17), and Mr. Jurgovan acknowledged that it was Ramsey who first raised that concern after Frito-Lay expressed a desire for a pinch-grip openable bag. (RX 1073, 71:19 – 73:8). As discussed below, it was Ramsey who conceived a solution to that problem. Those facts further demonstrate that Jurgovan's "idea" did not contain all of the limitations of Counts 1 and 2.

**B.    Jurgovan's "Idea" Was Not Conception Because Undue Experimentation Was Needed Before That Idea Could Be Reduced To Practice.**

On page 4, lines 7-8 of its motion, Jurgovan alleges that its conception on January 2, 1997 was sufficiently detailed such that it could be reduced to practice without undue experimentation.    Jurgovan must make this contention because he did absolutely nothing to reduce the "conception" to practice other than ask Minigrip to develop the technology. On page 6, lines 2-4, Jurgovan further alleges that its February 20 and 24, 1997 "conception" was conveyed in sufficient detail that a person of ordinary skill in the art could reduce the inventions to practice without undue experimentation.

The response is that the ideas of January 2nd and 24th, and February 20th and 24th could not be reduced to practice without undue experimentation and thus were not conceptions. Conception requires that a "definite and permanent idea" must be so clearly defined in the inventor's mind that only ordinary skill would be required to reduce the invention to practice without extensive research or experimentation. *Burroughs Wellcome Co. v. Barr Labs,* 40 F. 3d 1229, 1238, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994), *cert. denied,* 516 U.S. 1070 (1996) (citations omitted). Jurgovan's ideas of January and February 1997 fail to meet this standard, as Jurgovan clearly sought Ramsey's expertise in creating a technological solution that would enable the application of pinch grip reclosable technology to food packages. Jurgovan suggested no means or method to enable attachment of zipper parts to package walls in a manner that would permit opening of the zipper and a top seal joining the tops of the walls by application of a pinch-grip force without stripping the zipper from the package walls or deforming or tearing the walls.

Jurgovan's request that Mingrip provide a solution for its desire for pinch grip openable food packages did not allow a reduction to practice without extensive research or

experimentation by Ramsey. As discussed above, Jurgovan's "conception" never addressed or articulated certain limitations of Counts 1 and 2 and did not provide one of ordinary skill in the art with a concept sufficiently detailed to enable reduction to practice without undue experimentation. The lack of definiteness in Jurgovan's idea is illustrated by the fact that while zipper was readily available from Minigrip and at least two other sources known to Jurgovan (RX 1073 12:11–13:8), Jurgovan took no steps toward reduction to practice (other than to "wait" for Minigrip's zipper and application technology) until Ramsey taught Jurgovan the critical means and method of attaching zipper to package walls in a manner that permitted pinch grip opening.

It was Ramsey that undertook that effort because, as Jurgovan acknowledges, developing pinch grip technology was a "Minigrip development issue." (RX 1025 at 1; RX 1011, ¶31; RX 1012, ¶28). In mid-January 1997, Art Malin advised Jurgovan that zipper had to have a high enough internal opening force to remain engaged and withstand an airblast during manufacture of a food package. (JX 2036 at 53; RX 1011, ¶21). At a January 29-30, 1997 meeting with Frito-Lay, Minigrip representatives explained to Jurgovan that contrary to Jurgovan's expression that a four-flange zipper could be used for pinch-grip technology, a three flange zipper would be required. (JX 2036 at 57). At the same meeting, Mr. Hogan advised Mr. Jurgovan and others that two considerations that would have to be taken into account were having the product side opening force of the zipper lower than the bond strength of the layers of the package film and keeping the zipper engaged during the FFS process to enable formation of a food package with engaged zipper parts. (*Id.* at 58; RX 1012, ¶¶18, 21-23).

The laboratory notebook of Larry Share, one of the Ramsey co-inventors, further demonstrates the type of experimentation undertaken by Minigrip in devising a pinch grip

9

**A90**

openable food package. On February 17, 1997, Mr. Share noted that elimination of a flange from the leading half of the female zipper profile would facilitate acceptable passage of the engaged zipper profiles over the forming collar during the FFS process and thus permit the profiles to remain engaged together. (RX 1069 at 35; RX 1070, ¶10). Mr. Share also noted that such an adjustment comes with a tradeoff: removal of the leading flange of the zipper would require sealing a three-flange zipper profile to the side walls of the package using a three-point seal, with the female zipper profile attached only at one point. (*Id.* at ¶¶ 9-10). Mr. Share further noted that such a design results in high shear force stresses, and could further result in "unpredictable zipper opening mechanics," such as zipper stripping (which may result in tearing and deformation of the bag walls). (RX 1069 at 35; RX 1070, ¶11). Mr. Share's other work, such as extension of the leading edge flanges and use of perforated lines of weakness (RX 1069 at 37, 39-40; RX 1020) further shows the extent of innovation required to develop a solution to Jurgovan's request for pinch-grip zipper technology. Ramsey's continued developmental effort is also evidenced by Mr. Malin's inverted zipper design (zipper at the bottom of the package) that was sent to Mr. Jurgovan on February 26, 1997. (RX 1020).

While Ramsey was identifying the requirements of a pinch grip openable food package and attempting to devise solutions, Jurgovan was simply recycling the desire for pinch grip openable packaging. While Mr. Jurgovan touts "Option 5" (JX 2033 at 17) as his design, that drawing turns out to be simply a depiction of a Minigrip four-flange zipper within a diagram of a package with a top seal. (RX 1073 78:25–80:2). This "evidence" indicates that Jurgovan made no advance of its January 2, 1997 idea (for the reasons stated above), and thus that drawing did not allow one of ordinary skill in the art to reduce the Inventions to practice. Indeed, as Mr. Share's work demonstrated, Mr. Jurgovan's "Option 5" was a non-solution that was not and

could not be reduced to practice. Mr. Jurgovan's diagram did not even incorporate what Ramsey had told Jurgovan about the zipper design back on January 29-30, 1997 --- that a conventional four-flange zipper was not suitable due to the zipper popping open over the forming collar of the FFS equipment used to create (and place food product in) such packages. Thus, Mr. Jurgovan's pinch grip "designs" allegedly conceived on February 20, 1997 and communicated to Mr. Malin on March 10, 1997 (JX 2033 at page 17) did not enable one of ordinary skill in the art to reduce such a design to practice without undue experimentation.

The need for extensive innovation and experimentation is further shown by Jurgovan's own conduct. Although Jurgovan now claims that it took Ramsey over eight months to accomplish the "pedestrian" task of providing Jurgovan with suitable zipper, the fact is Jurgovan never sought to design his own zipper or obtain a zipper from another source in order to reduce the "idea" to practice. The reason why Jurgovan did not do so is obvious: considerable research and experimentation was needed in order to respond to Frito-Lay's request for pinch grip zipper technology. Ramsey's considerable work and experimentation in January, February and March 1997 led to conception of the Inventions on March 29, 1997, with a three-flange zipper which addressed the engagement members being "openable under a pinch-grip pulling force" and "resist tearing and deformation" elements by providing for modifications to the shape and dimension of the profiles (RX 1023; RX 1010, ¶12), and allowed one skilled in the art to reduce the Inventions to practice. Because Jurgovan's "idea" did not have the requisite specificity and detail, Jurgovan did not have conception before March 29, 1997.

## C.    Jurgovan Did Not Communicate Conception Of The Inventions To Ramsey Prior To March 29, 1997.

On page 6, lines 21-22 of its Motion, Jurgovan asserts that it communicated its conception to Mr. Hogan on January 2, 1997; on page 7, lines 11-12, Jurgovan asserts

communication of its conception to Messrs. Hogan and Malin on January 29 and 30, 1997; on page 8, lines 17-18, Jurgovan asserts communication of its conception to Messrs. Malin and Hogan on March 10, 1997; on page 9, lines 8-12, Jurgovan asserts communication of conception to Mr. Malin before March 29, 1997. Jurgovan also contends that it communicated conception to Ramsey on September 2, 1997, September 18, 1997, and September 24, 1997. (Jurgovan Appendix B, ¶112).

The response to each of these assertions is that Jurgovan's request for relief should be denied since its communications on January 2, 1997, January 29 and 30, 1997, and March 10, 1997 were not communication of conception of the Inventions and thus cannot serve as the basis for a claim of derivation. Further, Jurgovan's alleged communications of September 2, September 18, and September 24, 1997 occurred long after Ramsey's conception of the Inventions, and Ramsey's communication of the Inventions to Jurgovan.

As discussed above, Jurgovan's idea was not a conception and thus, as a matter of law, Jurgovan could not have communicated conception of the Inventions to Ramsey before March 29, 1997. What Jurgovan communicated to Ramsey before Ramsey's conception date of March 29, 1997 represents, at most, communication of elements of the Inventions that were already known in the field. Accordingly, Jurgovan did not communicate a patentable idea to Ramsey. For example, even if one were to credit Mr. Jurgovan's testimony,[4] his alleged disclosure to Bob

---

[4] Mr. Jurgovan stated on cross-examination that he had no independent recall of January 2, 1997 conversation and that his direct testimony about that conversation had been based solely on the contents of the documents. (RX 1073 at 44-45). The only contemporaneous note that Jurgovan made about the conversation was a single line in his day-to-day notebook. (JX 2036 at 47). His lab notebook entry was created at least three weeks later and says considerably less about the conversation than Mr. Jurgovan's did in his Declaration some eight years later. (Compare JX 2033 at 1 with JX 2020 ¶¶27-30). The Board should not credit Mr. Jurgovan's direct testimony about

Hogan on January 2, 1997 did not communicate conception of the Inventions. Jurgovan's notation in his lab notebook that "Concept requires redesign of Minigrip/Bosch proposed zipper to reduce zipper opening force from underside of zipper" (JX 2033 at p.1) reflects only a request to have Minigrip develop zipper technology for a reclosable package having a reduced internal opening force zipper, which was known to Mr. Hogan and others based on the opening forces of conventional Minigrip zipper and the strength of the standard Frito-Lay film. (RX 1012, ¶¶7-8; RX 1011, ¶¶8-9). Jurgovan's assertion that it communicated the complete scope of the Inventions to Ramsey on January 29 and 30, 1997 fails for the same reason. (Jurgovan Motion for Judgment, at 7; Appendix B, ¶¶77-87). There is no evidence that Jurgovan recognized the entire scope of the Inventions at that time, let alone communicated it to Ramsey.

Mr. Jurgovan also did not communicate the complete scope of the invention to Messrs. Malin and Hogan either in his March 10, 1997 memo (Appendix B, ¶¶95-103) or at a March 14, 1997 meeting (Appendix B, ¶¶104-109). Mr. Jurgovan's statement that the "zipper lock mechanism" must be redesigned was a restatement of a well-known idea that the internal zipper-opening force had to be reduced to permit pinch grip opening. (RX 1073, 97:10-16). Mr. Jurgovan's concern was that the customer's experience on opening a pinch grip package be consistent with how customers normally open snack food packages. (*Id.* at 101:12-24). Jurgovan contends that on March 14, 1997 he provided a diagram embodying his conception (JX 2040 at 2) to Ramsey. That diagram, which is another version of the drawing placed at page 2 of his lab notebook (JX 2033), communicates nothing about how to produce a zipper and attach it to the package wall to allow pinch grip opening while preventing zipper stripping so as to

---

his January 2, 1997 conversation with Mr. Hogan, as it is clear that he had no knowledge that he actually made those statements. (RX 1073 at 44-46).

prevent bag wall deformation. Further, since the method and product of the Invention are "food packages" which, both parties concede, are to be formed on FFS machines, the diagram suggests nothing about how to keep the zipper engagement elements closed during manufacture, notwithstanding that Mr. Jurgovan was told by Minigrip about the concern that the zipper will not stay intact during manufacture. (*See* JX 2038; RX 1073, 71:19 – 73:8).

Jurgovan's contentions that it also communicated conception to Ramsey on September 2, 1997, September 18, 1997, and September 24, 1997) (Appendix B, ¶112) are also without merit. First, Mr. Jurgovan does not even contend that communications on any of these dates was a communication of conception. (*See* JX 2020, ¶¶63-64). Mr. Jurgovan merely stated that he asked Ramsey for a specific internal opening force zipper on those dates. As Ramsey was the first to both conceive of all elements of the Counts and communicate all of these elements, as arranged in the Counts, to the other party, any communications in September 1997 were long after Ramsey had disclosed its concept to Jurgovan.

Second, Jurgovan did not communicate conception to Ramsey on those dates. Jurgovan claims that he "requested that Minigrip supply a zipper that would have 2 lb. (consumer side) and 2 lb. (product side) opening forces for testing prototypes at Frito-Lay" on September 2, 1997 and a lower than 2 lb. internal opening force zipper on September 18, 1997. (JX 2033, ¶63). However, the evidence shows that zipper with equal and differential opening forces had been suggested by Ramsey to Jurgovan months before that date. (RX 1012, ¶¶ 24, 31; RX 1014, ¶23). Finally, Jurgovan claims that a September 24, 1997 presentation to Minigrip reflects its suggestion of different internal opening force zippers using standard figures of a Minigrip zipper. (RX 1073, 122:2-8). Mr. Jurgovan admitted that the presentation provided no design information on the profiles or where or how to seal the zipper to bag to achieve the desired

14

**A95**

internal opening force. (*Id.* at 122:9-12). Notably, Mr. Jurgovan conceded that while he was "gaining experience" by this point, he had no information that a two-pound internal opening force zipper would remain intact while the package was being made and hence that such a zipper could be used on food packages. (RX 1073, 119:21-120:8, 121:6-22). In sum, while Jurgovan's "experience" (learned from Minigrip) perhaps allowed him to request zipper with certain opening forces, that is a far cry from communicating conception.

For the foregoing reasons, the Board should reject Jurgovan's claim that Ramsey derived the Inventions from Jurgovan.

## II.    JURGOVAN IS NOT ENTITLED TO JUDGMENT UNDER 35 U.S.C. 102.

### A.    Because Jurgovan Did Not Conceive The Inventions, Its Priority Motion Fails As A Matter Of Law.

Because Jurgovan's "ideas" did not constitute conception of the Inventions (*see supra* at 3-9), Jurgovan is unable to prevail on its Motion for Judgment based on priority.

### B.    To The Extent That Jurgovan's January/February 1997 "Idea" Constitutes Conception, It Is Unpatentable Under 35 U.S.C. §§102(a) and (b).

Even if Jurgovan's January/February idea could be viewed as a conception of *any* invention, it would be unpatentable in light of the demonstration by Messrs. Hogan and Mulder in November 1996 of the opening of a zipper package using a pinch grip. Jurgovan's "idea" was nothing more than the restatement of elements known in the prior art, combined in a manner that was also known in the prior art. Food packaging designed to be opened with the "pinch grip" technique (RX 1014, ¶13), application of reclosable zipper technology to pinch grip openable packaging (RX 1011, ¶¶14, 17; RX 1012, ¶¶13-16; RX 1016, ¶¶7-8), and varying of the internal and external holding forces of the zipper profiles (RX 1012 ¶23) were all known in the art before December, 1996. It was also clear to those familiar with conventional Minigrip zippers and the

15

**A96**

features of the Frito-Lay film that a pinch grip openable bag would require a zipper with an internal opening force lower than the 6 lb. opening force of a conventional type of Minigrip zipper. What was not known was what opening force would enable pinch grip opening of the zipper and top seal without stripping the zipper from the walls or tearing or deforming the walls themselves and how to attach such zipper to food package walls in a manner that would avoid tearing or deformation of the walls. (RX 1011, ¶19; RX 1012, ¶18).

1.   **Ramsey's Alleged "Conception" In January 1997 Is Barred From Patentability Under 35 U.S.C. §102(b).**

If Jurgovan's idea is conception of an invention, it is no more than a statement of what was shown at the trade show --- pinch grip opening of a reclosable zipper package. (RX 1012 ¶¶14-16; RX 1016, ¶¶7-8; RX 1063.) Jurgovan's "conception" is thus barred from patentability by 35 U.S.C. §§ 102 (a) and (b).

Section 102(b) provides that a person shall be entitled to a patent unless it was in public use in this country more than one year prior to the date of the application for patent in the United States. The statutory phrase "public use" includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor. *New Railhead Manufacturing, L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297, 63 USPQ2d 1843, 1848-49 (Fed. Cir. 2002).

Messrs. Mulder and Hogan's November 1996 demonstration of pinch grip opening of a reclosable bag meets those criteria. Their demonstration was open and accessible, taking place at the 1996 Pac Expo --- an industry-wide packaging trade show attended by Mr. Jurgovan, other Frito-Lay representatives and a large number of other people involved in the packaging industry. Messrs. Hogan and Mulder demonstrated the concept of opening a conventional zipper package without the zipper stripping from the package walls or the package walls deforming, thereby

16

**A97**

presenting a fully-enabling demonstration of Mr. Jurgovan's "invention" no later than November 1996. The pinch grip demonstration by Mr. Hogan and Mr. Mulder would have enabled one of ordinary skill in the art to make and use the package demonstrated at that time. Of course, what was not shown is how such pinch grip opening could be applied to a food package to permit pinch grip opening of the package without tearing or deforming the package walls. As neither Mr. Mulder (who performed some of the demonstrations) nor the witnesses to the demonstration were under a confidentiality obligation as to pinch grip openable packaging technologies, their opening of the packages at PacExpo 1996 constitutes a bar under 35 U.S.C. §102(b) to any patentability of Jurgovan's so-called conception. *See Netscape Communications Corporation v. Konrad,* 295 F.3d 1315, 1320-22, 63 USPQ2d 1580, 1583-85 (Fed. Cir. 2002). Thus, if Jurgovan's January/February 1997 "ideas" were found to be conception of an invention, it would not be patentable in light of the November 1996 demonstration, which was more than one year before Jurgovan applied for a patent in May 1998.

**2.    Jurgovan's Alleged "Conception" Is Barred From Patentability By 35 U.S.C. §102(a).**

Based on the same facts, Jurgovan's "idea" is not patentable under 35 U.S.C. §102(a). That section provides that a person shall be entitled to a patent unless the invention was "known or used by others in this country," meaning knowledge or use which is accessible to the public. *Carella v. Starlight Archery,* 804 F.2d 135, 231 USPQ 644, 646-47 (Fed. Cir. 1986). As Jurgovan has claimed conception in December 1996, all events that took place at the November 1996 trade show are potentially anticipatory under 35 U.S.C. §102(a). At the November 1996 trade show, Mr. Mulder and Mr. Hogan demonstrated pinch grip opening of a reclosable package that was commensurate in scope with Jurgovan's "conception." To the extent that Jurgovan's idea would have enabled others of ordinary skill in the art to make and use such a package as set

forth in the Counts (which Ramsey denies) so did the Mulder/Hogan demonstration. Given the demonstration undertaken by Hogan and Mulder at the 1996 trade show, and the fact that that Jurgovan's "conception" was encompassed or --- at the very least --- made obvious by Mulder and Hogan's demonstration, Jurgovan's pinch grip "idea" is also barred from patentability under 35 U.S.C. §102(a).

### C. Jurgovan Was Not Diligent In Reducing Any Alleged Conception Of The Inventions To Practice During June-August 1997.

On page 17, line, 3 of its Motion, Jurgovan argues that it diligently pursued a reduction to practice from before March 29, 1997, and on page 18, lines 12 it is specifically argued that Jurgovan was diligent from June 15, 1997 to August 28, 1997.

The response is that Jurgovan's request of a priority judgment on the basis of its alleged status as the first party to conceive the invention and the second to reduce the invention to practice with diligence should be denied. Even if Jurgovan had been the first party to conceive the Inventions (which Ramsey disputes), Jurgovan was not diligent in reducing its "invention" to practice. Diligence requires continuous work on reducing the subject of the invention counts to practice, and does not include work on unrelated inventions. *In re Jolley,* 308 F.3d 1317, 1327, 64 USPQ2d 1901, 1908-09 (Fed. Cir. 2002) ("There must be either a direct point of attachment to the subject matter of the count, or a context established by other evidence in which otherwise isolated experimentation is seen as part of an overall scheme of inventive activity directed toward reducing the invention to practice"); *see generally Louis v. Okada,* 2002 Pat. App. LEXIS 190 (BPAI 2002). The standards for finding reasonable diligence are harsh, and delays as short as 2 days have been found sufficient to prevent a showing of diligence. *In re Mulder,* 716 F.2d 1542, 1545-46, 219 USPQ 189, 193-94 (Fed. Cir. 1983).

Jurgovan's alleged diligence fails to meet this standard. Jurgovan's timeline lacks any

specific citation of activities to support its claim of reasonable diligence. Indeed, Jurgovan's first step to reduce his "invention" to practice was to call someone at Minigrip and request that Minigrip develop the technology, and the vast majority of the later steps of Jurgovan's "diligence" were to "wait" for Minigrip to complete its development. (RX 1073, 39:20 – 40:17). Jurgovan made no effort to reduce the "invention" to practice, as it acknowledged that Ramsey was doing the development work on pinch grip. It never sought zipper from any other supplier, a tacit acknowledgment that its "idea" required considerable research and experimentation and that it made virtually no effort to reduce its "invention" to practice. (*See* RX 1073, 11:7 – 12:23).

Jurgovan's conduct in early March 1997 also does not support its diligence claim, as it was continuing to look to Ramsey to develop the pinch grip technology. Thereafter, Jurgovan's own evidence reveals that it did almost nothing on pinch grip until late August 1997. Virtually all of Jurgovan's status reports about the reclosure project in this period say nothing about pinch grip. (*See, e.g.,* JX 2044, JX 2047). Perhaps no better proof of Jurgovan's lack of diligence is the Frito-Lay decision to stop work on the pinch grip project at a June 24, 1997 meeting. At this meeting, Mr. Jurgovan and other Frito-Lay personnel decided to suspend efforts on the peelable seal and pinch grip concepts. (RX 1011, ¶32; RX 1012, ¶29). Mr. Jurgovan confirmed that decision in written minutes summarizing the June 24th meeting, which stated that pinch grip was "tabled" by Frito-Lay. (RX 1028). At his deposition, Mr. Jurgovan contended that when he said "tabled," he really meant that pinch grip remained a "lower priority." (RX 1073, 115:14). That testimony is not credible. Earlier documents show that when Mr. Jurgovan wanted to establish that pinch grip was low priority, he knew how to do so. (*See* RX 1025; RX 1011, ¶31). There can be no legitimate dispute that when it asked Minigrip to "table" the pinch grip project in late

June 1997, Frito-Lay stopped its work on the pinch grip project. (RX 1012, ¶29).[5]

The "tabling" decision dooms Jurgovan's contention that it exercised reasonable diligence. That Jurgovan continued to pursue development of a peel seal consumer-side open package does not help its claim of diligence, for that activity was outside the scope of the Counts and was not necessary for constructing an embodiment of a pinch grip openable package. *See Louis v. Okada,* 2002 Pat. App. LEXIS 190 at **11-12. Although Jurgovan renewed interest in pinch grip technology in late August or early September 1997, its inactivity on pinch grip for months before that time defeats its claim of diligence throughout the critical period.

**D.    Ramsey Was The First To Reduce The Inventions To Practice Because Jurgovan's Testing Inures To The Benefit Of Ramsey.**

On page 11, line 4 of its motion, Jurgovan alleges that it reduced the Inventions to practice prior to Ramsey on September 25, September 30, November 6, and December 18, 1997, and March 19 and 20, 1998.

The response is that Jurgovan's request for judgment on the basis of first reduction to practice should be denied because: (1) all of Jurgovan's activities in reducing the Inventions to practice inure to the benefit of Ramsey because it utilized the zipper technology supplied by Ramsey; (2) Jurgovan's alleged reductions to practice on September 25 and 30, 1997 were not an actual reduction to practice of the Inventions; and (3) Jurgovan's alleged reduction to practice of March 19 and 20, 1998 are irrelevant in light of Ramsey's constructive reduction to practice on March 6, 1998. In order to establish a reduction to practice, the inventor must prove that (1) he constructed an embodiment or performed a process that met all of the limitations of the interference count; or (2) he determined that the invention would work for its intended purpose.

---

[5] It should be noted that, notwithstanding Frito-Lay's request, Minigrip did keep on working on reducing to practice pinch-grip openable food packages. (RX 1011 ¶32; RX 1014, ¶20).

*Cooper v. Goldfarb,* 154 F.3d 1321, 1327, 47 USPQ2d 1896, 1901 (Fed. Cir. 1998). The inventor need not personally reduce to practice his conception. Acts by others working explicitly or implicitly at the inventor's request will inure to the inventor's benefit. *Id; Therriault v. Garbe,* 53 USPQ2d 1179, 1184 (BPAI 1999).

Jurgovan's activities in reducing the Inventions to practice inure to the benefit of Ramsey. Inurement focuses on the relationship between two parties, and does not require that the inventor communicate the entire concept to the other party. Depending on the exact relationship between the parties, the junior party's reduction to practice may inure to the benefit of the senior party even if the junior party independently conceives the invention in the course of performing experiments at the senior party's request. *Cooper v. Goldfarb,* 154 F.3d at 1331-32.

Here, Ramsey regularly constructed zipper, tested this zipper, developed zipper application techniques, and then produced reclosable packages for testing by requesting Jurgovan to produce these packages using Frito-Lay film and FFS equipment and Minigrip's zipper and zipper application technology. Ramsey asked Jurgovan to construct and test these packages because Minigrip did not have a fully-functional FFS machine (RX 1010, ¶17), but Ramsey did perform limited testing using a mock-up of a FFS machine. (RX 1013, ¶8). As Ramsey's development of the zipper modifications and attachment technology are central to Counts 1 and 2 and were recognized as a "Minigrip development issue" (RX 1025; RX 1011, ¶31; RX 1012, ¶28), it was understood that Jurgovan would take pre-tested Minigrip zipper and, using Frito-Lay's VFFS machine, apply the zipper to film, and make a food package with zipper technology also obtained from Ramsey. Jurgovan (and other Frito-Lay personnel) then tested those packages that happened to be produced with an intact zipper properly attached (as distinct from packages formed with an open zipper or other failures) by pinch grip opening them.

The mechanical nature of Jurgovan's bag making, the simplicity of testing whether a reclosable package can be successfully pinch grip opened, and Ramsey's expectation that its zipper and zipper attachment technology would work for its intended purpose, means that Jurgovan's testing of Ramsey's invention inured to Ramsey's benefit. That another person can act as the invention's "hands" is a settled principle of patent law. In *Applegate v. Scherer*, 332 F.2d 571, 573, 141 USPQ 796, 798-99 (CCPA 1964), the Court of Customs and Patent Appeals held that a corporation was entitled to priority over a government agent even though the agent conducted the tests that reduced the invention to practice. The Court held that in view of the disclosure to Applegate of a conception of the invention of the count, the reduction to practice by Applegate inured to the benefit of Scherer. *Id.* (citing *Shumaker v. Paulson*, 136 F.2d 700, 58 USPQ 279 (CCPA 1943)). Here, for each package run that Jurgovan claims as a reduction to practice, Ramsey supplied zipper with sealant layers that taught Jurgovan where to attach the zipper to the film used to construct the reclosable package. (*See* JX 2020, ¶¶65, 76-79, 82-83, 95-97). Accordingly, each of Jurgovan's alleged reductions to practice inured to Ramsey's benefit.

On page 11, lines 5-10 it is asserted that Counts 1 and 2 were reduced to practice on September 25, 1997, when Mr. Jurgovan and Mr. Reaves "manufactured 41 pinch grip openable packages falling within the scope of Count 1 and tested them in a manner that falls within the scope of Count 2 so as to demonstrate that the packages and the method of opening them would each work for its intended purposes." (Jurgovan Motion for Judgment at page 11, lines 6-10; JX 2051 at 50; JX 2020, ¶67; JX 2022, ¶23; JX 2023, ¶25; JX 2057 at 4; JX 2020, ¶88).[6]

The response is that, while Jurgovan's activities of (approximately) September 25 and

---

[6] Mr. Jurgovan was not exactly sure when the September 25th "testing" actually occurred. *See generally* JX 1073, pp. 130-135.

September 30, 1997 inure to Ramsey's benefit, such activities were not reduction to practice. In his lab notebook with the relevant entries, Mr. Jurgovan does not even record those test results. His "September 25 test" reported that 30% of packages that had been made then failed when pinch grip opened. Jurgovan's subsequent September 30th test undercuts its claim that the previous test constituted a reduction to practice, for on September 30, 1997, fewer than half of the pinch grip packages that were successfully made were then pinch grip opened without tearing or deforming the package wall or stripping the zipper from the package wall. (JX 2051 at 51; JX 2022, ¶¶22-25). *See Birmingham v. Randall*, 171 F.2d 957, 960, 80 USPQ 371, 373 (CCPA 1948) (conduct of an alleged inventor subsequent to an experiment can negate the claim "that the results were satisfactory"); *see generally Parins and Poppe v. Slater*, 2000 WL 33980533 (BPAI 2000) (no reduction to practice in light of the inconsistencies between the contemporaneous record and after-the-fact testimony regarding the success of the alleged reduction to practice). Mr. Jurgovan's notebook entry for November 6, 1997 (JX 2033 at 46) confirmed his view at the time that all previous testing had been unsuccessful because there had been a failure rate of greater than 10% (20% - 50% range), and discredits Jurgovan's current claim that its pre-November 1997 testing illustrated an invention suitable for its intended purpose.

On November 6, 1997 Jurgovan first reduced Counts 1 and 2 to practice on behalf of Ramsey. The previous day, Mr. Ramsey had sent modified zipper (which Minigrip had recently tested) for use in a pinch grip bag to Jurgovan, along with a diagram of the modified zipper and the proper attaching technology. (*See* RX 1010, ¶16; RX 1041). This zipper embodied the invention conceived by Ramsey on March 29, 1997. Based on Minigrip's experimentation and modification of its zipper during the months of September and October 1997, Ramsey expected that its zipper design as embodied in RX 1041 would work for its intended purpose—namely,

23

**A104**

reducing the opening force when the package was pinch grip opened so as to enable such a package to meet all of the limitations of Counts 1 and 2.

This reduction to practice enabled by the zipper sent from Ramsey to Jurgovan and utilizing Ramsey's zipper attachment technology finds support both in the testimony of the parties to this proceeding and in their contemporaneous records.  For example, Jurgovan's notebook entries in both his composition notebook (JX 2051 at 70) and laboratory notebook (JX 2033 at 46) reference Mr. Ramsey's memorandum of November 5, 1997, and confirm that all but 7 or 8 of the 150 packages tested were successfully opened and reclosed.  (*See* RX 1010, ¶¶17-18).  Mr. Jurgovan's memo of November 7, 1997 (JX 2063) and Mr. Ramsey's memorandum of the same date (RX 1042; RX 1010, ¶18) indicate that Frito-Lay was prepared to use the zipper design conveyed to it by Ramsey on November 5, 1997 (with a slight further modification) for a production run for packages to be used in a market test.  These November 7, 1997 memos reflect the fact that both Ramsey and Jurgovan considered Ramsey's invention to be actually reduced to practice on November 6, 1997, and thereafter sought to commercialize the Inventions.

In light of the inurement of Jurgovan's package testing to Ramsey's benefit and of the successful reduction to practice of November 6, 1997, Jurgovan's assertion of December 1997 and March 1998 reductions to practice are irrelevant.  First, any additional testing performed using Minigrip's zipper in December 1997 inured to the benefit of Ramsey, as there was continued work to commercially optimize Minigrip's invention during that time.  Second, Frito-Lay's alleged March 1998 conception is irrelevant in light of Ramsey's constructive reduction to practice of the Counts.  *See Justus v. Appenzeller,* 177 USPQ 332, 340-41 (BPAI 1971).

## CONCLUSION

For the foregoing reasons, the Board should find that Jurgovan was not the first to conceive Counts 1 and 2 of this interference; did not communicate conception to Ramsey prior to Ramsey's conception date of March 29, 1997; was not diligent in reducing any "conception" to practice; and assisted Ramsey in reducing Ramsey's conception to practice in November, 1997. The Board should deny Jurgovan's motion for judgment as to derivation and priority.

Respectfully submitted,

Gerald Levy
Registration No. 24,419
Lead Counsel for RAMSEY

Lindsay S. Adams
Registration No. 36,425
Back-up counsel for RAMSEY

Pitney Hardin LLP
7 Times Square
New York, NY 10036
(212) 297-5800

25

**A106**

## CERTIFICATE OF FILING

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY OPPOSITION TO JURGOVAN MOTION FOR JUDGMENT** was filed this 13th day of May, 2005, via electronic filing, with the following:

> The Board of Patent Appeals and Interferences
> United States Patent and Trademark Office
> Madison Building East
> 9th Floor
> 600 Dulany Street
> Alexandria, VA 22314
> Phone No: 571-272-9797
> Facsimile No: 571-273-0042
> Email: BoxInterferences@USPTO.GOV

Lindsay S. Adams

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY OPPOSITION TO JURGOVAN MOTION FOR JUDGMENT** was served on this 13th day of May, 2005, via electronic filing, on the following counsel for Jurgovan:

> Joseph A. Hynds, Esq.
> Rothwell, Figg, Ernst & Manbeck, PC
> 1425 K Street, N.W.
> Suite 800
> Washington, DC 20005
> Tel.: (202) 783-6040
> Fax: (202) 783-6031
> E-mail: jhynds@rothwellfigg.com

Lindsay S. Adams

Paper No._____

Filed on behalf of JURGOVAN
By:     Lead Counsel - Joseph A. Hynds
        Backup Counsel - Richard Wydeven
        Rothwell, Figg, Ernst & Manbeck, PC
        1425 K Street, N.W.
        Suite 800
        Washington, DC 20005
        Tel:     202-783-6040
        Fax:     202-783-6031

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

_____

MARC A. JURGOVAN and MARTIN B. DIERL
Junior Party,
(Patent No. 5,972,396 and Application No. 09/372,646),

v.

RONALD L. RAMSEY, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application No. 09/481,723).

_____

Patent Interference No. 105,173

_____

**JURGOVAN REPLY IN SUPPORT OF JURGOVAN MOTION FOR JUDGMENT
(Based on Priority and Derivation)**

**A108**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

EVIDENCE CITED FOR THE FIRST TIME IN SUPPORT OF THE REPLY . . . . . . . . . . . . . 1

WHETHER FACTS ALLEGED BY RAMSEY ARE ADMITTED OR DENIED  . . . . . . . . . . 1

ADDITIONAL FACTS UPON WHICH JURGOVAN RELIES  . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    JURGOVAN HAS PROVEN THAT RAMSEY DERIVED THE INVENTION FROM
      JURGOVAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Ramsey's Contention That Jurgovan's Conception Did Not Contain Every
            Limitation of the Counts Is Without Merit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    Ramsey's Contention That Jurgovan's Conception Could Not Be Reduced
            to Practice Without Undue Experimentation Is Contrary to the Evidence
            and Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            1.    Jurgovan's Evidence Establishes That No Undue Experimentation Was
                  Required for Reduction to Practice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            2.    Ramsey Provides No Evidence of Undue Experimentation  . . . . . . . . . . 8

      C.    Ramsey's Contention That Jurgovan Did Not Communicate Conceptions
            of the Invention to Ramsey Prior to March 29, 1997 Is Meritless . . . . . . . . . . . 10

II.   JURGOVAN HAS PROVEN ENTITLEMENT TO JUDGMENT UNDER 35 U.S.C. §
      102(g) BASED ON PRIORITY OF INVENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Ramsey Admits that Jurgovan was the First to Reduce to Practice . . . . . . . . . . 11

      B.    Jurgovan's Reductions to Practice Do Not Inure to Ramsey's Benefit . . . . . . . . 13

      C.    Ramsey's Claim That Jurgovan's Conception Is Barred from Patentability
            under 35 U.S.C. §§ 102(a) and (b) Is Untimely and Without Merit  . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF FILING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

**A109**

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

**Cases**

*Burroughs Wellcome Co. v. Barr Labs.*,
40 F.3d 1223, 32 USPQ2d 1915 (Fed. Cir. 1994),
*cert. denied*, 516 U.S. 1070 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Cooper v. Goldfarb*,
154 F.3d 1321, 47 USPQ2d 1896 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*DSL Dynamic Sciences, Ltd. v. Union Switch & Signal, Inc.*,
928 F.2d 1122, 18 USPQ2d 1152 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


**Statutes**

35 U.S.C. § 102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

35 U.S.C. § 102(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

35 U.S.C. § 102(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

35 U.S.C. § 102(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 15

**EVIDENCE CITED FOR THE FIRST TIME IN SUPPORT OF THE REPLY**

*See* Appendix A.

**WHETHER FACTS ALLEGED BY RAMSEY ARE ADMITTED OR DENIED**

*See* Appendix B.

**ADDITIONAL FACTS UPON WHICH JURGOVAN RELIES**

*See* Appendix C.

**ARGUMENT**

I.     **JURGOVAN HAS PROVEN THAT RAMSEY DERIVED THE INVENTION FROM JURGOVAN**

    A.     **Ramsey's Contention That Jurgovan's Conception Did Not Contain Every Limitation of the Counts Is Without Merit**

On page 3, lines 1-5 of the opposition, Ramsey argues that Jurgovan's derivation motion should be denied because Jurgovan's conception allegedly did not contain every limitation of the Counts.  Specifically, on page 3, lines 11-15, Ramsey argues that Jurgovan's conceptions did not encompass the elements of: (1) "the zipper remaining engaged together while attached to a bag wall"; and (2) "having an internal opening force that would enable pinch grip opening while resisting tearing and deformation upon application of such pinch grip opening force."

The response, as it relates to alleged element (1), is that Ramsey does not accurately identify the language of the Counts, which are directed to a flexible package (and method for opening and reclosing that flexible package) including "said first and second engagement members being engaged together."  (JX 2009, pp. 1 and  9).  Jurgovan's proofs clearly establish conception of this element by January 2, January 24, January 29-30, February 24, March 10, and March 14, 1997.  (JX 2020, ¶¶ 23, 26, 33, 39, 47, 48; JX 2033, pp. 1, 2, 17; JX 2040, p. 2; JX 2038).  For example, Mr. Jurgovan's drawing on pages 2 and 17 of his laboratory notebook (JX

1

**A112**

2033), and the drawing dated March 14, 1997 (JX 2040, p. 2), show conception of a flexible package including, *inter alia*, first and second engagement members (the male and female zipper parts) being attached to the walls of the flexible package and being engaged together. That conception is corroborated by Mr. Callahan (JX 2021, ¶¶ 14, 19, 22, 30-31, 33-35), Mr. Reaves (JX 2022, ¶¶ 9-10), Mr. Keel (JX 2023, ¶¶ 7-8, 10-11) and even by Mr. Malin (JX 2040, p. 2).

As to the alleged element (2), Jurgovan responds that this is not an element of the Counts. Rather, both Counts recite "said front and rear bag walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening." (JX 2009, pp. 2 and 10). Jurgovan's corroborated evidence establishes conception of this element by January 2, January 24, January 29-30, February 24, March 10, and March 14, 1997. (JX 2020, ¶¶ 23, 39, 48; JX 2021, ¶¶ 14, 20, 21, 23, 27, 35; JX 2022, ¶¶ 9-10; JX 2023, ¶ 11; JX 2033, pp. 1, 2, 17; JX 2040, p. 2; JX 2038). For example, Mr. Callahan's declaration states that Mr. Jurgovan explained to him by at least January 24, 1997 that "consumers would open the top seal and the zipper material by manually gripping the front and back walls of the bag below the zipper material and pulling apart with a pinch grip pulling force that would open the zipper material and then the top seal of the bag, from the product side outward, in a single pinch-grip opening motion, without tearing or deforming the bag walls." (JX 2021, ¶ 14-15).

Jurgovan further responds that Ramsey's new interpretation of this "tearing and deformation" language – in response to Jurgovan's substantial evidence of prior conception – is contradicted by its positions in Ramsey Preliminary Motion No. 2 where Ramsey proposed substitute Counts 3 and 4 that eliminated the "said front and rear bag walls having a sufficient strength to resist tearing and deformation ..." language as being "superfluous," "redundant" and "unnecessary." (JX 2018, pp. 10-11; *see also* JX 2092, Ramsey Opposition No. 1, pp. 16-17).

2

**A113**

Ramsey argued that a bag without walls sufficiently strong to "resist tearing and deformation" is neither *pinch grip openable* nor *reclosable.  (Id. )*

On page 4, lines 12-16, Ramsey argues that Jurgovan's conception of January 2, 1997 "did not recognize, let alone propose a solution to, two limitations of the Inventions: (a) a zipper openable by a pinch grip pulling force; and (b) a method for attaching such zipper to bag walls in a manner that would preclude the zipper from stripping from the wall (and hence remaining closed) or the walls tearing or deforming upon application of a pinch grip force."  As to element "(a)," Jurgovan responds that it conceived this subject matter as of January 2, 1997 and prior to Ramsey's earliest possible conception date on March 29, 1997.  Jurgovan's laboratory notebook (JX 2033) at pages 1 and 2 discusses and illustrates a zipper openable by a pinch grip pulling force and is corroborated by Mr. Callahan.  (JX 2021, ¶¶ 14-17, 19-23).  This feature also is illustrated at page 17 of Jurgovan's laboratory notebook (JX 2033), Mr. Jurgovan's March 10, 1997 memo (JX 2038) and page 2 of the March 14, 1997 drawing (JX 2040), and is corroborated by Mr. Reaves (JX 2022, ¶¶ 9-10) and Keel (JX 2023, ¶¶ 7-8, 10-11).

As to alleged element "(b)," the response is that this is not an element of the Counts. Jurgovan also responds that, although not necessary for conception, Jurgovan conceived the means and method for attaching the zipper to the bag walls in a manner such that it would remain attached during pinch grip opening and wherein the bag walls would not tear or deform upon application of a pinch grip force.  (*See* JX 2021, ¶¶ 14, 15, 21, 22, 23; JX 2020, ¶¶ 29-33, 36; JX 2033, pp. 1 and 2; JX 2038; JX 2022, ¶ 9).  For example, Mr. Callahan states in his declaration that by at least January 24, 1997, Mr. Jurgovan explained that he wanted to use a reduced internal opening force zipper, and that the zipper opening forces must approach the bond strength of the sealed film when opened, to avoid stripping the zipper away from the bag walls when opened.

3

**A114**

(JX 2021, ¶ 15). Mr. Callahan also states that Mr. Jurgovan explained to him that these features would "permit the consumer to have a familiar pinch grip opening experience and would reduce potential damage to the bag material." (JX 2021, ¶¶ 21-22). Mr. Jurgovan also conceived redesigning the zipper lock mechanism "to equilibrate the opening force when opening the package from either direction" (JX 2038) and using Frito-Lay standard film (known to withstand pinch grip opening without tearing or deformation). (JX 2020, ¶ 23; JX 2021, ¶¶ 19-23).

On page 5, line 7 through page 6, line 1, Ramsey argues that pages 1 and 2 of Mr. Jurgovan's laboratory notebook (JX 2033) "say nothing" about the alleged "elements" (a) and (b) discussed above. The response is that these laboratory notebook pages, corroborated by Mr. Callahan, clearly establish that Mr. Jurgovan conceived this subject matter by no later than January 24, 1997. According to Mr. Callahan, he understood page 1 of the laboratory notebook (JX 2033) to be indicating, *inter alia*, "that the consumer would open the package by manually grabbing the side walls of the flexible package material and pulling with a pinch grip pulling force to disengage the zipper material and then open the top seal in a single pinch grip opening motion, without tearing or deforming the bag walls." (JX 2021, ¶ 20). Mr. Callahan further states that "I believe that this is how a person working in the bag reclosure technology would understand this disclosure." (*Id.*) This evidence, as well as all the other evidence discussed above, establishes that Mr. Jurgovan conceived of a zipper attached to a flexible package openable by a pinch grip pulling force without stripping or damaging the bag wall prior to any possible conception by Ramsey. (JX 2020, ¶ 23; 2021, ¶¶ 19-23).

On page 6, lines 1-3, Ramsey asserts factually that the drawing labeled "(Proposed) M. Jurgovan" on page 2 of Mr Jurgovan's laboratory notebook (JX 2033) is "virtually identical" to the one sketched by Mr. Jurgovan based on information given to him in October 1996. (*See* JX

2036 at 22). The response is that Ramsey is wrong. The drawing on JX 2036 at page 22 is of

Minigrip's existing commercial design which required accessing the zipper from the top,

consumer side. (*See also* upper drawing on page 2 of JX 2033). Mr. Jurgovan notes "tear

flange" and "zipper perforated for opening" which reflect the Minigrip's consumer-side opening

design. The drawings on JX 2036 at page 22 do not relate to Mr. Jurgovan's pinch grip design

reflected on page 2 of JX 2033. (*See* JX 2087, pp. 170-71).

On page 6, lines 11-16, Ramsey argues that Mr. Callahan's declaration testimony that Mr.

Jurgovan told him by January 24, 1997 that "the bag walls should be able to withstand the pinch

grip opening process without tearing or deformation" should be accorded no weight because Mr.

Jurgovan does not state this in his declaration, and the statement does not appear in the

contemporaneous documents. The response is that Mr. Jurgovan's declaration states that he "had

disclosed [his] invention to [his] supervisor, Steve Callahan," by at least January 24, 1997 (JX

2020, ¶ 34), which included this limitation. Mr. Callahan's declaration reflects his recollection

of events and is entirely consistent with Mr. Jurgovan's declaration. Jurgovan also responds that

the contemporaneous documents do support Mr. Callahan's declaration testimony. For example,

as discussed above, the documents reflect that Mr. Jurgovan conceived a *pinch grip openable* and

*reclosable* flexible package (which requires that the bag walls remain intact). (*See* JX 2020, ¶

23; JX 2021, ¶¶ 19-23; JX 2033, pages 1 and 2). Contrary to Ramsey's argument, Mr.

Callahan's testimony is supported by the contemporaneous record, fully corroborates Mr.

Jurgovan's conception, and is entitled to substantial weight. Moreover, Ramsey could have

taken Mr. Callahan's deposition to challenge his testimony, but chose not to do so.

On page 7, lines 13-20, Ramsey argues that food packaging is produced on VFFS

equipment and, accordingly, that there is an "inherent" requirement in the Counts that the zipper

members remain engaged during the package forming and filling as required by the VFFS equipment. Jurgovan's response is that there is absolutely no requirement in the Counts –either express or "inherent"– that the flexible package be made on VFFS commercial production equipment, or that the zipper members remain closed during manufacture on that commercial equipment. Indeed, the Counts do not require the packages to be made on any type of equipment. Moreover, salty snack food packages can be made with equipment other than VFFS such as, for example, horizontal form, fill and seal equipment, and they can even be made by *hand*. (*See* JX 2087, pages 51-52, 59-60, 66-68, 172-175). Ramsey's efforts to incorporate additional elements into the Counts must be rejected.

> **B.    Ramsey's Contention That Jurgovan's Conception Could Not Be Reduced to Practice Without Undue Experimentation Is Contrary to the Evidence and Should Be Rejected**

On page 8, lines 10-11, Ramsey argues that Jurgovan's "ideas" could not be reduced to practice without undue experimentation and thus were not conceptions. Specifically, on page 8, lines 16-18, Ramsey argues that Jurgovan did not conceive because he sought Minigrip's "expertise" with zipper material for use in his pinch-grip openable package. The response is that whether or not Jurgovan sought zipper material from Ramsey, the issue is whether Jurgovan's conception was so clearly defined in Jurgovan's mind that only ordinary skill would be required to reduce the invention to practice without extensive research or experimentation. *Burroughs Wellcome Co. v. Barr Labs.*, 40 F.3d 1223, 1238, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994), *cert. denied*, 516 U.S. 1070 (1996). As set forth below, Jurgovan's conception meets this definition.

> **1.    Jurgovan's Evidence Establishes That No Undue Experimentation Was Required for Reduction to Practice**

Jurgovan's evidence establishes that its conception was reduced to practice without undue experimentation. First, as described above, Jurgovan's conception met all elements of the counts

6

**A117**

and described how they would be combined to form a functional pinch grip openable bag. (*See also* Jurgovan's Opening Brief, pp. 3-6). <u>Second</u>, Jurgovan's conception was specific and addressed the problem recognized by Mr. Jurgovan with the existing high internal opening force zippers. (JX 2020, ¶ 29). In particular, as discussed above, Mr. Jurgovan conceived (a) using a lower internal force zipper, (b) having the zipper opening force be lower than the zipper bond strength, and (c) equilibrating the opening forces (JX 2038), to avoid zipper stripping from the bag walls and to provide the consumer with a consistent opening experience. <u>Third</u>, Ramsey acknowledges that the application of reclosable zipper technology, and making zippers with different internal and external opening forces, were known at the time Jurgovan requested zipper material. (*See* Ramsey Opposition at 15; RX 1011, ¶ 9; RX 1012, ¶ 23; RX 1014, ¶ 8).

In addition, Mr. Callahan testified that Mr. Jurgovan's conception described to him and reflected on pages 1 and 2 of his laboratory notebook (JX 2033) contains sufficient detail that a person working in bag reclosure technology could make and use a functional pinch grip openable bag without undue experimentation. (JX 2021, ¶ 24). Mr. Callahan provides the same testimony with respect to the evidence of Mr. Jurgovan's conception dated January 29-30, 1997 (JX 2021, ¶ 27), February 20, 1997 (JX 2021, ¶ 31), and March 10, 1997 (JX 2021, ¶ 35). This testimony by Mr. Callahan, a mechanical engineer with approximately 29 years of experience in the packaging industry (JX 2021, ¶ 1), has not been challenged or rebutted by Ramsey with any evidence and is entitled to substantial weight.

Jurgovan also responds that the laboratory samples made by Mr. Jurgovan further establish that no undue experimentation was required for reduction to practice. In particular, Mr. Jurgovan testified that he made functional, pinch-grip openable bags in the laboratory during the December 1996 and January 1997 time period by applying inverted standard Minigrip zipper (2lb

external (consumer side) and 6lb internal (product side) opening forces) to hand-made bags using standard Frito-Lay film. (*See* JX 2087, pages 51-52, 58-60, 66-68, 172-75). By inverting the standard Minigrip zipper, Mr. Jurgovan achieved his desired reduced internal opening force zipper (i.e. 2lb). (*Id.* at 58-60, 172-75). Mr. Jugovan testified that he was able to pinch grip open and reclose the hand-made samples without stripping the zippers from the bag walls. (*Id.*; *see also* Frito-Lay inverted zipper design at JX 2033, pp. 31 and 33 (Option 4)).

Last, Mr. Jurgovan was able to actually reduce the invention to practice on *commercial production equipment* within days of receiving the 2lb/2lb (and 2lb/<2lb) reduced internal opening force zipper from Minigrip specifically requested by Mr. Jurgovan. (JX 2020, ¶¶ 63-65; JX 2033, pp. 31, 35-37; JX 2054). Jurgovan's substantial evidence stands in contrast to the complete lack of evidence from Ramsey that any such undue experimentation occurred.

## 2.    Ramsey Provides No Evidence of Undue Experimentation

On page 8, line 23 though page 9, line 9, Ramsey argues that Jurgovan's request that Minigrip provide a solution for pinch grip openable food packages did not allow for reduction to practice without extensive research or experimentation. However, Ramsey simply provides no evidence of extensive research or experimentation.

On page 9, lines 10-21, Ramsey argues that Messrs. Malin, Hogan and unidentified Minigrip representatives allegedly communicated "critical means and methods" of zipper technology to Jurgovan such as, withstanding airblasts during commercial manufacturing, using a four flange zipper versus a three flange zipper on VFFS commerical equipment, and keeping the zipper engaged during commercial manufacturing on VFFS equipment. The response is that these issues may be general considerations for commercial manufacturing on VFFS equipment, but they are not necessary for reduction to practice and, in any event, do not reflect that any

8

**A119**

experimentation or research, much less *undue* experimentation or research, occurred.

On page 9, lines 22-23 through page 10, line 15, Ramsey argues that the laboratory notebook of Larry Share demonstrates "the type of experimentation" undertaken by Minigrip in "devising a pinch grip openable food package." The response is that Mr. Share's laboratory notebook does not reflect that *any* experimentation took place. Rather, it reflects that Mr. Share, in *one day* (February 17, 1997), *thought* about ways to make Mr. Jurgovan's proposed four-flange zipper work better on VFFS commercial production equipment. In particular, on page 36 of RX 1069, Mr. Share writes that "[t]he *best most secure zipper attachment* to film occurs when all four flanges (above and below each male and female profile half) are sealed to the film." (Emphasis added). Mr. Share's illustration of a four-flange zipper is remarkably similar to Mr. Jurgovan's earlier proposed four-flange zipper. (*Compare* JX 2040, page 2 and JX 2033, page 2, with RX 1069, page 36). Mr. Share was concerned that, in the context of commercial manufacturing on VFFS equipment, the leading edge of the female flange would jam going over the shoulder. (*See* RX 1069, page 35). Mr. Share proposed to eliminate this possibility by simply providing a "weak, temporary perforation (perforation) that would enable the leading outside flange to clear the shoulder and tube...." (*Id.* at 36).

Notably, while Ramsey relies on Mr. Share's notebook to show "unpredictable zipper opening mechanics," Ramsey completely leaves out the fact that Mr. Share –in *one day* (February 17, 1997)– proposed a simple modification to Mr. Jurgovan's proposed four-flange zipper to eliminate the possibility of jamming on VFFS commercial production equipment. Rather than showing undue experimentation, Mr. Share's notebook is additional evidence that no undue experimentation – indeed no experimentation at all – was required to address the alleged challenges for making Mr. Jurgovan's pinch grip package on VFFS commercial production

equipment. Moreover, Mr. Malin's proposed zipper design of February 26, 1997 (JX 2033, page 19) is yet another example of a zipper configuration acceptable for VFFS commercial production equipment, and additional evidence of a lack of undue experimentation.

On page 11, lines 14-19 of the opposition, Ramsey argues that the "considerable work and experimentation in January, February and March 1997" led to conception of the invention by Ramsey on March 29, 1997, with a three-flange zipper that allegedly addressed the alleged two missing elements of the Counts discussed above. The response is that Ramsey's evidence of this "considerable work and experimentation" is utterly lacking. Further, this alleged work was only directed at an alleged *conception,* not a reduction to practice. Last, Ramsey's assertion that its alleged March 29, 1997 conception – a non-specific proposal for future design considerations – could be reduced to practice without undue experimentation further establishes that no undue experimentation was required to reduce to practice Mr. Jurgovan's conception.

**C.    Ramsey's Contention That Jurgovan Did Not Communicate Conceptions of the Invention to Ramsey Prior to March 29, 1997 Is Meritless**

On page 12, lines 7-12 of the opposition, Ramsey argues that Mr. Jurgovan's communications of conception to Ramsey cannot serve as the basis for a derivation claim because they were not communications of the "conception of the Inventions." The response is that, for reasons set forth above in Sections I.A and B, and in Jurgovan's Opening Brief in Sections I.B. and C., Mr. Jurgovan communicated a complete conception to Ramsey on at least each of January 2, January 29 and 30, March 10 and March 14, 1997.

On page 13, lines 1-7, Ramsey argues that Mr. Jurgovan did not communicate conception to Mr. Hogan because he communicated elements, such as the use of a reduced internal opening force zipper, that were known to Mr. Hogan and persons skilled in the art. The response is that the use of a reduced internal opening force zipper *in a pinch grip openable bag* was not known to

10

**A121**

Mr. Hogan (or to persons outside of Frito-Lay) until Mr. Jurgovan disclosed his invention to Mr. Hogan. Further, the fact that Mr. Hogan and others skilled in the art knew *how to make* reduced internal opening force zippers does not negate communication of Mr. Jurgovan's conception, but it does reinforce that no undue experimentation was required for reduction to practice.

On page 13, lines 7-10, Ramsey argues that Jurgovan failed to "recognize" or communicate the "entire scope of the Inventions" to Ramsey during the meeting on January 29 and 30, 1997. The response is that Mr. Callahan's declaration testimony corroborates that a complete conception was communicated to Messrs. Malin and Hogan, and Mr. Mulder of Bosch, at this meeting. (JX 2021, ¶¶ 26-28). This evidence is *unchallenged by Ramsey* and is entitled to substantial weight. Moreover, the Mulder declaration (RX 1016) submitted by Ramsey says nothing about the January 29 and 30, 1997 meeting.

## II.    JURGOVAN HAS PROVEN ENTITLEMENT TO JUDGMENT UNDER 35 U.S.C. § 102(g) BASED ON PRIORITY OF INVENTION

### A.    Ramsey Admits that Jurgovan was the First to Reduce to Practice

On page 23, lines 17-23 through page 24, lines 1-14 of the opposition, Ramsey admits that the manufacture and testing of pinch grip openable packages conducted by Messrs. Jurgovan and Reaves at Frito-Lay on November 6, 1997 constitutes an actual reduction to practice of the invention of Counts 1 and 2. (*See also* Ramsey Appendix B–Whether Facts Alleged by Jurgovan are Admitted or Denied, Fact Nos. 125-129). The response is that Jurgovan agrees. Nowhere in Ramsey's opposition does Ramsey assert that it actually reduced the invention to practice at any time either before or after November 6, 1997. Accordingly, it is undisputed that Jurgovan's activity on November 6, 1997 constitutes an actual reduction to practice of Counts 1 and 2.

On page 22, line 21 through page 23, line 16, Ramsey argues that Jurgovan's activities on or about September 25, 1997 did not constitute reduction to practice on grounds that (a)

subsequent testing on September 30, 1997 undercuts Jurgovan's claim, and (b) Mr. Jurgovan's laboratory notebook entry for November 6, 1997 (JX 2033 at 46) allegedly states his view that all previous testing was unsuccessful. The response is that Ramsey cannot and does not deny that Mr. Jurgovan's testing on or about September 25, 1997, on *commercial production equipment,* established that the invention worked for its intended purpose. Contemporaneous evidence establishes that Mr. Jurgovan and others considered this testing to be successful. (JX 2052, second paragraph; JX 2057, page 4; JX 2022, ¶ 23; JX 2023, ¶ 25; JX 2089, ¶¶ 2-6; JX 2090, ¶¶ 2-6; JX 2020, ¶¶ 65-67). While Mr. Jurgovan's subsequent notebook page entry states that testing in October 1997 was not successful, Mr. Jurgovan testified that this referred to success from a *commercial production standard.* (JX 2087, pages 147-48). This does not mean that Mr. Jurgovan had not reduced his invention to practice. *See DSL Dynamic Sciences, Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122, 1126, 18 USPQ2d 1152, 1155 (Fed. Cir. 1991) ("there is certainly no requirement that an invention, when tested, be in a commercially satisfactory stage of development in order to reduce the invention to practice."). Further, the results of the September 30, 1997 testing, while not acceptable for commercial production, also showed that the invention worked as intended. (*Id.; see also* Jurgovan's Opening Brief, page 12).

Because Ramsey admits that Jurgovan actually reduced to practice the invention of Counts 1 and 2 and that Ramsey did not, Ramsey's only chance of prevailing on the issue of priority is to claim that Jurgovan's reductions to practice inure to Ramsey's benefit. As set forth below, Ramsey's argument lacks any factual or legal basis, and should be rejected.[1]

---

[1]Although Jurgovan maintains that it acted diligently, given Ramsey's admission that it never actually reduced to practice the invention, its criticisms of Jurgovan's evidence of diligence (Opposition at 18-20) are legally irrelevant, because only one who is the first to conceive and

**B.     Jurgovan's Reductions to Practice Do Not Inure to Ramsey's Benefit**

On page 20, lines 14-17, and page 21, lines 11-23 through page 22, line 14 of the

opposition, Ramsey argues that all of Jurgovan's activities in reducing the inventions to practice

inure to Ramsey's benefit. Jurgovan responds that Ramsey's inurement claim is groundless.

Inurement involves a claim by an inventor that, as a matter of law, the acts of another person

should accrue to the benefit of the inventor. *Cooper v. Goldfarb*, 154 F.3d 1321, 1331-32, 47

USPQ2d 1896, 1904 (Fed. Cir. 1998). In order to establish inurement, an inventor must show,

among other things, that the other person was working either explicitly or implicitly at the

inventor's request. *Id.*

Ramsey cannot satisfy any element of inurement. Counts 1 and 2 in this interference are

directed to a pinch-grip openable flexible package and a method of opening and reclosing that

flexible package. (JX 2009, pages 1 and 9). The Counts are not directed to a zipper *per se*, or for

use in VFFS commercial production equipment, as Ramsey would suggest. As shown herein,

and in Jurgovan's Opening Brief, Jurgovan conceived the subject matter of Counts 1 and 2 and

communicated that conception to Ramsey. Ramsey is not the inventor of the subject matter of

the Counts and, therefore, Jurgovan's activities cannot inure to Ramsey's benefit. *Cooper*, 154

F.3d at 1331-32, 47 USPQ2d at 1904. That Ramsey supplied Jurgovan zippers, just one of many

components of the subject matter of the Counts, cannot change this conclusion. Ramsey supplied

the zipper at Jurgovan's explicit request and direction. In particular, the zippers used in

Jurgovan's actual reductions to practice in September and November 1997 were 2lb internal and

2lb external (and 2lb/less than 2lb) opening force zippers conceived and requested by Mr.

Jurgovan. (*See* JX 2020, ¶¶ 63-65, JX 2033, p. 31, 35-37; JX 2054). Ramsey's argument on

---

second to reduce to practice need show reasonable diligence. 35 U.S.C. §102(g).

page 14, lines 14-20 that the 2lb/2lb zipper had been suggested by Ramsey is unsupportable and contradicted by contemporaneous records created by Ramsey. (*See* JX 2057, p. 4 "Concept" – "2lb/2lb zipper", "Idea Generated By"–"Frito-Lay").

Ramsey's allegation that it asked Jurgovan to construct and test packages is false. The cited evidence (RX, 1010, ¶ 17) nowhere states that Jurgovan was asked to construct and test packages. To the contrary, the record compels the conclusion that Ramsey was working at the request of Jurgovan, and not *vice versa*. It was Frito-Lay/Jurgovan's project to manufacture a reclosable bag for its snack food products, and who asked Minigrip/Ramsey to provide zipper material that Frito-Lay/Jurgovan would incorporate into its bags. (RX 1012, ¶ 11; RX 1011, ¶ 12; JX 2020, ¶¶ 18, 27, 29; JX 2033, pp. 1, 35, 38). Nor does it matter if Jurgovan's bag making was "mechanical in nature," or that Ramsey expected its zipper to work. Ramsey is not an inventor of the subject matter of the Counts, and Ramsey was working explicitly at Jurgovan's request. Therefore, Ramsey's inurement argument fails as a matter of law.

### C.  Ramsey's Claim That Jurgovan's Conception Is Barred from Patentability under 35 U.S.C. §§ 102(a) and (b) Is Untimely and Without Merit

On page 16, lines 7-12 of the opposition, Ramsey argues that Jurgovan's conception in January 1997 is no more than a statement of what was shown at the 1996 PacExpo trade show and, therefore, is barred from patentability under 35 U.S.C. §§ 102(a) and (b).

Jurgovan responds that Ramsey's claim must be rejected for two separate and independent reasons. First, Ramsey's argument is nothing more than a motion for unpatentability that should have been raised, if at all, during the preliminary motions stage of this interference. All of the alleged events supporting Ramsey's argument have been known to Ramsey since November 1996, and Ramsey provides no explanation as to why this issue was not raised earlier. Ramsey's arguments are untimely and should be rejected for this reason alone.

14

**A125**

Second, Ramsey's argument has no merit because Ramsey fails to establish that it placed anything into the public domain at PacExpo. On page 16, lines 23-24 through page 17, line 2, Ramsey alleges that Messrs. Hogan and Mulder "demonstrated the concept of opening a conventional zipper package without the zipper stripping from the package walls or the package walls deforming" by no later than November 1996. Remarkably, Ramsey fails to cite to *any* evidence in support of this proposition. There is no such evidence. Indeed, the declarations of Hogan and Mulder fail to specify, inter alia: (1) what packages were allegedly pinch-grip opened at PacExpo, (2) what features those packages had, (3) what the results were of the alleged attempts to pinch-grip open the bags; (4) whether these activities met all limitation of the Counts; (5) and whether any member of the public ever witnessed the alleged demonstration. Further, nowhere in those declarations does it state that a conventional zipper package was opened without the zipper stripping from the package walls or the package walls deforming, or that the packages were even opened and then reclosed. Ramsey's argument should be rejected for this additional reason.

## CONCLUSION

For the reasons set forth above and in Jurgovan's Opening Brief, Jurgovan's Motion for Judgment under 35 U.S.C. §§ 102(f) and (g) should be granted.

Respectfully submitted,
ROTHWELL, FIGG, ERNST & MANBECK, P.C.

Date: June 16, 2005                     By _____
                                         Joseph A. Hynds
                                         Registration No. 34,627
                                         1425 K Street, N.W., Suite 800
                                         Washington, D.C. 20005
                                         Telephone: (202) 783-6040
                                         Facsimile: (202) 783-6031
                                         *Lead Counsel for Jurgovan*

15

**A126**

## APPENDIX A

### JURGOVAN LIST OF EVIDENCE CITED FOR THE FIRST
### TIME IN SUPPORT OF THE REPLY

In support of its Reply, Jurgovan cites for the first time the following evidence:

JX 2091      Legible Copy of Larry Share's Laboratory Notebook.

JX 2092      Ramsey Opposition No. 1

**APPENDIX B**

**STATEMENT WHETHER EACH MATERIAL FACT ALLEGED IN
RAMSEY'S OPPOSITION IS ADMITTED OR DENIED**

Jurgovan's statement of whether each material fact alleged in Ramsey's opposition to

Jurgovan's motion for judgment is admitted or denied is set forth below.

1.     Admits that Marc Jurgovan became involved in the Frito-Lay reclosure project

after Frito-Lay involved Minigrip, otherwise denied.

2.     Admits that Mr. Jurgovan maintained a laboratory notebook (JX 2033) and

computation notebooks (JX 2036 and 2051), otherwise denied.

3.     Admits that varying of the internal and external holding forces of zipper profiles

was known to persons of ordinary skill in the art before December 1996.  Jurgovan submits that

the second sentence is vague, confusing and not understood, and therefore Jurgovan is unable to

admit or deny the second sentence.  Otherwise, denied.

4.     Denied.

5.     Denied.

6.     Admitted.

7.     Denied.

8.     Denied.

9.     Admits that Mr Jurgovan made no requests for zipper material to zipper

manufactures other than Minigrip in 1997, otherwise denied.

10.     Denied.

11.     Denied.

Appendix B - 1

**A128**

12.     Denied.

13.     Admits that the quoted language appears in Mr. Share's notebook (RX 1069) on page 35, otherwise denied.

14.     Admits that Mr. Share's laboratory notebook reflects that on one day (February 17, 1997), Mr. Share proposed a way to make Mr. Jurgovan's proposed four-flanged zipper work better on FFS commercial production equipment and evidences a lack of undue experimentation – or experimentation of any kind–, otherwise denied.

15.     Unable to admit or deny.

16.     Admit that Mr. Malin sent to Mr. Jurgovan on February 26, 1997, after Mr. Jurgovan had communicated his conception to Mr. Malin, a facsimile containing a zipper design, otherwise denied.

17.     Denied.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Unable to admit or deny whether Minigrip zipper supplied to Frito-Lay was "pre-tested," otherwise denied.

25.     Admits that Minigrip supplied Jurgovan with zipper material, otherwise denied.

26.     Admits that on JX 2033, page 46, Mr. Jurgovan wrote under the heading of "Previous Tests In October" that "all tests were unsuccessful" and "failure rate > 10% (20-50% range)," otherwise denied.

27.     Admit that on November 5, 1997, Ron Ramsey sent a modified zipper to Jurgovan, at Jurgovan's request, for use in a pinch grip bag.  Otherwise denied.

28.     Unable to admit or deny, but note that the evidence cited (RX 1014 ¶¶ 27, 28) does not support the alleged fact.

29.     Denied.

Appendix B - 3

**A130**

## APPENDIX C

## STATEMENT OF ADDITIONAL MATERIAL
## FACTS TO REBUT THE OPPOSITION

254.    In Ramsey's Preliminary Motion No. 2 (to substitute counts under Rules 633(c) and 633(I)), Ramsey moved to substitute proposed Counts 3 and 4 for existing Counts 1 and 2. Proposed substitute Counts 3 and 4 were identical to the original Counts, but removed the language "said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during the pinch grip opening" from the counts. (JX 2018, p. 10). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

255.    Ramsey argued in support of Ramsey Preliminary Motion No. 2 that "Senior Party Ramsey respectfully submits that this language is superfluous and redundant with language already in Counts 1 and 2 (and Claims 31 and 42)." (JX 2018, p. 10). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

256.    Ramsey argued in support of Ramsey Preliminary Motion No. 2 that:

"Senior Party Ramsey respectfully points out that a bag without bag walls sufficiently strong to 'resist tearing and deformation' is not pinch grip openable but rather would tear during the first attempted opening and would not serve its intended purpose."

(JX 2018, p. 10). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

257.    Ramsey argued in support of Ramsey Preliminary Motion No. 2 that:

"Moreover, Count 2, as well as proposed substitute Count 4 (which is identical to Count 2 but for the omitted language discussed above) recites, *inter alia,* that the claimed method is of pinch grip opening and thereafter re-closing a flexible package. Similarly,

Appendix C - 1

**A131**

Count 1 as well as proposed substitute Count 3 (which is identical to Count 1 but for the omitted language discussed above) recites that the first and second engagement members are manually pinch-grip openable under a pinch grip pulling force applied to the walls. It is respectfully submitted that this language clearly shows that the walls of the bag are inherently strong enough to not tear or deform during pinch-grip opening thus rendering the omitted language '...sufficient strength to resist tearing and deformation...' redundant and unnecessary."

(JX 2018, p. 11). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

258.    Ramsey argued in support of Ramsey Preliminary Motion No. 2 that:

"Senior Party Ramsey respectfully submits that the newly proposed claims merely remove redundant language from the original counts, that these new counts likewise correspond [to] Jurgovan's claims as did the original counts."

(JX 2018, p. 11). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

259.    In Ramsey's opposition to Jurgovan's Preliminary Motion No. 1 (for invalidity based on lack of written description), Ramsey argued that the limitation of Counts 1 and 2 that "said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during the pinch grip opening" is an inherent characteristic of the walls of the re-closable bag disclosed in Ramsey's application. (JX 2092, p. 16). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

260.    In Ramsey's opposition to Jurgovan's Preliminary Motion No. 1 (for invalidity based on lack of written description), Ramsey argued that a bag without bag walls sufficiently strong to "resist tearing and deformation" is not pinch grip openable but rather would tear during the first attempted opening and once the bag is torn, it could no longer be re-closed by re-

Appendix C - 2

**A132**

engaging the zipper. (JX 2092, p. 17). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

261.    In Ramsey's opposition to Jurgovan's Preliminary Motion No. 1 (for invalidity based on lack of written description), Ramsey argued that:

> "claim 42 of Ramsey's '723 application recites that the first and second engagement members are manually pinch-grip openable under a pinch-grip pulling force applied to the walls (Additional Facts Upon Which Ramsey Relies, No. 8). The pinch-grip pulling force could not open the engagement members if the bags were not sufficiently strong to transmit the force to the engagement members. It is respectfully submitted that this language clearly shows that the walls of the bag are inherently strong enough to not tear or deform during pinch-grip opening thus rendering the language '...sufficient strength to resist tearing and deformation...' inherent, superfluous and redundant."

(JX 2092, p. 17). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

262.    Salty snack food packages can be made with equipment other than VFFS such as, for example, horizontal form, fill and seal equipment, and they can even be made by *hand*. (*See* JX 2087, pages 51-52, 59-60, 66-68, 172-175). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

263.    The application of reclosable zipper technology to flexible packaging on VFFS equipment, and making zippers with different internal and external opening forces, were known before December 1996. (*See* Ramsey Opposition at 15; RX 1011, ¶ 9; RX 1012, ¶ 23; RX 1014, ¶ 8). This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition.

264.    Mr. Jurgovan made functional, pinch-grip openable bags in the laboratory during the December 1996 and January 1997 time period by applying inverted standard Minigrip zipper

Appendix C - 3

# A133

(2lb. external (consumer side) and 6lb. internal (product side) opening forces) to hand-made bags using standard Frito-Lay film.  (*See* JX 2087, pages 51-52, 58-60, 66-68, 172-75).  By inverting the standard Minigrip zipper, Mr. Jurgovan achieved his desired reduced internal opening force zipper (i.e. 2lb.).  (*Id.* at 58-60, 172-75).  Mr. Jugovan was able to pinch grip open and reclose the hand-made samples without stripping the zippers from the bag walls.  (*Id.*).  This fact was not set out in the motion because it rebuts an argument raised for the first time in Ramsey's Opposition and because the facts were identified for the first time during questioning by Ramsey's counsel.

265.    Mr. Share's laboratory notebook (JX 2091), on pages 32-37, does not report the results of *any* experimentation.  This fact was not set out in the motion because it rebuts evidence and argument raised for the first time in Ramsey's Opposition.

266.    On page 36 of his laboratory notebook (JX 2091), Mr. Share writes that "[t]he best most secure zipper attachment to film occurs when all four flanges (above and below each male and female profile half) are sealed to the film."  This fact was not set out in the motion because it rebuts evidence and argument raised for the first time in Ramsey's Opposition.

267.    Mr. Share's illustration of a four-flange zipper on page 36 of his laboratory notebook (JX 2091) is remarkably similar to Mr. Jurgovan's earlier proposed four-flange zipper.  (*Compare* JX 2033, page 2 and JX 2040, page 2, with JX 2091, page 36).  This fact was not set out in the motion because it rebuts evidence and argument raised for the first time in Ramsey's Opposition.

268.    Mr. Share was concerned that, in the context of commercial manufacturing on VFFS equipment, the leading edge of the female flange of a four-flange zipper could jam going

over the shoulder. (*See* JX 2091, page 35). This fact was not set out in the motion because it rebuts evidence and argument raised for the first time in Ramsey's Opposition.

269.    Mr. Share proposed to eliminate this possibility by simply providing a "weak, temporary perforation (perforation) that would enable the leading outside flange to clear the shoulder and tube...." (JX 2091, page 36). This fact was not set out in the motion because it rebuts evidence and argument raised for the first time in Ramsey's Opposition.

270.    The fact that Mr. Hogan and others skilled in the art knew *how to make* reduced internal opening force zippers (Ramsey Opposition, page 13, lines 1-7) reinforces that no undue experimentation was required to reduce to practice Mr. Jurgovan's conception. This fact was not set out in the motion because it addresses evidence and argument raised for the first time in Ramsey's Opposition.

271.    Mr. Mulder's declaration says nothing about the meeting between Frito-Lay, Minigrip and Bosch on January 29-30, 1997. This fact was not set out in the motion because it addresses evidence and argument raised for the first time in Ramsey's Opposition.

Appendix C - 5

**A135**

## CERTIFICATE OF FILING

The undersigned hereby certifies that a true and correct copy of the foregoing **JURGOVAN REPLY IN SUPPORT OF JURGOVAN MOTION FOR JUDGMENT (Based on Priority and Derivation)** was filed this 16th day of June, 2005, via electronic filing, with the following:

> The Board of Patent Appeals and Interferences
> United States Patent and Trademark Office
> Madison Building East
> 9th Floor
> 600 Dulany Street
> Alexandria, VA 22314
> Phone No.: 571-272-9797
> Facsimile No.: 571-273-0042
> E-mail: BoxInterferences@USPTO.GOV

Erik van Leeuwen

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **JURGOVAN REPLY IN SUPPORT OF JURGOVAN MOTION FOR JUDGMENT (Based on Priority and Derivation)** was served on this 16th day of June, 2005, via electronic filing, on the following counsel for Party Ramsey:

> Gerald Levy, Esq.
> PITNEY HARDIN LLP
> 7 Times Square
> New York, NY 10036-7311
> Phone No.: 212-297-5800
> Facsimile No.: 212-682-3485
> E-mail: glevy@pitneyhardin.com

Erik van Leeuwen

# A136

Paper _____

Filed on behalf of Illinois Tool Works Inc.
By:       Gerald Levy, Esq.
           Lindsay S. Adams, Esq.
           Ronald E. Brown, Esq.
           PITNEY HARDIN LLP
           7 Times Square
           New York, NY 10036-7311
           Tel: 212-297-5800
           Fax: 212-682-3485

## UNITED STATES PATENT AND TRADEMARK OFFICE

---

### BEFORE THE BOARD OF PATENT APPEALS
### AND INTERFERENCES
(Administrative Patent Judge Sally C. Medley)

---

MARC A. **JURGOVAN** and MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application 09/372,646),

v.

RONALD L. **RAMSEY**, ARTHUR MALIN, ROBERT HOGAN,
LAWRENCE SHARE and RICHMOND M. SCOTT
Senior Party,
(Application 09/481,729)

---

Patent Interference No. 105,173

---

### RAMSEY REPLY BRIEF
### (Based on Derivation And Priority)

# A137

I.    **EVIDENCE UPON WHICH RAMSEY RELIES IN SUPPORT OF REPLY**

*See* Appendix A.

II.   **WHETHER FACTS ALLEGED BY JURGOVAN ARE ADMITTED OR DENIED**

*See* Appendix B.

III.  **STATEMENT OF ADDITIONAL FACTS SUPPORTING THE OPPOSITION**

*See* Appendix C.

**ARGUMENT**

I.    **RAMSEY WAS FIRST TO CONCEIVE THE INVENTIONS OF THE COUNTS**

On page 2, lines 14-17 of the Jurgovan Opposition to Ramsey Motion for Judgment ("Jurgovan Opposition"), Jurgovan argues that Ramsey has not submitted evidence that Ramsey was in possession of all elements of the Counts before: (1) conception by Jurgovan, and (2) Jurgovan's disclosure of conception to Ramsey. The response is that Ramsey had possession of all elements of the Counts by March 29, 1997, which was before conception by Jurgovan, as Jurgovan never independently conceived all the elements of the Counts.

A.    **Ramsey Had Possession of all the Elements of the Counts Prior to Jurgovan.**

Ramsey first conceived the Counts on March 29, 1997 and was the first party to have possession of all of the elements of the Counts. *See Van Otteren v. Hafner and Cork,* 278 F.2d 738, 742, 126 USPQ 151, 155 (CCPA 1960).[1] By that date Ramsey, using pinch-grip and reclosable packaging technologies known in the art, conceived the novel elements of the Counts: (1) zipper technology so designed that the engagement members were pinch grip openable with a

---

[1] Jurgovan's contention that the March 29, 1997 memo (RX 1023) does not show all of the elements of the Counts is irrelevant. The requirement is that the inventors have possession of all elements of the invention, not that an inventor's possession of all elements is specifically described in a particular document. *See Price v. Symsek,* 988 F.2d 1187, 1196, 26 USPQ2d 1031, 1038 (Fed. Cir. 1993).

1

**A138**

force below the members so that the bag walls of a food package would "resist tearing and deformation;" and (2) a means of maintaining the first and second engagement members "engaged together."

First, before March 29, 1997 Ramsey recognized the need to maintain the engagement members engaged together as a manufacturing requirement and conceived a method for doing so. (RX 1011 ¶27; RX 1070 ¶10). One such method is described in Art Malin's February 26, 1997 sketch, which Ramsey provided to Jurgovan, which appears at page 19 of Jurgovan's lab notebook, and which is reproduced virtually identically as Figure 6 of Jurgovan's '396 patent. (RX 1011 ¶24; JX 2033 at 19; JX 2001, Fig. 6). Jurgovan's blatant pirating of this Ramsey concept in and of itself establishes Jurgovan's derivation of the Counts.

Second, by March 29, 1997, Ramsey recognized that even with a relatively low internal opening force zipper, a cantilever effect would defeat pinch grip opening on a package containing food which, by its nature, was formed of a laminate film (JX 2020 ¶¶20, 23, 57, 58, 59; JX 2001; JX 2002). The cantilever effect resulted from rotation of the zipper about the hinge (i.e., attachment) points when the package was opened from the product side, thereby transferring the opening force directly to the zipper/film seal and the film itself, instead of allowing the engagement members to separate. (RX 1014 ¶17; RX 1023). The cantilever effect caused the opening force to strip the zipper from the laminate film bag walls or delaminate the walls themselves.

To overcome the "cantilever effect," which would result from simply attaching zipper to the inside surface of the front and rear walls, Ramsey conceived of modifying the shape of the zipper profile as well as changing the sealant locations. These developments constituted conception of the final and critical element of Counts 1 and 2: a means of providing the bag

2

**A139**

walls with the capability of "resist[ing] tearing and deformation" upon application of a pulling force below the product side of the zipper to disengage the zipper and thereafter open the top seal of the package (hereinafter "pinch grip opening"). Mr. Scott's suggestion of modifying the male and female profiles (which also includes modifying the flanges and sealant location) recognized that it was necessary to direct the opening force towards the engagement members of the profiles and away from the zipper/film seal and the underlying film, thereby permitting the opening force to disengage the engagement members, and then delaminate the top seal to open the package.

**B.     Ramsey's Conception Is Corroborated.**

On page 8, lines 8-10, Jurgovan argues that Ramsey has not corroborated its possession of all elements of the Counts as of March 29, 1997 or any other date. The response is that Ramsey's documentary evidence and noninventor testimony corroborate its March 29, 1997 conception and possession of all elements of the Counts. Corroboration is assessed under a "rule of reason" standard, requiring the Board to examine "all pertinent evidence" to determine the credibility of the inventor's story and assesses the record as a whole. *Brown v. Barbacid,* 276 F.3d 1327, 1335, 61 USPQ2d 1236, 1240 (Fed. Cir. 2002), *Blicharz v. Hays,* 496 F.2d 603, 605-606, 181 USPQ 712, 714 (CCPA 1974). Ramsey's evidence of conception as of March 29, 1997 is easily corroborated under the "rule of reason" standard.

Ramsey had possession of most of the elements of the Courts as they were in the prior art before March 29, 1997. (*See supra* at 1). Ramsey's conception of the "resisting tearing and deformation" element discussed above is corroborated by the March 29 memorandum, whose contents are corroborated by a non-inventor (RX 1079). Moreover, the portion of that memo indicating that the cantilever effect will tend to defeat pinch grip is reflected in the lab notebook of Larry Share (RX 1069, RX 1070), which has also been corroborated. (RX 1071). Mr. Share's

notebook shows Ramsey's recognition that the "zipper opening dynamics" (i.e. the cantilever effect) associated with a pinch grip method for opening the package will cause the zipper to separate from the package walls. Moreover, Ramsey's conception of the "resist tearing and deformation" element (RX 1023) by modifying the dimension of the profiles is illustrated in a September 24, 1997 Minigrip drawing, which is also corroborated. (RX 1033, RX 1078). Thus, the evidence, considered as a whole under the rule of reason standard, corroborates Ramsey's conception no later than March 29, 1997. *See Blicharz v. Hays,* 496 F.2d at 605-06.[2]

C.    **Jurgovan Did Not Have Conception Prior To Ramsey's Conception.**

On page 3, lines 16-17 Jurgovan argues that Ramsey "fails to identify a single element of the Counts that was lacking from Jurgovan's conception." The response is that Jurgovan's "ideas" of January, February, and March failed to provide any means of achieving the "resists tearing and deformation" element of the bag walls upon pinch grip opening.[3] Conception requires not just an idea or appreciation of what is to be accomplished but also the conception of the means of accomplishing that purpose. *See Willis v. Suppa & Willis v. Koehler & Zupfer,* 209 USPQ 406, 417-18 (Pat. & Tr. Office Bd. App. 1980). Jurgovan's ideas are not conceptions because they do not provide a means or method of achieving those elements of the Counts. Indeed, even Jurgovan's specifications acknowledge the "difficulties" associated with pinch grip opening a zipper attached to a laminated film, and discuss Ramsey's conception of modifying the location of the sealant layers on the zipper as a way to reduce shearing (i.e., cantilever). While the '396 patent acknowledges that the shearing phenomenon was a significant difficulty to

---

[2]  Ramsey's conception of the "remain engaged" element (see RX 1011 ¶27; RX 1070 ¶10) is corroborated by the Share notebook (RX 1069 at 35), as well as Mr. Jurgovan's own notebook (*See* JX 2036 at 57).

[3]  As noted in Ramsey's Opposition, Jurgovan also failed to provide any way of ensuring that the engagement members remain "engaged together."

overcome, Jurgovan's ideas in January, February, and March 1997 do not even acknowledge the phenomenon, let alone provide a solution that could be reduced to practice by a skilled artisan. Jurgovan's "evidence" of conception of the "resists tearing and deformation" limitation amounts to no more than simply its proposal that Minigrip (Ramsey) develop zipper to be attached to Frito-Lay film. (*See* JX 2033, pp. 2 and 17).

Jurgovan's assertion that the Frito-Lay film in conjunction with existing zipper technology would inherently withstand tearing and deformation in the context of the Counts strains credibility given the clear statement to the contrary in Jurgovan's '396 patent and '646 application that "Where the inner layers 11i and 12i can de-laminate, placement of a zipper 40 in a package 10 with de-laminating walls 11 and 12 presents difficulties." (*See* JX 2001, col. 7 ll. 29-32; JX 2002 p.13, ll. 21-23). Those difficulties in developing zipper technology that would allow the package walls to resist tearing and deformation are acknowledged by Mr. Jurgovan. (*See* JX 2020, ¶23). Jurgovan's inherency argument underscores that it *never* possessed any means of achieving a package where the walls "resist tearing and deformation" upon pinch grip opening. Ramsey's conception of March 29 (RX 1023) and U.S. patent application No. 09/481,723 (JX 2003) both describe a package with walls that "resists tearing and deformation" by avoiding the cantilever effect that caused tearing and deformation. Both JX 2003 and RX 1023 demonstrate that Ramsey provided a solution to this problem. Jurgovan's alleged conceptions did not address the problem, much less provide a solution.

Jurgovan's failure to provide a means of achieving bag walls that "resist tearing and deformation" is also evidenced by Jurgovan's own declaration and patent specifications. Mr. Jurgovan admitted that a problem with attaching a reclosable zipper to a food package film is that the film delaminates. (JX 2035; JX 2020 ¶¶18, 20). Both the '396 patent and the '646

application describe delamination of the bag walls as the tearing and deformation of the walls. (JX 2001, col. 6, lines 26-36; 38-39; 56; col. 7, lines 8-9, 25-32; JX 2002 p.5, lines 8-9; p.7, lines 24-25; p.13, lines 17-21).

The '396 patent and the '646 application note that the zipper must be designed to avoid delamination of the bag walls during pinch grip opening. (*See* JX 2001, col. 7, lines 24-29; JX 2002 at 13, lines 17-21). However, none of the Jurgovan alleged "conceptions" suggests any solution to this admitted problem, which shows that Jurgovan never independently possessed a solution or means (e.g., design of the zipper technology) that avoided delamination of the bag walls during pinch grip opening. The solution came from Ramsey, who developed and provided Jurgovan with a redesigned zipper system that avoided tearing and deforming the bag walls during pinch grip opening. Jurgovan's admission that zipper placement can cause delamination problems shows that it did not possess all of the elements of the Counts in January to March 1997, and that if it ever had possession of all elements of the Counts, it received such information from Ramsey.

## D.    Jurgovan's "Ideas" Required Undue Experimentation.

On page 5, lines 15-16, Jurgovan argues that "not one of the seven declarants for Ramsey states in his declaration that undue experimentation was required to reduce that conception to practice." The response is that "undue experimentation" is a conclusion of law based on factual findings. *See Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education and Research,* 346 F.3d 1051, 1054, 68 USPQ2d 1373, 1376 (Fed. Cir. 2003). What is required is evidence showing the need for undue experimentation, not having a witness state a legal conclusion reserved for the Board. Here, the evidence shows the need for extensive experimentation, indeed, inventiveness by Ramsey to solve the engineering problem presented

6

**A143**

by Jurgovan.  (*See* RX 1011 ¶¶20-22; RX 1012 ¶¶20-22; RX 1010 ¶11; RX 1070 ¶¶6-11.)

Jurgovan's specifications admit that application of zipper to food packaging film "presents

difficulties" in preventing delamination.  While Ramsey worked on various solutions to this

problem (*see* RX 1011 ¶24-25, RX 1070, RX 1071), the ultimate approach it took (RX 1011 ¶27)

required it to modify the male and female profiles (which also included flange and sealant

position modifications) so that the package walls would not tear or deform upon pinch grip

opening.  (RX 1011 ¶29; RX 1014 ¶17; RX 1012  ¶¶25-26; RX 1010 ¶12; RX 1070 ¶¶10-11).

Jurgovan's alleged "conceptions" fail to provide any enabling disclosure on achieving a solution

for the above-noted elements of the Counts, and its patent specifications pirate the concepts

developed by Ramsey that would allow a skilled artisan to reduce the inventions to practice.  The

evidence shows that Jurgovan's "concept" required extensive experimentation and inventiveness

to be reduced to practice.

## II.    RAMSEY WAS THE FIRST TO REDUCE ITS INVENTION TO PRACTICE

At page 10, lines 17-23, Jurgovan argues that (a) Ramsey cannot demonstrate an actual

reduction to practice; (b) Jurgovan's activities related to reduction to practice do not inure to the

benefit of Ramsey; and (c) Ramsey's evidence establishing an actual reduction to practice is not

adequately corroborated.  The response is that Ramsey was the first to reduce to practice because

Jurgovan's activities inure to the benefit of Ramsey and are corroborated.

### A.    Jurgovan's Testing of Ramsey's Zipper Inures To The Benefit Of Ramsey.

At page 15, lines 9-10, Jurgovan asserts that because Ramsey derived the Counts from

Jurgovan and Jurgovan's manufacture and testing of packages using Ramsey's zipper was not

requested by Ramsey, Jurgovan's activity does not inure to Ramsey's benefit.  The response is

first that Ramsey did not and could not derive its conception from Jurgovan, as Jurgovan never

7

**A144**

possessed all the elements of the Counts before Ramsey's March 29, 1997 conception. (See *supra* at I.B.)  Second, a "fair reading of the record" shows that Ramsey, not Jurgovan, developed the zipper technology that reduced its invention to practice, and Jurgovan simply took that zipper and had a VFFS machine make reclosable packages.  Accordingly, Jurgovan's activities inure to Ramsey's benefit.

In response to Jurgovan's request for a reclosable pinch grip snack food package, Ramsey conceived of the invention, tested and developed a zipper required to reduce such an invention to practice, and communicated a novel solution to Jurgovan in the form of pre-tested zipper.[4]  In providing zipper with preapplied sealant, Ramsey taught Jurgovan where the zipper was to be attached to the film when it was made into packages on an FFS machine. (RX 1074 ¶¶2-3). Jurgovan then took Ramsey's zipper technology and had a VFFS machine make reclosable packages and then opened the packages using a pinch grip method.  As Jurgovan indisputably relied on Ramsey to develop and provide the zipper technology and took that zipper and mechanically made packages, Jurgovan's activity inured to Ramsey's benefit.

Contrary to Jurgovan's assertion, inurement determination does not hinge on which party hired the other. *Cooper v. Goldfarb*, 154 F.3d 1321, 1331-32, 47 USPQ2d 1896, 1905 (Fed. Cir. 1998).  Rather, inurement is an issue of the nature of the relationship between parties.  Ramsey conceived the Inventions and thereafter designed zipper profile and determined the zipper attachment technology.  Ramsey submitted its solution to Jurgovan expecting that the Inventions would work (as Ramsey had already engaged in considerable testing of the zipper) and that Jurgovan would test this zipper in the pinch-grip opening context, as evidenced, for example, in

---

[4] Both Mr. Ramsey (RX 1010 ¶17) and Mr. Share (RX 1013 ¶8) discuss that Ramsey evaluated its zipper technology for the Frito-Lay project before sending it to Frito-Lay.

Mr. Ramsey's memorandum. (RX 1041) ("The concept behind the modification of the male and female on the CONSUMER side is to reduce the opening force when the package is "pinch gripped"). In providing zipper with sealant to Jurgovan, Ramsey provided Jurgovan the zipper technology (e.g. shape of the profile, dimension of the flanges, where to attach the zipper through use of pre-applied sealant) that taught Jurgovan how to manufacture a food package so that the walls would not tear or deform upon application of a pinch grip opening force. Jurgovan acknowledged that it simply took Ramsey's zipper and had a VFFS machine at Frito-Lay make packages, which Jurgovan then opened using the pinch grip method. In light of the parties' relationship, Ramsey's inventiveness and extensive experimentation on the zipper technology, and the pedestrian nature of Jurgovan's efforts, there is no doubt that Jurgovan's activities inured to Ramsey's benefit.[5]

**B.    Ramsey's Reduction To Practice Is Corroborated.**

On page 15, lines 15-16, Jurgovan asserts that Ramsey's reduction to practice is not sufficiently corroborated. The answer is that Jurgovan claims reduction to practice in November 6, 1997 and in September 1997. (See JX 2020 ¶¶ 65-67).[6] It is axiomatic that one party to an interference's testimony may corroborate the assertions of the other party. *Bennett v. Serota,* 177 USPQ 753, 757 (CCPA 1973). Because Mr. Jurgovan and others confirm production of reclosable packages made with Minigrip zipper on November 6, 1997 (when Ramsey claims reduction to practice), and September 1997 (when Jurgovan claims reduction to practice), there is no merit to the argument that Ramsey's reduction to practice is not corroborated.

---

[5] Jurgovan disputed that Mr. Ramsey participated in the reduction to practice on November 6, 1997. Whether Mr. Ramsey was physically present does not alter the fact that Jurgovan's activities inured to Ramsey's benefit.

[6] Although Ramsey disputes that the September 1997 production/testing was reduction to practice, that activity would inure Ramsey's benefit even if it were deemed a reduction to practice.

## III.    RAMSEY DILIGENTLY REDUCED ITS INVENTIONS TO PRACTICE

### A.    Ramsey Was The First To Conceive.

At page 2, lines 14-17, Jurgovan argues that Ramsey was not in possession of all elements of Counts 1 and 2 before Jurgovan's conception. The response is that Jurgovan has never demonstrated conception of the Counts, and Ramsey was the first to conceive the Counts.

### B.    Ramsey Has Shown Reasonable Diligence Throughout The Critical Period.

At page 17, lines 13-15, Jurgovan argues that Ramsey has failed to prove diligence throughout Ramsey's entire critical period from March 29, 1997 to November 6, 1997. The response is that Ramsey has proven reasonable diligence and has corroborated such diligence. Diligence does not require that a party drop all other projects or work constantly on the invention. *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1364, 59 USPQ2d 1930, 1938 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002). Ramsey's activities likewise show a consistent, ongoing effort to reduce the Inventions to practice after March 29, 1997. Ramsey's research (RX 1076, 1077), development (RX 1076 ¶¶2-4; RX 1066 ¶4; RX 1064-1068) and communications with Frito-Lay personnel corroborate Ramsey's diligence. Both Ramsey and Jurgovan's evidence shows that Ramsey regularly communicated with Frito-Lay throughout the critical period regarding reducing the pinch-grip concept to practice. (E.g., RX 1025). Even after Jurgovan stopped work on the project in June 1997, Ramsey continued to work towards reducing the pinch-grip invention to practice (RX 1076, RX 1077). When Jurgovan resumed work on pinch grip technology in late August/early September 1997, its own evidence shows that Ramsey designed zipper technology (which it produced and tested), and delivered the technology to Frito-Lay, expecting it to work on a pinch grip application. (See *supra* at pp. 8-9). Ramsey's activity continued through actual reduction to practice to March

1998, when Ramsey filed its patent application. (JX 2004).

On page 19, line 20 - page 20, line 4, Jurgovan asserts that Ramsey's attorneys were not reasonably diligent. The response is that Jurgovan's argument fails because attorneys do not need to work on a patent application on a day-to-day basis to show diligence. The fact that an attorney works on other matters along with the particular application does not indicate a lack of diligence. *Bey v. Kollonitsch,* 806 F.2d 1024, 1028, 231 USPQ 967, 970 (Fed. Cir. 1986). Ramsey has shown, with competent evidence, that the filing of Ramsey's patent application was accomplished in a reasonable period of time, given the need to prepare the application, and review and incorporate revisions from Ramsey. (RX 1015, RX 1078 ¶¶4-11). Ramsey's counsel took six months to complete this work, several months less than it took Jurgovan's counsel to file its application. Those facts, and the governing law, demonstrate that Ramsey's counsel were reasonably diligent in working to file the application.

### C.    Ramsey's Evidence of Diligence Is Corroborated

At page 16, lines 21-22, Jurgovan argues that Ramsey's diligence is not adequately corroborated. The response is that Ramsey has corroborated its diligence, with testimony and documentary showing specific acts at specific times directed at a reduction to practice. *See Naber v. Cricchi,* 567 F.2d 382, 386, 196 USPQ2d 294, 296 (CCPA 1977), *cert. denied,* 439 U.S. 826 (1978). Both the meeting notes and test result data (RX 1023; RX 1024; RX 1026; RX 1027; RX 1029-1045) corroborate Ramsey's diligence in reducing the Inventions to practice. Michael Pollack and Mr. Jurgovan further corroborate Ramsey's diligence. Mr. Pollack's testimony corroborates Ramsey's numerous pinch-grip related tests between March and December 1997 (RX 1077), and Mr. Jurgovan's testimony and writings also corroborate Ramsey's activity related to reduction to practice in April 1997 (JX 2036 at 112, 118); on May

13, 1997 (JX 1020 ¶53; RX 1073 108:20 – 109:20); June 24, 1997 (RX 1073 112:6 – 115:17); and September 24, 1997 (RX 1073 123:8 – 133:17). Jurgovan's documents also show Ramsey's work both designing the zipper technology and modifying it between October 1997 and March 1998, when Ramsey filed its patent application. (See JX 2036 at 39-47; 56-58; 66-67; JX 2051 at 58, 60, 62-63, 67, 70, 74, 79, 86-87, 89, 93, 97, 101, 111-112, 118, 119, 121, 126, 128, 138, 141-143, 148).

## IV.    JURGOVAN DERIVED THE INVENTIONS FROM RAMSEY

### A.    The Elements Of Jurgovan's 1997 Idea Were Known By November 1996.

At page 3, lines 14-17 of its Motion for Judgment and page 3, lines 3-5 of the Jurgovan Opposition, Jurgovan argues that by January 2, 1997 he had conceived of a reclosable pinch-grip openable package meeting all of the elements of the Counts. Further, Jurgovan alleges at page 22, lines 20-22 of its Opposition that Ramsey has not established: "(1) what packages were allegedly pinch-grip opened at PacExpo; (2) what features those packages had; and (3) what the results were of the alleged attempts to pinch-grip open the bags." The response is, first, that Ramsey has established: (1) the features of the bags at the 1996 trade show in its Priority Brief (RX 1012 ¶15; RX 1016 ¶8; RX 1063); and (2) that the bags were opened by pinch-grip opening so that customers were able to inspect the zipper structure, and that at least some of these packages were subsequently resealed. (RX 1011, ¶16; RX 1012, ¶15).

Second, Messrs. Mulder, Hogan, and Malin establish that all elements of Jurgovan's "conception" of January 2 were known in the art as of November 1996. As discussed *supra*, reclosable packaging incorporating engagement members that "resists tearing and deformation" of the bag walls during pinch grip opening *was not* known before Ramsey's March 29, 1997 conception and thus are not part of Jurgovan's alleged "conception" in January 1997. (*See* RX

12

**A149**

1073: 78:25-80:2; 71:19-73:8; 119:21-120:8, 121:6-22).  However, the following elements of

Jurgovan's January-March 1997 "ideas" were publicly presented in November 1996: reclosable

packages (RX 1011 ¶¶12, 15; RX  1012 ¶¶11, 14; RX 1016 ¶7) with the front wall and rear wall

being sealed together at a top seal (RX 1075 ¶4); having a first portion of the zipper wall

attached to a front wall of flexible package material (i.e., a flexible elastomeric material) and

facing the rear wall (RX 1075 ¶4); a second portion of the zipper material attached to the back

wall of flexible package material and facing the front wall (Id.); so that the zipper was engaged

together just below the top seal of the bag and above the food product (RX 1012 ¶15; RX 1016

¶8; RX 1075 ¶4); the top seal and the zipper material would be openable by manually gripping

the front and back walls of the bag below the engagement members and pulling apart with a

force that would disengage the zipper profiles and then open the top seal of the bag in a single

pinch grip opening motion material (RX 1012 ¶15; 1016 ¶8; RX 1075 ¶5); and, after pinch grip

opening and removing food product, reclosing the package by manually re-engaging the zipper

members. (Id.)  If Jurgovan's "idea" is conception of the Counts, then all elements of that idea

were in public use more than one year prior to Jurgovan's application for patent in May, 1998,

and are unpatentable under 35 U.S.C. §§102(a) and (b).[7]

**B.    Ramsey Communicated All Elements Of The Counts To Jurgovan.**

As noted above, Ramsey first developed means of achieving the "remaining engaged"

and "resist tearing and deformation" elements of the Counts, and the other elements of the

Counts were publicly known at least as early as November 1996.[8]  Because Jurgovan did not

---

[7] A chart showing that Jurgovan's idea was in the prior art is attached as Appendix D. *See Bamberger v. Cheruvu,*
55 USPQ2d 1523, 1528-29 (BPAI 1998).

[8] Jurgovan's claim that Ramsey may not present evidence from before the conception date as set forth in Ramsey's
Preliminary Statement is wrong.  A party may submit evidence regarding an earlier conception date. *See Moran &*

know "resist tearing and deformation" and "remain engaged" elements, it did not conceive the Inventions before Ramsey's March 29, 1997 conception. Moreover, Ramsey's communication of both the "resist tearing and deformation" and "remain engaged" elements to Jurgovan during 1997 (and before any conception by Jurgovan) establishes Ramsey's derivation claim.

Ramsey communicated those elements to Jurgovan by Ramsey when it provided zipper technology that enabled the production of a reclosable package whose walls resist tearing and deformation upon application of a pinch grip opening force. In addition to inventing and producing this zipper technology, Ramsey provided it with sealant already attached (RX 1074 ¶¶2-3), which taught Jurgovan where and how to attach the zipper to the film so that the film would resist tearing and deformation. Mr. Jurgovan's testimony confirms communication of the "resist tearing and deformation" element by Ramsey. (RX 1073 123:25–125:19). Ramsey also conveyed the "resist tearing and deformation" element to Jurgovan no later than September 24, 1997, when Ramsey conveyed its concept of overcoming the cantilever effect by modifying the male and female profiles (which also included modifying the flanges and the positions of sealant) to Jurgovan (RX 1014 ¶24; RX 1012 ¶31; RX 1011 ¶35; RX 1033; RX 1074 ¶¶4-5). Ramsey communicated the "engaged together" element of the Counts to Jurgovan, as Ramsey first noted the need for the engagement members to remain engaged together and conceived a solution that accomplished this goal. (*See* RX 1073, 71:19–73:8; RX 1011 ¶27; RX 1070 ¶¶9-10; RX 1073 73:1-8.) The evidence establishes that Ramsey communicated the novel elements of the Counts to Jurgovan.

---

*Volgyesy v. Paskert,* 205 USPQ 356, 358 (BOPI 1979); *Biel v. Chessin,* 146 USPQ 293, 297(CCPA 1965) ("While Chessin cannot get the *benefit* of a date, even if *proved,* earlier than his asserted date, it is certainly not error to accept and consider evidence of activity prior to that date.") (emphasis in original).

**C.    Jurgovan Never Had Conception Prior to Ramsey's Communication**

At page 21, lines 21-22, Jurgovan alleges that it did not derive the Inventions from Ramsey, as it had conception before Ramsey. The response is that Jurgovan has not shown that it ever had conception of the Inventions. Ramsey establishes that all elements of Jurgovan's "conception" were in the public domain no later than November 1996 and that Jurgovan never conceived the novel elements of the Counts, let alone prior to Ramsey's conception. Indeed, the evidence shows unequivocally that Jurgovan looked to Ramsey to develop the zipper technology and in that process Ramsey conceived of the novel elements of the Counts. Accordingly, Jurgovan did not have conception before Ramsey's communication of conception to Jurgovan.

## CONCLUSION

For the foregoing reasons, the Board should find that Jurgovan has not met its burden of showing priority and award judgment to Ramsey on priority, and that to the extent that Jurgovan had conception (which Ramsey disputes), that it should find that Jurgovan derived the Inventions from Ramsey.

Respectfully submitted,

Gerald Levy
Registration No. 24,419
Lead Counsel for RAMSEY

Ronald E. Brown
Registration No. 32,200
Back-up counsel for RAMSEY

Pitney Hardin LLP
7 Times Square
New York, NY 10036
(212) 297-5800
Date: June 16, 2005

15
**A152**

## CERTIFICATE OF FILING

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY REPLY TO JURGOVAN OPPOSITION TO RAMSEY MOTION FOR JUDGMENT** was filed this 16th day of June, 2005, via electronic filing, with the following:

> The Board of Patent Appeals and Interferences
> United States Patent and Trademark Office
> Madison Building East
> 9th Floor
> 600 Dulany Street
> Alexandria, VA 22314
> Phone No: 571-272-9797
> Facsimile No: 571-273-0042
> Email: BoxInterferences@USPTO.GOV

David Joyal

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **RAMSEY REPLY TO JURGOVAN OPPOSITION TO RAMSEY MOTION FOR JUDGMENT** was served on this 16th day of June, 2005, via electronic filing, on the following counsel for Jurgovan:

> Joseph A. Hynds, Esq.
> Rothwell, Figg, Ernst & Manbeck, PC
> 1425 K Street, N.W.
> Suite 800
> Washington, DC 20005
> Tel.: (202) 783-6040
> Fax: (202) 783-6031
> E-mail: jhynds@rothwellfigg.com

David Joyal

The opinion in support of the decision being entered today is <u>not</u>
binding precedent of the Board.

Paper 94

Trial Division Merits Panel
Mail Stop Interference
P.O. Box 1450
Alexandria VA 22313-1450
Tel: 571-272-9797
Fax: 571-273-0042

<u>Filed:</u>
November 29, 2005

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————————

MARC A. JURGOVAN
and
MARTIN B. DIERL
Junior Party,
(Patent 5,972,396 and Application No. 09/372,646),

v.

RONALD L. RAMSEY, ARTHUR MALIN,
ROBERT HOGAN, LAWRENCE SHARE,
and
RICHMOND M. SCOTT
Senior Party,
(Application 09/481,723).

———————————

Patent Interference No. 105,173

———————————

Before TORCZON, DELMENDO, and MEDLEY, <u>Administrative Patent
Judges</u>.

DELMENDO, <u>Administrative Patent Judge</u>.

<u>DECISION ON MOTIONS FOR JUDGMENT AND
MOTIONS TO EXCLUDE EVIDENCE</u>

**A154**

Party Jurgovan filed a motion for judgment (JMJ) asserting that Party Ramsey derived the inventions recited in counts 1 and 2 from Jurgovan.  (JMJ at 1.)  Jurgovan further asserts that it should be awarded priority because it was the first to conceive and actually reduce the inventions to practice and exercised reasonable diligence from prior to any conception by Ramsey to Jurgovan's reduction to practice.  (Id.)

In counter position, Ramsey filed a motion for judgment (RMJ) asserting that Jurgovan derived the inventions recited counts 1 and 2 from Ramsey.  (RMJ at 2.)  Ramsey also asserts that it should be awarded priority because it was the first to conceive the inventions and to reduce the inventions to practice and exercised reasonable diligence from prior to any conception by Jurgovan through Ramsey's reduction to practice.  (Id.)

We grant Jurgovan's motion for judgment on the basis that, by a preponderance of the evidence, Ramsey derived the inventions from Jurgovan.  Accordingly, we dismiss Ramsey's motion for judgment on the same basis.

Additionally, the Board has before it Jurgovan's "MISCELLANEOUS MOTION 1" and "MISCELLANEOUS MOTION 2," both filed on June 23, 2005, and Ramsey's June 23, 2005 motion to exclude certain evidence.

We deny Ramsey's motion to exclude evidence to the extent that the motion relates to evidence on which we rely in support of our decision.  We do not reach Jurgovan's miscellaneous motions because they are moot.


## FINDINGS OF FACT

The following findings of fact are supported by a preponderance of the evidence in the record.  Additional factual findings are made in the analysis section of this decision.

Background

1.  This interference was declared on December 8, 2003 between: (i) Jurgovan's United States Patent 5,972,396 ('396 patent) and Application 09/372,646 ('646 application); and (ii) Ramsey's Application 09/481,723 ('723 application).  (37 CFR § 1.611 notice.)

2.  Jurgovan's '396 patent issued on October 26, 1999 from Application 09/079,382 filed on May 15, 1998. No benefit of an earlier filing date was accorded to Jurgovan.  (37 CFR § 1.611 notice at 3.)

3.  Ramsey's '723 application, on the other hand, was filed on January 12, 2000 and was accorded the benefit of an earlier filing date to March 6, 1998 based on Application 09/036,232, now United States

**A156**

Interference No. 105,173                          Paper 94

Patent 6,030,122 issued on February 29, 2000.  (37
CFR § 1.611 notice at 4.)

4.    The real parties in interest are said to be: RECOT,
INC. (now known as FRITO-LAY NORTH AMERICA), the
assignee of Jurgovan's '396 patent and '646
application; and ILLINOIS TOOL WORKS, INC., the
assignee of Ramsey's '723 application.[1]  (JMJ at 2,
¶¶10, 12; RMJ at 3, ¶¶10, 12.)

5.    The interference was declared with two counts,
Counts 1 and 2.  (37 CFR § 1.611 notice at 5-6.)

6.    Count 1, which is identical to claim 1 of Jurgovan's
'646 application or claim 42 of Ramsey's '723
application, is reproduced as follows:

> Count 1.  In combination:
> a)    a flexible package having a [sic,
> an] elastomeric front wall and an elastomeric
> rear wall;
> said front wall and said rear wall being
> sealed together at a top seal;
> a first zipper part attached to an
> inside surface of said front wall and having
> a first engagement member facing said rear
> wall;
> a second zipper part attached to an
> inside surface of said rear wall and having a
> second engagement member facing said front
> wall;

---

[1]    The record in this interference contains numerous
references to "Minigrip" and "Bosch."  Minigrip, a division
of ILLINOIS TOOL WORKS, INC. (RMJ at 3, ¶13), is a supplier
of zipper materials.  Bosch (THE ROBERT BOSCH COMPANY) is a
supplier of machinery used for applying the zipper material
to flexible film.  (Exhibit J2020, Declaration of Marc A.
Jurgovan at 3-4, ¶8.)

4

**A157**

said first and second engagement members being engaged together;

said top seal being manually pinch-grip openable and said first and second engagement members being manually pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening; and

b) a food product stored inside said package below said first and second engagement members.

7.    Count 2, which is identical to claim 1 of Jurgovan's

'396 patent or claim 31 of Ramsey's '723

application, reads as follows:

Count 2.  A method of opening and re-closing a flexible package containing a food product, comprising the steps of:
1) providing in combination:
a) a flexible package having a [sic, an] elastomeric front wall and an elastomeric rear wall;

said front wall and said rear wall being sealed together at a top seal;

a zipper having first and second zipper parts;

said first zipper part attached to an inside surface of said front wall and having a first engagement member facing said rear wall;

said second zipper part attached to an inside surface of said rear wall and having a second engagement member facing said front wall;

said first and second engagement members being engaged together;

said top seal and said first and second engagement members being pinch-grip openable under a pinch-grip pulling force applied to said front and rear walls below said engagement members;

said front and rear walls having a
sufficient strength to resist tearing and
deformation under the application of said
pinch-grip pulling force during pinch-grip
opening; and
    b) a food product stored inside said
package below said first and second
engagement members;

    2) pinch-grip opening said package by
manually pulling with a force of at least
said pinch-grip pulling force opposite sides
of said package below said zipper to open
both said zipper, by disengaging said first
and second engagement members, and said top
seal from the product side outward in a
single pinch-grip opening step;

    3) removing a portion of said food
product from said package;

    4) re-closing said package by manually
re-engaging said first and second engagement
members.

8.  <u>Count 1</u>: Claims 1-26 of Jurgovan's '646 application

    and claims 42-47 of Ramsey's '723 application are

    designated as corresponding to count 1, while claims

    1-31 of Jurgovan's '396 patent and claims 31-33, 35-

    39, and 41 of Ramsey's '723 application do <u>not</u>

    correspond to count 1.  (37 CFR § 1.611 notice at

    5.)

9.  <u>Count 2</u>: Claims 1-31 of Jurgovan's '396 patent and

    claims 31-33, 35-39, and 41 of Ramsey's '723

    application are designated as corresponding to count

    2, while claims 1-26 of Jurgovan's '646 application

    and claims 42-47 of Ramsey's '723 application do <u>not</u>

correspond to count 2.   (37 CFR § 1.611 notice at

6.)

10.   An oral hearing was held on August 10, 2005.

11.   Jurgovan's '396 patent and '646 application explains

(column 1, lines 32-39 of Jurgovan's '396 patent;

page 1, line 29 to page 2, line 1 of Jurgovan's '646

application):

> Although a number of packages with re-
> closable zippers are known, the existing
> packages have a number of drawbacks.  For
> example, these prior packages typically must
> be initially opened using two distinct steps.
> First, a heat seal must be broken by cutting
> the package with scissors or by removing a
> tear-away, perforated strip.  The re-closable
> zipper closure is then opened in a distinct
> second step.

12.   The prior art reclosable packages described in

Jurgovan's '396 patent and '646 application were

representative of commercial products available in

November 1996.  (JX2020 at 5, ¶12-15; JX2021 at 5,

¶9.)

13.   Thus, these prior art reclosable packages are opened

from the "consumer" side rather than from the food

product side.  (JX2020 at 6, ¶¶14-15; JX2021 at 5,

¶¶9-10.)

14.   According to Jurgovan, the two-step opening

characteristic of the prior art package

"substantially reduces the consumer appeal of the

packages and makes the packages undesirable for a
variety of products, such as for snack food chips
and the like." (Column 1, lines 39-42 of Jurgovan's
'396 patent; page 2, lines 1-4 of Jurgovan's '646
application.)

15. Marc A. Jurgovan, one of the named inventors in both
the Jurgovan '396 patent and '646 application,
declares that, in 1996, he was assigned to develop a
reclosable flexible package for certain of Frito-
Lay's salty snack food products. (JX2020, ¶3.)

16. Stephen M. Callahan, Frito-Lay's Senior Project
Engineer (JX2021 at 2, ¶1), is not an inventor in
either of the Jurgovan '396 patent or the '646
application.

17. Mr. Callahan managed Frito-Lay's reclosable flexible
package development project. (Declaration of
Stephen M. Callahan, JX2021 at 1-4, ¶¶1-7.)

18. Mr. Callahan states that Mr. Jurgovan reported to
him on the reclosable flexible package development
project from October 1996 through approximately
March 1997. (JX2021 at 4, ¶7.)

19. Regarding Frito-Lay's reclosable flexible package
development project, Mr. Jurgovan explains (JX2020
at 3):

Interference No. 105,173                    Paper 94

       6.  Frito-Lay wanted to market a
flexible, reclosable package for certain of
its salty snack food products in which
consumers could open and then reclose to
better preserve the freshness of any food
product remaining in the package.  A
reclosure project was initiated at Frito-Lay
in 1996 to develop a reclosable package
solution for its salty snack food products.

20.  To avoid significant costs, Frito-Lay desired to

develop a reclosable flexible package using standard

Frito-Lay materials and manufacturing processes.

(JX2020 at 3, ¶7; JX2021 at 3-4, ¶6.)

21.  In connection with Frito-Lay's reclosable package

design project, Frito-Lay was engaged in potential

customer-vendor business relationships with Minigrip

and Bosch.  (JX2020 at 3-4, ¶8; JX2021 at 3, ¶4.)

22.  In the November and December 1996 timeframe,

Minigrip/Bosch offered a solution involving a zipper

system similar to those used in prior art reclosable

packages.  (JX2020 at 3-4, ¶¶8-15; JX2021 at 5, ¶¶9-

10.)

23.  Regarding the Minigrip/Bosch proposal, Mr. Callahan

states (JX2021 at 5-6):

       9.  In November and December 1996, we
began evaluating a reclosable bag solution
using a Minigrip zipper system applied to the
standard Frito-Lay snack-food chip film.  It
was my understanding that this Minigrip
zipper system was similar to zipper systems
that Minigrip had supplied to other customers
and used commercially.  In particular, the
Minigrip zipper system was constructed having

Interference No. 105,173                              Paper 94

a tear strip at the top of the package, a
primary seal below the tear strip, and a
zipper located below the primary seal.  In
use, the tear strip would be torn away
transversely across the top of the package.
The primary seal would then be opened by
peeling apart the upper portions of the film
material thereby exposing the zipper
material.  The zipper members would then be
separated manually thereby allowing access to
the snack-food chip product contained in the
bag.  The package would then be reclosed by
manually re-engaging the zipper material.

    10.  This prototype reclosable package
was similar to all other commercially
available reclosable packages that I became
aware of in connection with my technical
evaluation in that it was opened from the top
of the package and above the zipper (from the
"consumer side") to gain access to the
contents of the package.

    11.  I understood from my involvement in
the project and from conversations with Marc
Jurgovan that we were having significant
problems with the Minigrip design.  In
particular, the film would tear
uncontrollably and randomly when the tear
strips were torn across the top of the
package.  Also, when the primary seal
(located above the zipper material) was
opened, the inner laminar bonds of the Frito-
Lay film would often fail causing further
uncontrolled tearing down and into the
package.

24.  Callahan and inventor Jurgovan believed that the

    Minigrip/Bosch design was unsatisfactory because

    "the film would tear uncontrollably and randomly

    when the tear strips were torn across the top of the

    package."  (JX2021 at 5, ¶11; JX2020 at 6, ¶16.)

25.  Additionally with respect to the proposed

    Minigrip/Bosch design, Callahan and inventor

10

**A163**

Jurgovan state that the inner laminar bonds of the Frito-Lay film would often fail when the primary seal (located above the zipper material) was opened, further causing uncontrolled tearing down and into the package. (JX2020 at 6, ¶16; JX2021 at 5, ¶11.)

26. Because the prior art and the proposed Minigrip/Bosch suffered from these shortcomings, Jurgovan sought a new reclosable package that was pinch-grip openable requiring only a single motion typical of that commonly used to open existing Frito-Lay snack food packages. (JX2020 at 7-8, ¶¶19-22; JX2021 at 5-6; ¶¶11-14.)

27. The invention recited in Jurgovan's involved claims is said to differ from the proposed Minigrip/Bosch design in that the package "could be pinch grip opened from the interior (or from the 'product side') of the bag like consumers customarily open [Frito-Lay's] snack-food chip bags." (JX2021, ¶14; column 3, lines 5-10 of Jurgovan's '396 patent; page 5, lines 7-11 of Jurgovan's '646 application.)

28. Jurgovan asserts that it conceived the invention by no later than January 2, 1997. (JMJ at 3-6.)

29. Jurgovan asserts that it communicated the conception to party Ramsey on January 2, 29, and 30, 1997 and March 10, 1997. (JMJ at 6-9.)

Interference No. 105,173                                    Paper 94

30. Jurgovan further asserts that it actually reduced the invention to practice in September 1997. (JMJ at 7.)

31. Ramsey, on the other hand, contends that it conceived the invention no later than March 29, 1997. (RMJ at 13.)

32. Ramsey further contends that it communicated the conception to Jurgovan no later than May 13, 1997. (RMJ at 23.)

33. Ramsey's preliminary statement also asserts a conception date of March 29, 1997. (Preliminary statement, paper 22, at 2-5.)

34. Ramsey asserts that it actually reduced the invention to practice on November 6, 1997. (RMJ at 17.)

35. Regarding conception of the invention, Mr. Jurgovan avers (JX2020 at 8):

> 22. In the latter part of December 1996, I conceived of a reclosable bag that could solve the problems we experienced with the Bosch/Minigrip prototype. In particular, I thought that we should not be attempting to incorporate a reclose structure which requires the transverse and downward forces on the standard Frito-Lay snack film that it was not designed to experience. Instead, I thought that we should use a reclose solution that took advantage of the standard way that consumers opened Frito-Lay's snack food product, i.e. in a pinch-grip motion.

36. Mr. Jurgovan further explains (id. at 8-9, ¶23):

12

**A165**

> The top seal and the zipper material would be
> opened by manually gripping the front and
> back walls of the bag and pulling apart with
> a force that would open the zipper material
> and then the top seal of the bag from the
> product side outward in a single pinch-grip
> opening motion.  Because we wanted the
> package to be reclosable, the flexible film
> needed to withstand the pinch grip opening
> process without tearing or deforming.  I knew
> this was a quality of the Frito-Lay standard
> film which is opened using the pinch-grip
> motion without tearing or deformation.

37.  Mr. Jurgovan states that unlike the Bosch/Minigrip

system, the invention would solve the problem of

uncontrollable tearing created by opening the tear

strip as well as the delamination problem created by

delaminating the film down into the bag as the

primary seal is opened.  (Id. at 9, ¶24.)

38.  Mr. Jurgovan states that he disclosed the invention

to Robert E. Hogan, an employee of Minigrip and one

of the named inventors of the Ramsey '723

application, and Steven C. Mulder, former Director

of Engineering and Technical Services and Director

of Operations and Technical Services of Bosch who

worked closely with Minigrip, by telephone on

January 2, 1997.  (JX2020 at 9-10, ¶26.)

39.  Specifically, Mr. Jurgovan declares (id.):

> On January 2, 1997, I had a telephone
> conversation with Bob Hogan at Minigrip and
> Steve Mulder at Bosch.  I explained to them
> the problems we were having with the existing
> prototypes [proposed by Minigrip/Bosch].  I

also disclosed to them my invention of the pinch-grip reclosable package which I believed would solve these problems. In particular, <u>I disclosed to them my idea of attaching the zipper material to the front and back walls of the Frito-Lay's standard flexible bag material so that the zipper could be engaged just below the top seal of the bag and above the food product. I disclosed to them that the top seal and the zipper material could be opened by the consumer by manually gripping the front and back walls of the bag and pulling apart with a force that would open the zipper material and then the top seal of the bag from the product side outward in a single pinch-grip opening motion. After consuming the snack food, the consumer could then reclose the package using the zipper material.</u> I explained to them that this concept would eliminate the need for tear strips, peel seals and the like.

40. Mr. Hogan states (Declaration of Robert E. Hogan, RX1012 at 6, ¶18):

18. I note that Marc Jurgovan claims that on January 2, 1997 he communicated with me about pinch grip opening. He states that he told me that a pinch grip bag would require a reduced internal opening force perhaps approaching the bond strength of the film. <u>I do not recall whether I had such a conversation with Mr. Jurgovan on January 2, 1997.</u> In any event, whenever Marc Jurgovan first told me that Frito-Lay was requesting zipper technology that would permit pinch grip opening, I told him that such a method would require a zipper opening force lower than the bond strength of the layers of the film. [Emphasis added.]

41. Mr. Mulder declares (Declaration of Steven C. Mulder, RX1016, ¶10):

I understood that Mr. Jurgovan now contends that he conceived of a pinch grip reclosable

bag and specified that the internal opening
force had to be lower and approach the "bond
strength of the film." While I suspect that
he had previously gotten information about
internal opening force from Minigrip, it
would self-evident [sic] to one skilled in
the art that the internal opening force of
the zipper on a pinch grip openable bag would
have to be less than the force needed to
either separate the zipper from the film or
deform the film itself. [Underscoring
added.]

42. Thus, neither Hogan nor Mulder denies inventor

Jurgovan's testimony that a January 2, 1997

telephone discussion regarding a pinch-grip

openable, reclosable food package took place on

January 2, 1997.

43. Mr. Callahan states that by January 24, 1997 at the

latest, Mr. Jurgovan informed him about the

invention recited in the involved claims. (JX2021

at 6-7, ¶¶14-15.)

44. Specifically, Mr. Callahan recalls (JX2021 at 6-7,

¶¶14-15):

14. At least by January 24, 1997, Marc
Jurgovan came to me and said that he thought
he had an idea for a reclosable bag solution
that is different from the Minigrip system,
and that he thought it might be patentable.
Mr. Jurgovan took me step-by-step through the
elements of his invention. His concept
was to have a reclosable bag that could be pinch
grip opened from the interior (or from the
"product side") of the bag like consumers
customarily open snack-food chip bags. He
explained that his invention involved
attaching zipper material to the front and
back walls of the Frito-Lay standard snack-

food chip bag material so that the zipper
could be engaged just below the top seal of
the bag and above the food product.  The
Frito-Lay standard film used for its snack-
food chip products is a flexible, elastomeric
material.  Mr. Jurgovan explained that
consumers would open the top seal and the
zipper material by manually gripping the
front and back walls of the bag below the
zipper material and pulling apart with a
pinch grip pulling force that would open the
zipper material and then the top seal of the
bag, from the product side outward, in a
single pinch-grip opening motion, without
tearing or deforming the bag walls.  The
consumers could then remove a portion of the
product and reclose the package by manually
reclosing the zipper material.  [Emphasis
added.]

15.  Mr. Jurgovan also explained to me
at this time that because zippers used in
standard reclosable packages had internal
("product side") opening forces that were
significantly larger than external ("consumer
side") opening forces, he wanted to use a
zipper having a reduced internal opening
force.  Otherwise, the large internal zipper
opening force could cause the zipper to strip
from the bag walls.  He explained that to
further avoid stripping the zipper material
away from the package side walls, the zipper
opening forces must approach the bond
strength of the sealed film when opened.
[Emphasis added.]

45.  Mr. Callahan is a packaging/project engineer with

almost 30 years of professional experience with

extensive expertise in many different facets of

package and machine development, testing, and

implementation.  (JX2021 at 2, ¶1.)

46.  Mr. Callahan is of the opinion "that Mr. Jurgovan's

conception of his pinch grip invention, as

16

**A169**

described...and as reflected on pages 1 and 2 of his

laboratory notebook (JX 2033), contains sufficient

detail that a person working in bag reclosure

technology could make and use a functional pinch

grip openable reclosable bag without undue

experimentation." (Id. at 11, ¶24.)

47. Mr. Callahan corroborates inventor Jurgovan's

testimony as follows (JX2021 at 9, ¶¶19-20):

> 19. On January 24, 1997, Mr. Jurgovan
> asked me to review the laboratory notebook
> that he kept in connection with his work on
> the bag reclsoure [sic] project at Frito-
> Lay...My signature appears at the bottom of
> pages 1 and 2 of the laboratory notebook,
> which I signed on January 24, 1997. At the
> time I signed this laboratory notebook, I
> would have wanted to understand what was
> being described on these pages, both as an
> engineer and as Mr. Jurgovan's supervisor on
> this project, and I would have insisted on
> understanding what was described. By no
> later than January 24, 1997, Mr. Jurgovan
> provided me with a thorough explanation of
> the contents of these pages, and I understood
> them.
>
> 20. On page 1 of the laboratory
> notebook, Mr. Jurgovan describes his pinch
> grip invention and states that this was
> discussed with Bob Hogan of Minigrip and
> Steve Mulder of Bosch on January 2, 1997.
> The description states that Mr. Jurgovan
> asked Minigrip to develop a prototype that
> allows consumers to open bags like they open
> current flex bags using a pinch grip motion,
> and that this would eliminate the need for
> tear strips, peelable seals, etc. I
> understood this to be communicating the
> concept of a package formed with flexible,
> elastomeric walls sealed at the top and
> bottom, and zipper members attached to the
> side walls of the elastomeric material below

17

**A170**

Interference No. 105,173                          Paper 94

> the top seal of the package.  I also
> understood this to be indicating that the
> consumer would open the package by manually
> grabbing the side walls of the flexible
> package material and pulling with a pinch
> grip pulling force to disengage the zipper
> material and then open the top seal in a
> single pinch grip opening motion, without
> tearing or deforming the bag walls.  This
> further indicates that after a consumer would
> remove a portion of the food product
> contained in the package, the package could
> be reclosed by manually re-engaging the
> zipper material.  I believe that this is how
> a person working in the bag reclosure
> technology would understand this disclosure.
> [Emphasis added.]

48.   Ramsey does not rely on any cross-examination

      testimony of Mr. Callahan to challenge the accuracy

      or credibility of the averments made in the Callahan

      declaration.  (Ramsey Opposition to JMJ filed on May

      13, 2005, Appendix A.)

49.   Frito-Lay, Inc. Technology Notebook No. 3558 (JX

      2033 at 2) contains the following drawings and

      notes, which were "witnessed and understood" by Mr.

      Callahan on January 24, 1997:

18

**A171**



**A172**

Interference No. 105,173                              Paper 94


   50.  Frito-Lay, Inc. Technology Notebook No. 3558 (JX

        2033 at 17) contains certain drawings and notes,

        which were "witnessed and understood" by Mr.

        Callahan on February 24, 1997 and reproduced on the

        following page.



51.  Mr. Callahan declares (JX2021 at 15, ¶31):

> Option 5 on page 17 [of JX2033], however, was
> Mr. Jurgovan's pinch grip design which I
> understood was considered by him to be the
> preferred concept.  I understood Mr.
> Jurgovan's Option 5 to disclose a male zipper
> member attached to the interior surface of
> one side of a flexible bag wall material and
> a female zipper member attached to the
> interior surface of the an [sic] opposite
> side wall of the flexible package material.
> The drawing further shows that the male and
> female zipper members are engaged together
> below the top seal of the package and above
> where the food product would be located.  I
> understood from this drawing that the zipper
> and top seal would be opened by pulling on
> the bag side walls below the zipper material
> with a pinch grip pulling force that would
> disengage the zipper members and open the top
> seal in a single pinch grip pulling motion.
> I also understood from this drawing that the
> package would be reclosed after the product
> is removed from the bag by manually re-
> engaging the zipper members.  Mr. Jurgovan's
> description of his pinch grip invention was
> sufficiently detailed that a person working
> in bag reclosure technology could make and
> use a functional pinch grip openable
> reclosable bag without the exercise of
> special skill or undue experimentation.

52.  Don Keel, a Senior Project Designer at Frito-Lay, is

not an inventor in either of the Jurgovan '396

patent or '646 application.  (Declaration of Don

Keel, JX2023 at 1, ¶1.)

53.  Mr. Keel declares that Mr. Jurgovan made a

presentation to members of the Frito-Lay Technology

group on February 20, 1997.  (Declaration of Don

Keel, JX2023 at 3, ¶7.)

54.  Specifically with respect to Mr. Jurgovan's February

20, 1997 presentation, Mr. Keel states (JX2023 at 4,

¶8):

> 8.  I understood from Mr. Jurgovan's
> presentation that he had conceived a snack
> food package with front and rear elastomeric
> walls sealed at the top and bottom and zipper
> elements attached to the walls and engaged
> with each other, whereby the zipper elements
> could be disengaged and the upper seal could
> be opened by the consumer applying a pinch-
> grip force to the front and rear walls below
> the zipper.  <u>This is reflected in the drawing
> of Option 5 at page 17 of the lab book (JX
> 2033)</u>.  [Emphasis added.]

55.  Inventor Jurgovan states (JX2020 at 11, ¶29):

> Because my concept involved opening from the
> product side, the zipper opening force had to
> be reduced.  If not, the consumer experience
> in pinch-grip opening the bag would be
> different and there would be a risk that the
> zipper material would strip off the bag
> walls.

56.  Non-inventor Callahan declares (JX2021 at 9-10,

¶21):

> [I]t was known that zipper material intended
> to be opened from the consumer side of the
> package, such as Minigrip's, had a much
> higher zipper opening force from the interior
> (or product side) in comparison to zipper
> opening force from the exterior (or consumer
> side).  This is reflected on page 2 of the
> laboratory notebook [JX2033 at 2] where Mr.
> Jurgovan writes that the consumer side
> opening force of the Minigrip zipper was 1.5
> to 2.0 lbs. and the product side opening
> force was 5-6 lbs.  <u>I therefore understood
> Mr. Jurgovan's disclosure to mean that the
> internal zipper opening force should be
> reduced.  As Mr. Jurgovan explained to me,
> this would facilitate opening the zipper from</u>

23

**A176**

Interference No. 105,173                          Paper 94

> <u>the product side by the consumer and reduce</u>
> <u>the possibility that the zipper material</u>
> <u>would be stripped off of the bag walls.</u>
> [Emphasis added.]

57. Adjusting or optimizing the zipper force by varying
the configuration of the male and female members of
the zipper was well known to a person having
ordinary skill in the art prior to November/December
1996. (Column 7, lines 33-45 of Jurgovan's '396
patent; page 13, line 24 to page 14, line 4.)

58. By January 24, 1997, which is well before Ramsey's
asserted conception date, Mr. Jurgovan conveyed to
non-inventor Callahan that the package Jurgovan
invented would be pinch-grip openable without
tearing or deforming the film walls. (JX2020 at 8-
9, ¶¶22-23; JX2021 at 6-7, ¶14-15.)

59. Frito-Lay, Inc. Technology Notebook No. 3558 (JX
2033 at 1) contains the following hand-written
entries by Mr. Jurgovan, which was "witnessed and
understood" by Mr. Callahan on January 24, 1997:

> • DISCUSSED WITH BOB HOGAN (MINIGRIP) ON
> 1/2/97 AND STEVE MULDER (BOSCH) ISSUES WITH
> EXISITING BAG RECLOSURE PROTOTYPES.
> • TEAR FEATURE DOES NOT WORK RELIABILITY
> [sic] & CONSISTENTLY.
> • ASKED MINIGRIP TO DEVELOP A PROTOTYPE
> THAT ALLOWS CONSUMERS TO OPEN BAGS
> [ILLEGIBLE] LIKE THEY OPEN CURRENT FLEX BAGS
> (USING PINCH-GRIP MOTION)
> • CONCEPT ELIMINATES NEED FOR TEAR STRIPS,
> PEELABLE SEALS, ETC.

- CONCEPT REQUIRES REDESIGN OF MINIGRIP/BOSCH PROPOSED ZIPPER TO REDUCE ZIPPER OPENING FORCE (IF OPENED FROM UNDERSIDE OF ZIPPER.
- ZIPPER OPENING FORCE MUST APPROACH (BE LOWER THAN?) BOND STRENGTH OF SEALED FILM WHEN OPENED
- ELIMINATES CONCERNS OF PACKAGE DAMAGE AT OR AROUND END SEAL/FIN SEAL JUNCTURE

60. Frito-Lay Technology Computation Notebook (in the name of Marc Jurgovan) contains certain hand-written entries, including an entry with Mr. Hogan's name circled, reproduced as follows:



61. Mr. Callahan declares that he attended a meeting on
    January 29 and 30, 1997 in which members of his
    reclosable bag project team (including inventor
    Jurgovan), Hogan and Arthur Malin of Minigrip, and
    Mulder of Bosch were also present.  (JX2021 at 12,
    ¶26.)

Interference No. 105,173                    Paper 94

62. Mr. Callahan recalls that at the January 29 and 30,

1997 meeting, inventor Jurgovan disclosed the

invention to Hogan and Malin in sufficient detail

"that a person working in bag reclosure technology

could make and use a functional pinch grip openable

reclosable bag without the exercise of special skill

or undue experimentation." (JX 2021 at 12-13, ¶27.)

63. Mr. Callahan's recollection is as follows (id.):

> Mr. Jurgovan explained his idea of applying a
> reduced opening force zipper to the standard
> Frito-Lay film (which was known to be a
> flexible, elastomeric film) below the top
> seal of the package and above where the food
> product would be located. He explained that
> the package could be pinch grip opened by
> manually pulling the side walls of the bag
> with a pinch grip pulling force that would
> disengage the zipper members and then the top
> seal in a single pinch grip motion, without
> tearing or deforming the bag walls. He
> further explained that the consumer could
> then reclose the package by manually re-
> engaging the zipper material after food
> product was removed from the package. Mr.
> Jurgovan also discussed that his pinch grip
> design would require a reduced opening force
> zipper when opening from the consumer side of
> the package.

64. On March 10, 1997, Mr. Jurgovan addressed a

memorandum captioned "BAG OPENING DEVELOPMENT

UPDATE" (reproduced on the following page) to

various individuals including Messrs. Callahan and

Keel. (JX2038.)

Interference No. 105,173                                    Paper 94

**Frito-Lay, Inc.**

To:   Joel Berry
      Steve Callahan
      Bill Derkacz
      Don Kets
      Jerry Reeves
      Gary Wilhelm

Copies:  Bob Hogan, Madison
         Monte Jump
         Art Mohr, Michigan
         Steve Vander Bosch

From:    Marc Jurgovan

Date:    March 10, 1997

Subject: BAG OPENING DEVELOPMENT UPDATE

The following options are being pursued to identify a functional opening method on a package with zipper reclosure:

- **"Pinch-Grip" Method** (Preference): Allows consumers to open packages using current "pinch-grip" manner. Requires new die / die components (block, plates, die) from Madison in order to achieve this reclosure, as well as redesign of the zipper handling parts, format, and print on the Booth bagmaker. The zipper web application must be redesigned to coordinate the zipper opening force when opening the package from either direction.

  Madison has expressed several concerns with this option, as they have not previously worked with zipper having equal opening forces from both directions. They are concerned with how this zipper will travel over the former shoulder (and whether it will pop open due to the lower opening forces present). Madison is also concerned with the layout of the new -13 sealers on the die design, as it believes differently than other options. The zipper material delivery to Booth was delayed due to several concerns with the production of this material on either material fabrication, so further redesign of the tool mechanism was required to achieve the desired zipper opening forces in both directions.

      Die Fabrication Window:
      Bagmaker Modification Window:                                         Option
  Evaluation Window:

- **Open Bag From Top By Peeling Apart Filter Seals**: Requires packaging film former seal to open caused by movement to minimize / eliminate filet delamination. Frito-Lay is currently evaluating this option along a modified jaw design.
      Option Evaluation Window:          Week of 3/10

- **Open Bag From Top Using Zipper Peelable Seal**: Madison will supply seal materials the week of 3/17 for evaluation in Frito-Lay. Option is currently least preferred because of the concern over the existing moisture and oxygen barrier will be compromised by relying on the zipper peelable seal as the barrier seal. No Frito-Lay film "barrier" seal would be present with this option.

      Option Evaluation Window

Again, these options all focus on integrating the zipper reclosure with our current flexible packaging structures. The Booth bagmaker checkout (prior to shipment) is currently scheduled for the week of 3/3, with shipment the week of 3/4. Delivery and installation would occur the week of 3/17, with a Booth serviceman on-site the week of 3/24 for Spencer training, etc. The Wisconsin Patents bagmaker will be relocated to the Packaging Equipment Lab to accomplish the Booth bagmaker.

If you have any questions or comments, please advise.

Jurgovan EXHIBIT 2038
Jurgovan v. Ramsey
Interference No. 105,173

**A181**

65. Copies of Mr. Jurgovan's March 10, 1997 memorandum
    appear to have been provided to Hogan and Malin,
    both of Minigrip, as well as Steven C. Mulder of
    Bosch. (JX2038.)

66. Mr. Jurgovan states (JX2020 at 25-26, ¶65):

> 65. By at least September 25, 1997, we
> received from Minigrip zipper material that
> had 2 lb. (consumer side) and 2 lb. (product
> side) opening forces, as well as a reversed
> male and female zipper member. Jerry Reaves
> and I made prototype pinch grip openable bags
> using this zipper material and standard
> Frito-Lay snack food film by at least
> September 25, 1997. These prototypes had the
> male and female side zipper portions attached
> to the front and back walls of the standard
> Frito-Lay film (which is a flexible,
> elastomeric material) and were engaged below
> the top seal of the bag. These were not
> "hand made" prototypes, but were made using
> production grade VFFS bag making equipment.[2]
> Jerry Reaves is a technician at Frito Lay
> with expertise in maintaining and running bag
> making equipment.

67. Mr. Jurgovan further avers that these prototypes
    were tested and that the tests, as recorded in
    Frito-Lay Technology Computation Notebook (JX2051 at
    50), reflected a success rate of 30 out of 41 bags,
    i.e., 30 bags were successfully pinch-grip openable
    and reclosable without deformation and tearing.
    (Id. at 26-27, ¶¶66-67.)

---

[2] "VFFS" is an acronym for "vertical form, fill and
seal." (JX2020 at 4, ¶10.)

68.  Frito-Lay technician Mr. Jerry Reaves, who is not an inventor in either of Jurgovan's '396 patent or '646 application, corroborates Mr. Jurgovan's averment that the invention was actually reduced to practice on September 25, 1997.  (JX2022 at 7-9, ¶¶20-24.)

69.  A Frito-Lay internal memorandum dated September 25, 1997 from the inventors of the subject Jurgovan '396 patent and '646 application to Donna Diermeier (JX2052) reads in part as follows:

> Testing of a lower interior opening force zipper has reduced stripping the zipper off of the film (due to film delamination) from 100% to approximately 30%.

70.  In its opposition to Jurgovan's preliminary motion 1, Ramsey represented to the Board as follows (Ramsey Opposition No. 1 filed on June 11, 2004 at 16-17):

> Jurgovan refers to the "front and rear walls having sufficient strength to resist tearing and deformation under the application of a pinch-grip pulling force during the pinch grip opening" as being an "important aspect of the invention".  Ramsey's reply is that this sufficient strength to perform the function and purpose of the pinch grip opening is not properly characterized as an "important aspect" <u>but rather is an inherent characteristic of the walls of the re-closable bag</u>...
> The pinch-grip pulling force could not open the engagement members if the bags were not sufficiently strong to transmit the force to the engagement members.  <u>It is respectfully submitted that this language clearly shows that the walls of the bag are inherently</u>

<u>strong enough to not tear or deform during
pinch-grip opening thus rendering the
language "...sufficient strength to resist
tearing and deformation..." inherent,
superfluous and redundant.</u>   [Emphasis added.]

71.   Party Ramsey states (Ramsey Opposition at 15):

Food packaging designed to be opened with the
"pinch grip" technique (RX 1014, ¶13),
application of reclosable zipper technology
to pinch grip openable packaging (RX 1011,
¶¶14, 17; RX 1012, ¶¶13-16; RX 1016, ¶¶7-8),
and varying of the internal and external
holding forces of the zipper profiles (RX
1012 ¶23) were all known in the art before
December, 1996.

72.   Hogan states (RX1012 at 5-6, ¶¶14-16):

14.   In November 1996, the Packaging
Machinery Manufacturers Institute ("PMMI")
held its tradeshow ("PacExpo") in Chicago.
Bosch Packaging, which makes FFS equipment
but uses Minigrip's TD technology, and
Minigrip both attended the show.[3]   As part
of Bosch's booth at the show, it had a VFFS
machine that produced TD zipper bags
utilizing a three-flange Minigrip zipper.
That is, either the male or female profile
had flanges on both sides of the zipper
track, and the other had a flange only on one
side of the track.
15.   The demonstration TD zipper bags
had a top seal and were intended to be opened
by cutting the top seal with a scissors [sic]
and then separating the zipper profiles from
the top (consumer side) of the bag.   However,
when scissors (or a knife) were not available

---

[3]   "FFS" and "TD" are acronyms for "form, fill and
seal" and "transverse direction," respectively.   (RX1012 at
2 and 3, ¶¶5, 11.)   According to Hogan, "an FFS method
involves a process in which a machine (or series of
machines) form a plastic container from the bag film, fill
the container with the product, and then create the final
seals on the container," while "TD" technology refers to the
application of zipper on the film at a 90° angle relative to
the direction of film travel on the FFS machine.   (Id.)

> to cut the top seal, Steven Mulder (a Bosch
> representative at the show) and I both opened
> demonstration bags by applying an outward
> force on the bag walls below the zipper so as
> to cause the zipper to open from the product
> side and then "pop" the top seal to open the
> bag.  Thus, we used a pinch grip method to
> open the sample bags in order to enable us to
> show individuals the zipper structure of the
> bags.  A photocopy of one such bag is shown
> at Ramsey Exhibit 1063.
>      16.   Frito-Lay representatives attended
> the PacExpo trade show and visited the Bosch
> booth at the show in November 1996.  I am
> virtually certain that at least some of the
> Frito-Lay representatives saw the
> demonstration bags being opened with a pinch-
> grip method, as discussed above.

73.  Mulder, like Hogan, asserts that certain bags were

     opened using a pinch-grip opening motion at the

     PacExpo trade show in November 1996.  (RX1016, ¶¶7-

     10.)

74.  Party Ramsey did not file a preliminary motion for

     judgment against Jurgovan based on the

     unpatentability of Jurgovan's involved claims over

     the PacExpo prior art.


                              DISCUSSION

     Each party charges the other with derivation, arguing

that it conceived the invention first and communicated it to

the other party.  (JMJ at 2-9; RMJ at 20-24.)  For reasons

discussed more fully below, Jurgovan has demonstrated by a

preponderance of the evidence that Ramsey derived the

invention from Jurgovan.  Because Jurgovan has proven that Ramsey is not the true inventive entity of the subject matter recited in its involved claims, Ramsey cannot prevail in this interference.

A party asserting derivation in an interference proceeding must establish: (1) prior conception of the claimed subject matter; and (2) communication of the conception to the party charged with derivation.  Price v. Symsek, 988 F.2d 1187, 1190, 26 USPQ2d 1031, 1033 (Fed. Cir. 1993).

"Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."  Burroughs Wellcome Co. v. Barr Laboratories, Inc., 40 F.3d 1223, 1228, 32 USPQ2d 1915, 1919 (Fed. Cir. 1994).  Our reviewing court explained:

> [T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure.  An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue.  See Fiers v. Revel, 984 F.2d 1164, 1169, 25 USPQ2d 1601, 1605 (Fed. Cir. 1993); Amgen, Inc. v. Chugai Pharmaceutical Co., 927 F.2d 1200, 1206, 18 USPQ2d 1016, 1021 (Fed. Cir. 1991)(no conception of chemical compound based solely on

its biological activity).  The conception analysis
necessarily turns on the inventor's ability to
describe his invention with particularity.  Until
he can do so, he cannot prove possession of the
complete mental picture of the invention.  These
rules ensure that patent rights attach only when
an idea is so far developed that the inventor can
point to a definite, particular invention.

Burroughs Wellcome, 40 F.3d at 1228, 32 USPQ2d at 1919.

The standard for communication requires a showing that

the communication "'enabled an ordinary mechanic, without

the exercise of any ingenuity and special skill on his part,

to construct and put the improvement in successful

operation'" (emphasis original).  Gambro Lundia AB v. Baxter

Healthcare Corp, 110 F.3d 1573, 1577, 42 USPQ2d 1378, 1382

(Fed. Cir. 1997)(quoting Agawam Co. v. Jordan, 74 U.S. 583,

602-03 (1868)); accord Hedgewick v. Akers, 497 F.2d 905,

908, 182 USPQ 167, 169 (CCPA 1978)("Communication of a

complete conception must be sufficient to enable one of

ordinary skill in the art to construct and successfully

operate the invention.").


1. Prior Conception

Ramsey filed its preliminary statement on April 9, 2004

(paper 22 at 3), alleging a conception date of March 29,

1997.[4]  (FF 33.)  At the time the preliminary statement was

_____

[4]  Consistent with its preliminary statement, Ramsey
urges the same conception date of March 29, 1997 in its

Interference No. 105,173                    Paper 94

filed, the interference rules "strictly held [a party] to
any date alleged in the preliminary statement." 37 CFR §
1.629(a)(2004). Thus, for purposes of proving the prior
conception element of derivation on the part of Ramsey,
Jurgovan need only establish a date of conception before
March 29, 1997.

In 1996, Frito-Lay undertook a project to develop
reclosable packages for its salty snack food products. (FF
15.) While Jurgovan admits that reclosable packages were
already known in the prior art, these prior art packages
suffered from various drawbacks. One problem of the prior
art is described as follows (FF 11; column 1, lines 32-39 of
Jurgovan's '396 patent; page 1, line 29 to page 2, line 1 of
Jurgovan's '646 application):

> Although a number of packages with re-closable
> zippers are known, the existing packages have a
> number of drawbacks. For example, these prior
> packages typically must be initially opened using
> two distinct steps. First, a heat seal must be
> broken by cutting the package with scissors or by
> removing a tear-away, perforated strip. The re-
> closable zipper closure is then opened in a
> distinct second step.[5]

Thus, these prior art reclosable packages are opened from
the "consumer" side using a two-step process. (FF 13;

---

motion for judgment. (Finding of Fact, hereinafter "FF,"
31; RMJ at 13.)

[5] The prior art reclosable packages described in
Jurgovan's '396 patent and '646 application were

Interference No. 105,173                          Paper 94

JX2020 at 6, ¶¶14-15; JX2021 at 5, ¶¶9-10.)   According to
Jurgovan, the two-step opening characteristic of the prior
art package "substantially reduces the consumer appeal of
the packages and makes the packages undesirable for a
variety of products, such as for snack food chips and the
like."   (FF 14; column 1, lines 39-42 of Jurgovan's '396
patent; page 2, lines 1-4 of Jurgovan's '646 application.)

Marc A. Jurgovan, one of the named inventors in both
the Jurgovan '396 patent and '646 application, was assigned
to Frito-Lay's reclosable package project from which a
reclosable package for use with salty snack food products
was to be developed.   (FF 15; JX2020, ¶3.)   During the
significant time periods of this project, Mr. Jurgovan
reported to Frito-Lay Senior Project Engineer Stephen M.
Callahan, who is not an inventor in either of the Jurgovan
'396 patent or the '646 application.   (FF 16-18; JX2021 at
4, ¶7.)

To avoid significant costs, Frito-Lay desired to
develop a reclosable flexible package using standard Frito-
Lay materials and existing manufacturing technology.   (FF
20; JX2020 at 3, ¶7; JX2021 at 3-4, ¶6.)   As part of this
effort, Frito-Lay selected Minigrip and Bosch as potential
suppliers of zipper materials and equipment.   (FF 21; JX2020

representative of commercial products available in November
1996.   (FF 12; JX2020 at 5, ¶12-15; JX2021 at 5, ¶9.)

at 3-4, ¶8; JX2021 at 3, ¶4.)  Thus, Frito-Lay was engaged

in potential customer-vendor business relationships with

Minigrip and Bosch.

In the November and December 1996 timeframe,

Minigrip/Bosch offered a solution involving a zipper system

similar to those used in prior art reclosable packages.  (FF

22; JX2020 at 3-4, ¶¶8-15; JX2021 at 5, ¶¶9-10.)  Regarding

the Minigrip/Bosch proposal, Mr. Callahan recalls (FF 23;

JX2021 at 5-6):

> 9.  In November and December 1996, we began
> evaluating a reclosable bag solution using a
> Minigrip zipper system applied to the standard
> Frito-Lay snack-food chip film.  It was my
> understanding that this Minigrip zipper system was
> similar to zipper systems that Minigrip had
> supplied to other customers and used commercially.
> In particular, the Minigrip zipper system was
> constructed having a tear strip at the top of the
> package, a primary seal below the tear strip, and
> a zipper located below the primary seal.  In use,
> the tear strip would be torn away transversely
> across the top of the package.  The primary seal
> would then be opened by peeling apart the upper
> portions of the film material thereby exposing the
> zipper material.  The zipper members would then be
> separated manually thereby allowing access to the
> snack-food chip product contained in the bag.  The
> package would then be reclosed by manually re-
> engaging the zipper material.
> 10.  This prototype reclosable package was
> similar to all other commercially available
> reclosable packages that I became aware of in
> connection with my technical evaluation in that it
> was opened from the top of the package and above
> the zipper (from the "consumer side") to gain
> access to the contents of the package.
> 11.  I understood from my involvement in the
> project and from conversations with Marc Jurgovan
> that we were having significant problems with the
> Minigrip design.  In particular, the film would

> tear uncontrollably and randomly when the tear
> strips were torn across the top of the package.
> Also, when the primary seal (located above the
> zipper material) was opened, the inner laminar
> bonds of the Frito-Lay film would often fail
> causing further uncontrolled tearing down and into
> the package.

Thus, Callahan and inventor Jurgovan believed that the

Minigrip/Bosch design was unsatisfactory because "the film

would tear uncontrollably and randomly when the tear strips

were torn across the top of the package." (FF 24; JX2021 at

5, ¶11; JX2020 at 6, ¶16.) Additionally, the inner laminar

bonds of the Frito-Lay film would often fail when the

primary seal (located above the zipper material) was opened,

further causing uncontrolled tearing down and into the

package. (FF 25; JX2020 at 6, ¶16; JX2021 at 5, ¶11.)

Because the prior art and the proposed Minigrip/Bosch

suffered from these shortcomings, Jurgovan sought a new

reclosable package that was pinch-grip openable in one

simple motion. (FF 26; JX2020 at 7-8, ¶¶19-22; JX2021 at 5-

6; ¶¶11-14.) Specifically, the package "could be pinch grip

opened from the interior (or from the 'product side') of the

bag like consumers customarily open [Frito-Lay's] snack-food

chip bags." (FF 27; JX2021, ¶14; column 3, lines 5-10 of

Jurgovan's '396 patent; page 5, lines 7-11 of Jurgovan's

'646 application.)

Jurgovan asserts that it conceived the invention by at

least January 2, 1997. (FF 28.) The evidence weighs in

favor of Jurgovan's position that it conceived the invention

prior to Ramsey's earliest conception date of March 29,

1997.  To start, we have inventor Jurgovan's credible

representations to this Board.  Specifically, Mr. Jurgovan

avers (FF 35; JX2020 at 8):

> 22.  In the latter part of December 1996, I
> conceived of a reclosable bag that could solve the
> problems we experienced with the Bosch/Minigrip
> prototype.  In particular, I thought that we
> should not be attempting to incorporate a reclose
> structure which requires the transverse and
> downward forces on the standard Frito-Lay snack
> film that it was not designed to experience.
> Instead, I thought that we should use a reclose
> solution that took advantage of the standard way
> that consumers opened Frito-Lay's snack food
> product, i.e. in a pinch-grip motion.

Mr. Jurgovan further explains (FF 36; _id._ at 8-9, ¶23):

> The top seal and the zipper material would be
> opened by manually gripping the front and back
> walls of the bag and pulling apart with a force
> that would open the zipper material and then the
> top seal of the bag from the product side outward
> in a single pinch-grip opening motion.  Because we
> wanted the package to be reclosable, the flexible
> film needed to withstand the pinch grip opening
> process without tearing or deforming.  I knew this
> was a quality of the Frito-Lay standard film which
> is opened using the pinch-grip motion without
> tearing or deformation.

Mr. Jurgovan states that unlike the package proposed by

Minigrip/Bosch, the invention would solve the problem of

uncontrollable tearing that could occur with the tear strip

as well as delamination of the film down into the bag as the

primary seal is opened.  (FF 37; _id._ at 9, ¶24.)

An inventor's testimony alone is not sufficient to prove conception.[6] Here, however, other evidence corroborates Mr. Jurgovan's representations. Mr. Jurgovan's averments are consistent with and fully supported by the unimpeached declaration of Mr. Callahan. According to Mr. Callahan, inventor Jurgovan informed him about the inventions recited in the counts by January 24, 1997 at the latest. (FF 44; JX2021 at 6-7, ¶¶14-15.) Specifically, we credit Mr. Callahan's testimony, which states (id.):

> 14. At least by January 24, 1997, Marc Jurgovan came to me and said that he thought he had an idea for a reclosable bag solution that is different from the Minigrip system, and that he thought it might be patentable. Mr. Jurgovan took me step-by-step through the elements of his invention. His concept was to have a reclosable bag that could be pinch grip opened from the interior (or from the "product side") of the bag like consumers customarily open snack-food chip bags. He explained that his invention involved attaching zipper material to the front and back walls of the Frito-Lay standard snack-food chip bag material so that the zipper could be engaged just below the top seal of the bag and above the food product. The Frito-Lay standard film used for its snack-food chip products is a flexible, elastomeric material. Mr. Jurgovan explained that consumers would open the top seal and the zipper material by manually gripping the front and back walls of the bag below the zipper material and pulling apart with a pinch grip pulling force that would open the zipper material and then the top seal of the bag, from the product side outward, in a single pinch-grip opening motion, without tearing or deforming the bag walls. The consumers could then remove a portion of the product and

---

[6] See, e.g., Price, 988 F.2d at 1194-95, 26 USPQ2d at 1036-37.

reclose the package by manually reclosing the
zipper material.  [Emphasis added.]

   15.  Mr. Jurgovan also explained to me at
this time that because zippers used in standard
reclosable packages had internal ("product side")
opening forces that were significantly larger than
external ("consumer side") opening forces, he
wanted to use a zipper having a reduced internal
opening force.  Otherwise, the large internal
zipper opening force could cause the zipper to
strip from the bag walls.  He explained that to
further avoid stripping the zipper material away
from the package side walls, the zipper opening
forces must approach the bond strength of the
sealed film when opened.  [Emphasis added.]

In addition, Frito-Lay, Inc. Technology Notebook No.

3558 (FF 49, 59; JX 2033 at 1-2) contains notes and drawings

that are consistent with the testimonies of Callahan and

inventor Jurgovan.[7]  Mr. Jurgovan's notes (id.) reflect the

understanding that:

-       "current flex bags" (i.e., existing Frito-Lay

        snack food packages) would be modified to be

        reclosable and would be openable using a

        "pinch-grip motion"

-       the concept eliminates the need for problematic

        tear strips or peelable seals

-       the "concept requires redesign of [a]

        Minigrip/Bosch proposed zipper to reduce zipper

        opening force (if opened) from [the] underside

_____

     [7]  Mr. Jurgovan's notes and drawings were "witnessed
and understood" by Mr. Callahan on January 24, 1997.

Interference No. 105,173                          Paper 94

     of [the] zipper" and the "zipper opening force

     must approach (be lower than?) [the] bond

     strength of [the] sealed film when opened"

-     the concept "eliminates concerns of package

     damage at or around [the] end seal/fin seal

     juncture"

The drawings (FF 49; JX2033 at 2), reproduced on the

following page, provide additional details of Jurgovan's

concept.

42

**A195**

Interference No. 105,173                    Paper 94



Interference No. 105,173                              Paper 94

    In the drawings, Mr. Jurgovan includes two package
designs - one identified as "(EXISTING) MINIGRIP" and the
other labeled as "(PROPOSED) M. JURGOVAN."  The latter
depicted design shows an "A" side flexible film wall (i.e.,
an elastomeric wall), a "B" side flexible film wall, a top
seal S1, a zipper part attached to the "A" side, and a
zipper part attached to the "B" side.  Mr. Jurgovan's notes
at JX2033 at 2 indicate that the "zipper opening force from
top or bottom needs to approach sealed film opening force."
As noted in Mr. Callahan's declaration, Mr. Jurgovan
conveyed the idea "that to further avoid stripping the
zipper material away from the package side walls, the zipper
opening forces must approach the bond strength of the sealed
film when opened."  (FF 44; JX2021 at 6-7, ¶¶14-15.)  Thus,
these drawings and notes describe every element of counts 1
and 2.

    Frito-Lay, Inc. Technology Notebook No. 3558 (FF 50; JX
2033 at 17) contains further evidence in support of Mr.
Callahan's testimony in the form of certain drawings and
notes, which were "witnessed and understood" by Mr. Callahan
on February 24, 1997.  This documentary evidence is
reproduced on the following page.

Interference No. 105,173                          Paper 94



**A198**

Interference No. 105,173                              Paper 94

 

    Mr. Callahan declares (FF 51; JX2021 at 15, ¶31):

    Option 5 on page 17 [of JX2033], however, was Mr.
    Jurgovan's pinch grip design which I understood
    was considered by him to be the preferred concept.
    I understood Mr. Jurgovan's Option 5 to disclose a
    male zipper member attached to the interior
    surface of one side of a flexible bag wall
    material and a female zipper member attached to
    the interior surface of the an [sic] opposite side
    wall of the flexible package material.  The
    drawing further shows that the male and female
    zipper members are engaged together below the top
    seal of the package and above where the food
    product would be located.  I understood from this
    drawing that the zipper and top seal would be
    opened by pulling on the bag side walls below the
    zipper material with a pinch grip pulling force
    that would disengage the zipper members and open
    the top seal in a single pinch grip pulling
    motion.  I also understood from this drawing that
    the package would be reclosed after the product is
    removed from the bag by manually re-engaging the
    zipper members.  Mr. Jurgovan's description of his
    pinch grip invention was sufficiently detailed
    that a person working in bag reclosure technology
    could make and use a functional pinch grip
    openable reclosable bag without the exercise of
    special skill or undue experimentation.

    The declaration of Don Keel, a Senior Project Designer

at Frito-Lay who is not an inventor in either of the

Jurgovan '396 patent or '646 application, further buttresses

Jurgovan's conception prior to March 29, 1997.  (FF 52-53;

Declaration of Don Keel, JX2023 at 3, ¶7.)  Mr. Keel recalls

that Mr. Jurgovan made a presentation to members of the

Frito-Lay Technology group on February 20, 1997.  (FF 53;

Declaration of Don Keel, JX2023 at 3, ¶7.)  Specifically,

Mr. Keel states (FF 54; id. at 4, ¶8):

 

**A199**

Interference No. 105,173                    Paper 94

      8.  I understood from Mr. Jurgovan's
presentation that he had conceived a snack food
package with front and rear elastomeric walls
sealed at the top and bottom and zipper elements
attached to the walls and engaged with each other,
whereby the zipper elements could be disengaged
and the upper seal could be opened by the consumer
applying a pinch-grip force to the front and rear
walls below the zipper.  <u>This is reflected in the
drawing of Option 5 at page 17 of the lab book (JX
2033)</u>.  [Emphasis added.].

The testimonies of non-inventors Callahan and Keel,[8] as

well as Frito-Lay's laboratory notes, fully corroborate

inventor Jurgovan's testimony.  Taken together, the

preponderance of the evidence indicates that Jurgovan

conceived of the inventions recited in the counts well

before Ramsey's earliest conception date of March 29, 1997.

<u>Price</u>, 988 F.2d at 1195, 26 USPQ2d at 1037 ("An evaluation

of <u>all</u> pertinent evidence must be made so that a sound

determination of the credibility of the inventor's story may

be reached.").

    Ramsey argues that Jurgovan's idea lacks certain

elements of the counts.  Specifically, with respect to count

1, Ramsey contends that Jurgovan's idea lacks "any means or

method for disengaging engaged first and second engagement

members by application of a pulling force below the

engagement members sufficient to disengage the members

---

     [8]  Ramsey does not rely on any cross-examination
testimony of Callahan or Keel to challenge the accuracy or
credibility of the averments made in the Callahan or Keel

without stripping the members from their associated wall surfaces or tearing or deforming the walls." (Ramsey Opposition to JMJ at 1.)  With respect to count 2, Ramsey urges that Jurgovan's idea lacks "any means or method for attaching engaged first and second zipper parts to front and rear walls, any means or method for manually pinch-grip opening such zipper parts without tearing or deforming the front and rear walls and any means or method for providing engaged engagement members manually openable upon application of a pinch-grip pulling force (rather than stripping from the wall upon application of such force)." (Id. at 1-2.)

We find no merit in Ramsey's argument.  Ramsey does not accurately identify the language recited in the counts. Specifically, we find no language in either of the subject counts on applying a "pulling force below the engagement members [of the zipper parts] sufficient to disengage the members without stripping the members from their associated walls." Instead, the counts recite: "said front and rear walls having a sufficient strength to resist tearing and deformation under the application of said pinch-grip pulling force during pinch-grip opening."

---

declaration.  (FF 48; Ramsey Opposition to JMJ filed on May 13, 2005, Appendix A.)

Even assuming that the subject counts inherently require the application of a "pulling force below the engagement members [of the zipper parts] sufficient to disengage the members without stripping the members from their associated walls," the evidence indicates that Jurgovan had possession of this concept and disclosed it to others before March 29, 1997. In particular, inventor Jurgovan states (FF 55; JX2020 at 11, ¶29):

> Because my concept involved opening from the product side, the zipper opening force had to be reduced. <u>If not, the consumer experience in pinch-grip opening the bag would be different and there would be a risk that the zipper material would strip off the bag walls</u>. [Emphasis added.]

This testimony is fully corroborated by non-inventor Callahan, who declares (FF 56; JX2021 at 9-10, ¶21):

> [I]t was known that zipper material intended to be opened from the consumer side of the package, such as Minigrip's, had a much higher zipper opening force from the interior (or product side) in comparison to zipper opening force from the exterior (or consumer side). This is reflected on page 2 of the laboratory notebook [JX2033 at 2] where Mr. Jurgovan writes that the consumer side opening force of the Minigrip zipper was 1.5 to 2.0 lbs. and the product side opening force was 5-6 lbs. <u>I therefore understood Mr. Jurgovan's disclosure to mean that the internal zipper opening force should be reduced. As Mr. Jurgovan explained to me, this would facilitate opening the zipper from the product side by the consumer and reduce the possibility that the zipper material would be stripped off of the bag walls</u>. [Emphasis added.]

Here, Ramsey has failed to sufficiently prove that one of ordinary skill in the art would not have been able to

adjust or optimize the zipper opening force by varying the

configuration of the male and female members of the zipper

to avoid stripping the zipper from the film walls.  Most

crucial to our inquiry, Ramsey itself asserts as follows (FF

71; Ramsey Opposition at 15):

> Food packaging designed to be opened with the
> "pinch grip" technique (RX 1014, ¶13), application
> of reclosable zipper technology to pinch grip
> openable packaging (RX 1011, ¶¶14, 17; RX 1012,
> ¶¶13-16; RX 1016, ¶¶7-8), and varying of the
> internal and external holding forces of the zipper
> profiles (RX 1012 ¶23) were all known in the art
> before December, 1996.[9]

Even the declaration of one of Ramsey's own proponents

supports Jurgovan's position.  In particular, Mulder

declares (FF 41; RX1016, ¶10):

> I understood that Mr. Jurgovan now contends that
> he conceived of a pinch grip reclosable bag and
> specified that the internal opening force had to
> be lower and approach the "bond strength of the
> film."  While I suspect that he had previously
> gotten information about internal opening force
> from Minigrip, it would self-evident [sic] to one
> skilled in the art that the internal opening force
> of the zipper on a pinch grip openable bag would
> have to be less than the force needed to either
> separate the zipper from the film or deform the
> film itself.  [Emphases added.]

According to Ramsey's own expert, the element of the counts

which Ramsey argues is missing from Jurgovan's conception

_____

[9]    Ramsey's assertion that "varying...the internal and
external holding forces of the zipper profiles...were all
known in the art before December, 1996" is consistent with
the discussions concerning the admitted prior art in
Jurgovan's '396 patent and '646 application.  (FF 57; Column

Interference No. 105,173                    Paper 94

"would [be] self-evident to one skilled in the art," and

thus necessarily be a part of the pinch-openable, reclosable

bag conceived by Jurgovan prior to Ramsey's earliest

conception date.

   With respect to the language "said front and rear walls

having a sufficient strength to resist tearing and

deformation under the application of said pinch-grip pulling

force during pinch-grip opening" actually recited in the

counts, Ramsey has failed to sufficiently demonstrate that

the recited characteristics of the walls would not be

inherent in a reclosable flexible package.  If tearing and

deformation occurred, the flexible bag would not be a

reclosable flexible package or even a reusable package at

all.  Moreover, the evidence indicates that by January 24,

1997, which is well before Ramsey's asserted conception

date, Mr. Jurgovan conveyed to non-inventor Callahan that

the package he invented would be pinch-grip openable without

tearing or deforming the film walls.  (FF 58; JX2020 at 8-9,

¶¶22-23; JX2021 at 6-7, ¶14-15.)

   In its opposition to Jurgovan's preliminary motion 1,

Ramsey represented to the Board as follows (FF 70; Ramsey

Opposition No. 1 filed on June 11, 2004 at 16-17):

> Jurgovan refers to the "front and rear walls
> having sufficient strength to resist tearing and

7, lines 33-45 of the '396 patent; page 13, line 24 to page
14, line 4 of the '646 application.)

> deformation under the application of a pinch-grip
> pulling force during the pinch grip opening" as
> being an "important aspect of the invention".
> Ramsey's reply is that this sufficient strength to
> perform the function and purpose of the pinch grip
> opening is not properly characterized as an
> "important aspect" <u>but rather is an inherent
> characteristic of the walls of the re-closable
> bag...</u>
> <u>The pinch-grip pulling force could not open the
> engagement members if the bags were not
> sufficiently strong to transmit the force to the
> engagement members.  It is respectfully submitted
> that this language clearly shows that the walls of
> the bag are inherently strong enough to not tear
> or deform during pinch-grip opening thus rendering
> the language "...sufficient strength to resist
> tearing and deformation..." inherent, superfluous
> and redundant</u>.  [Emphasis added.]

After arguing that the recitation "sufficient strength to

resist tearing and deformation" is an inherent

characteristic of the recited pinch-grip openable,

reclosable package, Ramsey is in no position to now argue

the contrary.  <u>Cf</u>. <u>Bosies v. Benedict</u>, 27 F.3d 539, 543-44,

30 USPQ2d 1862, 1865-66 (Fed. Cir. 1994).

Ramsey also argues that Jurgovan's idea was not

conception that was sufficiently defined "so that a skilled

artisan could take it and reduce the [i]nventions to

practice without undue experimentation."  (Ramsey Opposition

at 2.)  We disagree.  Mr. Callahan is a packaging/project

engineer with almost 30 years of professional experience

with extensive expertise in many different facets of package

and machine development, testing, and implementation.  (FF

45; JX2021 at 2, ¶1.)  Mr. Callahan avers "that Mr.

Jurgovan's conception of his pinch grip invention, as described...and as reflected on pages 1 and 2 of his laboratory notebook (JX 2033), contains sufficient detail that a person working in bag reclosure technology could make and use a functional pinch grip openable reclosable bag without undue experimentation." (FF 46; id. at 11, ¶24.) We credit Mr. Callahan's testimony. Ramsey must show that one of ordinary skill in the art would have been subject to "extensive research or experimentation" to reduce the conceived invention to practice. Ramsey did not meet this burden.

Ramsey's position that "extensive research or experimentation" would have been necessary to reduce Jurgovan's conception to practice cannot be squared with other facts on which it relies and is therefore untenable. By Ramsey's own admission, reclosable zipper technology for pinch-grip openable packages was well known in the art before December 1996. Again, we refer to Ramsey's opposition at 15 (FF 71):

> Food packaging designed to be opened with the "pinch grip" technique (RX 1014, ¶13), application of reclosable zipper technology to pinch grip openable packaging (RX 1011, ¶¶14, 17; RX 1012, ¶¶13-16; RX 1016, ¶¶7-8), and varying of the internal and external holding forces of the zipper profiles (RX 1012 ¶23) were all known in the art before December, 1996.

Interference No. 105,173                    Paper 94


Furthermore, Robert E. Hogan, a named inventor of Ramsey's

'723 application, asserts (FF 72; Declaration of Robert E.

Hogan, RX1012 at 5-6, ¶¶14-16):

> 14. In November 1996, the Packaging
> Machinery Manufacturers Institute ("PMMI") held
> its tradeshow ("PacExpo") in Chicago. Bosch
> Packaging, which makes FFS equipment but uses
> Minigrip's TD technology, and Minigrip both
> attended the show. As part of Bosch's booth at
> the show, it had a VFFS machine that produced TD
> zipper bags utilizing a three-flange Minigrip
> zipper. That is, either the male or female
> profile had flanges on both sides of the zipper
> track, and the other had a flange only on one side
> of the track.
> 15. The demonstration TD zipper bags had a
> top seal and were intended to be opened by cutting
> the top seal with a scissors [sic] and then
> separating the zipper profiles from the top
> (consumer side) of the bag. However, when
> scissors (or a knife) were not available to cut
> the top seal, Steven Mulder (a Bosch
> representative at the show) and I both opened
> demonstration bags by applying an outward force on
> the bag walls below the zipper so as to cause the
> zipper to open from the product side and then
> "pop" the top seal to open the bag. Thus, we used
> a pinch grip method to open the sample bags in
> order to enable us to show individuals the zipper
> structure of the bags. A photocopy of one such
> bag is shown at Ramsey Exhibit 1063.
> 16. Frito-Lay representatives attended the
> PacExpo trade show and visited the Bosch booth at
> the show in November 1996. I am virtually certain
> that at least some of the Frito-Lay
> representatives saw the demonstration bags being
> opened with a pinch-grip method, as discussed
> above.

Mulder, like Hogan, states that certain bags were opened

using a pinch-grip opening motion at the PacExpo trade show

in November 1996. (FF 73; RX1016, ¶¶7-10.) Under these

circumstances, Ramsey cannot now argue that one of ordinary

skill in the art would have been subject to "extensive research or experimentation" to reduce Jurgovan's conception to practice.[10]

Furthermore, the mere fact that extensive engineering was or would have been required to make the packages in a commercially viable manner (i.e., to produce reclosable packages using Frito-Lay's existing machinery and starting materials) is not the proper inquiry.  The more relevant question is whether "extensive research or experimentation" would have been necessary to reduce Mr. Jurgovan's conception of a pinch-grip openable reclosable food bag to practice.  Ramsey does not direct us to any evidence that would establish that "extensive research or experimentation" would have been necessary to make the recited reclosable bag from Jurgovan's conception.[11]  Rather, Ramsey seems to focus on whether any extensive engineering would have been necessary to modify Frito-Lay's existing equipment to facilitate the commercial production of snack foods with the

---

[10]  We decline to make any ruling on unpatentability of the involved claims based on this information because Ramsey did not file a timely preliminary motion based on this material information.

[11]  Again, Ramsey has represented that "[f]ood packaging designed to be opened with the 'pinch grip' technique (RX 1014, ¶13), application of reclosable zipper technology to pinch grip openable packaging (RX 1011, ¶¶14, 17; RX 1012, ¶¶13-16; RX 1016, ¶¶7-8), and varying of the internal and external holding forces of the zipper profiles (RX 1012 ¶23)

Interference No. 105,173                    Paper 94

new package.  (FF 71; Ramsey Opposition at 9-10.)  Here, the

corroborated evidence indicates that Jurgovan was able to

reduce the conception (i.e., pinch-grip openable bags) to

practice without much difficulty using zipper material

having 2 lb. (consumer side) and 2 lb. (product side)

opening forces.  In this regard, Mr. Jurgovan states (FF 66;

JX2020 at 25-26, ¶65):

> 65.  By at least September 25, 1997, we
> received from Minigrip zipper material that had 2
> lb. (consumer side) and 2 lb. (product side)
> opening forces, as well as a reversed male and
> female zipper member.  Jerry Reaves and I made
> prototype pinch grip openable bags using this
> zipper material and standard Frito-Lay snack food
> film by at least September 25, 1997.  These
> prototypes had the male and female side zipper
> portions attached to the front and back walls of
> the standard Frito-Lay film (which is a flexible,
> elastomeric material) and were engaged below the
> top seal of the bag.  These were not "hand made"
> prototypes, but were made using production grade
> VFFS bag making equipment.  Jerry Reaves is a
> technician at Frito Lay with expertise in
> maintaining and running bag making equipment.

Mr. Jurgovan further avers that these prototypes were

tested and that the tests, as recorded in Frito-Lay

Technology Computation Notebook (FF 67; JX2051 at 50),

reflected a success rate of 30 out of 41 bags, i.e., 30 bags

were successfully pinch-grip openable and reclosable without

deformation and tearing.  (FF 67; id. at 26-27, ¶¶66-67.)

Mr. Jurgovan's statements are not only corroborated by

---

were all known in the art before December, 1996."  (Ramsey
Opposition at 15.)

Frito-Lay's notes but are also consistent with additional

corroborative evidence in the form of a declaration by a

non-inventor, namely Frito-Lay technician Jerry Reaves (FF

68; JX2022 at 7-9, ¶¶20-24) as well as an internal

memorandum to Donna Diermeier (FF 69; JX2052), which reads

in part as follows:

> Testing of a lower interior opening force zipper
> has reduced stripping the zipper off of the film
> (due to film delamination) from 100% to
> approximately 30%.

While these results may not be satisfactory for Frito-Lay's

ultimate <u>commercial</u> manufacturing purposes, it is clear to

us that Jurgovan did reduce the conception to practice

without extensive research or experimentation by at least

September 25, 1997.

Ramsey faults Jurgovan for not manufacturing zippers on

its own or seeking an alternative zipper supplier to reduce

the conception to practice more quickly.  (Ramsey Opposition

at 11.)  However, there is no requirement under the law for

an inventor to manufacture all of the components (e.g.,

resin, adhesives, zippers, or the like) needed to reduce an

invention to practice.  Frito-Lay is in the packaged food

business, not the zipper supply business.

For these reasons, we determine that Jurgovan conceived

the invention prior to Ramsey's earliest conception date of

March 29, 1997.

2. Communication

Jurgovan sufficiently demonstrated, by a preponderance of the evidence, that Jurgovan communicated its conception to Ramsey on several occasions prior to Ramsey's earliest conception date of March 29, 1997.

First, we have Mr. Jurgovan's testimony. According to Mr. Jurgovan, he disclosed the invention to Hogan of Minigrip and Mulder of Bosch by telephone on January 2, 1997. (FF 38-39; JX2020 at 9-10, ¶26.) Mr. Jurgovan's declaration states:

> On January 2, 1997, I had a telephone conversation with Bob Hogan at Minigrip and Steve Mulder at Bosch. I explained to them the problems we were having with the existing prototypes [proposed by Minigrip/Bosch]. I also disclosed to them my invention of the pinch-grip reclosable package which I believed would solve these problems. In particular, I disclosed to them my idea of attaching the zipper material to the front and back walls of the Frito-Lay's standard flexible bag material so that the zipper could be engaged just below the top seal of the bag and above the food product. I disclosed to them that the top seal and the zipper material could be opened by the consumer by manually gripping the front and back walls of the bag and pulling apart with a force that would open the zipper material and then the top seal of the bag from the product side outward in a single pinch-grip opening motion. After consuming the snack food, the consumer could then reclose the package using the zipper material. I explained to them that this concept would eliminate the need for tear strips, peel seals and the like.

Thus, according to Mr. Jurgovan, he disclosed to Hogan and Mulder on January 2, 1997 a reclosable food package having elastomeric front and rear walls ("Frito-Lay's standard flexible bag"), a top seal, and a "zipper [that] could be opened by the consumer by manually gripping the front and back walls of the bag and pulling apart with a force that would open the zipper material and then the top seal of the bag from the product side outward in a single pinch-grip opening motion." Because the disclosed food package is reclosable, the elastomeric front and rear walls must necessarily have "sufficient strength to resist tearing and deformation" during pinch-grip opening.

Mr. Callahan corroborates Mr. Jurgovan's testimony. Mr. Callahan, who was not cross-examined by Ramsey, testifies (FF 47; JX2021 at 9, ¶¶19-20):

> 19.  On January 24, 1997, Mr. Jurgovan asked me to review the laboratory notebook that he kept in connection with his work on the bag reclsoure [sic] project at Frito-Lay...My signature appears at the bottom of pages 1 and 2 of the laboratory notebook, which I signed on January 24, 1997. At the time I signed this laboratory notebook, I would have wanted to understand what was being described on these pages, both as an engineer and as Mr. Jurgovan's supervisor on this project, and I would have insisted on understanding what was described. By no later than January 24, 1997, Mr. Jurgovan provided me with a thorough explanation of the contents of these pages, and I understood them.
> 20.  On page 1 of the laboratory notebook, Mr. Jurgovan describes his pinch grip invention and states that this was discussed with Bob Hogan of Minigrip and Steve Mulder of Bosch on January

> 2, 1997. The description states that Mr. Jurgovan
> asked Minigrip to develop a prototype that allows
> consumers to open bags like they open current flex
> bags using a pinch grip motion, and that this
> would eliminate the need for tear strips, peelable
> seals, etc. I understood this to be communicating
> the concept of a package formed with flexible,
> elastomeric walls sealed at the top and bottom,
> and zipper members attached to the side walls of
> the elastomeric material below the top seal of the
> package. I also understood this to be indicating
> that the consumer would open the package by
> manually grabbing the side walls of the flexible
> package material and pulling with a pinch grip
> pulling force to disengage the zipper material and
> then open the top seal in a single pinch grip
> opening motion, without tearing or deforming the
> bag walls. This further indicates that after a
> consumer would remove a portion of the food
> product contained in the package, the package
> could be reclosed by manually re-engaging the
> zipper material. I believe that this is how a
> person working in the bag reclosure technology
> would understand this disclosure. [Emphasis
> added.]

Thus, Mr. Callahan recalls thoroughly discussing the

reclosable bag project, including reviewing the contents of

Frito-Lay's laboratory notebook (JX2033), with inventor

Jurgovan on January 24, 1997. According to Mr. Callahan's

testimony, Mr. Jurgovan fully explained the contents of the

notebook to him on January 24, 1997 and that he understood

on that date that Mr. Jurgovan stated he had disclosed the

conception to Hogan and Mulder on January 2, 1997. (FF 47;

JX2021 at 9, ¶¶19-20.)

The testimonies of inventor Jurgovan and non-inventor

Callahan, which we find credible, are sufficient to

establish by a preponderance of the evidence that Mr.

Jurgovan communicated the inventions to Hogan and Mulder on
January 2, 1997.  Significantly, neither Hogan nor Mulder
denies that Mr. Jurgovan described the conception to them on
January 2, 1997.[12,13]  Indeed, the testimonies of inventor
Jurgovan and non-inventor Callahan are consistent with the
contents of: (i) Frito Lay Technology Computation Notebook
(in the name of Marc Jurgovan)(JX2036 at 47) and (ii) Frito-
Lay, Inc. Technology Notebook No. 3558 (JX 2033 at 1).

---

[12]  Mr. Hogan states (FF 40; RX1012 at 6, ¶18):

> 18.  I note that Marc Jurgovan claims that on
> January 2, 1997 he communicated with me about
> pinch grip opening.  He states that he told me
> that a pinch grip bag would require a reduced
> internal opening force perhaps approaching the
> bond strength of the film.  I do not recall
> whether I had such a conversation with Mr.
> Jurgovan on January 2, 1997.  In any event,
> whenever Marc Jurgovan first told me that Frito-
> Lay was requesting zipper technology that would
> permit pinch grip opening, I told him that such a
> method would require a zipper opening force lower
> than the bond strength of the layers of the film.
> [Emphasis added.]

[13]  Mr. Mulder declares (FF 41; RX1016, ¶10):

> I understood that Mr. Jurgovan now contends that
> he conceived of a pinch grip reclosable bag and
> specified that the internal opening force had to
> be lower and approach the "bond strength of the
> film."  While I suspect that he had previously
> gotten information about internal opening force
> from Minigrip, it would self-evident [sic] to one
> skilled in the art that the internal opening force
> of the zipper on a pinch grip openable bag would
> have to be less than the force needed to either
> separate the zipper from the film or deform the
> film itself.  [Underscoring added.]

Interference No. 105,173                          Paper 94


Frito Lay Technology Computation Notebook (FF 60; JX2036 at

47) contains certain hand-written entries, including an

entry with Mr. Hogan's name circled, reproduced as follows:



Frito-Lay, Inc. Technology Notebook No. 3558 (FF 59; JX 2033

at 1) contains the following hand-written entries by Mr.

Jurgovan, which were "witnessed and understood" by Mr.

Callahan on January 24, 1997:

- DISCUSSED WITH BOB HOGAN (MINIGRIP) ON 1/2/97 AND STEVE MULDER (BOSCH) ISSUES WITH EXISITING BAG RECLOSURE PROTOTYPES.
- TEAR FEATURE DOES NOT WORK RELIABILITY [sic] & CONSISTENTLY.
- ASKED MINIGRIP TO DEVELOP A PROTOTYPE THAT ALLOWS CONSUMERS TO OPEN BAGS [ILLEGIBLE] LIKE THEY OPEN CURRENT FLEX BAGS (USING PINCH-GRIP MOTION)
- CONCEPT ELIMINATES NEED FOR TEAR STRIPS, PEELABLE SEALS, ETC.
- CONCEPT REQUIRES REDESIGN OF MINIGRIP/BOSCH PROPOSED ZIPPER TO REDUCE ZIPPER OPENING FORCE (IF OPENED FROM UNDERSIDE OF ZIPPER. [sic]
- ZIPPER OPENING FORCE MUST APPROACH (BE LOWER THAN?) BOND STRENGTH OF SEALED FILM WHEN OPENED
- ELIMINATES CONCERNS OF PACKAGE DAMAGE AT OR AROUND END SEAL/FIN SEAL JUNCTURE

Second, the declaration of non-inventor Callahan provides additional independent evidence of Jurgovan's communication of the conception to Ramsey before March 29, 1997. Mr. Callahan declares that he attended a meeting on January 29 and 30, 1997 in which members of his reclosable bag project team (including inventor Jurgovan), Hogan and Arthur Malin of Minigrip, and Mulder of Bosch were all present. (FF 61; JX2021 at 12, ¶26.) Mr. Callahan specifically recalls that at the January 29 and 30, 1997 meeting, inventor Jurgovan disclosed the invention to Hogan and Malin in sufficient detail "that a person working in bag reclosure technology could make and use a functional pinch grip openable reclosable bag without the exercise of special skill or undue experimentation." (FF 62; JX 2021 at 12-13,

Interference No. 105,173                        Paper 94

¶27.)    Specifically, Mr. Callahan's recollection is as

follows (FF 63; id.):

> Mr. Jurgovan explained his idea of applying a
> reduced opening force zipper to the standard
> Frito-Lay film (which was known to be a flexible,
> elastomeric film) below the top seal of the
> package and above where the food product would be
> located.  He explained that the package could be
> pinch grip opened by manually pulling the side
> walls of the bag with a pinch grip pulling force
> that would disengage the zipper members and then
> the top seal in a single pinch grip motion,
> without tearing or deforming the bag walls.  He
> further explained that the consumer could then
> reclose the package by manually re-engaging the
> zipper material after food product was removed
> from the package.  Mr. Jurgovan also discussed
> that his pinch grip design would require a reduced
> opening force zipper when opening from the
> consumer side of the package.

Thus, again on January 29-30, 1997, Jurgovan communicated to

Ramsey a reclosable food package within the scope of the

counts.

Third, we have a memorandum, which on its face,

disclosed Jurgovan's conception to Ramsey prior to March 29,

1997.  On March 10, 1997, Mr. Jurgovan addressed a

memorandum captioned "BAG OPENING DEVELOPMENT UPDATE"

(reproduced on the following page) to various individuals

including Messrs. Callahan and Keel.  (FF 64; JX2038.)

Copies of the memorandum appear to have been provided to Mr.

Hogan and Mr. Malin, both of Minigrip, as well as Mr. Mulder

of Bosch.  In that memo, inventor Jurgovan describes a

Interference No. 105,173                              Paper 94

pinch-grip openable food package within the scope of the
subject counts.



Jurgovan EXHIBIT 2038
Jurgovan v. Ramsey
Interference No. 105,173

Considering the evidence as a whole, Jurgovan has carried the burden of establishing communication of the conception to Ramsey prior to March 29, 1997.

Referring to JX2033 at 2 and JX2036 at 22, Ramsey contends that Mr. Jurgovan's drawing of the conception is "virtually identical to the one sketched in his notebook based on information given to him by Minigrip personnel when he first met with them in October 1996." (Ramsey Opposition at 6.) Ramsey fails to point out, however, that the drawing representing Minigrip's package (JX2033 at 22) shows a tear-open flange at the top, thus indicating that it is nothing more than the prior art. While Ramsey also urges that it advised Jurgovan of certain things in October 1996 and January 1997 (Ramsey Opposition at 6 and 9), these communication(s) cannot constitute communication of the conception because they occurred well before Ramsey's earliest alleged conception date of March 29, 1997. That is, it would be impossible for one to communicate something before he or she is even in possession thereof. At best, these communications merely relate to modification of Frito-Lay's production equipment to accommodate Jurgovan's conception.

In summary, the totality of the evidence supports Jurgovan's position that it conceived the inventions before Ramsey's conception date of March 29, 1997, that the

conceptions could have been reduced to practice by one skilled in the relevant art "without extensive research or experimentation," and that the conceptions were communicated to Ramsey before March 29, 1997.

In view of the factual findings and legal determinations above, Jurgovan has sufficiently demonstrated that Ramsey derived the invention from Jurgovan. Because Ramsey is not the true inventive entity of the subject matter of its involved claims, it cannot prevail against Jurgovan under 35 U.S.C. § 102(g). Hence, Ramsey's motion on priority is moot.


Evidentiary Issues

Ramsey has filed a motion to exclude certain evidence. (Ramsey Motion to Exclude Evidence filed on June 23, 2005.) In it, Ramsey argues for the exclusion of, inter alia, certain portions of the declarations of Jurgovan, Reaves, and Keel as well as Jurgovan's notebook entries.

First, Ramsey argues that Mr. Jurgovan's testimony regarding his January 2, 1997 conversations with Hogan and Mulder should be excluded for lack of personal knowledge because "his testimony on those matters was not based on events perceived by and actually known by him, but was speculation based on his reading documents years later." (Ramsey Motion at 2.) According to Ramsey, "[i]t turns out

that this testimony was a fabrication." (Id. at 3.) Ramsey
also attacks the declarations of Reaves and Keel on similar
grounds. (Ramsey Motion at 6.)

Ramsey's position is without merit. While Ramsey cites
to pages 40, 44-5, and 61 of the Jurgovan deposition
(JX2087) as evidence supporting Mr. Jurgovan's
"fabrication," Ramsey is mischaracterizing Mr. Jurgovan's
testimony. For example, Ramsey alleges: "Mr. Jurgovan
conceded at his deposition that he had no recollection of a
January 2, 1997 conversation with Messrs. Hogan or Mulder
(JX 2087 44:22 - 45:1.)" (Ramsey Motion at 3.) This charge
is false. The cited portion of Jurgovan's deposition
relates to whether Jurgovan recalled what Hogan said to him
on January 2, 1997, not what Jurgovan told Hogan or
Mulder.[14] Contrary to what Ramsey would have us believe,
Mr. Jurgovan testified under oath: "It is my clear
recollection that that [zipper opening force lower than bond
strength] is something I said to him [Hogan]." (JX2087 at
44:16-17.) Ramsey failed to establish why Mr. Jurgovan
cannot testify as to his memory of events. The same is true

---

[14] The exchange between Mr. Jurgovan and Ramsey's
counsel in the Jurgovan deposition at JX2087, p. 40 relates
to whether Mr. Jurgovan recalled if the January 2, 1997
discussions with Hogan and Mulder took place through one
joint phone call. With respect to the exchange at JX2087,
p. 61, Ramsey has not established that Mr. Jurgovan's answer
relates to the deposition testimony that he disclosed the
invention to Hogan and Mulder on January 2, 1997.

Interference No. 105,173                    Paper 94

with respect to the Reaves and Keel declarations.  In any
event, it appears to us that Ramsey's attack goes to
credibility and weight, not admissibility.

   Accordingly, Ramsey's motion as to these evidentiary
documents is denied.

   Ramsey also contends that Jurgovan's notebook entries
as to his telephone conversation with Hogan and Mulder
should be excluded because they are inadmissible hearsay in
that they were not entered simultaneously with the purported
events.  (Ramsey Motion at 7-10.)  For example, Ramsey
argues that Jurgovan acknowledged that an entry was made on
January 24, 1997 for a January 2, 1997 event.  (Ramsey
Motion at 9.)

   We reject Ramsey's motion on this ground as well
because we are not relying on Jurgovan's notes regarding his
conversations with Hogan and Mulder on January 2, 1997 for
establishing the truth of the matter asserted (i.e., that
Jurgovan disclosed the conception to Ramsey on January 2,
1997).  Rather, we admit them for the limited purpose of
establishing that during a January 24, 1997 conference
between inventor Jurgovan and non-inventor Callahan,
Callahan was made aware of the January 2, 1997 telephone
discussion(s) in which Jurgovan disclosed the conception to
Hogan and Mulder.  In other words, the notes with respect to
the January 2, 1997 telephone discussions are admitted as

69

**A222**

basis for Callahan's corroborative testimony, not for the fact that Jurgovan disclosed the conception to Hogan and Mulder on January 2, 1997.  Moreover, Ramsey's argument based on the lateness of the entry of the notes regarding the telephone conversation appears to relate to credibility and weight, not admissibility.  Thus, we disagree with Ramsey that these notes should be excluded as inadmissible hearsay.

Lastly, Ramsey urges that Mr. Jurgovan's testimony as to the September 1997 reduction to practice is irrelevant and should be excluded.  (Ramsey Motion at 12.)  We disagree.  Mr. Jurgovan's testimony is relevant to the issue that the conception was reduced to practice without extensive research or experimentation.  To the extent that the admissibility of Mr. Jurgovan's testimony is attacked on grounds of credibility and weight, we deny it as well.

Judgment is entered against Ramsey in a separate paper.

Interference No. 105,173                                    Paper 94


/Richard Torczon/_____ )
RICHARD TORCZON                   )
Administrative Patent Judge       )
                                  )
                                  )
/Romulo H. Delmendo/_____ )  BOARD OF PATENT
ROMULO H. DELMENDO                )
Administrative Patent Judge       )    APPEALS AND
                                  )
                                  )  INTERFERENCES
                                  )
/Sally C. Medley/_____ )
SALLY C. MEDLEY                   )
Administrative Patent Judge       )


cc (<u>via</u> e-mail):

Attorney for JURGOVAN:
JOSEPH A. HYNDS, ESQ.
e-mail: jhynds@rothwellfigg.com

Attorney for RAMSEY:
GERALD LEVY, ESQ.
e-mail: glevy@pitneyhardin.com